**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **TERA A. McMILLAN,** | ) | |
| | ) | |
| | ) | **Case No: 2:07:CV-01-WKW** |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **ALABAMA DEPARTMENT OF** | ) | |
| **YOUTH SERVICES and** | ) | |
| **MICHAEL J. HARDY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

The Defendant Alabama Department of Youth Services ("DYS") in support of its Motion

for Summary Judgment filed simultaneously herewith, submits the following brief:

**UNDISPUTED FACTS**

Tera McMillan was first employed at DYS as a Youth Services Aid on October 21, 2002.

Ms. McMillan works at the Mt. Meigs campus, which is the most secure facility in the DYS

system and is staffed with older, more ungovernable male juvenile delinquents.  She currently

works in the Intensive Treatment Unit dormitory on Mt. Meigs campus.

DYS maintains an anti-discrimination policy that prohibits sexual harassment.  (Exhibit

3: DYS Policy 3.13.2).  Ms. McMillan does not dispute that she was at all times relevant to this

case aware of the policy and the reporting procedures.  (Exhibit 1: Hardy transcript P. 96, p. 116;

Exhibit 2: McMillan depo. P. 52-53).[1]  The Policy and Procedure book is available to each employee in the workplace and the Plaintiff concedes that she took turns with her co-workers going through it.  (Exhibit 2: McMillan dep. P. 45).

In addition, all new DYS employees are given 40 hours in service training before they are assigned to the dorms.  Included within that training is the DYS anti-harassment policy and procedures.  (Exhibit 3: DYS Policy 3.13.2).  Ms. McMillan does not specifically recall that her in service training covered anti-harassment but she does not deny that it did.  (Exhibit 1: Hardy transcript p. 100, Exhibit 2: McMillan depo. P. 36).  She does, however, specifically recall receiving training regarding the DYS anti-harassment policy after her first six months of employment.  (Exhibit 2: McMillan depo. P. 49-52).  It is not in dispute that at all times relevant the alleged harassment, Ms. McMillan was aware of the policy and aware of the reporting procedures as a result of the Defendant's dissemination of and training regarding the policy.

Ms. McMillan claims that she was subjected to a sexually hostile work environment by her supervisor, Michael Hardy, for two years, beginning in May 2003 through July 2005. (Exhibit 4: EEOC Charge of Discrimination).  Ms. McMillan does not allege that she was discharged, and has no evidence of a demotion or reassignment to an undesirable reassignment.  Mr. Hardy constantly gave Ms. McMillan average or above average evaluations and she has received all the privileges of employment to which she is entitled.  (Exhibit 1: Hardy transcript p. 165; Exhibit 2: McMillan depo. P. 202).  The Plaintiff thus has no evidence that she suffered any significant

---

[1] Ms. McMillan is also independently knowledgeable about the procedures for reporting sexual harassment and discrimination as evidenced by the fact that she previously initiated an anti-discrimination lawsuit against a previous employer, and in that lawsuit Ms. McMillan was a class representative.  (Exhibit 1: Hardy transcript p. 102-104).

change in her employment status.

Ms. McMillan claims that she eventually decided to get away from Mr. Hardy by seeking reassignment to a different dorm.[2]  She claims that on or about June 25, 2005, she went to see Hardy's supervisor, Ms. Phyllis Rankins, about the transfer.  (Exhibit 1: Hardy transcript p. 67)[3]. Ms. McMillan concedes that she did not intend to report any alleged harassment pursuant to the anti-harassment policy, but simply saw Ms. Rankings because she sought a reassignment to a different dorm. (Exhibit 1: Hardy transcript P. 98).  However, Ms. McMillan claims Ms. Rankins pressed her for the reason for requesting a dorm reassignment and Ms. McMillan told Ms. Rankins that she had been sexually harassed by Mr. Hardy.   Ms. Rankins, as required by DYS policy and procedure, instantly required Ms. McMillan to speak with DYS Personnel Director, Debra Spann.

Ms. McMillan only then went to Personnel, as required by the DYS anti-harassment policy and procedure, and made a report of the alleged sexual harassment.  Upon hearing the allegations of sexual harassment, Ms. Spann took Ms. McMillan's statement and initiated an

---

[2]  Ms. McMillan also needed to transfer dorms in order to work a second job.  Mr. Hardy contends that McMillan's allegations of harassment were not true and she only made up the allegations in order to get the transfer and shift change.  Ms. McMillan admits that she attempted to get a transfer but had been unable to get a transfer and that she told Mr. Hardy in May–approximately one month before she reported the alleged sexual harassment–that she wanted to transfer dorms so she could leave work earlier and work an "administrative job." (Exhibit 2: McMillan depo. P. 178-179).  However, because all facts in connection with this motion must be construed in the light most favorable to the Plaintiff, that issue will not be pursued and this motion will treat all Ms. McMillans allegations as thought they were true.

[3]  Previous DYS documents incorrectly identified the date of Ms. McMillan's complaint as June 14.  However, based on Ms. McMillan's testimony and based on the time and attendance records which show the actual date Ms. McMillan was assigned to ITU, it appears the actual date was June 25.

investigation pursuant to DYS policy.  In addition, while Ms. McMillan was in Ms. Spann's office making her first report of sexual harassment, Ms. Rankins called Ms. McMillan on the phone and accommodated Ms. McMillan's request for reassignment to a different dorm on the campus.  Over the telephone, Ms. Rankins instructed Ms. McMillan to temporarily report to Trustee Hall.  Ms. McMillan was soon thereafter permanently reassigned to the ITU dorm pursuant to her request.[4]   (Exhibit 1: Hardy transcript P. 144).  Ms. McMillan never again came under the supervision of Mr. Hardy, (Exhibit 1: Hardy transcript P. 99), and seldom came in contact with him thereafter.

It is noteworthy that, assuming Ms. McMillan had not schemed to sue DYS before she made the report of alleged sexual harassment, within two weeks of reporting the alleged harassment Ms. McMillan clearly had a change of heart, because by July 12, 2005, approximately two weeks later, Ms. McMillan had hired a lawyer in Birmingham and filed an EEOC Charge of Discrimination against DYS.  (EEOC Charge of Discrimination).

Between January 2005, and June 25, 2005–the date Ms. Rankins granted her request for reassignment to ITU–Ms. McMillan concedes that she rarely saw Mr. Hardy.  In fact she claims to have only had one allegedly sexually harassing encounter with him during that time period. She claims that in April 2005, Mr. Hardy asked her to go to a hotel with her.  (Transcript p. 153-154).  The next day she claims that Mr. Hardy told her she was "losing her foundation", which

---

[4]  Ms. McMillan continued to function as a Youth Services Aid and obviously neither her duties nor her benefits changed as a result of the reassignment which Ms. McMillan specifically requested.  The ITU dorm is one of the few assignments on campus at which a 10:00 p.m. to 6:00 a.m. shift is available, and that shift allowed Ms. McMillan the opportunity she had been seeking to work a second job.  (Exhibit 1: Hardy transcript P. 165).  Ms. McMillan began working that second job about three months after she got the reassignment.  (Exhibit 1: Hardy transcript P. 165).

Ms. McMillan somehow perceived as sexually harassing. The statute of limitations (180 days before the EEOC COD was filed) was January 13, 2005.

Soon after Ms. McMillan's report to Ms. Spann and soon after the investigation began, several events transpired that resulted in DYS Executive Director Walter Wood taking action to prohibit any appearance of retaliation by DYS. The first event was a memo, or series of memos, by Mr. Hardy's staff expressing their support for Mr. Hardy and their opposition to anyone who accused Mr. Hardy of inappropriate conduct. The second event was a planned meeting with Ms. McMillan about her transfer to a different dorm. The third was a so-called "grievance" Mr. Hardy filed against Ms. McMillan. Hardy filed the so-called grievance memo with Ms. Spann, which was not the proper grievance procedure. In response to these events, the Defendant–through Executive Director Walter Wood, Jr.–prevented any meetings from taking place with Ms. McMillan, stopped the so-called grievance cold, and arranged immediately for State Personnel to come to DYS and conduct a special supplemental training seminar on anti-retaliation. An Assistant Attorney General conducted the training for all DYS employees. (Exhibit 1: Hardy transcript -Wood testimony, p 385-408).

After the investigation, Ms. Spann concluded that some of Ms. McMillan's allegations were founded. A follow up investigation was conducted based on Mr. Hardy's alleged defenses, and a fact finding hearing was held at which Mr. Hardy had an opportunity to present his side of the story. A recommendation was then made to Executive Director Wood that Mr. Hardy's employment be terminated. A part of the basis for termination was Mr. Hardy's conduct during the investigation that DYS perceived as attempted retaliation. DYS successfully prevented Mr.

Hardy from retaliating against Ms. McMillan[5], yet Ms. McMillan now sues DYS for alleged retaliation.

Since Mr. Hardy's discharge, Ms. McMillan has complained about retaliation on several occasions and on each occasion she has been interviewed and her allegations were investigated. She has suffered no adverse employment actions and there has been no retaliation–and certainly none by DYS. Ms. McMillan does not actually complain about retaliatory action by DYS but rather complains that her co-employees retaliated against her on behalf of Mr. Hardy–even though DYS previously terminated Mr. Hardy's employment. DYS has taken every conceivable action to protect Ms. McMillan and prevent any retaliation.

## ARGUMENT

***FARAGHER-ELLERTH* DEFENSE**. Generally, an employer is not liable for a hostile work environment unless the plaintiff shows that the employer "had notice of the alleged harassment and failed to take immediate and appropriate corrective action." *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1257 (11th Cir.2003).

As this Court has recently held in *Croskey v. Big Lots Stores, Inc.*, Slip Copy, 2007 WL 2023493 (M.D. Ala., 2007), even if a Plaintiff can make a prima facie case of hostile work environment, the *Faragher-Ellerth* defense is applicable if the Plaintiff suffered no harassment by her supervisors which resulted in a "tangible employment action, such as discharge, demotion or undesirable reassignment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761-63 (1998). In such a case, a defendant avoids liability if: (1) the employer "exercised reasonable care to prevent and correct promptly any

---

[5] Hardy vehemently denies that he had any intention to retaliate against Ms. McMillan.

sexually harassing behavior"; and (2) the employee "unreasonably failed to take advantage of any preventive or corrective opportunities ... provided." *Croskey, citing Faragher*, 524 U.S. at 807; *Burlington Indus.*, 524 U.S. at 765.

Ms. McMillan was not discharged, demoted or reassigned to an undesirable reassignment, nor did she suffer any significant change in her employment status; thus no tangible employment action was taken.[6]  Accordingly, the *Faragher-Ellerth* defense is applicable.  The Defendant will now turn to the elements of the defense.

It is clear that DYS Policy 3.13.2 prohibits sexual harassment and describes the procedures for complaining about it and it is not disputed that Ms. McMillan knew the anti-discrimination policy and knew the procedures for reporting harassment.  The employer thus "exercised reasonable care to prevent and correct promptly any sexually harassing behavior".  That satisfies the first element of the *Faragher-Ellerth* defense.  With regard to the second, it is undisputed that the Plaintiff failed to report the alleged harassment pursuant to DYS policy until June 25, 2005.  At the moment she reported the alleged harassment, prompt and effective action was taken and Ms. McMillan suffered no further harassment from Hardy.

