**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **TERA A. McMILLAN** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No: 2:07-cv-001-WKW** |
| | ) | |
| **ALABAMA DEPARTMENT OF** | ) | **(JURY DEMAND)** |
| **YOUTH SERVICES, et al.,** | ) | |
| **Defendants** | ) | |

**BRIEF IN OPPOSITION TO DEFENDANT MICHAEL J. HARDY'S**
**MOTION FOR SUMMARY JUDGMENT**

COMES NOW THE PLAINTIFF, by and through undersigned counsel, and submits her response in opposition to defendant Michael J. Hardy's motion for summary judgment on her federal claims against him in this action. Hardy's reliance on *res judicata* as grounds for his motion is not supported by the law or the facts, and is due to be denied and the Plaintiff is due to be granted summary judgment as to Hardy's liability on her Section 1983 claim against him.

**FACTS RELEVANT TO THE MOTION**

1) Tera McMillan began employment as a Youth Services Aide with the Alabama Department of Youth Services (DYS) on October 21, 2002. (Ex. 1: Wood appointment letter dated October 22, 2002)

2) Michael J. Hardy was McMillan's supervisor (See Dft. brief at p. 1) and exploited his position for more than two years to subject her to a variety of unwelcome and offensive acts of sexual harassment and discrimination. Among these acts, Hardy, on one occasion, grasped McMillan's breasts while she was sitting at a desk performing her duties as a Youth Services Aide. He also made inappropriate inquiries into her sexual

1

preferences and availability; asked her to meet him at a motel; asked her to be his "side woman"; requested that she perform oral sex on him; and, asked her to view pornographic internet sites. (Ex. 2: Notes of Investigative Findings by Debra Spann dated June 14, 2005; Ex. 3: Memorandum from Debra Spann, DYS Personnel Manager, to J. Walter Wood Jr., DYS Executive Director, dated July 19, 2005; and, Ex. 4: Excerpt from Statement of Phyllis Rankins to Alan Staton, Special Investigator, March 10, 2006, p. 03:06-11)

3)    After McMillan reported this offensive conduct to DYS officials in June of 2005, Hardy retaliated against her by filing a grievance in which he made false allegations of misconduct by her. (Ex. 6: Letter from J. Walter Wood to Michael Hardy dated November 4, 2005, ¶ 2)

4)    DYS personnel manager Debra Spann investigated McMillan's charges of sex harassment and retaliation; found them to be valid; and recommended the termination of Hardy's employment. (Ex. 3: Memorandum from Debra Spann, DYS Personnel Manager to J. Walter Wood Jr. DYS Executive Director, July 19, 2005; Ex. 8: Memorandum from Tim Davis, Deputy Director to J. Walter Wood, Executive Director, November 3, 2005). The investigation also found that Hardy had violated DYS policy in his effort to retaliate against McMillan after her complaint was lodged.

5)    Following an administrative fact-finding hearing held on November 15, 2005, the Executive Director of DYS determined that Hardy had violated Rules of the State Personnel Board governing "disruptive conduct, use of abusive or threatening language, serious violation of any other department rule" and "DYS Policy…Prohibition

of Sexual Harassment." and terminated his employment effective January 6, 2006 (Ex. 9: Letter from J. Walter Wood Jr. to Michael Hardy, January 6, 2006, ¶¶ 2, 3).

6)    Hardy appealed his dismissal on these grounds, in accordance with the Alabama State Personnel merit system rules[1], to the State Personnel Board on or about January 12, 2006. (Ex. 5: ALJ Order, p. 6 ¶ 3)  Hardy's appeal was assigned to an administrative law judge (ALJ) who conducted a hearing on May 8 and June 10, 2006 during which Hardy was represented by counsel and allowed to present evidence and witnesses on his behalf, and to question evidence and witnesses presented against him. (Ex. 5: ALJ Order, pp. 1, 2)

7)    The administrative law judge upheld Hardy's termination and although she did not enter any Findings of Fact, she did conclude that Hardy "…violated the DYS sexual harassment policy[2]." (Ex. 5: ALJ Order, p. 29 ¶ 1) and that Hardy had inappropriately instigated a complaint against McMillan after she filed her complaint

---

[1] 670-X-18-.02 Dismissals.

(1) An appointing authority may dismiss a classified employee whenever he considers the good of the service will be served thereby, for reasons which shall be stated in writing, served on the affected employee and a copy furnished to the Director, which action shall become a public record.

(2) The dismissed employee may, within 10 days after receipt of written notice, appeal from the action of the appointing authority by filing with the Board and the appointing authority a written answer to the charges. The Board shall, if demand is made in writing by the dismissed employee within 10 days after receipt of written notice of discharge, order a public hearing and, if the charges are proved unwarranted, order the reinstatement of the employee under such conditions as the Board may determine. Upon a majority vote of the Board, the Board may impose a punishment other than termination including but not limited to a reinstatement with forfeiture of back wages and benefits between the date of termination and the date of the Board's order reinstating the employee, or a suspension up to and including 30 days. (For hearing procedure, see Rule 670-X-5-.08.) *Alabama Administrative Code.*

[2] The ALF stated in dicta that she did not believe McMillan was the victim of sex harassment even though she found that Hardy was guilty of violating the sex harassment policy.  This is very odd statement since the only evidence of sexual harassment against Hardy was that presented which involved his conduct with McMillan.

against him (Ex. 5: ALJ Order, p. 30, ¶ 3 – p. 31, ¶ 1)  Hardy did not appeal this decision to the state circuit court.

8)    McMillan was not a party to either the administrative fact-finding proceeding in November 2005 which resulted in Hardy's termination, or to the review of that action by the State Personnel Board in March and May 2006 which upheld his termination by DYS.   Although McMillan was called as a witness by legal counsel for DYS at both of these proceedings, she did not have the right or opportunity to present her own claims against Hardy nor to seek any remedies for the wrongs he had perpetrated upon her in either instance.

## ARGUMENT AND CITATIONS OF AUTHORITY

### I. The Summary Judgment Standard.

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, and the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986); Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir.1993) (*discussing burden-shifting under Rule 56*).  In a case such as this, where the moving party relies upon legal doctrine as justification for judgment as a matter of law, he must prove that he meets all elements necessary for the application of the doctrine, and show that the non-movant can not present any disputed facts on any element of proof.

A. **Hardy can not meet his burden of proof on the *res judicata* defense**.

Hardy seeks to have this Court bar McMillan from prosecuting her Section 1983 claims for sexual harassment and retaliation against him because of the successful action brought against him by the Alabama Department of Youth Service on those issues. McMillan agrees that the matter of Hardy's liability for the issues has been established in the earlier actions, but denies that her federal legal claims against him were addressed in the prior forums.  In order to invoke the doctrine of *res judicata* – claim preclusion – Hardy must show: (1) the prior decision was rendered by a court of competent jurisdiction; (2) there was a final judgment on the merits; (3) the parties were identical in both suits; and (4) the prior and present causes of action are the same." *Davila v. Delta Air Lines, Inc.,* 326 F.3d 1183, 1187 (11th Cir.2003).  McMillan will show below that Hardy can not carry this burden, and that any preclusive effect of the prior proceedings would dictate that summary judgment should be entered against Hardy.

1. Lack of a Court of competent jurisdiction.    The personnel board and DYS were certainly competent to render a decision on whether Hardy violated state policies when he sexually harassed and retaliated against McMillan, but neither DYS's executive director or the personnel's board's administrative law judge had jurisdiction to decide a cause of action arising under 42 U.S.C. §§ 1983, 2000e., or the Equal Protection clause.

Determinations on employment discrimination claims made pursuant to administrative proceedings or contractual grievance processes are not given any preclusive effect, under doctrines like *res judicata*, in future suits to redress rights under Title VII[3] or § 1981. *Smith v. State of Ala.*, 996 F.Supp. 1203 (M.D. Ala., 1998); citing *Stafford v. Muscogee County Bd. of Educ.*, 688 F.2d 1383, 1392 (11th Cir. 1982)

_____
[3] McMillan's § 1983 claim is grounded in Hardy's denial of her Equal Protection and Title VII rights.

(rejecting any preclusive effect of a determination made by executive branch civil rights office on future Title VII and § 1981 lawsuit); *Hutchings v. United States Indus., Inc.*, 428 F.2d 303, 313-14 (5th Cir.1970) (rejecting any preclusive effect of arbitrator's holding under contractual grievance process on future Title VII lawsuit because grievance involved assertion of contractual rights, whereas lawsuit involved assertion of Title VII rights). The remedies in an administrative action or under a grievance procedure are different than those available under Title VII or § 1981, *Stafford*, 688 F.2d at 1392, and, in any event, the federal courts are intended to be the final arbiter of rights under Title VII, not administrative agencies or private tribunals. *Hutchings*, 428 F.2d at 313-14.