---

[6] McMillan does claim that Hardy transferred her to the night shift shortly after Christmas 2004.  However, the shift change did not significantly change her responsibilities, was not a demotion in duties or title; was not a job termination; did not affect compensation; and did not impose discipline.  The action was therefore not an adverse employment action because the term "adverse employment action" includes " 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.' "  *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir.1998) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)).  Generally, a mere inconvenience or alteration of job responsibilities is not an adverse employment action.  *Id;  See also, e.g. Hunt v. Rapides Healthcare System, LLC*, 277 F.3d 757 (5th Cir. 2001) (holding that assignment to the night shift on a full time basis was not an adverse employment action that violated the anti-retaliation provision of the FMLA) *citing* 29 C.F.R. § 825.220( c)).

The Plaintiff specifically requested her reassignment on June 25, 2005, to a different dorm and shift.  She concedes that she had been attempting to get that transfer for several months and she concedes that it is one of the few assignments where she could work a shift to allow her to obtain a second day job.  She can hardly challenge that reassignment as a "tangible employment action" because the facts are not in dispute whether the reassignment was both requested by the Plaintiff and actually favorable to the Plaintiff because it allowed her to work a shift that did not conflict with her second job.  Moreover, as stated in the footnote above, a "tangible employment action" is one which constitutes "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. Even a reassignment to a more *inconvenient* position is insufficient to constitute a tangible employment action, *id.* (citing *Harlston v. McDonnell Douglas Corp*., 37 F.3d 379, 382 (8th Cir.1994)), as is an unfulfilled threat by one's supervisor. *Reed v. MBNA Mktg. Sys., Inc.*, 333 F.3d 27, 34 (1st Cir.2003) (internal citations omitted);  *Kohler v. Inter-Tel Technologies,* 244 F.3d 1167, 1179 (9th Cir. 2001) (doubting that inconvenient work schedule and poor work performance review constituted tangible employment action). It necessarily follows that reassignment which was specifically requested by the Plaintiff and was beneficial to the Plaintiff is not actionable.

The Defendant thus submits that it is entitled to summary judgment on the harassment claim under the *Faragher-Ellerth* defense.

**PRIMA FACIE CASE**.  Ms. McMillan claims that between May, 2003 and June 25, 2005, Mr. Hardy subjected her to a sexually hostile working environment.  Assuming the claim

was not barred by the *Faragher-Ellerth* defense, it would fail because the Plaintiff's allegations do not establish a prima facie case. The Plaintiff has alleged the following incidents over the course of a twenty five month time period:

-Hardy allegedly asked McMillan for oral sex;

-(The next day) Hardy took off his shirt while doing PT, and looked at McMillan;

-Hardy allegedly rewarded a juvenile delinquent who said "I want you" to Ms. McMillan (the connection between Hardy and the alleged student's statement is left to the imagination);

-Hardy allegedly approached McMillan from behind and cupped her breasts with both hands and said "I like big titties";

-Hardy allegedly mentioned a pornographic internet cite to McMillan;

-Hardy allegedly threatened to write McMillan up (issue a reprimand) but did not do so;

-Hardy allegedly offered to pay McMillan $200.00 per month and keep tires on her car in exchange for sex;

-Hardy allegedly called her on the phone repeatedly, and on one occasion Hardy asked McMillan to go to a hotel to have drinks and talk;

-Hardy allegedly asked McMillan if she was involved with another man;

-Hardy allegedly asked a co-worker "what it would take to get Mac";

-Hardy allegedly changed McMillan's shift (with her consent), which coincidentally resulted in McMillan seldom coming in contact with Hardy any more;

-Hardy allegedly went to McMillan's house the Saturday after Christmas 2004, McMillan offered him alcohol which he accepted, and Hardy removed his shirt and asked McMillan to lick his chest;

-Hardy allegedly told McMillan the "clique" would "get her";

-McMillan felt that her co-workers began to ostracized her, for example her supervisor refused to allow Ms. McMillan to mail a father's day card for a student (against

DYS policy and procedure) and told McMillan she was "fucking up his shift"[7]. She somehow attributes the alleged treatment from her co-workers to Hardy.

McMillan concedes that she teased and talked about sex, although not on the job she claims.  (Exhibit 2: McMillan depo. P. 56).  She is clearly not offended by sexual banter as evidenced by her admitted participation in it.  This fact tends to show that the subjective test is not met in this case.  *See, e.g., Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21-22 (1993).

Assuming the complained of conduct was subjectively offensive to McMillan in spite of her concession that she teases and talks about sex, the Defendant submits that the Plaintiff's case also fails the objective test.  To constitute a valid claim, the conduct complained of must have been 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment .' " *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).  The Defendant submits that the events about which the Plaintiff complains, assuming they occurred, did not create an objectively hostile working environment.  *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir.1999) (en banc).  "Title VII is not a federal 'civility code.' " *Mendoza*, 195 F.3d at 1245.  It is not a "federal guarantee of refinement and sophistication in the workplace.... [I]t prohibits only harassing behavior that is so severe or pervasive as to render the workplace objectively hostile or abusive." *Blevins v. Heilig-Meyers Corp.*, 52 F.Supp .2d 1337 (M.D.Ala.1998).

As a guideline for assessing the objective standard, courts consider four non-exhaustive

---

[7] The incident with her supervisor was the last incident because on that day, June 25, 2005, Ms. McMillan reported the alleged harassment to Hardy's supervisor and she was immediately reassigned, pursuant to her request, to a different dorm–where she worked a more favorable shift.  After that report she had no more contact with Mr. Hardy.

factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.  *Mendoza v.. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir.1999).

First, there is no "magic number" for harassing incidents.  *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir.2002) (citing *Shanoff v. III. Dep't of Human Servs.*, 258 F.3d 696, 704 (7th Cir.2001)).   Generally speaking, "offhand comments [ ] and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment." ' *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).   The conduct about which Ms. McMillan complains was obviously spread out.  Because it allegedly occurred over a period of twenty five months, it had to have been separated by periods of days, weeks or even months.

The Defendant submits that the frequency factor in this case tends to show there was no objectively hostile working environment.  The several complained of events, spread out over 25 months, are too infrequent to be actionable other than as discrete acts for which the statute of limitations has expired.  The Eleventh Circuit has stated, for example, that "roughly fifteen separate instances of harassment over the course of four months" tended to point in the direction of objectively severe and pervasive harassment.   *Johnson v. Booker T. Washington Broad. Serv.*, Inc., 234 F.3d 501, 509 (11th Cir.2000).  This case does not come close to that standard.

Second, regarding severity of the complained of conduct, the alleged severity varies significantly.  The allegations range from innocuous comments to allegedly physically cupping the Plaintiff's breasts.  When viewed as a whole, the Defendant submits that the alleged conduct

11

does not reach a level of severity that is sufficient to meet the severity factor and satisfy the objective test. *See, e.g. Koelsch v. Belton Elec. Corp.*, 46 F.3d 705 (7th Cir.1995) (finding that a supervisor who stroked plaintiff's leg once, grabbed her buttocks on a separate occasion, told her he found her attractive, and asked her out on dates did not commit actionable acts).

Likewise, the third factor, whether the conduct is physically threatening or humiliating, or a mere offensive utterance, tends to show there was no objectively actionable claim. McMillan was obviously not physically threatened, as evidenced by the fact that she plied Hardy with drinks at her own home shortly after Christmas 2004. As for whether she was humiliated, Ms. McMillan claims that when Mr. Hardy approached behind her and cupped her breasts with his hands, she simply said "please don't do that anymore." (Exhibit 2: McMillan depo. P. 93-97).

Finally, the Defendant submits that the complained of conduct did not unreasonably interfere with the conduct of the Plaintiff's job. The Plaintiff consistently received favorable evaluations, received all the benefits of employment, and has no evidence that she was unable to perform. It is clear that the Plaintiff was indeed capable of performing her job and that she did so well enough.

**STATUTE OF LIMITATIONS**.  Shortly after Christmas 2004, McMillan concedes that after Hardy reassigned her from the 4:00 p.m. to 12:00 shift to the 12:00 to 8:00 a.m. shift. McMillan seldom saw Hardy. (Exhibit 1: Hardy transcript, 90,125-127). The only event McMillan complains of during January 2005, was the alleged incident that took place at McMillan's home on the Saturday following Christmas, when McMillan gave Hardy alcohol and she claims he took off his shirt. Clearly, if any actionable hostile environment existed, it ended no later than the Saturday after Christmas, 2004. The statute of limitations (180 days before the

12

EEOC Charge of Discrimination) was January 13, 2005.  Accordingly, the EEOC Charge of Discrimination was filed too late and the statute of limitations bars the claim.

The Plaintiff claims that after her shift reassignment, in January 2005, Hardy committed a single act which she perceived as offensive.  (Exhibit 1: Hardy transcript, 153-154).  She claims that Hardy asked her in April to go to a hotel to talk and have drinks.  However, because the Plaintiff was no longer working in contact with Hardy, any objectively hostile environment, if it ever existed, had ended.  The Defendant submits that the single event in April was an isolated discrete act insufficient to revive the untimely claim.  *See, United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period").

**RETALIATION**.  The Plaintiff also has no evidence of facts to substantiate an allegation of retaliation.  The Plaintiff continues her employment and has received all the benefits and privileges she has earned.  (Exhibit 2: McMillan depo. P. 202).  She complains, however, of retaliatory harassment by her co-workers as a result of her complaint against Mr. Hardy.

"[A] plaintiff alleging a retaliation claim under Title VII must begin by establishing a prima facie case; the plaintiff must show that (1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir.1997).   The Defendant challenges elements two and three.

It is not disputed that Ms. McMillan participated in a protected activity.  However, Ms. McMillan has suffered no adverse employment action because she has received all the benefits

13

and privileges she has earned.  She gave that testimony under oath and the issue cannot now be disputed.  (McMillan dep. P. 202-206).

"To prove a causal connection, we require a plaintiff only to demonstrate that the protected activity and the adverse action were not wholly unrelated." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir.1999). "[A] plaintiff satisfies this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." *Id.* Ms. McMillan cannot establish a causal connection and no facts exist to show such a connection.