2.  Lack of identity of parties. McMillan was not a party to either the DYS proceeding or the personnel board review below. DYS utilized her as a witness in its action against Hardy but she did not have any opportunity to present evidence on her own claims, or to cross-examine Hardy or other DYS witnesses on those issues that were decided against Hardy in the proceedings. (*Ex. 5: ALJ Order pp. 1-7*)

3.  Lack of identical causes of action. McMillan's Section 1983 and Title VII claims were not presented in either the DYS administrative proceeding or in the review of that decision by the State Personnel Board. The only issues heard by the DYS against Hardy were whether he had violated its policies in sexually harassing McMillan and then retaliating against her when she complained of his misconduct. (*Ex. 6 & 9, Wood letters to Hardy*)

In order to establish a cause of action in this case under Section 1983, McMillan has to present evidence that Hardy intentionally violated her constitutional or statutory

rights (to not be subjected to sex discrimination or harassment, or retaliation) while acting under the color of state law.  McMillan has a constitutional right to be free from unlawful sex discrimination and sexual harassment in public employment. *Davis v. Passman*, 442 U.S. 228, 235, 99 S.Ct. 2264, 2271 (1979).

These elements were not presented to, or decided in, the DYS proceeding or the personnel board proceeding.  While the issues of Hardy's sexual harassment and retaliation against McMillan were presented, examined, and decided against him, the matter of his liability for damages under Section 1983 and/or Title VII was not. Additionally, neither of the earlier proceedings considered any remedy that was or could be available to McMillan under the causes of actions presented in this case.

4.  <u>Lack of final judgment on the merits</u>.  As McMillan has shown above, the causes of action she brings in this suit were not present in the prior proceedings, and no judgment was rendered at all on the merits of her Section 1983 Equal Protection or Title VII claims below.  The issues of Hardy's sexual harassment and retaliation toward McMillan were decided against Hardy by DYS, and he exercised his right to seek a review of this decision before the State Personnel Board.  The personnel board found that Hardy did, in fact, violate DYS policies when he sexually harassed and retaliated against McMillan, and affirmed his termination of employment on those grounds. (Ex. 5: ALJ Order p. 29, ¶ 1, "*…Hardy had more than a work-related relationship with McMillan and violated the DYS sexual harassment policy.*"; and, p. 30, ¶ 3, "*…Hardy also admitted to filing a 'grievance' against McMillan.  As a supervisor, he knew better than to conduct himself in such a harassing manner.  …  This type of threatening behavior, in and of itself merited dismissal…*")

## CONCLUSION

The plaintiff has shown by reference to the law and to the evidence that this defendant's invocation of *res judicata* as a bar to her claims in this case is due to be denied.

Respectfully submitted this 3rd day of January 2008.

/S/ JIMMY JACOBS
JIMMY JACOBS (JAC051)
Attorney for Plaintiff
4137 Carmichael Rd, Ste 100
Montgomery, Alabama 36106
(334) 215-1788

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using CM/ECF system and service will be perfected upon counsel of record following this the 3rd of January, 2008.

/s/Jimmy Jacobs
JIMMY JACOBS (JAC051)
Attorney for Plaintiff

COUNSEL OF RECORD:

T. Dudley Perry, Jr.
Deputy Attorney General
Post Office Box 66
Mt. Meigs, AL 36057

James Eldon Wilson, Esquire
Deputy Attorney General
4265 Lomac Street
Montgomery, AL 36106

**PLAINTIFF'S LIST OF EXHIBITS SUBMITTED IN OPPOSITION TO
DEFENDANT MICHAEL HARDY'S  MOTION FOR SUMMARY JUDGMENT**

**Exhibit**

1    Wood appointment letter dated October 22, 2002.

2    Notes of Investigative Findings by Debra Spann dated June 14, 2005.

3    Memorandum from Debra Spann, DYS Personnel Manager, to J. Walter
     Wood Jr., DYS Executive Director, dated July 19, 2005.

4    Excerpt from Statement of Phyllis Rankins to Alan Staton, Special
     Investigator, March 10, 2006.

5    Administrative Law Judge  Order dated August 1, 2007.

6    Letter from J. Walter Wood to Michael Hardy dated November 4, 2005.

7    DYS Time & Attendance Report dated 6/25/05.

8    Memorandum from Tim Davis, Deputy Director to J. Walter Wood,
     Executive Director, November 3, 2005.

9    Letter from J. Walter Wood Jr. to Michael Hardy, January 6, 2006.


PLAINTIFF'S
EXHIBIT
1



*State of Alabama*

## Department of Youth Services

*Post Office Box 66*
*Mt. Meigs, Alabama 36057*

October 22, 2002



**DON SIEGELMAN**
**GOVERNOR**

J. WALTER WOOD, JR.
EXECUTIVE DIRECTOR

Ms. Tera A. McMillian
4110 Fitzpatrick Blvd        Apt. 1003
Montgomery, AL 36116

Dear Ms. McMillian:

This will confirm your appointment to a full-time, permanent Youth Services Aide position effective October 21, 2002, at a salary of $793.30 biweekly. You have been assigned to the Mt. Meigs Complex in Montgomery, AL and will serve a six (6) month probationary period. You will receive your first check as a full time employee on November 15, 2002.

Your acceptance of this position is considered acknowledgment and agreement that your job here will be your primary employment and will take precedence over any other employment you may have while working with this department. You are expected to work any shift as scheduled.

I am pleased to appoint you to this full-time position. If I can be of further assistance, please do not hesitate to contact me.

Sincerely,

J. Walter Wood, Jr.

J. Walter Wood, Jr.
Executive Director

JWW/ldj

cc:    Personnel File
       Mr. Booker
       Ms. Coles
       Mr. Ray


PLAINTIFF'S
EXHIBIT
4

1

DEPARTMENT OF YOUTH SERVICES

STATEMENT OF MS. PHYLLIS RANKINS

Youth Service Specialist

Statement date:  March 10, 2006, 10:36 A.M.

INTERVIEW BY: MR. ALAN STATON, SPECIAL INVESTIGATOR

2

1   BY MR. STATON:

2            All right, it's March the 10th, 2006.  It's 10:36

3   A M.  I'm talking with Ms. Rankins.

4        Q.   Ms. Rankins, would you state your whole name for

5   me, please?

6        A.   Phyllis L. Rankins.

7        Q.   All right.  Ms. Rankins, I want to ask you a

8   couple of questions involving Hardy-McMillian case.  I'm

9   going to start off with when did Ms. McMillian come to see

10   you?

11        A.   I don't have the date with me but it was at the

12   time when most of the staff, the administrators, had gone to

13   Eufaula for the leadership training that the department was

14   sponsoring.

15        Q.   Okay.

16        A.   And I may have been the only administrator in the

17   building that day.  Cause I think I heard later that Ms.

18   McMillian had tried to see Ms. Lewis or Ms. Coles at the

19   time.  And when Ms. Coles wasn't in somebody -- and someone

20   directed her to my office so she came in.

21        Q.   When she came in, what did she tell you?

22        A.   She was very -- seemed very distraught or very

23   upset.  And she came in and told me she wanted to talk to me

24   about a real private matter.  And I had her to come in and

25   close the door.  And so she began telling me, you know, how

1 she -- how much she loved her job and loved working in Paige

2 Hall (phonetic).  And she loved the people she worked with.

3 But said -- She said that she was having some problems

4 because of supervisor was trying to change her shift or

5 something to that effect.

6    And after that she started telling me about him

7 making passes or sexual propositions towards her and -- at

8 various times.  And at one point she got up and came around

9 my desk and demonstrated to me how her supervisor had

10 grabbed her breasts and, um -- as she was work -- doing some

11 paperwork or something.  And I soon realized that it was

12 very serious and that it was a matter that we -- I needed to

13 refer up to the personnel department.  So, I, you know, told

14 her as much.  And eventually told her that I hope she

15 realize, you know, the seriousness of her allegations and

16 that, um, I would have to move her from Paige Hall.  You

17 know, even though she was saying, you know, she liked

18 working where she was working.

19    But, um, I, um, did indicate to her that I had

20 to -- I would have to move her out of that unit at least for

21 now, you know, temporarily I would have to move her.  And,

22 um, she seemed real reluctant about that, you know.  And

23 questioned me about where would she be moved and I told her

24 I would get back with her.  And eventually I picked up the

25 phone and called Ms. Spann who is our personnel manager and

PLAINTIFF'S
EXHIBIT
2
PENGAD-Bayonne, N. J.

14-05: sexual harassment.

a McMillan -
wants ✓ ~ ✓ ~ dorm -
        ⊃ - Paige Hall -
Michael Hardy: sexual adv ⊃ 2 yrs -
        told her ō wanted her ✓ suck his dick while ✓ kids went ✓ din.
            hall.
                s/o finished when ✓ kids ~ ;

✓ chind ✓ desk ∪ grabbed her breasts -

asked her friend 'g much # ✓ get her -

talked w/her ✓ website "blackp" {black pussy}

Hardy knew wh her house was → ~ ✓ talk. @ her career -
    ō was ✓ Christmas -- when she told him she lived - Spring Valley /she was
    ~. ✓ tell him 'ō ✓ get ; ō said ō knew wh she lived; ~ ✓ ō they hung ∪ ✓
        phone ō was - her driveway;
    her friend was ✓ ; they had drinks + talked.              pulled his T-shirt over his head -

put her @ 11-8 shift -→ 3 ✓ wanted /;
    Boss ⊃ , trans -
Hardy told her /~ take her 2 yrs ✓ trans ō ✓ his dorm -→ ⊂ō reason
        Chiske got ō was because ō was white ·
        Hardy said he was in the clique -
            he had gotten out of everything because he could write ;

Ingria Williams: ✓ interested - men -                590-7197
    Dortch sex harass her until ō fig /ō.
    bought $300 worth ✓ mdse ✓ him.