On a related point, generally speaking, an employer cannot be liable for retaliatory conduct that is not attributable to the employer.  *See, Briones v. Runyon*, 101 F.3d 287, 292 (2d Cir.1996); *Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 334 (4th Cir.2003) and *Mikels v. City of Durham*, 183 F.3d 323, 332 (4th Cir.1999) .  The alleged retaliation about which Ms. McMillan complains is not attributable to DYS.  It is undisputable that DYS has provided an avenue for complaint and that Ms. McMillan has utilized it freely.  Ms. McMillan simply claims that Mr. Hardy utterly convinced her that he had an almost mystical power to retaliate against her through her co-workers.  She acknowledged, however, that her perception was not reasonable in light of the actions taken by DYS in this matter.  At Mr. Hardy's discharge hearing before the State Personnel Board, Ms. McMillan testified as follows:

```
2  Q.  Okay.  A few follow-ups.  Mr. Stokes was
3      asking you questions about some things that
4      you believed co-workers did because of
5      Mr. Hardy.  And I understand your testimony
6      to be that at the time, you did believe that
7      was connected to Mr. Hardy.  Sitting here
8      today, knowing that, in part, as a result of
```

14

9   the fact that you did file a complaint
10   against Mr. Hardy, that employees at DYS
11   terminated Mr. Hardy, do you think any
12   differently about some of those things which
13   you previously attributed in your mind to
14   Mr. Hardy?
15 A.  Well, he's not as powerful as he perceived
16   himself to be or as I perceived him to be.
17 Q.  For example, the incident -- I forget his
18   name.
19 A.  Mr. --
20 Q.  The one that --
21 A.  -- Harvest?
22 Q.  Yes, when you actually decided to go and see
23   somebody about a transfer to another dorm.  I

169

1   mean, sitting here today, do you think any
2   differently about whether that was
3   attributable to Mr. Hardy?
4 A.  I do now.  But at that time, like I say, I
5   was very anxiety filled.  And I thought
6   that -- like he had always said about his
7   position of power there on the campus, being
8   that he had been there so long and had good
9   friends who were also powerful, it's possible
10    that I could have misinterpreted that.

(Exhibit 1: Hardy transcript, p. 168-169).  It is beyond reasonable question that DYS has indeed

"done something about" Ms. McMillan's allegations of harassment.  Moreover, after the date of

Mr. Hardy's discharge Ms. McMillan has not been subjected to an adverse employment action by

the Defendant that would support a retaliation claim and the Plaintiff can come up with no

evidence of any such action that is connected to her complaint about Hardy and attributable to

DYS.

Respectfully submitted,

                                **s/ T. Dudley Perry Jr.**
                                T. Dudley Perry, Jr.
                                Bar Number: 3985-R67T
                                General Counsel
                                Alabama Department of Youth Services
                                Post Office Box 66
                                Mt. Meigs, AL 36057
                                Telephone: (334) 215-3803
                                Fax: (334) 215-3872
                                E-Mail: dudley.perry@dys.alabama.gov

### CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of November, 2007, I electronically filed the foregoing, BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

                                Jimmy Jacobs
                                E-mail:jacobslawoffice@charter.net
                                Attorney At Law
                                143 Eastern Boulevard
                                Montgomery, AL 36117
                                Tel: (334) 215-1788
                                Fax: (334) 215-1198

                                **s/ T. Dudley Perry Jr.**
                                T. Dudley Perry, Jr.
                                Bar Number: 3985-R67T
                                General Counsel
                                Attorney for the Defendant

1                        BEFORE THE

2                   STATE OF ALABAMA

3               DEPARTMENT OF PERSONNEL

4                 MONTGOMERY, ALABAMA

5

6    IN THE MATTER OF:   MICHAEL HARDY

7                        TERMINATION APPEAL

8

9

10                        ▬▬▬▬

11                        ▬▬▬▬

12

13

14            * * * * * * * * * *

15          TESTIMONY AND PROCEEDINGS, taken before

16    the Honorable Julia J. Weller, Administrative Law

17    Judge, at The Folsom Administration Building, 64

18    North Union Street, Montgomery, Alabama, on

19    Monday, May 8, 2006, and Monday, July 10, 2006,

20    and reported by Laura A. Head, Court Reporter and

21    Commissioner for the State of Alabama at Large.

22            * * * * * * * * * *

23

EXHIBIT

1

```
 1    A.   Tera McMillian.

 2    Q.   Where are you employed?

 3    A.   With the Department of Youth Services at

 4         Mount Meigs.

 5    Q.   Where do you live?

 6    A.   At 312 Adler Drive, Montgomery.

 7    Q.   How old are you?

 8    A.   Thirty-three.

 9    Q.   You've been employed at DYS for how long?

10    A.   It will be four years in October of this

11         year.

12    Q.   Where are you -- in which dorm do you

13         currently work?

14    A.   ITU.

15    Q.   That stands for Intensive Treatment Unit?

16    A.   Yes, sir.

17    Q.   In which dorm were you previously assigned?

18    A.   In Paige Hall and before that Holloway Hall.

19    Q.   Okay.  Think back to Paige Hall.  Who was

20         your unit manager at Paige Hall?

21    A.   Mr. Hardy.

22    Q.   Mr. Hardy sitting here at the table in here

23         this morning?
```

```
 1          sent out a memo stating that only unit

 2          managers could from then out be at the Whole

 3          Dorm.

 4     Q.   All right.  Let me back you up.  I

 5          interrupted you.  You were talking about the

 6          day when he asked you for oral sex and you

 7          said no and y'all went outside.  Did you have

 8          any more discussions about that subject?

 9     A.   Outside?

10     Q.   Or anywhere.

11     A.   You know, it switched from -- he didn't

12          actually say oral sex.  He didn't ask me --

13     Q.   I know.

14     A.   -- to do that anymore.  But yes, there

15          were -- he called me on the phone and asked

16          me why not, was there another man.  And I

17          told him no, I just didn't feel comfortable.

18          He said that he didn't believe that.  You can

19          go ahead and tell me if it's another man.  I

20          said, No, it's not.  I just don't feel

21          comfortable.  There was another time when he

22          asked me to lick his chest.  There was a time

23          when he grabbed my breasts.
```

1    we started talking.  And I asked him what is

2    it about this that Mr. McCullum doesn't

3    respect me because I don't feel like he

4    doesn't.  So he says again that the child, C.

5    N., says that Mr. McCullum was saying some

6    things to me the night that we worked

7    together, and I told him that that was not

8    true.  So he says that he's getting -- after

9    he finishes his drink and he puts his glass

10   on the floor in front of him, he says that

11   he's getting hot.  So he lifts his sweater up

12   over his head, like how little kids do when

13   it's hot.  It's not all the way off, but it's

14   behind his neck.  And he says that didn't

15   do.  He's still hot.  And I told him that it

16   can't be hot in here because, mind you, it's

17   December.  We didn't turn the heater on

18   because we didn't get a chance to.  So he has

19   an A-line tee shirt.  He pulls that up too.

20   And he turns to me this way, and he asks me

21   to lick his chest.  And I say no.

22   Q.   Where was Ms. Harris?

23   A.   Ms. Harris at this point is in the doorway of

1      Farley had come a little later than us.  So

2      we got -- we were at the desk, and when he

3      came in, he went straight to the other side

4      and really didn't say very much.

5  Q.  Farley is now -- he doesn't live here

6      anymore, does he?

7  A.  No, sir.

8  Q.  Afterward, after Christmas, was there a time

9      when your hours of work, your shift changed?

10 A.  Yes, sir.

11 Q.  Who changed it?

12 A.  Mr. Hardy.

13 Q.  What shift had you previously worked?

14 A.  I worked -- my main schedule was 4:00 to

15     12:00, and I would work 2:00 to 10:00 on

16     occasions.

17 Q.  And he changed it to what?

18 A.  12:00 to 8:00.

19 Q.  Okay.  When did that happen?

20 A.  That happened in January.

21 Q.  Okay.

22 A.  2005.

           THE COURT:  I'm sorry.  He changed it

```
 1            that, and it was probably 2004 probably.
 2    Q.   Okay.  Why did you wait to talk to Deborah
 3         Spann?
 4    A.   Because --
 5    Q.   First of all, let me make sure we cover
 6         something.  Deborah Spann is the personnel
 7         director, right?
 8    A.   Yes.
 9    Q.   And you know that if you have a sexual
10         harassment complaint, the person to speak
11         with is Deborah Spann, right?
12    A.   Yes.
13    Q.   And you knew that?
14    A.   (Witness nodded head.)
15    Q.   Why did you wait?
16    A.   Because I didn't want any backlash.
17    Q.   What do you mean?
18    A.   Like Mr. Hardy always say, his power base is
19         on the hill.  And I didn't want any backlash.
20    Q.   What does that mean?
21    A.   I didn't want any problems.
22    Q.   What does that mean that his power base is on
23         the hill?  What did you understand that to
```

that he's invincible, doesn't he.  And I said

yes.  And she said, Well, let me show him the

power of Phyllis Rankins.

Q.  And she sent you to personnel?

A.  Yes, sir.

Q.  So you never did make a decision on your own

to make the report to Deborah Spann as a

sexual harassment complaint.

A.  No.  Actually, when I left from Ms. Rankins'

office, I actually just wanted to go home and

lay down at that point.  But my mother told

me --

Q.  Your mother went with you?

A.  Yes.  It would be best if you go ahead and do

something about this.

Q.  That brings us full circle.  The first thing

you testified, one of the first things was

your conversation with Deborah Spann that

day, right?

A.  (Witness nodded head.)

Q.  And that was the conversation that your

mother was there --

A.  Yes, sir.

1    Q.   -- and after you had left Phyllis.  All

2         right.  With regard to your work assignment

3         at DYS, did anything happen or change that

4         day?

5    A.   Yes.  Ms. Rankins called me while I was still

6         up at Ms. Spann's office.  And she instructed

7         me to go to Trustees Hall that night, and she

8         said that I wouldn't be returning to Paige

9         Hall.

10   Q.   Okay.  And you were then immediately

11        reassigned to ITU, right?

12   A.   Yes, sir.

13   Q.   And that was what you had wanted from the

14        beginning was to get to another dorm, right?

15   A.   Yes.

16   Q.   And since then, have you ever worked under

17        Mr. Hardy's supervision?

18   A.   No, sir.

19            MR. PERRY:  Okay.  That's all the

20        questions I have.  Thank you.  Now,

21        Mr. Stokes will ask you some questions and

22        you answer his questions, please.

23            MR. STOKES:  We left our exhibit book.

*Laura A. Head, Court Reporter*
*(334) 286-4938 or (334) 202-4851*

Let me see if they brought it.

(Brief pause)

MR. STOKES:  I'm sorry for the interruption.

CROSS EXAMINATION

BY MR. STOKES:

Q.   Ms. McMillian?

A.   Yes, sir.

Q.   Prior to you being employed with DYS, you worked other places; is that correct?

A.   Yes, sir.

Q.   And once you were employed with DYS, it is correct to say you were trained, you got some training at DYS, and you went to a weeks' conference in Birmingham?

A.   Yes.

Q.   A training session.  They talked to you about sexual harassment up there, did they not?

A.   It's possible that they discussed that there.

Q.   Okay.  And what you do when you have a sexual harassment complaint, they talked about that at this week-long training conference prior to you being employed at DYS; is that true?