Chemical book is falsified: told her to make up stuff -
    left in Jan but kept book until March-April.


Greta Johnson / Carl Gadson

ō said ō would give her ✓ monthly sal ∪ she would ⊂ his side woman -
mom heard him ask him ✓ meet her ✓ · hotel -

∪ heard ō tried ✓ ~ ō Bernice Howard (former empl).
                    Mary       Moten

Eugene Smith got moved because ✓ rumor · @ Mr. Hardy → nobody believed / b/ / was true -

EXHIBIT
Emp. Ex. 26
PENGAD 800-631-6989

6-22-c

Angria Williams)                                        Oct. 2003
ō would help her ∅ car I she would c ō her.

       Tera McMillian) & Mike Hardy
ō her house ō took his shirt off — ō fondled his nipples.
when Ms. Wms was c pole — → Dortch —

       Dortch: messy.
bought c $300 ⅔ sweatsuits, purses —


       1225 on tape —

Veronica Harris                                                    6-23-

6 much / would take ) her -

o = really /v 2 Mr. H → I v were tag: / date her.
   think o 2 pretty well -

o / v give her : response ⟹ hmmm -

on campus ⟹ has / : while v ⟹ Maten was sti

here -

998

MaMillian) called right ⁿ she left / said lady was afraid ) her job ) she
   just told her / tell v truth -



PHONE CALL

FOR Debra Spann    DATE 6-23-05    TIME 8:19 A.M. P.M.
M Targi M
OF
PHONE/MOBILE 284-9559    FAX
MESSAGE
   Ms. Hall    An: Webster
   blankets
   shots
   "on rights"

☐ TELEPHONED
☐ RETURNED YOUR CALL
☑ PLEASE CALL
☐ WILL CALL AGAIN
☐ CAME TO SEE YOU
☐ WANTS TO SEE YOU

SIGNED Gina Carleton    1154

Questions:

1. Did you ask Ms. McMillian's friend how much it would take to get her?
   If so, why?
   Why do you think they would have said you said this?

2. Did you go to Ms. McMillian's house around the Christmas holidays, talk, have drinks
   and pull up and/or remove your tee shirt? Why?
   Why do you think they would have said you did go?

3. Did you offer to give Ms. McMillian a monthly salary if she would be your side
   woman?
   Why do you think they would have said you said this?

4. Did you talk to Ms. McMillian about the website "blackp"?
   What type of website is it? What does it mean?
   Why would you have talked to her about this?
   Why would someone have said you talked with her about this?

5. Did you/do you ask/coerce staff to purchase merchandise from you?
   What type of goods do you have? Where do you get them?
   What happens if they do not buy them?
   Why would people say they have to buy them or they have bought stuff from you?

6. Did you get behind Ms. McMillian when she was sitting at a desk and cup her breasts?

7. Did you ask Ms. McMillian to meet you at a hotel?

8. Have you ever asked Ms. McMillian to falsify the Chemical Book?

9. Did you ask Ms. McMillian to suck your dick?

10. Have you talked to Ms. M since this incident? Have you had anyone else talk
    to her for your since this incident?

11. What did you mean when you told Ms. M she couldn't transfer for 2 yrs?
    Why did you tell her the only reason Chrisko got to transfer was because he was wh
    What do you mean by the statement you are a member of the Mon clique? That
    What do you mean by the statement you have gotten out of a lot of stuff because
    you could write good? Please give examples —
    Why did Mr. Eugene Smith transfer out of your dorm? Ms. M allego you told he
    the rumor(s) were true — what were the rumor(s)?
    It is alleged you harassed Ms. Mary Moten — is this true?
    "  "  "  "  "  Bernice Howard  "  "  "
    Did ... ... m ... to the 12-8 shift when 3 other men wanted the shift.

Michael Holley

- Have you talked to Ms. McMillian since this incident? Have you had anyone else talk to her for you since this incident?

- Did you assign Ms. McMillian to the 12-8 a.m. shift when three other men wanted the shift. Was it because she had talked to Mr. Bolling about a transfer?

- What did you mean when you told Ms. McMillian she couldn't transfer for two (2) years? Why did you tell her the only reason Chriske got to transfer was because he was white?

- Why did Mr. Eugene Smith transfer out of your dorm? Ms. McMillian alleges you told her the rumor(s) were true; what were the rumors?

- It is alleged you have harassed other female staff on campus who are no longer with the department (i.e., Ms. Moten and/or Ms. Howard). Is there any truth to this?

- Did you/do you ask/coerce staff to purchase merchandise from you?
  What type of goods do you have? Where do you get them?
  What happens if they do not buy them?
  Why would people say they have to buy them or they have bought stuff from you?

- Have you ever asked Ms. McMillian to falsify the Chemical Book?

- What do you mean by the statement you are a member of the Mt. Meigs Clique?

- What do you mean by the statement you have gotten out of a lot of stuff because you could write good? Please give examples.

- Did you go to Ms. McMillian's house around the Christmas holidays, talk, have drinks and pull up and/or remove your tee shirt? Why?
  Why do you think they would have said you did go?

- Did you talk to Ms. McMillian about the website "blackp"?
  What type of website is it? What does it mean?
  Why would you have talked to her about this?
  Why would someone have said you talked with her about this?

- Did you ask Ms. McMillian's friend how much it would take to get her?
  If so, why?
  Why do you think they would have said you said this?

- Did you get behind Ms. McMillian when she was sitting at a desk and cup or fondle her breasts?

- Did you ask Ms. McMillian to meet you at a hotel?

- Did you offer to give Ms. McMillian a monthly salary if she would be your side woman? Why do you think they would have said you said this?

- Did you ask Ms. McMillian to suck your dick?



PLAINTIFF'S
EXHIBIT
3

*State of Alabama*

*Department of Youth Services*

*Post Office Box 66*
*Mt. Meigs, Alabama 36057*

**COPY**

July 19, 2005

BOB RILEY
GOVERNOR

J. WALTER WOOD, JR.
EXECUTIVE DIRECTOR

M E M O R A N D U M

TO:        J. Walter Wood, Jr.
           Executive Director

FROM:      Debra L. Spann
           Personnel Manager

SUBJECT:   Sexual Harassment Complaint
           Tera McMillian vs. Michael Hardy

I have investigated the above complaint. I find the complaint to be valid. Two (?) witnesses heard or were asked sexually inappropriate questions concerning Ms. McMillian by Mr. Hardy. In addition, from the information provided by Ms. McMillian, I definitely feel one or more of the incidents which were described to me occurred.

Mr. Hardy is making much of the fact he has not seen or been around Ms. McMillian except for a few minutes since February, 2005 – she has been on the 12-8 a.m. shift. Ms. McMillian states these incidents occurred over the past two (2) years. Mr. Hardy also is quite concerned that confidentiality has been breached and his good name and character have been compromised.

Mr. Hardy should be disciplined for his actions. All staff should be re-trained on sexual harassment. It is apparent to me thinking has not changed in this department. We cannot condone telling staff to do one thing and doing something else ourselves (it is my understanding Mr. Hardy went over sexual harassment at every staff meeting). I have contacted Maxine Wheeler to do Sexual Harassment Training for our staff as it did not sink in with State Personnel doing it.

DLS



R E C E I V E D
NOV 3 2005
DYS-LEGAL COUNSEL

EXHIBIT
Emp. Ex. 10

**COPY**

PLAINTIFF'S
EXHIBIT
5

# BEFORE THE STATE PERSONNEL BOARD
## IN THE MATTER OF

| | |
|---|---|
| MICHAEL HARDY, | ) |
| | ) |
| Employee, appellant, | ) |
| | ) |
| v. | ) Case No.: 06-004-JJW |
| | ) |
| ALABAMA DEPARTMENT OF | )          000003 |
| YOUTH SERVICES, | ) |
| | ) |
| Appellee. | ) |

## RECOMMENDED ORDER TO THE STATE PERSONNEL BOARD

The undersigned conducted a hearing on May 8, 2006 and June 10, 2006 at

the offices of the Alabama State Personnel Department in Montgomery, Alabama.

Theron Stokes, Esq. and Monica Arrington, Esq. appeared as counsel on behalf of

Michael Hardy (hereinafter "Hardy" or "the Employee"). T. Dudley Perry, Esq.

appeared on behalf of the Department of Youth Services (hereinafter "DYS").

Following the hearing, the parties requested permission to file post-trial briefs.

Briefs were filed on or about July 25, 2006. The parties also requested a transcript

of the proceedings which was provided to the undersigned around April 10, 2007.

DYS introduced seven exhibits numbered 1-7. The Employee introduced

30 exhibits numbered 1-30.[1]

---

[1] Employee's Exhibit 14, which are the private personnel records of another employee, were excluded. Furthermore, the exhibits in this cause contain unredacted confidential and privacy protected information. Accordingly, **all exhibits in this case, both those submitted by**

DYS called as witnesses:

(1) the Employee;

(2) Tera McMillian, a DYS employee;

(3) Birdie Montgomery, (by deposition), McMillian's mother;

(4) Veronica Harris, a Youth Services Aide at DYS; and

(5) Walter Wood, Director of DYS.                    000004

The Employee called as witnesses:

(1) Eugene Smith, a DYS Employee;

(2) Rashin Farley a DYS Employee; and

(3) Rogers Leon Dortch, a DYS Employee.