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | And you told him, Don't do that again. |
| 3 | A. | Yes, sir. |
| 4 | Q. | Nobody saw that, did they? |
| 5 | A. | No. |
| 6 | Q. | Okay.  There wasn't anything prohibiting you |
| 7 | | to go and tell Deborah Spann about that, was |
| 8 | | there? |
| 9 | A. | Excuse me? |
| 10 | Q. | There wasn't anything that prohibited you |
| 11 | | from going and telling Deborah Spann, the |
| 12 | | personnel manager, about that, was there? |
| 13 | A. | Nothing physical, no. |
| 14 | Q. | But you elected not to do that. |
| 15 | A. | Yes, I did. |
| 16 | Q. | Okay.  But you knew you could do that. |
| 17 | A. | Yes. |
| 18 | Q. | Yes.  Now, then you stated that there was an |
| 19 | | incident that -- where you were at home.  And |
| 20 | | Mr. Hardy called you at home, and you |
| 21 | | answered the telephone.  And I think you |
| 22 | | stated that Mr. Hardy -- well, your mother |
| 23 | | actually was the one that answered the |

1    Q.   Okay.  So at this time in which y'all was

2          there drinking and Mr. Hardy came by there

3          and you offered him a drink, then I think you

4          stated that Mr. Hardy said he got hot?

5    A.   That's what he said.

6    Q.   That's what he said.  Did Mr. Hardy seem like

7          he was fanning?

8    A.   I don't know.  I can't remember him fanning.

9    Q.   You don't remember him fanning?

10   A.   But he did say -- he leaned back and he said,

11         It's hot in here.  And he started doing like

12         that.  I'm not sure if he was fanning or not.

13   Q.   And if Ms. Vanessa Harris said he was

14         fanning, you wouldn't have any reason to

15         disagree with that, would you?  I mean,

16         Veronica Harris.

17   A.   That's probable.

18   Q.   Okay.  But Mr. Harris said he was hot.  Did

19         Mr. -- were you aware that Mr. Hardy suffered

20         from high blood pressure?

21   A.   Yes, he did say that on occasion.

22   Q.   So you're aware of that.  And were you aware

23         that he was taking three medications for

```
 1    Q.   All right.  So Mr. Hardy came and he
 2         requested that -- he wanted to assign you or
 3         Ms. Williams to the shift, did he not?
 4    A.   That's what he said.
 5    Q.   And he gave you the option, did he not?
 6    A.   Me or her.
 7    Q.   So you could at that time have said, No,
 8         Mr. Hardy, I don't want to go on that shift.
 9         You had that authority, the right to do that,
10         didn't you?
11    A.   Uh-huh.
12    Q.   Mr. Hardy didn't make you do it, did he?
13    A.   Well, like he said, pressure busts a pipe.
14    Q.   No, I'm not asking you about pressure.  But
15         he never made you do that, did he not?
16    A.   No, he didn't make me.  And like I told him,
17         whatever shift he asked me to work I would
18         work.
19    Q.   But he gave you the option.
20    A.   Yes.
21    Q.   Same way they gave you the option when you
22         left Holloway Hall; is that correct?
23    A.   I didn't know if we had an option or not.
```

1    Q.   Well, by going to the 12:00 to 8:00 shift,

2         you would not even see Mr. Hardy too often,

3         would you?

4    A.   Yes.

5    Q.   But now you're claiming he was retaliating

6         for putting you on the 12:00 to 8:00 shift in

7         which you wouldn't even see him.  You claim

8         that's part of this retaliation.

9    A.   Yes.

10   Q.   All right.  So now let's talk about it.  You

11        went to the 12:00 to 8:00 shift in January of

12        2005; is that correct?

13   A.   Yes.

14   Q.   Isn't it really -- isn't it true that you

15        didn't even -- you very seldom saw Mr. Hardy

16        after you went to the 12:00 to 8:00 shift?

17   A.   It is true that I very seldom saw Mr. Hardy.

18        But I did see people that, like, Mr. Hardy

19        had relations with and I also felt like --

20   Q.   No, I'm not asking you what you feel.  I'm

21        not asking you what you think.  I'm asking

22        you personally.  When you went to the 12:00

23        to 8:00 shift in which Mr. Hardy gave you a

1        choice to get, you very seldom saw him; is

2        that correct?

3    A.    Exactly.

4    Q.    Now, you talked about Ms. Ingria Williams

5        working a second job and that's why you

6        elected to go and work the shift instead of

7        allowing her to work the shift; is that

8        correct?

9    A.    Yes.

10   Q.    Isn't it true that at DYS, you're assigned

11        and you are made aware of the policy that at

12        DYS, your job is the primary job when you

13        work there?

14   A.    Yes.  But he didn't give Ingria that option;

15        he gave it to me.

16   Q.    I'm not asking you that.  I'm saying you were

17        aware of that; is that correct?

18   A.    Yes.

19   Q.    So now you go in in January.  You don't see

20        Mr. Hardy.  You rarely see him.  In May of

21        2005, you call Mr. Hardy up at McDonald's,

22        ask Mr. Hardy, you want to talk -- no, you

23        called him up on his cell phone.  Mr. Hardy

1          to ITU.  She told me to go to Trustees Hall.

2    Q.   And then was not your understanding you were

3          going to go to Trustees Hall for seven days

4          and then go to ITU, Ms. McMillian?

5    A.   No.

6    Q.   Did not --

7    A.   I stayed at ITU one day, and then I went to

8          Trustees.  I stayed at Trustees one day, and

9          then I went to ITU.  One night.

10   Q.   Isn't it correct to say that ITU was the only

11         dorm with a 10:00 to 6:00 shift?

12   A.   No.  CAPS has a 10:00 to 6:00, and I think

13         Holloway Hall does too.

14   Q.   Which one?

15   A.   I think CAPS and Holloway Hall does.  I'm not

16         for sure about that.

17   Q.   It was your desire to have a 10:00 to 6:00

18         shift, wasn't it?

19   A.   No, it wasn't.  It was my desire to have a

20         6:00 to 2:00.

21   Q.   And when you went to ITU, Ms. McMillian, I

22         think you stated that you went and talked to

23         Ms. Spann on June 25th; is that correct?  Of

1          would expect for them to believe what's in

2          there.

3    A.    Yes.

4    Q.    Okay.  And when you start talking about the

5          fact that you was experiencing anxiety and

6          you was having depression and all these

7          problems that you was having, in fact, you

8          had rarely seen Mr. Michael Hardy from

9          January of 2005.  And that is correct, isn't

10         it?

11   A.    I don't have to see him to feel anxiety from

12         him.

13   Q.    Okay.  But that is correct.

14   A.    That is correct that I didn't see, him but I

15         don't have to see him to feel anxiety from

16         him.

17   Q.    I understand that.

18             THE COURT:  But did he make any sexual

19         harassing statements from January to July?

20             THE WITNESS:  Yes.  April, he asked me

21         to go to the hotel with him.  When I took the

22         chemical book back to the job that he asked

23         me to do, which is supposed to be done on the

1    second shift but he had me doing it on the

2    third shift, that day that they were having

3    training and I was there at the training, I

4    took the chemical book back to the dorm.  And

5    he stopped me there and told me that I had

6    lost my foundation, and also he told me that

7    we could go to the hotel, get some drinks and

8    talk about it.  That was in April.  My uncle

9    died April the twenty-something.  So it was

10    sometime in April before that because they

11    stopped the training.  My aunt went to the

12    training, and she wasn't there.

13         THE COURT:  But is that the only time

14    he's made a sexually harassing statement?

15         THE WITNESS:  Since January?

16         THE COURT:  Between January and July.

17         THE WITNESS:  Yes, I think.

18    Q.  And even according to your testimony --

19         THE WITNESS:  I think.

20    Q.  Your testimony that you just gave, you said

21    that he said that y'all could go and have

22    some drinks, go to a hotel and have some

23    drinks.  That's what you just testified to.

1    allowed to work two jobs.

2    A.    Oh, yes, sir.  It's helped me to get through

3          the stress.  Sitting home thinking about it?

4          Yes, it's helped me.

5                THE COURT:  Wait.  You go to work at

6          Hyundai from 6:30 to --

7                THE WITNESS:  6:30 a.m. to 3:15, 4:15,

8          or 5:15.

9                THE COURT:  And then you go to work at

10         DYS from 12:00 to 6:00?

11               THE WITNESS:  10:00 to 6:00.

12               THE COURT:  10:00 to 6:00.  So you just

13         basically leave work at DYS and go straight

14         to Hyundai?

15               THE WITNESS:  Yes.

16               THE COURT:  Okay.

17               THE WITNESS:  I'm a team leader there.

18         I'm not actually on the line.

19   Q.    Your evaluation that Mr. Hardy has given you

20         --

21   A.    Yes, sir.

22   Q.    -- you always received average or above

23         average evaluations, haven't you?

1   A.   Yes, sir.

2   Q.   Okay.

3   A.   Yes, because he allowed me to do it myself.

4   Q.   Would it be correct to say that the only two

5        persons that you claim that have any evidence

6        of these alleged sexual acts by Mr. Hardy

7        against you, other than yourself, would be

8        your mother and Ms. Harris?

9   A.   Most people have none so I'm lucky, yes.

10  Q.   And you're aware that in these type cases,

11       most people have none.  So you're aware of

12       that.

13  A.   Yes.

14  Q.   Were you aware of that when you went and

15       filed your EEOC charge on July 12th?

16  A.   Actually, no.  September 30th, I was sitting

17       at home watching Oprah Winfrey and saw a show

         about it.

    Q.   Okay.  You saw a show on Oprah Winfrey in

         September of 2005 prior to you filing your

         EEOC charge.

    A.   After.

    Q.   Afterwards.

1    A.    Yes, sir.

2    Q.    Okay.  I want you to think back to June of

3          '05.  Did you have an occasion to speak with

4          anyone at the department about a complaint

5          against Mr. Hardy?

6    A.    Yes, sir, I did.

7    Q.    Do you remember the date?

8    A.    It may have been the 25th of June.

9    Q.    All right.  Were you on shift that day?

10   A.    I had just gotten off work.

11   Q.    What did you do?

12   A.    I got off.  I went home, took a shower, put

13         some clothes on.  I spoke with my mother, and

14         she and I went back to Mount Meigs to try to

15         get transferred to another dorm.

16   Q.    Okay.  Who did you see there about being

17         transferred?

18   A.    Ms. Phyllis Rankins.

19   Q.    Did you say anything to Phyllis in that

20         conversation asking for a transfer about

21         Mr. Hardy?

22   A.    Yes, sir.  When I asked her for the transfer,

23         she wanted to know why, and at first I told

```
 1    Q.    Okay.  A few follow-ups.  Mr. Stokes was
 2          asking you questions about some things that
 3          you believed co-workers did because of
 4          Mr. Hardy.  And I understand your testimony
 5          to be that at the time, you did believe that
 6          was connected to Mr. Hardy.  Sitting here
 7          today, knowing that, in part, as a result of
 8          the fact that you did file a complaint
 9          against Mr. Hardy, that employees at DYS
10          terminated Mr. Hardy, do you think any
11          differently about some of those things which
12          you previously attributed in your mind to
13          Mr. Hardy?
14    A.    Well, he's not as powerful as he perceived
15          himself to be or as I perceived him to be.
16    Q.    For example, the incident -- I forget his
17          name.
18    A.    Mr. --
19    Q.    The one that --
20    A.    -- Harvest?
21    Q.    Yes, when you actually decided to go and see
22          somebody about a transfer to another dorm.  I
23          mean, sitting here today, do you think any
```

1    differently about whether that was

2    attributable to Mr. Hardy?