## I. PROCEDURAL HISTORY AND CHARGES

The Department of Youth Services employed Hardy beginning in 1987 as a

Youth Services Child Care Worker. He became a Youth Services Counselor I in

1994. He remained in that position until his dismissal, which was effective on

January 6, 2006. He received an "Exceeds Standards" performance appraisal

rating every year, except for two wherein he received a "Meets Standards" rating.

---

the Employee and the Department, are placed UNDER SEAL and may not be viewed by the public for any reason absent the appropriate court order. Also in the Employee's exhibits are the depositions of witnesses Debra Spann, Derrick Bolling, Vanessa Hall, Sylvesta Lee, Reginald Boswell and Elijah Hood, Jr.

Tera McMillian, one of Hardy's subordinates, filed a complaint alleging that Hardy sexually harassed her and later retaliated against her after she filed a complaint. DYS investigated this complaint. In a letter to Hardy, Director Wood advised:

> Dear Mr. Hardy:
>
> I have received a recommendation that disciplinary action be taken regarding your employment as a Youth Services Counselor I. The recommendation reveals the following alleged inappropriate conduct and work performance as the reason for the recommendation:
>
> Violation of the Rules of the State Personnel Board 670-X-19-.01(1g)- (disruptive conduct); and/or violation of the Rules of the State Personnel Board 670-X-19-.01(2e) (use of abusive or threatening language) and/or violation of the Rules of the State Personnel Board 670-X-19-.01(2j- serious violation of any other department rule); and/or violation of DYS Policy 3.13.2 - Prohibition of Sexual Harassment: Specifically, you were alleged to have made sexual advances and/or to have created a hostile working environment for a subordinate employee, Tera McMillian, who filed a harassment complaint against you. In response to Ms. McMillian's harassment complaint you are alleged to have attempted, among other things, to cause an investigation against her for having filed a complaint against you. ...[2]

DYS held the pre-disciplinary conference on or about November 15, 2005, giving the Employee an opportunity to present any relevant or mitigating circumstances regarding his proposed termination.

---

[2] Employee Exhibit 11.

000005

On December 8, 2005, Marcia Calendar, Executive Assistant to Director

Walter Wood wrote memorandum summarizing the matter:

ALLEGATIONS

An administrative Fact Finding Hearing was held on November 15, 2005, at the Central Office at Mt. Meigs for Michael Hardy. You requested the hearing to determine whether disciplinary action is warranted based upon the followed alleged inappropriate work conduct:

Violation of Rules of the State Personnel Board (670-X-19-.01(1g)-disruptive conduct) and or violation of the Rules of the State Personnel Board (670-X-19-.01(2e)-use of abusive or threatening language) and/or violation of the Rules of the State Personnel Board (67--X-19-.01 2j) serious violation of any other department rule), and/or violation of DYS Policy 3.13.2 Prohibition of Sexual Harassment): Specifically, you were alleged to have made sexual advances and/or to have created a hostile working environment for a subordinate Tera McMillian, who filed a harassment complaint against you. In response to Ms. McMillian's harassment complaint you are alleged to have attempted to, among other things, to cause an investigation against her for having filed a complaint against you.

On June 14, 2005, Ms. Tera McMillian made a complaint of sexual harassment against Mr. Hardy. Mr. Hardy supervises Ms. McMillian. You assigned Ms. Spann to investigate the allegation. Ms. Spann concluded, based on corroborating evidence, as a matter of fact that the complaint was valid. Ms. Spann recommended disciplinary action. Attached hereto is a copy of Spann's finding and recommendation.

0-00006

**In addition, in response to Ms. McMillian's complaint against Mr. Hardy, Mr. Hardy sought to have Ms. McMillian [sic] investigated. Mr. Hardy filed with Ms. Spann a "grievance" against Ms. McMillian [sic] contrary to the grievance procedure. Moreover, the subject of the "grievance" was not an issue covered by the grievance procedure. Attached hereto is a copy of the "grievance" filed by Mr. Hardy against Ms. McMillian. ...[3]**

FINDINGS:

The following findings were determined based upon a review of the testimony, documents presented during the hearing, a review the employee's personnel file, and additional efforts to verify the testimony of the witnesses. All allegations against Mr. Hardy are found to be substantiated.

RECOMMENDATIONS:

Upon a review of the evidence presented during the hearing and a review of Mr. Hardy's personnel file including past performance evaluations, the following recommendation is made:

Terminate Mr. Hardy's employment as a Youth Services Counselor I for the stated allegations which were found to be substantiated. This employee was the complaining party's supervisor. He was aware of the prohibitions against sexual harassment and was well aware of the anti-retaliation policy.

The employee denies that he sexually harassed Ms. McMillian as Ms. Spann concluded. He argues that Ms. McMillian was working a second job with a Hyundai supplier and that her second job shift began before her DYS shift ended. He argues that she had a motive to fabricate the allegation and thereby acquire more favorable working hours. Ms. Spann investigated his defense and found this not credible, based in part on Ms. McMillian's denial that she had a

---

[3] Bold emphasis supplied.

000007

second job. I now have reason to doubt Ms. McMillian. Specifically, I was recently informed by Ms. Spann that she <u>does</u> have a second job, but stated that it began within the past two months – well after she made her sexual harassment complaint against Mr. Hardy. The existence of a possible motive for fabrication which has come to light since Ms. Spann's investigation thus creates a question whether Ms. Spann's conclusion was correct.

However, that doubt is insufficient to cause me to contradict Ms. Spann or to recommend disciplinary action less than termination. Mr. Hardy clearly attempted to retaliate against Ms. McMillian for filing the complaint against him. Mr. Hardy is, or should be, familiar with the grievance procedure which requires grievances to follow the chain of command, yet he filed this "grievance" with the personnel director. Moreover, the substance of this "grievance" was neither within the scope of the grievance procedure nor within the scope of the anti-discrimination complaint procedure–which requires complaints to be directed to the personnel director. Mr. Hardy is well aware how personally disturbing it is to be investigated by DYS. Witnesses confirmed that Mr. Hardy had discussed this with them prior to Mr. Hardy's retaliatory "grievance" against Ms. McMillian. I find that Mr. Hardy initiated the "grievance" to retaliate against Ms. McMillian. This Agency can no more tolerate retaliation than sexual harassment itself.

Following the pre-dismissal conference, DYS Director, Walter Wood advised

Hardy of his termination effective January 6, 2006, in a letter dated the same.[4]

The letter explained that Hardy was being terminated for violation of the rules set

forth above. Hardy timely appealed his termination to the Alabama State

Personnel Board on January 12, 2006. The matter was originally set in March,

---

[4] Employee Ex. 14.

2006, but continued at the request of the parties until May, 2006. The hearing did

not conclude in May as scheduled and was reconvened at the request of the parties

in June of 2006. Additionally, the parties requested an additional opportunity to

submit briefs, transcripts and further evidence, as set forth above. Finally, some

question existed as to whether a witness had recorded his testimony over a cell

phone during the hearing and sent it to another witnesses. That issue was

examined, as well.

## II. FACTUAL BACKGROUND

Having reviewed the documentary evidence and having heard the testimony

presented at the hearing and having observed the witnesses' demeanor and

assessed their credibility, the undersigned finds the weight of the evidence

supports the following findings of fact.

### A. DYS Policy and State Personnel Board Rules

#### (1) Grievances

Generally, the grievance procedure within DYS is employed when a

subordinate employee has a complaint against a supervisor. In this event, the

subordinate employee follows the chain of command and files the grievance with

the person who supervises the employee he or she claims has been the source of

the grievance action. In no event is the grievance filed with the Personnel

Director.

DYS Policy Number 3.13.1 states as follows:[5]

## I. POLICY

It is recognized that conflicts will develop between employee and employer. It shall be the policy of DYS to provide its employees an expeditious and systematic procedure for the resolution and alleviation of grievances as the might arise during the course of performing work-related activities. The grievance procedure is a method of settling disputes and break-downs in communication in a job-related situation. Suspensions and dismissals are not covered by this procedure.

...

000010

## III. PROCEDURES

Step A: Within five days of the event, **the aggrieved employee[6] should discuss the matter with his immediate supervisor.** If not resolved, the written documentation of the discussion must be maintained.

Step B: In the event that the employee is not satisfied with the decision of the supervisor, he may request the review by the departmental administrator in charge of his respective area. The request must be in writing and within 10 days of the decision of his supervisor. The matter should be heard within 10 days or as soon as practicable. A decision will be rendered in writing.

Step C: If the employee still feels that the decision rendered is not equitable, he may request a review by the Executive Director of DYS. This request must be in writing and filed within 10 days of receipt of the administrator's written decision. The director should reply in

---

[5] Employee Exhibit 3.

[6] Emphasis supplied.

Page 8 of 32

writing within 10 days of receipt of the request or as soon as practicable.

**000011**

Step D: The department considers the decision of the Executive Director as final. However, the State Personnel Board may elect to consider certain matters upon appeal to that body.