3 A. I do now.  But at that time, like I say, I

4    was very anxiety filled.  And I thought

5    that -- like he had always said about his

6    position of power there on the campus, being

7    that he had been there so long and had good

8    friends who were also powerful, it's possible

9    that I could have misinterpreted that.

10 Q. Let me show you -- I want to delve into this

11    a little bit more.  Look in that book, the

12    Employee's Exhibit 9-B.  One more page.  Have

13    you ever seen that?

14 A. No.

15 Q. Can you identify that?

16 A. No.

17 Q. Is that a memo addressed to whom it may

18    concern?

19 A. It is.

20 Q. Do you see the date on that memo?

21 A. June 21st.

22 Q. Is that approximately the date that you went

23    in and made your complaint?

```
 1          until after it was over, but it raised a

 2          significant question.  But if there were no

 3          calls, there were no calls.

 4                THE COURT:  Okay.  With that taken care

 5          of, the motion for protective order of these

 6          records is granted.  I will put them in the

 7          file, but they will not be attached to the

 8          exhibits or anything if my decision was ever

 9          reviewed.  But I'm denying the access to

10          these records since they don't involve a

11          phone call during the actual hearing.

12                MR. STOKES:  Thank you, Your Honor.

13                THE COURT:  All right.  Are there any

14          other matters that we need to take up before

15          we get started this morning?

16                MR. PERRY:  I don't know of any.

17                THE COURT:  All right.  Do we want to

18          just pick up where we left off?

19                MR. PERRY:  Mr. Wood is here, and if we

20          could -- I know, Theron, this is your part of

21          the case, but it would be -- if I can get

22          Mr. Wood in and get him out, that would be --

23                MR. STOKES:  We have no problem at all.
```

1           THE COURT:  All right.  And as I

2       explained to you, I think the last time --

3       the last time we were here, I think there was

4       a board meeting, and we were -- or for some

5       reason we were upstairs.  I will tell you, if

6       you have any witnesses that are waiting

7       around in the hall, I have a conference room

8       that's just outside my office where they're

9       welcome to sit rather than having to wait out

10      in the middle of the hallway.  I know that's

11      uncomfortable.  They're welcome to sit in

12      that conference room instead.

13

14                  WALTER WOOD

15          The witness, having first been duly

16      sworn to speak the truth, the whole truth, and

17      nothing but the truth, testified as follows:

18                  DIRECT EXAMINATION

19      BY MR. PERRY:

20      Q.   State your name.

21      A.   Walter Wood.

22      Q.   And you are the director of the Department of

23           Youth Services?

1    A.    Yes, sir.

2    Q.    Just to introduce you to the Hearing Officer,

3          tell about your employment history.

4    A.    I've been the director of the Department of

5          Youth Services in Alabama since July of

6          1999.  Prior to that, I was the director of

7          the youth services agency in Mississippi for

8          just under five years prior to that, I think

9          back to '94.  Prior to that, I was the

10         director of community services, which is a

11         probation and parole institutional liaison

12         type services for twenty-plus years, and

13         probation officer and youth juvenile court

14         counselor.  Taught for a time at Delta State

15         University's criminal justice program.  Went

16         back to school, got a master's degree in

17         counseling when I was a counselor.  Went back

18         to school, got a master's degree in

19         management when I was in administration.  And

20         like I said, have been here since July of

21         '99.

22   Q.    Total, how many years is that in juvenile

23         corrections?

1    A.    Approximately thirty-four.

2    Q.    Okay.  All right.  Are you a member of any

3          professional associations or boards?

4    A.    I'm a member of correctional associations

5          like the Southern States Correctional

6          Association, the American Correctional

7          Association, the National Council of Juvenile

8          Correctional Administrators, which I've

9          served on the executive board in the last

10         couple of years.  I'm also -- was appointed a

11         member of the -- an organization within the

12         American Correctional Association known as

13         the National Commission on Professional

14         Certification, which is the effort in the

15         American Correctional Association to certify

16         and help train and qualify staff to work in

17         corrections just as their accreditation

18         division accredits and trains and prepares

19         facilities to house children.  And a little

20         over a year ago, I was appointed the chairman

21         of that national commission by the president

22         of the American Correctional Association.

23   Q.    As I understand, essentially that's a

| | | |
|---|---|---|
| 1 | | committee, the function of which is to |
| 2 | | improve the professional qualifications or |
| 3 | | the level of qualifications of staff in |
| 4 | | juvenile correction facilities. |
| 5 | A. | Right.  It is actually the national effort to |
| 6 | | provide a certification process to establish |
| 7 | | the professional level of education and |
| 8 | | training and qualifications of professional |
| 9 | | staff, and we actually test and certify |
| 10 | | corrections staff all over the country who |
| 11 | | desire to be certified just like a CPA would |
| 12 | | want to be certified in his field. |
| 13 | Q. | Okay.  Now -- |
| 14 | A. | And I'm also a certified corrections |
| 15 | | professional. |
| 16 | Q. | All right.  Let's talk about the facts of |
| 17 | | this case.  I want you to think back to the |
| 18 | | middle of June of '05.  Did you learn |
| 19 | | anything about specifically Michael Hardy |
| 20 | | around that time? |
| 21 | A. | June '05 was when the initial complaint was |
| 22 | | made about the sexual harassment against |
| 23 | | him.  That was I think in early June of '05. |

1   Q.   Okay.  Now, Tim Davis is -- who is Tim Davis?

2   A.   Tim Davis is the deputy director for the

3        department in charge of basically

4        institutional operations treatment

5        programming.

6   Q.   Under which authority Mr. Hardy would fall in

7        line?

8   A.   Right.  All the campuses, our facility

9        operations fall under Mr. Davis' purview, and

10       so all the staff that work in the facilities

11       are in that chain of command.

12  Q.   Okay.  In connection with this matter

13       regarding Mr. Hardy, did you have any

14       conversations with Mr. Davis?

15  A.   Well, over the course of the period of time

16       all of this was going on, I'm sure we talked

17       at times about the incident.  There was some

18       of my closest, if you can say, involvement in

19       what was going on was a discussion with

20       Mr. Davis after we had received a bunch of

21       memos.  After the incident had been reported

22       and I believe after Ms. Spann had initiated

23       an investigation, there were some memos

1      written to instruct the lady who had filed

2      the complaint to -- it was either to attempt

3      to have her reassigned back to Mr. Hardy's

4      unit.  There was an effort to call her in for

5      a face-to-face meeting with Mr. Hardy in

6      charge of the meeting, all of this right on

7      the heels of the complaint.  Mr. Davis and I

8      talked about that as being inappropriate, and

9      I believe Mr. Davis was instructed to make

10     sure that anything that smacks of

11     intimidation or retaliation or anything like

12     this was stopped.  And I believe that he did

13     make sure those meetings did not take place.

14  Q.  Okay.  Why did you feel that it was important

15     to make sure that Mr. Davis stopped those

16     meetings from taking place?

17  A.  Ms. Spann had already initiated the

18     investigation.  She had taken what I think

19     was an appropriate step with the cooperation

20     of the complainant to have her reassigned to

21     another dormitory which would be usual

22     practice I would think to --

23         MR. STOKES:  Object to what he thinks

1    if he doesn't know.

2    THE COURT:  Just what was said rather

3    than uncommunicated mental operations.

4    THE WITNESS:  Yes, ma'am.

5    A.    In this circumstance, which has also been my

6    experience in similar cases, that the

7    complainant was separated by being reassigned

8    to another dormitory.  It was my

9    understanding that the nature of one of the

10    memos was to complain about the lady being

11    reassigned and demanding she be put back

12    under his supervision and that, secondary to

13    that, a meeting be held where she be forced

14    to come into a meeting with the person to

15    whom she had made the complaint.  All of this

16    to me was clearly an attempt to bring this

17    situation under his control to intimidate

18    this lady.  In my view, this action was

19    totally inappropriate.  I think it easily in

20    my mind was -- crossed the line into what

21    I -- clearly to me was intimidation and could

22    easily be classified as retaliatory.  It was

23    a situation where this lady should not have

1    been placed in and that she did not deserve

2    to be placed in, and so we stopped the

3    efforts to do that at that point.

4  Q.  Okay.  Let me show you a document which has

5    previously been, I believe, admitted.  I'm

6    not sure if it's been admitted because it's

7    been several days but marked by Mr. Stokes.

8    Have you ever seen that document?

9         THE COURT:  That's Exhibit -- what

10    number?

11         THE WITNESS:  It's Exhibit 9-B, Your

12    Honor.

13    MR. STOKES:  Your Honor, one other

14    thing.  We had some exhibit books, and I

15    thought we left them with you, one for you

16    and one for the witness.

17         THE COURT:  You may have.  I can check

18    back in my office and make sure.

19         MR. PERRY:  I've got a whopper here.

20         THE COURT:  You've got them?

21         MR. STOKES:  I thought we had one

22    specifically for you and one for the witness.

23         MR. PERRY:  That's all right.  He's got

1      the document, so we're in good shape.

2  Q.  Just go ahead and for the Record identify --

3      first of all, what's the exhibit number down

4      there?

5  A.  It's the Employee's Exhibit 9-B as in boy.

6  Q.  What's the date of that document?

7  A.  The memo date is June 21st, 2005.  To whom it

8      may concern, and it's apparently a letter of

9      support type memo saying that, you know,

10     anybody that attacks Mr. Hardy is attacking

11     everyone and that he's always behaved in a

12     professional manner and about eight staff

13     members have signed it.  I don't know if I

14     saw this individual memo.  I probably did.

15     There was a number of memos going back and

16     forth, but I don't remember if I saw this

17     particular one.  I probably did.

18 Q.  Okay.  Let me show you another one.  What's

19     the exhibit number down there on that one?

20 A.  This is 9-D as in delta.

21 Q.  And the date?

22 A.  Dated June 21st, 2005, from two other staff

23     members, a Mr. Harvest and Mr. Ellis,

1          addressing their desire to record their

2          insight into an alleged investigation

3          referencing Michael Hardy.

4     Q.   These employees were subordinates of

5          Mr. Hardy?

6     A.   I believe all of these were, yes, sir.

7     Q.   Let me show you --

8     A.   In fact, they have referenced as, Our unit

9          manager, Mr. Hardy.

10              MR. STOKES:  He identified them, but

11         for the Record, I don't know whether he

12         testified that he ever saw them.

13              THE COURT:  I'll allow it.

14    Q.   Now, this one, I don't have a number on it,

15         but I know that one has been admitted.