Institutions

Step A: The aggrieved employee should within five working days of the event discuss the matter with his immediate supervisor. Written documentation of the discussion must be maintained.

Step B: If in the opinion of the aggrieved employee satisfactory corrective measures have not been implemented, he should request a review of the grievance by the facility superintendent. This request must be in writing, accompanied by supportive documentation and made within ten working days of his supervisor's final decision. The superintendent should respond in writing within ten working days or as soon as practicable after receiving the request.

Step C: If still dissatisfied, the aggrieved employee may request a review of the grievance by the administrator of institutional services. This request must be in writing accompanied by supportive documentation and made within ten working days of the superintendent's written decision. The administrator should respond in writing with ten working days or as soon as practicable after receiving the request.

Step D: If the employee still feels that the decision rendered is not equitable, he may request a review by the Executive Director of DYS. This request must be in writing and filed within ten days of receipt of the administrator's written decision. The Director should reply in writing ten days of receipt of the request or as soon as practicable.

000012

### (2) Sexual Harassment

DYS Policy 3.13.2[7] states in pertinent part as follows:

### I. POLICY

Harassment on the basis of sex is a violation of Section 703 of Title VII. The Department of Youth Services will take any steps possible to prevent sexual harassment by its employees on its premises. If such harassment occurs the department will take immediate and appropriate corrective action.    ...

### III. PROCEDURES

Complaint should be made to the Departmental Personnel Manager. S/he will request that the Executive Director designate a non-biased investigator. Written records will be kepts of the complaint and investigation. The complainant and accused will be interviewed. If no violation is found both parties are notified and complainant is advised that if dissatisfied with the decision they have additional internal and external appeal routes. If sexual harassment is suspected or probable cause of violating the sexual harassment policy is found, refer complaints to the Executive Director for a hearing before him or his designee. The two parties may resolve the problem in a written statement of agreement acceptable to both. Appropriate disciplinary or personnel action may be taken.

### (3) Retaliation and/or Disruptive Conduct

State Personnel Board Rule 670-X-19-.01 General Work Rule provides:

(1) In addition to any special rules issued by the various appointing

---

[7] Employee Exhibit 2.

authorities for the guidance of their employees, the following standard general work rules shall apply to all classified employees:

(a) Violations that normally result in disciplinary actions of increasing severity: ...

7. Disruptive conduct of any sort.

(b) More serious violations that may result in suspension or discharge on the first offense, considering work record and length of service. ...

5. Use of abusive or threatening language. ...

10. Serious violation of any other department rule.

## B. The Basis for the Dismissal

DYS initially employed Hardy beginning in July, 1987 as a Youth Services Child Care worker.[8] In 1994, DYS promoted Hardy to the position of Youth Services Counselor I.

DYS also employed a woman by the name of Tera McMillian (hereinafter "McMillian") at Mount Meigs for approximately 4 years at the time of this hearing in the ITU (Intensive Treatment Unit). Prior to that time, McMillian worked in two dormitories on the Mount Meigs Campus: Paige Hall and prior to that, Holloway Hall. While working at both Paige and Holloway Hall, Hardy

---

[8] Hardy has been employed with the state for nearly 18 ½ years. After obtaining a BS degree Hardy testified that he took counseling courses from Troy State but did not complete the program. His first job with the state began in 1987 as a Mental Health Worker before coming to DYS as a Youth Services Child Care Worker to supervise students. He has also worked as a Youth Services Counselor.

*000014*

supervised McMillian either directly or indirectly, however, McMillian

encountered very little contact with Hardy while in Holloway Hall. McMillian

explained that from October of 2002, Hardy was her Unit Manager and she

worked with him occasionally.  At some point in time, the entire dormitory staff

transferred from Holloway Hall to Paige Hall.   Only two employees (Estes and

Duchett) remained at Holloway Hall.  No one told McMillian that she would be

required to transfer to Paige Hall in May of 2003, however, she transferred with

the rest of the group.  Prior to this point, she had very little direct day-to-day

contact with Hardy.

At the hearing, McMillian testified she first remembered being harassed by

Hardy while working in Paige Hall.  The first incident occurred when she went to

speak to Hardy about processing some accreddation paperwork.  At that time,

according to McMillian, Hardy told her that there were potential perks to her job

such as coming in late and leaving early.  He also talked to McMillian about

scripture, claiming he  had the gift of prophecy.  However, he confessed that he

still had some "yokes."  Then McMillian states that he began making sexual

remarks, such as that he said he had a fantasy for her to "s*** his d***" while the

others were in the dining hall.  McMillian stated Hardy held a gold necklace in his

hand twirling while he talked.  McMillian stated she refused Hardy's offer and

left the room by telling Hardy she needed some air. After McMillian allegedly refused Hardy, she reported many other occasions wherein Hardy would say "Mac, I need to talk to you out on the porch." McMillian speculates that Hardy threatened to "write her up" later for an incident in retaliation for her refusal of Hardy's advances. However, no evidence suggests that Hardy actually ever disciplined McMillian.

After the first harassment incident, Hardy asked McMillian if she refused him because she was involved with another man. McMillian described a second incident when Hardy was on duty one night. McMillian stated that she sat at a desk when Hardy reached over to her and said "I want you."

On a third occasion, McMillian stated that she and Hardy were in the same building. She had just returned from lunch after stopping at Subway. She sat down at desk and began eating her sandwich. Hardy came out of his office, walked up to desk and grabbed her breast. Hardy said to McMillian "I just wanted to get a little feel before Smitty gets here because I like big t***s." McMillian contends she told him not to do this.

Another time, McMillian testified that Hardy asked her how much her child support payments were and offered to pay them along with upkeep of her car and yard for the prospect of getting a key to her home. McMillian stated that Hardy

would call her at home on her off days for just conversation. McMillian stated

that during these phone calls, Hardy would ask her to go to a hotel with him to just

have some drinks and talk. One time when Hardy called home phone number,

McMillian was in the restroom. McMillian's mother answered the phone and gave

it to her. Her mother sat at the kitchen table during this conversation. This is the

conversation which included the "is it another man..." question. Her mother asked

her who it was and she said it was her boss. Her mother overheard the entire

conversation on McMillian's end.[9]

Veronica Harris (hereinafter "Harris") has worked with DYS since

December of 2001. Harris presented herself as poised, well spoken and articulate.

Although Harris has been childhood friends with McMillian for many years, she

appeared very reluctant to have become involved in this matter and her testimony

carried a great deal of credibility. Having worked in the dormitories at Mt.

Meigs, Harris was very familiar with Hardy. Harris testified that she had one

conversation with Hardy and during that conversation he asked her, "What would

it take for Mac?" Harris understood Hardy to be talking about money. She did not

believe that Hardy was talking about sex at that point, but instead she thought that

Hardy was asking McMillian for some sort of favor. Harris only replied "I don't

---

[9] Employee Exhibit 18; Deposition of Birdie Montgomery, pages 22-46.

know." They talked bit more while standing in front of Harris Hall.  Harris

testified that this conversation took place a couple of months before December

2004.

One of the most significant events, according to McMillian, occurred a few

days after Christmas of 2004, when she returned home after shopping.  That day,

Hardy called her cell phone.  He said that someone was not "respecting"

McMillian at work.  Harris and McMillian were returning to McMillian's home to

wrap presents.  As McMillian talked to Hardy on the phone, McMillian and

Harris went inside to "make drinks," according to McMillian.  A few minutes after

McMillian hung up the phone, Hardy arrived.  McMillian also testified that Hardy

claimed that he had to bring her a check from work, however, McMillian stated

her salary is generally paid by direct deposit.[10]  Nevertheless, McMillian admitted

to allowing Hardy to come to her home and offering him an alcoholic drink.

Hardy specifically requested a specialty drink, a Long Island iced tea, which

McMillian testified she had on hand and provided to Hardy.  She stated this was

the type of mixed drink which she purchased premixed from the liquor store.  The

---

[10] Hardy testified that he went to McMillian's home to deliver an envelope that included
a check because she called the dormitory and asked for someone to bring her a check.   The shift
ends at 4 o'clock and a staff member asked him to bring the check to her home. He does not
normally do this for staff, however, he considered "Mac" a special friend and agreed to deliver
the check to her.

000018

testimony demonstrated that a Long Island iced tea was the only alcoholic drink that Hardy enjoyed.

After McMillian gave Hardy the Long Island iced tea, Hardy and McMillian sat together in the living/den area to talk while Harris went to another room to giftwrap presents. McMillian admitted to also having "a couple of drinks" while she was with Hardy. Harris testified that Hardy remained at the house for at least an hour. Harris testified that she went to sleep for a portion of the time.

At some point in the conversation between Hardy and McMillian, McMillian claims that Hardy stated the temperature in the room was hot. Then, McMillian testified Hardy pulled up his shirt and asked McMillian to "lick his chest."[11] Harris happened to observe Hardy raise his shirt while in the other room, but did not hear the conversation. Harris did not state that McMillian asked her to come in the room at that point, nor did McMillian leave the room. However, Harris did stay in the house, but not in the living/den area, until after Hardy left.