16              MR. STOKES:  It's 7.

17    Q.   This is the grievance.  It's Employee's

18         Exhibit Number 7, although it's not marked on

19         that one.  If you would, Mr. Wood -- okay.

20         Thank you.  Can you identify Exhibit 7?

21    A.   Yes, sir.  This is a memo written to Deborah

22         Spann from Michael Hardy July 14th, 2005,

23         where he has --

1    Q.    He who?

2    A.    He, Michael Hardy, is saying that

3          Ms. McMillian is making unsubstantiated -- I

4          guess is what he meant to say -- derogatory

5          statements regarding him and that he would

6          like to file a grievance under DYS Policy

7          3.13.1.

8    Q.    All right.  Let's talk about that just a

9          second.  You are familiar with the grievance

10         procedure and policy at DYS, right?

11   A.    Yes, sir.

12   Q.    Is this so-called grievance an appropriate

13         step for a supervisor to take against a

14         subordinate employee who has filed a sexual

15         harassment claim or charge or complaint?

16   A.    It's not appropriate under any circumstances

17         whether sexual harassment or otherwise.  The

18         grievance process, there first has to be

19         something that is, in fact, a grievable

20         issue.  And attempting to cloud the issue of

21         this complaint that the lady had filed by

22         sending this directly to Deborah Spann, even

23         if it were grievable, bypasses the grievance

```
 1              chain of command because you would have to go

 2              to his immediate supervisor in a certain

 3              number of days and ask for a response and

 4              then up the chain of command one level at a

 5              time.

 6       Q.     Okay.  So is sexual harassment a grievable

 7              issue?

 8       A.     No.

 9       Q.     That is covered by a different policy, isn't

10              it?

11       A.     Well, let me see if I understand what you're

12              asking me.  From the perspective of the

13              person who is being complained against, I

14              don't believe there is any mechanism to

15              respond other than to provide information in

16              the investigation.  There is not a way to

17              legitimately file grievances and complaints

18              against people after you've been complained

19              against.

20       Q.     So in other words, would you agree with me

21              that we don't have a policy or procedure

22              whereby an employee who a grievance has been

23              filed against him or her for sexual
```

```
 1            harassment can simply turn the tables and

 2            have the employees investigated?

 3     A.     That's correct.

 4     Q.     All right.  You also mention the chain of

 5            command.  The grievance procedure, how does

 6            it work?  This one went to Deborah Spann.

 7     A.     That's correct.

 8     Q.     Would a grievance have gone to Deborah Spann?

 9     A.     No, sir.

10     Q.     It would have gone to whom?

11     A.     It would have gone to someone actually in the

12            chain of command, like the specialist over

13            the unit that an individual works with, if

14            it's in the case of a unit manager, to the

15            facility administrator that operates the

16            overall facility, then to the administrators

17            in the -- Mr. Davis' -- basically Mr. Davis'

18            chain of command to him.  But Ms. Spann is a

19            support person in personnel not a

20            administrator nor is she in the chain of

21            command for grievances.

22     Q.     All right.  Now, as a result of these things

23            that you've testified about, the memos that
```

1    came out, the meeting that you stopped to

2    talk about moving her back after we had moved

3    her, this grievance to turn the tables, did

4    you take any action that you remember to

5    address from a broader standpoint these

6    issues?

7  A.    Well, when this came up, Mr. Davis and I

8    talked about it.

9         MR. STOKES:  We would object to what he

10    talked to Mr. Davis as hearsay.

11         THE COURT:  I'm going to allow it.

12  A.    In response to your question about what

13    action I took, I acted on several pieces of

14    information that were coming to me.  One was

15    in the form of memos that were being

16    circulated around the campus by people that

17    worked under Mr. Hardy's supervision.  This

18    grievance procedure, it was apparent that

19    this was being discussed a lot on the

20    campus.  There were a lot of people becoming

21    involved in it.  I was very concerned about

22    the implications that this information that

23    came to me in the form of these memos and

1        discussions with Mr. Davis were clearly

2        retaliatory and created an environment that

3        was unacceptable and that we could not

4        tolerate in our facilities.  So we went to

5        the extra length to call the State Personnel

6        Board to bring in outside trainers to do a

7        training session for everybody on campus and

8        available to remind them about the

9        seriousness of those kinds of issues, and we

10       had a staff person from State Personnel come

11       out and conduct additional training

12       specifically on these issues as they relate

13       to appropriate behavior, appropriate

14       mechanisms for handling issues like this and

15       all of this while, you know, we were doing in

16       addition to the investigation going on.

17   Q.  I believe you also had an Assistant Attorney

18       General from the Attorney General's office

19       come out and participate in that, right?

20   A.  They provided -- I think that's who the

21       Personnel Board actually brought in as the

22       presenter for the training session.

23   Q.  All right.  Okay.  Let me show you Employee's

1      Exhibit 10.

2   A.   Okay.

3   Q.   Can you identify that?

4   A.   This is a memo to me from Deborah Spann.

5        It's dated July 19th, 2005, regarding her --

6        I believe this is the one regarding her

7        findings in the investigation of

8        Ms. McMillian's complaint.

9   Q.   Okay.  Do you remember independently when you

10       first saw that?  Well, me ask you this:  It

11       has a stamp on it from the legal division.

12       Do you see the date on that stamp?

13  A.   Well, it's dated November 3rd, and I was

14       looking at the July 19th date.  This was --

15       there was a time lag where this was either

16       not turned in or was in process somewhere.  I

17       think we finally had to ask for this to be

18       produced, and it was much later than July.  I

19       remember that.  This one was dated received

20       November 3rd, so that would be about right.

21  Q.   Do does that sound about right?

22  A.   Yes.

23  Q.   All right.  Let me show you -- this one is

```
 1        not marked.  So this looks like it's the

 2        third page of Employee's Exhibit Number 1,

 3        which is the whole personnel file.  Can you

 4        identify that?

 5   A.   This is the recommendation by the deputy

 6        director of programs, Mr. Davis, dated

 7        November 3rd addressed to me that confirms

 8        Mr. Davis' recommendation that -- well,

 9        confirms that Ms. Spann concluded that the

10        investigation substantiated the complaint and

11        the recommendation that we terminate

12        Mr. Hardy's employment.

13   Q.   All right.  Now, let me show you another

14        document from the personnel file, which was

15        Exhibit 1.  Can you identify that?

16   A.   This is the follow-up letter to Mr. Davis'

17        recommendation that was sent to Mr. Hardy

18        that schedules what we call a pretermination

19        hearing which gives him -- outlines the

20        complaint.  It gives him the opportunity to

21        present his side of the story, and apparently

22        that was scheduled to be conducted November

23        the 10th, 2005, at Mount Meigs.
```

```
 1   Q.   Okay.  Do you conduct those hearings?

 2   A.   No, sir.  We rotate those duties between my

 3        executive assistant, Marcia Calendar, and

 4        Mr. Davis, who is the deputy director of

 5        programs.

 6   Q.   Whom did you appoint for this hearing?

 7   A.   It must be Monday.  I'm drawing a blank.  I'm

 8        not sure which one we had do this.  I did not

 9        do it.

10   Q.   Let me show you Agency Exhibit 6.

11   A.   Findings from Ms. Calendar.

12   Q.   Okay.

13   A.   Thank you.

14   Q.   Does that refresh your recollection?

15   A.   It does.  Had to be one of the two.

16   Q.   And it was she, right?

17   A.   Marcia Calendar, who is the executive

18        assistant in my office.

19   Q.   You weren't present at the fact-finding

20        hearing either, were you?

21   A.   No, sir.

22   Q.   Did you have any communications with

23        Ms. Calendar about that?  Obviously other
```

```
 1            than that memo is what I'm asking.
 2      A.    I don't recall any conversations we had about
 3            this until actually receiving this.
 4      Q.    Okay.
 5      A.    I do recall -- I think the only thing that
 6            was mentioned to me was that there was
 7            apparently some sort of delay between the
 8            hearing and actually getting this because of
 9            some background information that was being
10            developed by an investigator about some
11            outside employment questions.  That was the
12            only issue that I remember having any
13            conversation about which was really just a
14            report as to why I hadn't gotten anything
15            yet, and that was really it.
16      Q.    What's the date on that memo?
17      A.    Ms. Calendar's memo is dated December the
18            8th.
19      Q.    All right.  Who is the investigator that
20            you're talking about?
21      A.    We have a gentleman by the name of Mr. Allen
22            Staton who is the department's, for lack of a
23            better term, an internal affairs investigator
```

1          she believed based on her investigation that

2          the complaint was substantiated.

3    Q.    You've got a recommendation from Mr. Davis.

4    A.    Correct.

5    Q.    A recommendation from Ms. Calendar.

6    A.    The hearing officer, yes, sir.

7    Q.    And this is awkward but, frankly, from me,

8          right?

9    A.    Yes, sir.

10   Q.    Okay.  Anything else that you can recall?

11   A.    No, sir.  This was a very difficult situation

12         to deal with and was compounded by the issues

13         that came up after the complaint was filed.

14              MR. PERRY:  Okay.  That's all the

15         questions I've got for you.  Mr. Stokes will

16         ask you questions now so if you will answer

17         his questions.

18                    CROSS EXAMINATION

19   BY MR. STOKES:

20   Q.    Mr. Woods --

21              MR. PERRY:  Wood.

22   Q.    Mr. Wood, let me ask you:  You stated that

23         there were some letters and memos that were

| | | |
|---|---|---|
| 1 | A. | My decision was based on the recommendations |
| 2 | | from the staff who gathered the information |
| 3 | | in the course of an investigation and in the |
| 4 | | course of a hearing and recommended to me |
| 5 | | that he be terminated.  I concurred with that |
| 6 | | decision and primarily for the two reasons |
| 7 | | that you just enumerated.  One was that we |
| 8 | | had, in the view of our personnel director, a |
| 9 | | substantiated sexual abuse issue.  But even |
| 10 | | more important was this emerging problem with |
| 11 | | what I believe was an attempt to intimidate |
| 12 | | this lady and in some way retaliate for this |
| 13 | | complaint being filed.  That emerged as, even |
| 14 | | to me, an almost even more serious issue than |
| 15 | | the initial complaint.  So based on those two |
| 16 | | issues, I concurred that the employment |
| 17 | | should be terminated, and this is the letter |
| 18 | | that does that. |
| 19 | Q. | Okay.  You mentioned this recommendation from |
| 20 | | the staff.  Let's just be clear about what |
| 21 | | we're talking about.  You've got a |
| 22 | | recommendation from Deborah Spann, right? |
| 23 | A. | I have a confirmation from Deborah Spann that |



# Transcript of the Testimony of

## Tera McMillian

## Michael Hardy
## VS
## DYS, et al.

### <u>C</u>ase No:

March 23, 2006

Boggs Reporting & Video
Phone: 334.264.6227
Fax: 334.285.0448
Email: boggsreporters@aol.com
Internet: www.boggsreporters.com

EXHIBIT
PENGAD 800-631-6989
Emp.Ex 16

EXHIBIT
2

training there, how you should deal with students when they're upset, what you should and should not say to them.