Before the incident in December, 2004, McMillian worked 4 p.m. to 12 a.m. and occasionally worked the "second shift" from 2 p.m. to 12:00 a.m. After the December 2004 incident, around January 2005, Hardy changed McMillian's

---

[11] McMillian testified she was aware that Hardy suffered from high blood pressure, however, she did not anticipate this event. She stated that she was not aware of what medications Hardy was taking.

schedule to 12 a.m. to 8 a.m. (third shift).  On this shift, McMillian almost never

saw Hardy.  The reason for this shift change was to supposedly to accommodate

staffing requirements.  Two males and one female are required to be on each shift.

In January of 2005, the third shift had three males, thus the second shift would

have to move one of its second shift females to the third shift.  McMillian

discussed the shift change with Hardy and because only two females were

available, Hardy gave McMillian the choice of whether she or the other second

shift female would be moved to the third shift.  McMillian volunteered to move

third shift instead of her colleague, Ingria Williams.  McMillian knew that at that

time, the third shift would present a conflict for Williams because she teaches

school during the day and could not work until 8 a.m.  Hardy and McMillian had

little or no contact on a daily basis.[12]

McMillian testified that she did not apply for a transfer to a different

dormitory in December because she did not want to "challenge" Hardy at that

time.  She did not seem appeased by the fact that she was given a shift change in

---

[12] McMillian testified that the 4 p.m. to 12 a.m. shift in January included Miles,
Williams, Wilson, Farley, Dorthch, Cullam and Moore.  There were at least 4 or 5 people on the
shift at the time, yet it only takes three.  The 12 a.m. to 8 a.m. shift was made up of only three
employees–Harvis, Ellis, and Howard.  When one person on the night shift left, adjustments had
to be made.  Three people wanted the night shift.  Miles, Wilson and Farley all wanted the night
shift because they had discussed it with everyone when Bernice Howard reported that she was
leaving.

January where she had almost no contact with Hardy after that point.  **000020**

McMillian contends that in March or April of 2005, Hardy made a sexually harassing statement to her when she took a book back to him and he said that they could go to a hotel to have some drinks.

McMillian and Hardy's final contact occurred sometime in May. McMillian asked to meet Hardy for the purpose of discussing a transfer to another shift. She told Hardy that she had another job and needed a shift change. He told her that a shift change could take some time to work out. McMillian contends that Hardy never referred her to anyone else that she could talk to about a transfer to another shift. McMillian admits that she did not really have a second job at that time but stated that she may have told Hardy this as an excuse simply to attempt to be removed from under his supervision to another shift. She stated that she wanted to leave in good standing without angering Hardy.

She contends that later in June, she simply had enough and wanted to be out of Hardy's dorm so she went to talk to an EEOC counselor in June, 2005.[13] However, McMillian also admitted that she knew that Hardy's son had been ill and that Hardy had been away from DYS for most of May through September of 2005. Nevertheless, at the time McMillian reported the alleged harassment, she

---

[13] Employee Ex. 13.

000021

also told Phyllis Rankins about the alleged harassment and requested to be

transferred to another area of the campus.   When Rankins asked why McMillian

was requesting the transfer, McMillian first said that she simply needed a "change

of pace."   Later, McMillian told another employee, Debra Spann (hereinafter

"Spann"), her motive for the transfer was to avoid Hardy.   McMillian offered little

to explain her conflicting reasons as to why she waited so long to report the

alleged harassment.   When counsel inquired why McMillian waited so long after

the alleged sexual advances began or the December incident to report the

harassment, McMillian replied that she did not want any backlash.   McMillian

alleged that Hardy always said that his power base was "on the hill," (meaning the

Mt. Meigs campus) and she believed him.   McMillian filed a complaint with the

EEOC on or about July 12, 2005 which was not received by DYS legal counsel

until July 25, 2005.[14]

---

[14] Department Exhibit 1. The Complaint states as follows:
1. My name is Tera McMillian and I am employed by the Respondent at its Mount Meigs
campus. I was first hired by the Respondent in October 2002 and since that time I have always
performed my duties and responsibilities in a satisfactory manner. Since May of 2003, I have
been subjected to a sexually hostile work environment by my supervisory and my co-workers.

2. Beginning in May of 2003, I have persistently been propositioned for sex and sexual favors by
my immediate supervisor Michael J. Hardy. On an almost daily basis, Hardy has requested that I
"s*** his d***" He has offered me money and other material objects if I would perform this act
of oral sex on him. Furthermore, Hardy has almost on a daily basis talked about his sexual
prowess with other female workers at the Respondent's Mount Meigs campus. For example,
Hardy has stated to me that he can not "f*** all night like he used to" and that he can "only f***
real hard for 5 or 6 minutes" at this time in his life. Also, Hardy grabbed both my breasts while I

000022

After she reported the matter, DYS immediately reassigned McMillian to ITU where she was no longer under Hardy's supervision. When McMillian was initially hired with DYS, she admitted that she may have had sexual harassment training. She also admitted that she may have had other sexual harassment training while at DYS, although she did not readily recall the training.

Prior to working with DYS, McMillian worked with Call Points as a Senior Teleconferencing Operator. McMillian admitted that she had been terminated from that position. She also admitted that after being terminated, she and other employees instituted a lawsuit against Call Points wherein she alleged, *inter alia*, that she was the victim of race discrimination.[15] That lawsuit later settled out of

---

sat a desk [sic]in the facility. All of this behavior was uninvited and unwelcome and I asked Hardy to stop harassing me, but he did not. Hardy also stated that he loved big "t******" and requested that [sic] be allowed to suckle my breast in the office. Again, I declined his invitation. Hardy also spoke regularly of his abilities with regard to oral sex and asked me to allow him to try such with me. As before I declined his invitation and requested that he leave me alone.

3. During this time of almost constant harassment, I began seeing a doctor for anxiety and depression regarding these issues. My treating position [sic] placed me on medication and referred me to a therapist to help me deal with these issues.

4. In March of 2005, Hardy began asking for me to go to hotels with him for sex and offered to buy me a car, tires and other goods in exchange for my compliance. I did not go along with his request. Hardy's harassment of me continued until I reported him on June 16, 2005. After I reported Hardy, I was made to transfer to another Department within the Mount Meigs facility. Since arriving in the new department, I have been subject to retaliation in the form of personnel not willing to help me learn the new position and I have been threatened with being disciplined for no reason.

[15] Employee's Ex. 30. (a copy of a docket sheet from the Federal court.)

000023

court.

McMillian admitted she did not report most of the events she alleged against Hardy at the time they occurred.  Specifically, when Hardy touched her breasts, she did not report it, although she knew she could.   Likewise, when Hardy called her at home, she did not report those incidents right away.  Although, at the hearing, McMillian contended that Hardy asked her for a sexual relationship daily, beginning around May 2003 until she transferred to the 12 a.m. to 8 a.m. shift (which would have been in January 2005).  She waited to contact a lawyer until July 12.   To the contrary, on cross examination, McMillian appeared surprised when asked why she told the EEOC that she was *not* harassed on a daily basis from January 2005 until July 2005.  McMillian attempted to avoid this question by trying to ask another question.[16]

McMillian testified that her evaluations from Hardy were average or above average.   The only other witnesses to the alleged harassment by Hardy were Harris and her mother.  Despite any training she may have received at DYS, and the knowledge she may have acquired in any previous litigation experience,

---

[16] Employee's Ex. 28.  McMillian stated that she did not prepare this EEOC document but she gave the information to a legal secretary.  McMillian testified that she signed the EEOC statement under the penalty of perjury that the information she provided was correct and that she was not providing misleading information.  She stated that from January through May, Hardy was not abusing her as he had before.

McMillian testified that she did not decide to file a complaint until after she saw a 000024
show on Oprah one day.

On July 14, 2005, Michael Hardy in turn filed a grievance against his former
subordinate, Tera McMillian, on the basis that she had made unsubstantiated
derogatory statements referencing him.[17] The "grievance": stated as follows:

> Please consider this memo pursuant to DYS policy 3.13.1 i.e. filing of
> a grievance. Ms. Tera McMillian, a former Paige Hall Staff, has
> continued to make unsubstantiated [sic] derogatory statement [sic]
> referencing the writer. Additionally, she has encouraged past and
> present employees (Some of which have been disciplined by the
> writer) to interfere with an ongoing investigation and file false claims.
> Due to the fact that this investigation is ongoing, I am filing this
> claim with your office for assignment to proper authority.
>
> MJH/dm
>
> cc: J. Walter Wood
> Tim Davis
> G. Wayne Booker
> Janice Coles

Attached to this document were several pages of allegations Hardy made against
McMillian. Hardy filed this alleged grievance, not in accordance with the
grievance procedure, but rather, with Debra Spann, the Personnel Manager, who
had handled portions of McMillian's harassment complaint and transfer. Spann,
did not investigate or handle grievance matters. He also copied persons who were

---

[17] Employee Exhibit 7.

not within the appropriate chain of command according to the grievance      000025

procedure. His actions could have been perceived as purely responsive to

McMillian, rather than following any policy or procedure of DYS.