Q   Did the training have anything to do with -- did they go over any kind of sexual harassment policy of the company with you?

A   Not -- I can't recall them talking about sexual harassment.

Q   They didn't talk about sexual harassment -- you don't remember them talking about sexual harassment regarding coworkers or supervisors during this -- during that training session?

A   I don't recall.

Q   Okay.  You're not saying they didn't do it, but you don't recall it if they did it?

A   I don't recall.

Q   After the week's training, what was the next step in your seeking employment with DYS?

A   We were to report that weekend to work, and they called to let us know what dormitory we would be working in.

Q   At that time, were you still employed with

Page 45

1    those books.  There was only one.
2    Q    There was only one?
3    A    But we took turns going through it.
4    Q    And do you know -- do you ever remember
5         seeing what's marked as Defendant's Exhibit
6         No. 2 in the policy manual?
7    A    Back then?
8    Q    Yes.
9    A    No.
0    Q    When you were working from 4 to 12, who were
1         you working with?
2    A    Mainly Shadrick Wilson in the beginning.
3    Q    Was he the Youth Counselor Aid?
4    A    He was a Youth Services Aid.
5    Q    And on that 4 to 12 shift at Holloway Hall,
6         was it basically you and Mr. Shadrick
7         Wilson?
8    A    After 8:00.
9    Q    After 8:00?  And who worked with you before
0         8?
     A    Probably Mr. Smith and Mr. Miles and --
     Q    Mr. Smith and Mr. Miles.  What's Mr. Miles'
          first name?

12 (Pages 42 to 45)

Page 49

```
 1    would it be correct to say when you first --
 2    during your first six months there, if you
 3    had a problem with sexual harassment, you
 4    didn't know where to go or who to talk to?
 5  A   Probably not.
 6  Q   And you don't know whether or not the sexual
 7    harassment is covered in the mandatory
 8    training?
 9  A   Excuse me?
10  Q   You don't know whether sexual harassment is
11    covered in any of your mandatory training?
12  A   It is.
13  Q   And when did you receive that training?
14  A   Probably after the six months.
15  Q   After the six months.  Would it have been
16    the first year you -- during the first year
17    you were employed there?
18  A   I can't recall.
19  Q   Okay.  Let's go back.  When you did receive
20    the training, who did the training?
21  A   Mr. Chambers or Mr. Adams.
22  Q   Mr. Chambers or Mr. Adams.  And who is
23    Mr. Chambers, and what position did he have?
```

13 (Pages 46 to 49)

Page 52

1    this training did take place during the
2    first year?
3    A   I don't recall.
4    Q   You don't recall.  But DYS would have some
5        type of documents or records --
6    A   I'm sure they do.
7    Q   -- where you went to -- went to the
8        training?
9    A   Yes.
10   Q   And even during that training, do you ever
11       remember actually receiving or them showing
12       you a copy of what has been marked as
13       Defendant's Exhibit No. 2, which is the
14       policy and procedure on the Prohibition of
15       Sexual Harassment?
16   A   Yes, sir.
17   Q   You did receive or read a copy of that?
18   A   Yes, sir.
19   Q   Were you given a copy?
20   A   Yes, sir.
21   Q   And what, if anything, did you do with the
22       copy that was given to you?
23   A   Take them home.  I've got some in my car

Page 53

1        now.
2    Q   You've got some in your car now?
3    A   Uh-huh.
4    Q   You don't know exactly when that was, but
5        you do know you did receive that?
6    A   Yes.
7    Q   Okay.  Now, during the time you worked at
8        Holloway Hall -- let's go back to working
9        the 4 to 12 shift.  You had -- you mentioned
10       Shadrick Wilson.  He worked on the 4 to 12
11       with you.  Mr. Eugene Smith, Mr. Brian
12       Miles.
13   A   Mary Molton.
14   Q   Mary Molton?
15   A   In the beginning, Mr. Lewis also.
16   Q   What was Lewis' first name?
17   A   I don't recall.
18   Q   Now, how long did you work on the 4 to 12
19       shift at Holloway Hall?
20   A   The entire time, it was either 4 to 12 or 2
21       to 10.
22   Q   4 to 12 or --
23   A   2 to 10.

14 (Pages 50 to 53)

March 23, 2006

Page 56

1   Q   Yes.

2   A   Not that I can recall.

3   Q   Not that you recall.  Did you ever tease or
4       talk about sex?

5   A   Do I ever tease or talk about sex?
6       Hopefully not in a professional setting, but
7       I imagine I have.

8   Q   I'm talking about at work.  I'm not talking
9       about outside of work.  I'm limiting this
10      to --

11  A   Okay.  No.

12  Q   -- when you're working and you're doing
13      whatever your job is at DYS.

14  A   No.

15          MR. COOKS:  No?
16          THE WITNESS:  No.
17          MR. COOKS:  Okay.

18  Q   When you went to Page Hall, were you given
19      an option as to whether or not you wanted to
20      be transferred to Page Hall?

21  A   You know what?  When we found out that --
22      Mr. Hardy came down and told us that he was
23      being moved, and he said that he had made a

Page 91

```
 1       you?
 2    A   Yes, because he kept smiling and looking
 3        over at us.  That's why Farley made the
 4        comment.
 5    Q   After he did that and you were talking with
 6        Mr. Farley about the situation, did you
 7        decide then to go tell anybody?
 8    A   No, because Farley and I talked about the
 9        fact that maybe we should pretend like we
10        like each other and maybe he'd stop.
11    Q   So Mr. Farley told you that then.  If y'all
12        pretend like y'all like each other --
13    A   Maybe he'd stop.
14    Q   -- maybe Hardy would stop?  Now, the only
15        incident that you knew of then was the fact
16        that you had told him about he had asked you
17        to suck his penis and this shirt thing.
18        Those are the only two incidents at that
19        time; is that correct?
20             MR. COOKS:  Object to the
21             form.
22    Q   That you can remember involving Mr. Hardy
23        sexually?
```

Page 93

DYS, et al.
March 23, 2006

Michael Hardy
Tera McMillian

**Page 94**

1  did and I asked him to please don't do that
2  anymore, he said that he wanted to get a
3  quick feel before Smitty got back. And he
4  also made a statement, something about
5  Ms. Clemmons because he was supposed to be
6  having a relationship with her. And he said
7  that she had had a breast reduction. And he
8  actually liked big titis, but he didn't like
9  them with scars on them.
10 Q  Who was supposed to be working on the shift
11   from 2 to 10 with you?
12 A  Mr. Smith.
13 Q  That was all, you and Mr. Smith?
14 A  Well, others were probably going to come at
15   4.
16 Q  Okay. And Mr. Smith was at the hold dorm?
17 A  Uh-huh.
18 Q  What do you mean by hold dorm?
19 A  That's where they keep the kids who are
20   locked up during the daytime, who aren't
21   going to go to school.
22 Q  And what time -- how long was Mr. Smith
23   supposed to stay down in the hold dorm?

**Page 95**

1  A  Until right about before it's time to go get
2   the kids from school.
3  Q  What time was that?
4  A  Probably about 2.
5  Q  About 2. So when you went in early, where
6   were you located in the dorm?
7  A  At the front desk where the phone is.
8  Q  Okay. What was Mr. Hardy doing when you got
9   there?
10 A  He was in his office with the door closed.
11 Q  With the door closed. Okay. Then Mr. Hardy
12   came out.
13 A  Yes.
14 Q  Do you know why Mr. Hardy came out?
15 A  Do I know why he came out?
16 Q  Yes.
17 A  No.
18 Q  Was there anybody else in the dorm?
19 A  No.
20 Q  No kids in the dorm.
21 A  They were at school.
22 Q  And Mr. Hardy came out, and you were --
23 A  At the table.

**Page 96**

1  Q  -- at the table.
2  A  At the desk, rather, eating.
3  Q  At the desk eating.
4  A  Uh-huh.
5  Q  And Mr. Hardy just walked up there and
6   grabbed your breasts?
7  A  Yes. He walked behind me like he was going
8   to use the phone.
9  Q  Does he have a phone in his office?
10 A  He does.
11 Q  But he walked up behind you?
12 A  Uh-huh.
13 Q  Did he say, I'm going to use the phone?
14 A  No, he did not.
15 Q  Did you see him pick up the phone?
16 A  No, I did not.
17 Q  But he walked behind you?
18 A  Yes.
19 Q  Then he grabbed your breasts?
20 A  Yes, he did.
21 Q  Did you hit him?
22 A  Did I hit him?
23 Q  Yes.

**Page 97**

1  A  No. I did like this, and I told him please
2   don't do that anymore.
3  Q  You didn't physically respond to him in any
4   way towards him?
5  A  No, I did not.
6  Q  You just simply told him not to do it
7   anymore?
8  A  That's correct.
9  Q  Okay. Mr. Smith came in. Did you say that?
10 A  Yes, after that.
11 Q  After that. How long was it before
12   Mr. Smith came in?
13 A  Maybe about 10 minutes.
14 Q  About 10 minutes. When Mr. Smith came in,
15   did you immediately tell Mr. Smith that
16   Mr. Hardy grabbed your breasts?
17 A  No, sir.
18 Q  You didn't tell Mr. Smith that?
19 A  No, sir.
20 Q  And Mr. Smith was the first somebody -- you
21   knew he was a supervisor out there, unit
22   supervisor?
23 A  Yes.

25 (Pages 94 to 97)

Page 153

1    A    Yes.
2    Q    Do you know Mr. Harvest?  You said you know
3         Mr. Harvest.
4    A    I've worked with him.
5    Q    Did you ever have any problem with
6         Mr. Harvest?
7    A    Well, one morning Bundy asked me -- Father's
8         Day was going to be that weekend, and he
9         asked me would I mail his Father's Day card
10        for him because if it didn't get mailed that
11        day, then it wouldn't reach him in time.
12        And I told him sure.  And Mr. Harvest said I
13        was fucking up his shift, and I told him
14        that he didn't need to be talking to me like
15        that.
16   Q    And Mr. Harvest -- was it at that point you
17        decided --
18   A    I'm tired.
19   Q    -- that you're tired, and you had enough?
20        And then you went to Ms. Debra Spann?
21   A    No.  I went to get transferred from that
22        dorm.  That's all.
23   Q    So you didn't go to talk to Ms. Debra

39 (Pages 150 to 153)

v.