Wood testified that it is not appropriate under any circumstances, much less

for a supervisor, to file a grievance against a subordinate in a sexual harassment

investigation. Even if the circumstance was grievable, it should have followed the

chain of command, not given to Spann. Sexual harassment is not a grievable issue

when the grievant is the alleged sexual harasser. There is not a policy or

procedure wherein the harasser can turn the tables and have the victim

investigated. The grievance, had it been a legitimate offense, would go to a

specialist in the unit (such as the unit manager), to the facility administrator and

then to the director. Spann is not in the chain of command, she is the Personnel

Manager for DYS. When the matter arose, Wood discussed the matter with Tim

Davis. Wood then acted upon several pieces of information that came to him. The

grievance procedure was being discussed on campus and Wood became concerned

that Hardy's actions were retaliatory, even though McMillian was no longer under

Hardy's supervision. Wood then contacted the State Personnel Department to ask

for assistance in conducting training specifically addressing these issues as to

instruct all employees, including McMillian and Hardy, regarding appropriate

behavior and appropriate mechanisms to handle these types of situations. The

Personnel Department brought in someone from the Attorney General's Office to

assist with instruction.

Director Wood also testified that Debra Spann investigated the sexual

harassment complaint made by McMillian.[18]     Spann's investigation found as

follows:

> I have investigated the above complaint. I find the complaint
> to be valid. Two (2) witnesses heard or were asked sexually
> inappropriate questions concerning Ms. McMillian by Mr. Hardy. In
> addition, from the information provided by Ms. McMillian, I
> definitely feel one or more of the incidents which were described to
> me occurred.
> Mr. Hardy is making much of the fact that he has not seen or
> been around Ms. McMillian except for a few minutes since February,
> 2005 - she has been on the 12p.m.-8a.m. shift. Ms. McMillian states
> these incidents occurred over the past two (2) years. Mr. Hardy also
> is quite concerned that confidentiality has been breached and his good
> name and character have been compromised.
> Mr. Hardy should be disciplined for his actions. All staff
> should be retrained on sexual harassment. It is apparent to me
> thinking has not changed in this department. We cannot condone
> telling staff to do one thing and doing something else ourselves (it is
> my understanding Mr. Hardy went over sexual harassment at every
> staff meeting). I have contacted Maxine Wheeler to do Sexual
> Harassment Training for our staff as it did not sink in with State
> Personnel doing it.

---

[18] Employee Exhibit 10.

000027

DLS[19]

Hardy presented the testimony of three witnesses.  The first witness was a friend and former co-worker, Eugene Smith (hereinafter "Smith").  Smith has been employed with DYS for ten and a half years.  Smith became a Shift Supervisor about six years ago.    Smith usually supervises the 4 p.m. to 12 a.m. shift.  Smith testified that Hardy was the manager of Paige Hall at the time.  Smith has worked with McMillian on the 2 p.m. to 10 p.m. shift, as well at the 8 a.m. to 4 p.m. shift and the 4 p.m. to 12 a.m. shift. If staff has a problem, Smith was usually the first person they could talk to.  He talked to all the staff at Holloway Hall or Paige Hall. Smith testified that McMillian never complained that Hardy made any sexual advances toward her.  She got mad at him when he told her to fill out the log book, but otherwise she seemed happy.   She never said anything about Hardy groping her. The modular area where she and other employees worked is a wide open space and voices carry.   Smith also testified that McMillian was trained and told about the DYS Sexual Harassment policy every year.   Smith admitted that he and McMillian did not necessarily have a cordial relationship after she sold him a truck but he refused to pay her the price she demanded.  Following the sale, their relationship soured and turned "nasty."   Smith, who appeared to be colleagues

---

[19] Employee Ex. 10.

and friends with Hardy, described McMillian in such a crude and derogatory manner, that his perceptions lost credibility.[20] Smith has worked with Hardy for many years and had talked with him prior to coming to the hearing.

At the time of the hearing Rashin Farley (hereinafter "Farley") had been employed with DYS for about three years. He was originally assigned to Holloway Hall at Mt. Meigs and then to Paige Hall. Hardy was his supervisor. When Hardy moved, Farley moved with him. He moved only one time. When he was working with him, he was working on the evening shift 4 p.m. to 12 a.m. Farley worked with McMillian at times. Farley never recalled any instance in which Hardy made a request to McMillian of a sexual nature. Likewise, Farley testified that he did not perceive McMillian as being sexually aggressive with him or anyone else that he knew. Finally, Hardy called Rogers Leon Dortch (hereinafter "Dortch"). Dortch has been employed with DYS for 13 years. Prior to his DYS employment, he served in the United States Army for twenty years and retired as a SGT 1st Class. Dortch, at the time of the hearing, was a Shift Supervisor. The unit manager has the power to change the off-days of employees.

---

[20] Smith described some sexual contact which allegedly occurred between himself and McMillian. Smith stated that he did not complain about it, nor did he "brag" about it. He also stated that he did not complain or feel harassed. He also did not object when she asked him to take her to an adult "toy store" and purchase specific "lifelike" items which he described in detail. Smith then went on to say how he was a Christian and went to church. Then Smith looked at the undersigned as if these two contradictory actions bolstered his credibility.

000079

Unit managers have the ability to change or call an employee and ask them to cover a shift.   When he first came to DYS, he was assigned to Paige Hall and Hardy was his supervisor.  Dortch  worked with McMillian for a little over two years.  He testified that their shifts overlapped.  Specifically, he arrived 2 hours before she would and left 2 hours before her.  Dortch testified that McMillian had poor work habits.   Dortch also testified that McMillian volunteered to change shifts in January.   Dortch also confirmed that McMillian would have been well aware of the sexual harassment policy and that staff is well trained every year.

### C.  The Employee's Personnel File

A review of the Employee's personnel file reflects overall ratings throughout his career in the "Exceeds Standards" category with overall scores averaging around 28.  There were two exceptions wherein the Employee received a "Meets Standards" rating.

### III.  ISSUE

Did DYS produce sufficient evidence to warrant dismissal of the Employee for violations of DYS's grievance procedure, retaliatory or disruptive type conduct, prohibition of DYS sexual harassment policy and/or  State Personnel Board Rules regarding the use of abusive or threatening language?

000030

# IV. DISCUSSION

The purpose of the Administrative Appeal is to determine if the termination of the Employee is warranted and supported by the evidence. *Kucera v. Ballard*, 485 So. 2d 345 (Ala. Civ. App. 1986); *Thompson v. Alabama Dept. of Mental Health*, 477 So. 2d 427 (Ala. Civ. App. 1985); *Roberson v. Personnel Bd. of the State of Alabama*, 390 So. 2d 658 (Ala. Civ. App. 1980). In determining whether employee's dismissal is warranted, the departmental agency bears the burden of proving the charges warrant termination by a "preponderance of the evidence." The law is well settled that a "preponderance of the evidence" standard requires a showing of a *probability* that the Employee is guilty of the acts as charged. Thus, there must be more than a mere possibility or one possibility among others that the facts support the disciplinary action at issue, the evidence must establish that *more probably than not*, the Employee performed, or failed to properly perform, as charged. *See  Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 117 S. Ct. 1953, 138 L. Ed. 2d 327 (1997), holding that a "significant possibility" falls far short of the APA's preponderance of the evidence standard; *See also Wright v. State of Tex.*, 533 F.2d 185 (5th Cir. 1976)[21]

---

[21]*Bonner v. City of Pritchard,* 661 F.2d 1206, 1209 (11th Cir.1981) the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

**Violations of DYS Sexual Harassment Policy**

Based upon the evidence presented, the undersigned was convinced that Hardy had more than a work-related relationship with McMillian and violated the DYS sexual harassment policy. The testimony of Harris also convinced the undersigned that Hardy made comments to McMillian which were inappropriate for the workplace. However, the undersigned was NOT convinced that McMillian was the victim of sexual harassment. While Hardy's conduct as a supervisor was subject to disciplinary action, the undersigned does not believe that Hardy's advances were unwelcome. McMillian's testimony was exaggerated and lacked complete credibility and candor. Clearly, McMillian possessed a host of other personal motivations for her testimony. While McMillian and Hardy had some sort of relationship for some period of time, any relationship between the two involved McMillian's complicity. Nevertheless, that does not excuse Hardy for engaging in what he should have known could have been misconstrued as an inappropriate verbal exchange with a subordinate. Therefore, the undersigned does find that Hardy's verbal conduct supports termination.

Regardless of Hardy's relationship with McMillian, his most egregious offense however, is the manner in which he handled the investigation of

000032

McMillian's EEOC and sexual harassment complaint, as hereinafter discussed.

**Violations of the Grievance Procedure and Disruptive Conduct**

Despite the fact that McMillian's credibility has questionable merit, equally or more serious than the sexual harassment charge is the disruptive conduct, potential retaliation, and Hardy's violation of the grievance procedure. Employees must be allowed the freedom to have civil rights actions investigated, even if questionable, without the fear of retaliation. If McMillian's allegations proved to be meritless, the inquiry ends there.

In the present action, Hardy admitted he provided training on the sexual harassment policy on numerous occasions. He also admitted to instructing his employees on the proper procedure to follow when filing claims. McMillian followed the procedures as she had been trained to do.