Michael Hardy
Tera McMillian

Page 154

1      Spann about --
2    A   I didn't want any trouble.  I didn't want
3        any trouble.  And believe it or not, since
4        all of this has happened, there have been
5        times that I have said to myself, maybe I
6        should have sucked his dick.
7    Q   According to this, do you remember when the
8        incident involving Mr. Harvest -- do you
9        know whether or not it was about sending
10       letters to -- mailing letters out from DYS?
11   A   Mailing letters out from DYS?
12   Q   Yeah.
13               MR. COOKS:  You mean personal
14           letters, sir?
15   Q   Personal letters.
16   A   Well, they can write letters to their
17       parents.  They can write letters to their
18       probation officers.
19               MR. COOKS:  Were they your
20           personal letters?
21   Q   It was one of the kid's personal letters?
22   A   Yes.
23   Q   So one of the kids wanted to send a personal

Michael Hardy
Tera McMillian

Page 178

1      really good person and that, you know, I
2      wanted to come to him because I had spoke
3      with Mr. Bowling about possibly going to his
4      dorm.  And that's when he made the statement
5      about Mr. Bowling should have told him that;
6      he can't believe that he didn't.  And I told
7      him, well, I wanted you to know because I
8      didn't want you to think that I'm going
9      behind your back, but I want to transfer.
10     And he asked me what did I want from him.
11     What do you want from me?  And I told him I
12     just want to be transferred from your dorm.
13  Q   Did Mr. Hardy tell you -- did you make a
14     request to Mr. Hardy that you wanted to come
15     in -- you wanted to either leave early --
16  A   That was not going to be possible, sir.  All
17     I wanted him to do was not be upset because
18     I didn't want any mess.
19  Q   So you didn't make a request to him --
20  A   I told him I was possibly going to be
21     getting another job, an administrative job.
22     That way, if he sent me to another dorm,
23     then I possibly would be able to do that

Page 179

1   Q   Okay.  You were considering then getting
2      another job, an administrative job?
3   A   Uh-huh.
4   Q   And where were you going to get the
5      administrative job at?
6   A   I don't know.
7   Q   Okay.  But you were anticipating an
8      administrative job that would require you to
9      work during the daytime; is that correct?
10  A   Exactly.
11  Q   And then this job possibly would have meant
12     that you had to leave the dorm early to get
13     to the other job; is that correct?
14  A   To be honest with you, at that point, I just
15     wanted to leave the system.  If I could have
16     found me a job that I liked, I would have
17     left.
18  Q   Okay.  But I'm going back to this situation.
19     When you talked to him at McDonald's and
20     called him -- and he honored your request,
21     did he not?  When you called him and asked
22     him to meet with you, he did honor your
23     request?

Michael Hardy
Tera McMillian

Page 202

1  Q  What's today's date?
2  A  Today's date is the 23rd.
3  Q  Twenty-third. And it calmed down last week?
4  A  Uh-huh.
5  Q  What month is this? This is March. But you
6     have not had any problem directly from Mike
7     Hardy, have you?
8  A  No.
9  Q  Since you've been working at -- since the
10    situation has occurred, you have not been
11    demoted or suspended, have you?
12  A  No.
13  Q  And you receive all your full benefits and
14    privileges while you continue to work at
15    DYS?
16  A  Yes. I have to fight for them, but, yes, I
17    do.
18  Q  Why do you have to fight for them?
19  A  Because, like, Mr. Lee didn't want to give
20    me a personal day. He had to go up to the
21    White House to make sure I hadn't had it. I
22    needed to go to a funeral. He said I needed
23    to find somebody to work for me. What else?

Page 203

1    Let me see. Hold on. Like I said, you
2    know, I told him that my mother was sick and
3    I needed to leave. He wouldn't answer his
4    phone, and he was on-call. The first day he
5    came to the dorm, he changed my off days and
6    gave them to Ms. Witty. Ms. Witty and Ms.
7    Gryner opened up my paycheck.
8  Q  Now, when you say that they, did you say Mr.
9    Lee was doing something in retaliation
10    against you?
11  A  I didn't understand why he was doing it
12    because of the fact that Ms. Witty had gone
13    to Page Hall. They sent her over there, but
14    she said she couldn't go over there because
15    she couldn't walk the children to school.
16    So they sent her back to ITU.
17  Q  Would you agree that Mr. Lee had the
18    authority to change your work schedule?
19  A  Yes, he had the authority to do that, I'm
20    sure.
21  Q  Did you think when he changed your days, it
22    was in retaliation?
23  A  Yes, I do, because he said -- I think you've

Page 204

1    got it in here. Mr. Lee said since I was
2    the last one to come in, that's why he was
3    changing my days.
4  Q  And, in fact, that wasn't true because
5    Mr. Lee was the last one to come in.
6  A  Mr. Lee was the last one to come in because
7    that was his first day.
8  Q  That was his first day?
9  A  Uh-huh.
10  Q  All right. So, now, is it also true that
11    you stated that they normally would give you
12    three days off?
13  A  No, they don't give me three days.
14  Q  In a row, that it's a practice?
15  A  No, that's not a practice. But, like I
16    said, when he put holidays down for people,
17    he would give other people three days in a
18    row. I would like that same privilege too.
19  Q  So Mr. Lee wouldn't give you those days?
20  A  No.
21  Q  So you feel like Mr. Lee was retaliating
22    against you because he wouldn't give you
23    three days like he did other folks?

Page 205

1  A  Yeah. Like, on his tapes that he made of me
2    that he doesn't make of for people because
3    he tapes me and his conversation, but he
4    don't tape nobody else. Like he said, when
5    I put in for a day, he's going to
6    automatically not give it to me. That's on
7    the tape.
8  Q  So Mr. Lee started making tapes of his
9    conversations with you?
10  A  Uh-huh.
11  Q  And you think that was in retaliation of
12    what Mr. Hardy had done?
13  A  I think it has something to do with that.
14    What you think?
15        MR. COOKS: You can't ask him
16    questions.
17        THE WITNESS: Oh, I'm sorry.
18  Q  Has Mr. Lee ever made any sexual advances
19    towards you?
20  A  No, sir.
21  Q  Has Mr. Bowling made any sexual advances to
22    you?
23  A  No, sir.

52 (Pages 202 to 205)

Michael Hardy
Tera McMillian

Page

```
 1   Q   Have you ever had any type of sexual
 2       relationship with anybody employed at DYS
 3       since you've been employed at DYS?
 4   A   No, sir.
 5   Q   Mr. Smith?
 6   A   No, sir.
 7   Q   Mr. Tallis?
 8   A   No, sir.
 9   Q   Nobody?
10   A   No, sir.
11   Q   Those are all the questions I have.
12           MR. STOKES:  Dudley, do you
13       have anything?
14           MR. PERRY:  Well, I said not,
15       but I guess I do have one I want
16       to follow up on.  And it's
17       something you just covered.  I'm
18       interested about Mr. Lee.
19           EXAMINATION
20   BY MR. PERRY:
21   Q   Do you have any knowledge or any reason to
22       believe of any relationship between Mr. Lee
23       and Mr. Hardy?
```

**State of Alabama**
**Department of Youth Services**
# POLICY AND PROCEDURES

| | |
|---|---|
| **Related Standards:** | 3-JTS-1C-07, 3-JTS-1C-08, 3-JCRF-1C-04, 3-JTS-1C-07-1 |
| **Chapter:** | 3.0 Personnel |
| **Subject:** | Prohibition of Sexual Harassment |
| **Policy Number:** | 3.13.2 |

internal and external appeal routes. If sexual harassment is suspected or probable cause of violating the sexual harassment policy is found, refer complaints to the Executive Director for a hearing before him or his designee. The two parties may resolve the problem in a written statement of agreement acceptable to both. Appropriate disciplinary or personnel action may be taken.

IV.    **APPLICABILITY**

This policy applies to all DYS personnel and facilities.

**EXHIBIT**
3

Effective Date: DEC. 5, 1996    Issued By: _James Dupree Jr._    Page 2 of 2

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 130.2005.05479 |

_____ and EEOC

State or local Agency, if any

NAME (Indicate Mr., Ms., Mrs.)
Tera A. McMillan

HOME TELEPHONE (Include Area Code)
334-284-9559

STREET ADDRESS
312 Adler Drive

CITY, STATE AND ZIP CODE
Montgomery, AL 36116

DATE OF BIRTH
01/12/1973

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Alabama Department of Youth Services | Over 100 | (334) 215-3812 |

STREET ADDRESS
Po. Box 66

CITY, STATE AND ZIP CODE
Mount Meigs, AL 36057

RECEIVED

COUNTY
Montgomery

NAME

TELEPHONE NUMBER (Include Area Code)

STREET ADDRESS

CITY, STATE AND ZIP CODE

COUNTY

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

| ☐ RACE | ☐ COLOR | ☒ SEX | ☐ RELIGION | ☐ AGE |
| ☒ RETALIATION | ☐ NATIONAL ORIGIN | ☐ DISABILITY | ☐ OTHER (Specify) | |

DATE DISCRIMINATION TOOK PLACE EARLIEST
JUL 12 2005

May 2003

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

1. My name is Tera McMillan and I am employed by the Respondent at its Mount Meigs campus. I was first hired by the Respondent in October 2002 and since that time I have always performed my duties and responsibilities in a satisfactory manner. Since May of 2003, I have been subjected to a sexually hostile work environment by my supervisor and my co-workers.

2. Beginning in May of 2003, I have persistently been propositioned for sex and sexual favors by my immediate supervisor Michael J. Hardy. On an almost daily basis, Hardy has requested that I "suck his dick." He has offered me money and other material objects if I would perform this act of oral sex on him. Furthermore, Hardy has almost on a daily basis talked about his sexual prowess with other female workers at the Respondent's Mount Meigs campus. For example, Hardy has stated to me that he cannot "fuck all night like he used to" and that he can "only fuck real hard for 5 of 6 minutes" at this time in his life. Also, Hardy grabbed both my breasts while I sat a desk in the facility. All of this behavior was uninvited and unwelcome and I asked Hardy to stop harassing me, but he did not. Hardy also stated that he loved big "titties" and requested that be allowed to suckle my breast in the office. Again I declined his invitation. Hardy also spoke regularly of his abilities with regard to oral sex and asked me to allow him to try such with me. As before I declined his invitation and requested that he leave me alone.

3. During this time of almost constant harassment, I began seeing a doctor for anxiety and depression regarding these issues. My treating position placed me on medication and referred me to a therapist to help deal with these issues.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – (When necessary for State and Local Requirements)

_Janet R. Essif_

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

SIGNATURE OF COMPLAINANT

_Tera A. McMillan_

SUBSCRIBED AND SWORN TO BEFORE
(Day, month, and year)
7/12/2005

July 12, 2005
Date

Charging Party (Signature)

EEOC FORM 5 (10/94)

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Oct 26, 2005
BONDED THRU NOTARY PUBLIC UNDERWRITERS

EXHIBIT 4
tabbies
000181

2005 05479

4. In March of 2005, Hardy beg    asking me to go to hotels with him for sex a    offered to buy me a car, tires, and other goods in exchange for my compliance. I did not go along with his request. Hardy's harassment of me continued until I reported him on June 16, 2005. After I reported Hardy I was made to transfer to another department within the Mount Meigs facility. Since arriving in the new department, I have been subject to retaliation in the form of personnel not being willing to help me learn the new position and I have been threatened with being disciplined for no reason.

July 12, 2005
Date

Tera A. McMillan

JUL 1 2 2005

RECEIVED
EEOC

000182