Flying in the face of this policy, Hardy also admitted to filing a "grievance" against her for following the very procedure he trained her to follow. As a supervisor, he knew better than to conduct himself in such a harassing fashion. He knew he was not following policy, nor was he following the chain of command as proscribed in DYS Grievance Procedure 3.13.1 Since McMillian had filed a claim with the Personnel Manager, Debra Spann, Hardy in turn filed his "grievance" with Debra Spann. This type of threatening behavior, in and of itself, merited

000033

dismissal and was uncharacteristic of a supervisor with his training, background and experience. Such conduct is clearly disruptive and in violation of the <u>Rules of the State Personnel Board</u> 670-X-19-.01(1g)- (disruptive conduct), the <u>Rules of the State Personnel Board</u> 670-X-19-.01(2e)- (use of abusive or threatening language) and/or violation of the <u>Rules of the State Personnel Board</u> 670-X-19-.01(2j)-(serious violation of any other Department Rule). Further, such conduct could also be potentially perceived as retaliatory. This one violation alone, was sufficient to warrant Hardy's dismissal.

Since the above-referenced rules are sufficient to warrant dismissal in this cause, the issue of whether the conduct actually reaches the level of retaliation is moot and shall not be addressed in this forum.

Accordingly, the undersigned finds the totality of the evidence warrants dismissal in this cause. Therefore, the undersigned recommends to the State Personnel Board that the dismissal be UPHELD

Done, this the 1st day of August, 2007.

JULIA JORDAN WELLER
Administrative Law Judge
State of Alabama Personnel Department
64 North Union Street
Montgomery, Alabama 36130
(334) 242-3451
(334) 353-4481

VIA FACSIMILE AND UNITED STATES MAIL

C00034

Dudley Perry, Esq.
Alabama Department of Youth Services
P. O. Box 66
Mt. Meigs, AL 36057
FAX: 215-3872

Theron Stokes, Esq.
Monica Arrington, Esq.
Alabama Education Association
P. O. Box 4177
Montgomery, AL 36103-4177
FAX: 262-8377



STATE OF ALABAMA

**DEPARTMENT** OF YOUTH **SERVICES**

PLAINTIFF'S
EXHIBIT
6

POST OFFICE BOX 66
MT. MEIGS, ALABAMA 36057
November 4, 2005

**BOB RILEY**
GOVERNOR

**J. WALTER WOOD, JR.**
EXECUTIVE DIRECTOR

Mr. Michael Hardy
2900 Marti Lane
Montgomery, AL 36116

Dear Mr. Hardy:

I have received a recommendation that disciplinary action be taken regarding your employment as a Youth Services Counselor I. The recommendation reveals the following alleged inappropriate conduct and work performance as the reason for the recommendation:

Violation of the Rules of the State Personnel Board (670-X-19-.01 (1g) - disruptive conduct) and/or violation of the Rules of the State Personnel Board (670-X-19-.01 (2 e) - use of abusive or threatening language) and/or violation of the Rules of the State Personnel Board (670-X-19-.01 (2 j) - serious violation of any other department rule), and/or violation of DYS Policy (3.13.2 - Prohibition of Sexual Harassment): Specifically, you were alleged to have made sexual advances and/or to have created a hostile working environment for a subordinate employee, Tera McMillian, who filed a harassment complaint against you. In response to Ms. McMillian's harassment complaint you are alleged to have attempted, among other things, to cause an investigation against her for her having filed a complaint against you.

Based on the investigation of the complaint against you, the recommendation I have received, a review of your personnel file and a review of your past work history, it is my judgment that a hearing be held to determine whether disciplinary action is warranted.

A hearing will be conducted on Thursday, November 10, 2005, at 10:00 a.m., in the Conference Room at the Central Office on the Mt. Meigs Campus in Montgomery. The hearing will be conducted by either myself or my designee. At the hearing, you may present verbal and written information, produce witnesses and be represented by counsel if you choose. I will review the information presented and notify you of my decision regarding any possible disciplinary action. I consider your attendance to be mandatory, but if you do not attend, I will be forced to make my decision based on the information available to me.

Because this matter involves allegations of violation of the sexual harassment policy and anti-retaliation provisions of the law, I instruct you not to discuss this matter with the complaining party or any DYS Staff, nor to take any action which could in any way affect Ms. McMillian.

Sincerely,

J. Walter Wood, Jr.
Executive Director

JWW/dls

c: Mr. Tim Davis
   Mr. Wayne Booker
   Ms. Janice Coles
   Mr. T. Dudley Perry, Jr.

mylt 11/15/05

000338

Case 2:07-cv-00001-WKW-WC   Document 45-8   Filed 06/03/2008   Page 1 of 1

PLAINTIFF'S
EXHIBIT
7

# Daily Time & Attendance Report
## INTENSIVE TREATMENT UNIT (ITU)

Date: 6-25-05

| Name | Sat. Sun. Mon. Tue. In | Wed. Out | Thur. Leave Hrs Taken | Fri. Leave Code | Total Hrs Worked | Signature |
|---|---|---|---|---|---|---|
| Alexander, Johnson | | | | | | |
| *Bolling, Derrick* | | | | | | |
| Bosworth, Gayle (CM) | | | | | | |
| Chriske, Donald | | | | | | |
| Griner, Syreeta | | | | | | |
| Hall, Vanessa | 1:00 to | 1:00 | 1 hr | | | |
| Hammonds, Jacob | 7:00 | 10:00 | | | 7 hrs | V Hall |
| Hood, Elijah | 7:00 Am | 3:00 pm | | | 1 6 | J. Hamm |
| Hughes, Jason | | | 8 | M | 8.0 | E Hood |
| Johnson, Martha | 12:30 pm | 10:00 pm | | | 9.30 | A Johnson |
| Jones, Sammie L. | 10 AM | 2 pm | — | — | 8 | M Jone |
| McCall, James | | | | | | |
| Washington, Vincent | 2 | 10 | | | 8 | Wash |
| Webster, Greg | | | | | | |
| Whitted, Felicia | 2 pm | 8 pm | 2 | A | 1 6 | F Whitted |
| McMillie, Tera | 10 | 6 | | | 8 | Tera McMill |

1. Place in the Business Office box daily.
2. Please submit appropriate Leave Slip with this sign-in sheet.
3. It is the responsibility of the Unit Manager to make sure that the leave slip/authorization to work overtime form accompanies this sign-in sheet.

**Leave Codes:**
A - Annual   S - Sick   C - Comp   H - Holiday
J - Jury   M - Military   P - Personal

003766





**State of Alabama**
# DEPARTMENT OF YOUTH SERVICES
Post Office Box 66
Mt. Meigs, Alabama 36057

*J. WALTER WOOD, JR.*
*EXECUTIVE DIRECTOR*

*BOB RILEY*
*GOVERNOR*

# Memo

To:    J. Walter Wood, Jr., Executive Director

From:  Tim Davis, Deputy Director

Date:  November 3, 2005

Re:    Michael Hardy

On or about June 14, 2005, Tera McMillian filed a complaint against her supervisor Michael Hardy alleging sexual harassment. Ms. Spann, pursuant to your instructions, investigated the complaint and reported her findings to the legal department on October 17, 2005. Ms. Spann found the complaint valid, based on corroboration by two witnesses. Ms. Spann concluded that Mr. Hardy should be disciplined for his actions.

I have conferred with Dudley Perry and he also recommended strong disciplinary action. Based on Ms. Spann's investigation and the advise of counsel, it is therefore my recommendation that Mr. Hardy's employment with the department be terminated.



000339





State of Alabama
### Department of Youth Services
Post Office Box 66
Mt. Meigs, Alabama 36057

January 6, 2006

BOB RILEY
GOVERNOR

J. WALTER WOOD, JR.
EXECUTIVE DIRECTOR

Mr. Michael Hardy
2900 Marti Lane
Montgomery, AL 36116

Dear Mr. Hardy:

As you are aware, an administrative fact finding hearing was held on November 10, 2005, to determine what disciplinary action should be taken concerning your Youth Services Counselor I position with this department.

Based on the testimony and documents presented during the hearing, there was evidence to support that there was a violation of the Rules of the State Personnel Board (670-X-19-.01 (1g) – disruptive conduct) and/or violation of the Rules of the State Personnel Board (670-X-19-.01 (2 e) – use of abusive or threatening language) and/or violation of the Rules of the State Personnel Board (670-X-19-.01 (2 j) – serious violation of any other department rule) and/or violation of DYS Policy (3.13.2 – Prohibition of Sexual Harassment).

Based on the evidence and a review of your personnel file, I hereby order your dismissal from the Department of Youth Services effective at the close of business January 6, 2006. You will receive your last regular pay check on January 20, 2006. You will be paid for any unused annual, holiday, compensatory or personal leave you may have on February 3, 2006.

Your state employees' medical insurance will end on January 31, 2006. If you wish to purchase health insurance coverage you may contact the State Employees Insurance Board at 1-800-513-1384.

You may request a refund of your retirement contributions by completing a Form 7, Notice of Final Deposit and Request for Refund. The form may be obtained from the Human Resources Section. If you wish, you may leave your contributions on deposit for up to five years.

The Rules of the State Personnel Board state that you may, within ten (10) days after notification of dismissal, request a hearing by the State Personnel Board. The request should include a written answer to the charges. This request should be addressed to Ms. Jackie Graham, Personnel Director, State Personnel Department, 64 North Union Street, Montgomery, AL 36130. Please send a copy of the request to the Department of Youth Services.

Sincerely,

J. Walter Wood, Jr.
Executive Director

JWW/dls

c:  State Personnel Department
    Mr. Davis
    Mr. Booker
    Ms. Coles

000337