**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **TERA A. McMILLAN,** | **)** | |
| | **)** | |
| | **)** | **Case No: 2:07:CV-01-WKW** |
| **Plaintiff,** | **)** | |
| | **)** | |
| **vs.** | **)** | |
| | **)** | |
| **ALABAMA DEPARTMENT OF** | **)** | |
| **YOUTH SERVICES and** | **)** | |
| **MICHAEL J. HARDY,** | **)** | |
| | **)** | |
| **Defendants.** | **)** | |

**DEFENDANT ALABAMA DEPARTMENT OF YOUTH SERVICES' REPLY TO**
**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT ALABAMA DEPARTMENT**
**OF YOUTH SERVICES' MOTION FOR SUMMARY JUDGMENT**

COMES NOW THE DEFENDANT DEPARTMENT OF YOUTH SERVICES (DYS,)

by and through the undersigned counsel, and submits the following brief to reply to the plaintiff's

brief in opposition to DYS' motion for summary judgment.

**I.  REPLY TO DEFENDANT'S STATEMENT OF FACTS**

A. <u>Introduction</u>.

The plaintiff indicated in their brief that there are material and substantial disputed

matters of fact in the instant case and the motion is due to be denied.  In response, DYS believes

that there are no material and substantial disputed matters of fact to be presented to a jury.

B. <u>Statement of Undisputed Facts</u>

2. Ms. McMillan works at the Mt. Meigs campus, which is the most secure facility in the

DYS system and is staffed with older, more ungovernable male juvenile delinquents.

1

Plaintiff's Response: The plaintiff admitted that she works at Mt. Meigs. The remaining statements are not supported by any evidence in the record; are not relevant or material, and are due to be stricken in accordance with Section 2 of the Court's Rule 16 Scheduling Order (Doc. 15) and paragraph 8 of this Court's Order dated November 26, 2007. (Doc. 26)

DYS' REPLY: ITU (Intensive Treatment Unit) is a self-contained unit at Mt. Meigs with heavy locks, tight security, and a control room.   (McMILLAN Dep. P. 54, line 15 - 55 p. 11).

4. DYS maintains an anti-discrimination policy that prohibits sexual harassment.

Plaintiff's Response: The Plaintiff admits that DYS has such a written policy, but disputes that the defendant has produced or established any evidence that the written policy is implemented with adequate training or is effective.

DYS' REPLY:  The Plaintiff admitted in her brief that DYS has an anti-discrimination policy but she denied that it is "implemented with adequate training or that it is effective."  (Doc. 44, Plaintiff's Brief in Opposition, p. 2-3).  That "denial" is unsupported by facts and is ineffective as discussed in the following paragraphs.

Ms. McMillian testified in her deposition to all the facts that establish the affirmative defense.  She became familiar with the DYS policy during her first year of employment, she had the actual policy in her possession, she was trained on the policy beginning during her first year and continued to be trained thereafter, she was familiar with that policy and received training during the entire time Michael Hardy allegedly harassed her, she understood that she should have reported the alleged harassment to the DYS Personnel Director pursuant to the policy, but she nevertheless chose NOT to avail herself of the policy.  (McMILLAN dep. P. 136 line 17 - 166 line 1).  The Plaintiff furthermore concedes that at the time she made the report, she still had no

2

intention of making it–rather, she spoke with Hardy's supervisor with the intention to ask for a transfer to a different dorm.  (Citations below).

Furthermore, it is not in dispute that on the day the Plaintiff was required to report the alleged harassment to DYS Personnel[1], she was immediately separated from Hardy so that further harassment was not possible.  (McMillan dep. P. 170, line 7 - 171 line 5).  It is difficult to conceive of a factual scenario testified to **by the Plaintiff** to prove a more thoroughly distributed policy, better trained employees, or a more effective policy than the policy in issue in this case. The Plaintiff's denial is without factual support.

Stated more thoroughly, the facts in this case testified to by the Plaintiff do not raise an inference that the DYS anti-discrimination policy is ineffective.  It is incontrovertible that the policy was effective.  The facts are that Ms. McMillan made the Department aware of her complaint on or about May June 14, 2005.  (Spann Depo. P. 41, lines 6-13).  On that date she spoke to Hardy's supervisor, Phyllis Rankins.  McMillan concedes that she did not see Ms. Rankins for the purpose of complaining about sexual harassment.  (McMillan dep. P. 132 line 3 - 9).  However,  Ms. Rankins questioned Ms. McMillan regarding her motivation for seeking a transfer.  When McMillan told Rankins that Hardy had sexually harassed her, Rankins immediately put the Department's anti-discrimination policy into action (McMillan dep. P. 132 line 19 - 23), by doing two things: First, she instructed McMillan to go to Personnel and report the alleged discrimination, (McMillan dep. P. 13 lines 1-4).  Second, she immediately gave Ms. McMillan the reassignment she sought to separate McMillan from Hardy.  (McMillan dep. P. 134

---

[1] McMILLAN first reported the alleged harassment on June 14, 2005. (Spann Depo. P. P. 41, lines 1-14).

lines 4 - 14).  McMillan concedes that Rankins did exactly what she was supposed to do under the DYS policy.  The Plaintiff further concedes that from that point forward, Hardy was not able to sexually harass her on the job.  (McMillan Depo. p. 170 line 7 - p. 171 line 4).

The Plaintiff must do more than just deny that the Department's policy is effective.  The Plaintiff must present evidence to rebut the Defendant's evidence of an effective policy.  She has failed to do that.  As a result, the Department is entitled to the affirmative defense under *Faragher/Ellerth*.  If the employee can avoid the defense simply by denying  that the policy was "effective" under the facts of this case, then the defense is meaningless.

5. Ms. McMillan does not dispute that she was at all times relevant to this case aware of the policy and the reporting procedures.

Plantiff's Response: The plaintiff disputes that any admissible evidence has been presented that she was aware of the policy and reporting procedures "at all times relevant to this case."

DYS' REPLY: The plaintiff was aware of the policy and the reporting procedures as the Plaintiff testified during a Deposition on January 22, 2008 (Exhibit 1 pg 163 line 16 - page 165 line 7).

163

16 Q Let's turn quickly to a different subject.
17 You are familiar with the DYS policy on sexual
18 harassment, aren't you?
19 A Yes.
20 Q You are?
21 A Yes.
22 Q You were trained on that policy early in your
23 employment, weren't you?

164

1 A In the first year of my employment, yes.
2 Q And throughout the time that Michael Hardy was
3 interacting with you in a sexually inappropriate way,
4 you were familiar with that policy?
5 A Yes.
6 Q And you knew that the policy said that you
7 should go and complain to personnel?
8 A Yes.
9 Q You had a copy of that policy with you?
10 A With me?
11 Q Yes. At that time, didn't you?
12 A Where?
13 Q You had in your possession during that period
14 of time that policy?
15 A They have a policy book in the dorm.
16 Q And you actually physically went through that
17 policy and you had actually physically been over that
18 policy yourself in the dorm?
19 A Yes, sir, when I was in Holloway Hall, I did.
20 Q And, again, you had had training on more than
21 one occasion, actually, on that policy?
22 A Yes.
23 Q And there was no doubt in your mind, was

165

1 there, that your procedure would be to go and complain
2 about that to Debra Spann?
3 A Sir, I didn't want to start any problems.
4 Q I didn't ask you that. There was not any
5 doubt in your mind what the policy was and what you were
6 to do?
7 A Yes. I knew what the policy was.

In the face of her own testimony, the Plaintiff's denial is ineffective.

7.  In addition, all new DYS employees are given 40 hours in service training before they are assigned to the dorms.

Plaintiff's Response: The plaintiff disputes that there is any evidence in this case to

5

support this statement by the defendant, and it is due to be stricken in accordance with Section 2 of the Court's Rule 16 Scheduling Order (Doc. 15) and paragraph 8 of this Court's Order dated November 26, 2007. (Doc. 26)

DYS' REPLY: Please see also DYS' Policy and Procedures Number 4.2 Training for New Employees which indicates that all new employees shall receive 40 hours of training. (Exhibit 2).  In addition, the Plaintiff testified about the continuing training requirements as follows:

> 10 Q You are aware and you have been aware, it has
> 11 always been the policy, that it is required, to continue
> 12 to work here, if you want to keep your job, you have to
> 13 get that mandatory training every year? You know that?
> 14 A Yes, sir.
> 15 Q That is a requirement for you to keep your
> 16 job?
> 17 A Yes, sir.

(McMillan dep. P. 145 lines 10 - 17).

8. Included within that training is the DYS anti-harassment policy and procedures.

Plaintiff's Response: The plaintiff disputes that there is any evidence in this case to support this statement by the defendant, and it is due to be stricken in accordance with Section 2 of the Court's Rule 16 Scheduling Order (Doc. 15) and paragraph 8 of this Court's Order dated November 26, 2007. (Doc. 26)

DYS' REPLY: Debra Spann the Personnel Director for DYS indicated in a deposition that the policy is discussed in mandatory training of DYS employees. Please see Debra Spann's deposition (Exhibit 3 pg. 28 line 19 - pg. 29 line 23).  Moreover, the Plaintiff conceded that she was trained on the policy and knew that she was required by the policy to report it to Ms. Spann:

6

p. 163

17 You are familiar with the DYS policy on sexual
18 harassment, aren't you?
19 A Yes.
20 Q You are?
21 A Yes.
22 Q You were trained on that policy early in your
23 employment, weren't you?
P. 164
1 A In the first year of my employment, yes.
2 Q And throughout the time that Michael Hardy was
3 interacting with you in a sexually inappropriate way,
4 you were familiar with that policy?
5 A Yes.
6 Q And you knew that the policy said that you
7 should go and complain to personnel?
8 A Yes.
9 Q You had a copy of that policy with you?
10 A With me?
11 Q Yes. At that time, didn't you?
12 A Where?
13 Q You had in your possession during that period
14 of time that policy?
15 A They have a policy book in the dorm.
16 Q And you actually physically went through that
17 policy and you had actually physically been over that
18 policy yourself in the dorm?
19 A Yes, sir, when I was in Holloway Hall, I did.
20 Q And, again, you had had training on more than
21 one occasion, actually, on that policy?
22 A Yes.
23 Q And there was no doubt in your mind, was
p. 165
1 there, that your procedure would be to go and complain
2 about that to Debra Spann?
3 A Sir, I didn't want to start any problems.
4 Q I didn't ask you that. There was not any
5 doubt in your mind what the policy was and what you were
6 to do?
7 A Yes. I knew what the policy was.

(McMillan dep. P. 163-165).  Her denial in the brief does not stand up to her own testimony.

9. McMillan does not specifically recall that her in service training covered anti-harassment but she does not deny that it did.

Plaintiff's Response: The plaintiff disputes that there is any evidence in this case to support this statement by the defendant, and it is due to be stricken in accordance with Section 2 of the Court's Rule 16 Scheduling Order (Doc. 15) and paragraph 8 of this Court's Order dated November 26, 2007. (Doc. 26) The plaintiff disputes that any training that may have been provided was effective if she cannot recall it having been provided during the years she has been employed by the defendant.

DYS' REPLY: Please see above.  Clearly the training was effective because the Plaintiff clearly understood the policy and procedures. She simply unreasonably chose not to follow it.

10. She does however, specifically recall receiving training regarding the DYS anti-harassment policy after her first six months of employment.

Plaintiff's Response: The plaintiff disputes that there is any evidence in this case to support this statement by the defendant, and it is due to be stricken in accordance with Section 2 of the Court's Rule 16 Scheduling Order (Doc. 15) and paragraph 8 of this Court's Order dated November 26, 2007. (Doc. 26)

DYS' REPLY: Please above.  The Plaintiff conceded facts in her deposition that show this denial was false.

11. It is not in dispute that at all times relevant the alleged harassment, Ms. McMillan was aware of the policy and aware of the reporting procedures as a result of the Defendant's dissemination of and training regarding the policy.

Plaintiff's Response: The plaintiff disputes that there is any evidence in this case to

8

support this statement by the defendant, and it is due to be stricken in accordance with Section 2 of the Court's Rule 16 Scheduling Order (Doc. 15) and paragraph 8 of this Court's Order dated November 26, 2007. (Doc. 26) The plaintiff disputes that the assertion by DYS in footnote 1 that her participation in a prior race discrimination suit involving a former employer has any relevance to her knowledge of this defendant's polices and reporting procedures.

DYS' REPLY: Please above.  The Plaintiff clearly testified to facts that show this denial was false.

13.  McMillan does not allege that she was discharged, and has no evidence of a demotion or reassignment to an undesirable reassignment.

Plaintiff's response: Plaintiff admitted that she was not discharged but "disputes that her reassignment was not undesirable due to the continued harassment and retaliation she faces."

DYS' REPLY: McMILLAN **asked for** the transfer.  Phyllis Rankins did exactly what Ms. McMILLAN wanted by transferring Ms. McMILLAN to another dorm. (McMillan Deposition, Exhibit 1 pg 131 line 16 - pg. 134 line 14).

14. Mr. Hardy constantly gave McMillan average or above average evaluations and she has received all the privileges of employment to which she is entitled."

Plaintiff's Response: The plaintiff admits that her evaluations were average or above average, but disputes that defendant Hardy was responsible for all of the evaluations.  The plaintiff specifically disputes that she has received all the privileges of employment to which she is entitled; e.g., a workplace free of gender-based discrimination or retaliatory conduct

DYS' REPLY: McMillan indicated during her deposition that Mr. Hardy gave her good evaluations. (Exhibit 1 - pg. 175 line 6 - pg. 176 line 7) The Plaintiff's response that she

"disputes that she has received all the privileges of employment that she is entitled; e.g., a workplace free of gender-based discrimination and retaliatory conduct" is non-responsive to the facts for paragraph 14.  DYS disputes this legal conclusion by the plaintiff and submits that the Plaintiff has failed to submit any case law to support her non-responsive legal conclusion because there is no such case law.  The facts in this case are clear that the Plaintiff has suffered no adverse employment action.

15. The Plaintiff has no evidence that she suffered any significant change in her employment status.

Plaintiff's Response:   The plaintiff disputes this unsupported conclusory statement by the defendant, and states further that it is due to be stricken in accordance with Section 2 of the Court's Rule 16 Scheduling Order (Doc 15) and paragraph 8 of this Court's Order dated November 26, 2007. (Doc 26).

DYS' REPLY: Ms. McMillan testified at her deposition that her employment duties have not changed since she started working at DYS; in particular, her employment duties did not change despite a transfer to different dorms at DYS. Please see McMillan's Deposition (Exhibit 1 pg. 171 line 13 - pg. 173 line 12).  Not only has the Plaintiff failed to submit evidence of any significant change in her employment status, she has conceded that there was no such change.

16. McMillan claims that she eventually decided to get away from Mr. Hardy by seeking reassignment to a different dorm.

Plaintiff's Response: Admitted by the plaintiff that she had sought a move to another dorm from Hardy and that he refused her permission to do so.  The plaintiff further admits that she told Hardy she needed a transfer so that she could work a second job, even though she did not

have a second job at the time; and, that she went over Hardy's head seeking approval after Hardy threatened her and told her that it would take her at least two years to get a transfer away from his supervision (PX 1: Declaration of McMillan ¶ 11)

DYS' REPLY: The Plaintiff's response was again contradicted by her own testimony. Michael Hardy did not threaten Ms. McMillan by telling Ms. McMillan that it would take two years to transfer to another dorm. Michael Hardy suggested that Ms. McMillan speak with Mr. Hardy's supervisor if she wanted to transfer. (Exhibit 1 pg. 285 line 1 - pg. 286 line 16).

17. She claims that on or about June 25, 2005, she went to see Hardy supervisor, Ms. Phyllis Rankings, about the transfer.

Plaintiff's Response:   The plaintiff disputes this statement and states that the undisputed evidence in this case is that she spoke to Ms. Rankins and Ms. Spann on June 15, 2005.  (PX 2: Spann Meeting Notes/ITU Time & Attendance Report; 6/15/05)

DYS' REPLY: Only the actual date of this meeting is in dispute.  Ms. Spann testified that the report took place on June 14.  (Spann Depo. P. 41).  McMillan claims it took place on June 16. (McMillan dep. P. 42).  This two day difference is not material.

18. Ms. McMillan concedes that she did not intend to report any alleged harassment pursuant to the anti-harassment policy, but simply saw Ms. Rankins because she sought a reassignment to a different dorm.

Plaintiff's Response: The plaintiff admits that she did not intend to report Hardy's sexual harassment du to his intimidation of her and due to DYS acquiescence in the sexually charged environment at the Mt. Meigs campus (PX 1: Declaration ¶ 12)

DYS' REPLY: Plaintiff admitted that she did not intend to report Hardy's alleged sexual

11

harassment but claims that was due to "DYS acquiescence in the sexually charged environment at the Mt. Meigs campus." Ms. McMillan's affidavit (Doc. 44-2, Exhibit 1 to Plaintiff's opposition brief, paragraph 12) recites this denial but it does not support her claim that DYS acquiesces in the sexually charged environment at Mt. Meigs." There is simply no evidence in the record to support this outrageous and blatantly false claim.

19. McMillan claims that Rankins pressed her for the reason for requesting a dorm reassignment and Ms. McMillan told Ms. Rankins that she was being sexually harassed by Hardy.

Plaintiff's Response: The plaintiff disputes this statement on the grounds that no evidence is presented by the defendant to support it and it is due to be stricken in accordance with paragraph 8 of this Court's Order dated November 26, 2007. (Doc 26) The plaintiff states that she finally told Ms. Rankins of the harassment she was enduring when Rankins would not grant her request to move to another dorm. The plaintiff's emotional distress overcame her fear of Hardy and her suspicion of DYS' willingness to address the issue. (PX: Declaration ¶ 12)

DYS' REPLY: This partial denial is insignificant because the fact is clear that the Plaintiff NEVER decided to follow the sexual harassment policy. DYS agrees that the plaintiff told Ms. Rankins about alleged incidents involving Ms. McMILLAN and Mr. Hardy in order to get approval from Ms. Rankins to transfer to another dorm. However, the Plaintiff again contradicted her statement that "the plaintiff's emotional distress overcame her fear of Hardy and her suspicion of DYS's willingness to address the issue."(Exhibit 1, McMillan Depo. pg. 289 line 2 - pg. 290 line 17).

20. Ms. Rankins, as required by DYS policy and procedure, instantly required Ms.

12

McMillan to speak with DYS Personnel Director, Debra Spann.

Plaintiff's response: The plaintiff admits that Ms. Rankins sent her to talk to Ms. Spann about the hostile work environment and sexual harassment she endured under Ms. Hardy, but disputes that the defendant has offered any evidence to support its allegation about DYS policy and procedure.

DYS' REPLY: As stated above, that issue is not actually in dispute according to the Plaintiff's own deposition testimony.

DYS' Policy and Procedures Policy Number 3.13.2 indicates that reports of sexual harassment should be made to the Department Personnel Manager. (Exhibit 4) Further, DYS agrees that Ms. Rankins told Ms. McMillan to go and speak with Ms. Spann about Ms. McMillan's allegations against Michael Hardy.

21. Ms. McMillan only went to Personnel, as required by the DYS anti-harassment policy and procedure, and made a report of the alleged sexual harassment.

Plaintiff's Response: The plaintiff admits that this was her first report regarding the hostile work environment and sexual harassment she endured under Mr. Hardy, and states that she has been fearful of the consequences of reporting due to the unwillingness of DYS to enforce its policy on sexual harassment. (PX 1: Declaration ¶ 6)

DYS' REPLY: DYS disputes the unsupported and conclusory statement that the plaintiff alleges that "she was fearful of the consequences of reporting due to the unwillingness of DYS to enforce its policy on sexual harassment." The Plaintiff has submitted no credible evidence to support her claim that she was fearful of the consequenses of reporting sexual harassment. In addition, The plaintiff's statement does not respond to the facts as alleged in paragraph 21.

13

The Plaintiff's affidavit, at paragraph 6, claims that **Mr. Hardy** had told her that complaining would do no good.  She concedes in her affidavit that her decision was based in part on Mr. Hardy's word only.  However she also asserts the hearsay argument, without any factual support to back up her self serving claim, that "she also knew" about others who were "accused of harassment by another employee," and an employee who was allegedly "harassed by" another employee.  She does not say these employees ever complained to DYS, or that any of them ever actually filed a complaint of sexual harassment in compliance with the DYS policy and procedure and there is no evidence in this case that any of them did so.  Her unsupported hearsay claims are insufficient to create a factual dispute regarding whether DYS has an effective policy–particularly in light of the overwhelming evidence that it WAS so effective in this case.

24. Over the telephone, Ms. Rankins instructed Ms. McMillan to temporarily report to Trustee Hall.  Ms. McMillan was soon thereafter permanently reassignment to the ITU dorm pursuant to her request. (Exhibit 8; Hardy transcript P. 144)

Plaintiff's Response:   The plaintiff admits that she was told to report to the Intensive Treatment Unit dorm and was assigned to the Trustee dorm for one day.  The plaintiff disputes the statement that she specifically requested to be reassigned to the ITU dorm. (PX 1: Declaration ¶ 12)

DYS' REPLY: The plaintiff specifically requested to Ms. Rankins to be transferred to a different dorm. The plaintiff did not specify what dorm she wanted to be transferred to; Ms. Rankins transferred Ms. McMillan to another dorm as Ms. McMillan requested. Please see McMillan's deposition ( Exhibit 1 pg 131 line 16 - pg. 134 line 14)

26. It is noteworthy that, assuming Ms. McMillan had not schemed to sue DYS before

she made the report of alleged sexual harassment, within two weeks of reporting the alleged

harassment Ms. McMillan clearly had a change of hear, because by July 23, 2005, approximately

two weeks later, Ms. McMillan had hired a lawyer in Birmingham and filed an EEOC Charged of

Discrimination against DYS.  (PX3; EEOC Charge of Discrimination).

Plaintiff's Response:  The plaintiff admits that she filed a charge of discrimination, as

required by Title VII, with the EEOC on July 23, 3005.  She disputes the additional allegations of

this statement on the grounds that the defendant has not produced any evidence which would

support such conclusory allegations, and they are due to be stricken in accordance with paragraph

8 of this Court's Order dated November 26, 2007. (Doc 26)

DYS' REPLY: The Hearing Officer and the State Personnel Board found that the

Plantiff's testimony was "exaggerated and lacked complete credibility and candor.  Clearly,

McMillian possessed a host of other personal motivations for her testimony."  (Exhibit 6, p. 29).

27. Between January 2005 and June 25, 2005- the date Ms. Rankins granted her request

for reassignment to ITU - Ms. McMillan concedes that she rarely saw Mr. Hardy.

Plaintiff's Response:   The plaintiff disputes that statement on the grounds that the

defendant has not produced any evidence which provides a foundation for it.  The plaintiff state

further that she was assigned to the ITU dorm on June 15, 2005 (PX 1: Declaration ¶ 12)

DYS' REPLY: Ms. McMillan indicated during her deposition that before Ms. Rankins

transferred Ms. McMillan, she has not had any contact with Mr. Hardy. (Exhibit 1 pg. 305 line 5

- line 19)

28. In fact she claims to have only had one allegedly sexually harassing encounter with

him during this time period.

Plaintiff's Response:   The plaintiff disputes this statement on the grounds that the defendant has not produced any evidence to provide a foundation for it and it is due to be stricken in accordance with paragraph 8 of this Court's Order dated November 26, 2007. (Doc 26) The plaintiff states further that Hardy's conduct was constant throughout this time period (PX 1: Declaration ¶ 10)

DYS' REPLY: Please see the reply to paragraph 27 above. Further, Ms. McMillan indicated during her deposition that Mr. Hardy asked her to go to a hotel in April 2005 to talk, not to have sex as Ms. McMillan alleges in response to this paragraph. (Exhibit 1 pg. 300 line 9 - pg. 301 line 16).  She testified that in January 2005, her shift changed and she had contact with Hardy "a couple of times."  (Exhibit 1 pg. 173 line 6 - 174 line 8).

29. She claims that in April 2005, Mr. Hardy asked her to go to a hotel with her.

Plaintiff's Response:   The plaintiff admits that Hardy asked her to go to a hotel with him for sex in April of 2005, and that he was very angry with her when she refused his request. (PX 1: Declaration ¶ 10)

DYS' REPLY: Please see the reply to paragraph 28.

31. The statute of limitations (180 days before the EEOC COD was filed) was January 13, 2005.

Plaintiff's Response:   The plaintiff admits that January 13, 2005 is 180 days before July 12, 2005, but disputes that this limits her sexual harassment or hostile environment claim against these defendants.

DYS' REPLY: As discussed below, whether the Plaintiff's statute of limitations has expired hinges on whether the Plaintiff has set forth facts to establish the existence of a hostile

environment claim. The Defendant submits that the Plaintiff has only shown discrete act claims that do not arise to the level of a hostile environment claim.

32.    Soon after Ms. McMillan's report to Ms. Spann and soon after the investigation began, several events transpired that resulted in DYS Executive Director Walter Wood taking action to prohibit any appearance of retaliation by DYS.

Plaintiff's Response:  The plaintiff disputes this statement on the grounds that the defendant has not produced any evidence to provide a foundation for it and it is due to be stricken in accordance with paragraph 8 of this Court's Order dated November 26, 2007 (Doc 26)

DYS' REPLY: DYS prevented any attempts of retaliation by other employees against Ms. McMillan. Please see McMillan's deposition (Exhibit 1 pg. 179 line 3 - pg. 188 line 10).  The Plaintiff essentially conceded that she does not have a valid claim of retaliation.  This claim is nonsense.

33. The first event was a memo, or series of memos, by Mr. Hardy's staff expressing her support for Mr. Hardy and their opposition to anyone who accused Mr. Hardy of inappropriate conduct.

Plaintiff's Response:  The plaintiff disputes this statement on the grounds that the defendant has not produced any evidence to provide a foundation for it and it is due to be stricken in accordance with paragraph 8 of this Court's Order dated November 26, 2007. (Doc 26)

DYS' REPLY: Please see the reply to paragraph 32.

34. The second event was a planned meeting with Ms. McMillan about her transfer to a different dorm.

Plaintiff's Response: The Plaintiff disputes this statement on the grounds that the defendant has not produced any evidence to provide a foundation for it and it is due to be stricken in accordance with paragraph 8 of this Court's Order dated November 26, 2007. (Doc 26)

DYS' REPLY: Please see the reply to paragraph 32.

35. The third was a so-called "grievance" Mr. Hardy filed against Ms. McMillan.  Hardy filed the so-called grievance memo with Ms. Spann, which was not the proper grievance procedure.

Plaintiff's Response: The plaintiff disputes this statement on the grounds that the defendant has not produced or referenced any evidence in the record to provide a foundation for it, and it is due to be stricken in accordance with paragraph 8 of this Court's Order dated November 26, 2007. (Doc. 26)

DYS' REPLY: Please see the reply to paragraph 32.

36. In response to these events, the Defendant-through Executive Director Walter Wood, Jr., prevented any meetings from taking place with Ms. McMillan, stopped the so-called grievance cold, and arranged immediately for State Personnel to come to DYS and conduct a special supplemental training seminar on anti-retaliation.  An Assistant Attorney General conducted the training for all DYS employees.

Plaintiff's Response: The plaintiff disputes this statement on the grounds that the defendant has not produced any evidence to provide a foundation for it and it is due to be stricken in accordance with paragraph 8 of this Court's Order dated November 26, 2007.  (Doc. 26)

18

DYS' REPLY: Please see the reply to paragraph 32.

40. A part of the basis for termination was Mr. Hardy's conduct during the investigation that DYS perceived as attempted retaliation.

Plaintiff's Response:   See the plaintiff's response to number 32 above.

DYS' REPLY: DYS agrees that Mr. Hardy's action after Ms. McMillan filed a sexual harassment claim against Hardy was part of the basis for DYS to terminate Hardy.

41. DYS successfully prevented Mr. Hardy from retaliating against Ms. McMillan, yet Ms. McMillan now sues DYS for alleged retaliation.

Plaintiff's Response:   The plaintiff disputes this statement on the grounds that the defendant has not produced any evidence to provide a foundation for it and it is due to be stricken in accordance with paragraph 8 of this Court's Order dated November 26, 2007. (Doc. 26)

DYS' REPLY: Please see the reply to paragraph 32.

42.    Since Mr. Hardy's discharge, Ms. McMillan has complained about retaliation on several occasions and on each occasion she has been interviewed and her allegations were investigated.

Plaintiff's Response:   The plaintiff admits that she has complained of retaliation but disputes the remaining allegations on the grounds that the defendant has not produced any evidence to provide a foundation for it and it is due to be stricken in accordance with paragraph 8 of this Court's Order dated November 26, 2007.  (Doc. 26)

DYS' REPLY: Please see McMillan's deposition (Exhibit 1 pg 180 line 6 - 18).  Ms. McMillian complains that her co-workers mistreat her, and here she complains that her second

19

similar complaint did not cause those same co-workers to give a second recorded statement in connection with the investigation of the second complaint against them.

43. She has suffered no adverse employment actions and there has been no retaliation - and certainly none by DYS.

Plaintiff's Response:  The plaintiff disputes this unsupported conclusory allegation by the defendant and states that has been subjected to adverse employment acts and a hostile work environment on account of her sex and to retaliation on account of her complaints about her sexual harassment.  Specifically, she has also been denied off-days for which she has not been compensated; had been isolated and refused training by her supervisor and co-workers; had a discriminatory disciplinary warning placed in her file without notice and included on her evaluation; suffered a lowered evaluation; and, has been placed under surveillance by her co-workers at the instruction of her supervisor. (PX1: Declaration¶¶ 12,13,15)

DYS' REPLY: Please see the reply to paragraph 32 and please see McMillan's deposition which indicates that she has not lost any money.  (Exhibit 1 pg 175 line 6-23).  DYS disputes the plaintiff's additional allegations as evidence of adverse employment actions.  The plaintiff has not provided any evidence to support this conclusion other than the plaintiff's own declaration.

44. Ms. McMillan does not actually complain about retaliatory action by DYS but rather complains that her co-employees retaliated against her on behalf of Mr. Hardy-even though DYS previously terminated Mr. Hardy's employment.

Plaintiff's Response:  The plaintiff disputes this statement on the grounds that the defendant has not produced any evidence to provide a foundation for it and it is due to be stricken in accordance with paragraph 8 of this Court's Order dated November 26, 2007.  (Doc.

20

26) Her complaint in this action specifically includes a count of retaliation against DYS. (Doc. 1:¶¶ 12,19)

DYS' REPLY: The plaintiff indicates that there is a count of retaliation against DYS in the plaintiff's complaint in paragraph 12 and paragraph 19; however the complaint does not allege what action DYS took to retaliate against the plaintiff. (Exhibit 5 Plaintiff's Complaint page 3 and 5). Throughout her deposition, McMillian clearly complained only about her co-workers in connection with the retaliation claim. She has absolutely no evidence to show any nexus or connection between those co-workers' alleged actions and her sexual harassment complaint against Hardy. The claim is not only without evidence of a nexus, but the claim defies common sense.

45. DYS has taken every conceivable action to protect Ms. McMillan and prevent any retaliation.

Plaintiff's Response:  the plaintiff disputes this statement on the grounds that the defendant has not produced any evidence to provide a foundation for it and it is due to be stricken in accordance with paragraph 8 of this Court's Order dated November 26, 2007. (Doc. 26)

DYS' REPLY: Please see the reply to paragraph 32.

46. Plaintiff's Additional Fact: McMillan was subjected to inappropriate sexual remarks by Hardy and to requests from him for a sexual relationship while assigned under his supervision at DYS. The work environment at the Mt. Meigs campus was permeated with sexual commentary, innuendo and misconduct. (PX1: Declaration¶¶ 2,3,4,5,6)

DYS' REPLY: DYS disputes the facts as alleged by the plaintiff. The plaintiff's alleges

21

these conclusory facts without additional evidence to support them other than the plaintiff's declaration.

47. Plaintiff's Additional Fact: When McMillan resisted Hardy's advances, he attempted to overcome her resistance by bragging about his sexual prowess and by informing her of his power on the campus and his skill in overcoming other complaints of sex discrimination. (PX1: Declaration¶ 6) McMillan initially thought that Hardy would leave her alone once she made it clear that she did not want a relationship with him, but despite her continued refusal to have a relationship with him, Hardy engaged in inappropriate conduct on every occasion that he could be alone with her during the entire time that she was under his supervision at Paige Hall. (PX1: Declaration¶¶ 2,3,4,5,7, 10)

DYS' REPLY: DYS disputes the facts as alleged by the plaintiff. The plaintiff's alleges these conclusory facts without additional evidence to support them other than the plaintiff's declaration. Her unsupported factual allegations are insufficient to create a factual question as to a claim against DYS.

48. Plaintiff's Additional Fact: McMillan was persistently propositioned for sex and sexual favors by her immediate supervisor, Michael J. Hardy. Hardy has requested that she perform fellatio on him, and offered her money and other material things if she would perform oral sex on him. Hardy frequently bragged to McMillan about his sexual prowess with other female workers at the defendant's Mount Meigs campus. For example, Hardy has stated to McMillan he can not "f–k all night like he used to" and that he could "only f–k real hard for 5 or 6 minutes" at this stage of his life. On another occasion, Hardy grabbed both her breast while she was on duty at DYS. All of this behavior was uninvited, unwelcome, emotionally and physically

22

intimidating, and McMillan asked Hardy to stop harassing her but he would not.  Hardy also

stated to McMillan that he loved big "titties" and mad frequent requests to suck McMillan's

breasts.  Hardy also spoke regularly of his abilities with regard to oral sex and asked to perform

oral sex on McMillan.  McMillan always refused Hardy's overtures and requested that he leave

her alone.  (PX1: Declaration¶¶ 2,3,4,5,7, 10)

     DYS' REPLY:  DYS disputes the facts as alleged by the plaintiff. The plaintiff's alleges

these conclusory facts without additional evidence to support them other than the plaintiff's

declaration.  Her unsupported factual allegations are insufficient to create a factual question as to

a claim against DYS.

     49. Plaintiff's Additional Fact: In the winter and spring of 2005, Hardy began asking

McMillan to go to hotels with him for sex and offered to buy her a car, tires and other goods in

exchange for her compliance.  She did not give in to these requests and in the middle of April,

Hardy informed her that another employee was "disrespecting" her and that he would defend her

if she would go to a hotel with him to discuss it over drinks.  McMillan told Hardy that there was

no way that she was going to a hotel with him and he became very angry with her.  He confronted

her at work the next day and told her that she had "lost her foundation" at DYS.  McMillan

understood this threat to be another effort by Hardy to intimidate her into compliance with his

demands.  Hardy refused McMillan's efforts to move to another work assignment in order to get

away from his supervision and continued to treat her in hostile manner until McMillan reported

him on June 15, 2005. (PX1: Declaration¶ 10)

DYS' REPLY: DYS disputes the facts as alleged by the plaintiff. The plaintiff's alleges these

conclusory facts without additional evidence to support them other than the plaintiff's

declaration.  Her unsupported factual allegations are insufficient to create a factual question as to a claim against DYS.

50. Plaintiff's Additional Fact: After McMillan reported Hardy she was transferred to another dorm at the Mount Meigs facility, she was required to work eight or more days consecutively with no time off due to this move.  (PX1: Declaration1¶ 12) She was even required to work two shifts on the day that she was initially reassigned by Rankins.  (PX1: Declaration¶ 7: Daily Time & Attendance Reports, 6/11-19/05)

DYS' REPLY:   The Plaintiff conceded facts that clearly show that this was not punitive as a result of Ms.McMillan requesting a transfer to a different dorm. (Exhibit 1 pg. 134 line 22 - pg. 136 line 4).  McMillian was simply immediately assigned to a new dorm and McMillian never told anybody that she would thereby be required to work eight days without a day off.

51. Plaintiff's Additional Fact: Since arriving at the new dorm, she has been ostracized by personnel who refused to help her learn the new procedures.  PX: EEOC charge, 7/12/05) She has also been singled out by her supervisor for heightened scrutiny and surveillance by co-employees.  Between November 2005 and September 2007, the unit manager or staff wrote 27 memos concerning McMillan.  Most document a conversation or incident that involved McMillan.  (PX8: Memos/Reports at ITU re: McMillan) In January and February 2006 alone, immediately following McMillan's filing of the retaliation charge, nine memos were written on her.  (PX9:Memos).  In November 2006, McMillan's unit manager wrote her up for not attending a training session which she was never notified about.  (PX1: Declaration ¶ 15)

DYS' REPLY: DYS disputes the facts as alleged by the plaintiff. The plaintiff's alleges these conclusory facts without additional evidence to support them other than the plaintiff's

declaration.  Plaintiff does not allege that any of these facts resulted in any tangible loss.  These claims simply do not rise to the level necessary to establish a claim of retaliation against the Department.  Moreover, there is no evidence whatsoever to establish any nexus to the complaint against Hardy.

52. Plaintiff's Additional Fact: Between April 2006 and February 2007, McMillan's supervisor wrote six memos about her being tardy to work.  (PX10: 3 Memos re: Tardy) On February 12, 2007, he placed a disciplinary warning in her file for being late three times.  (PX 11: Disciplinary Warning )  Numerous other employees were late for work or left work early more than three times in the March-April 2006 time period alone, but only McMillan was written up.  (PX 12: Table of ITU Employee Sign In/Out Times, March-April 2006 with supporting Time & Attendance Reports) (PX1: Declaration ¶ 15, 16)

DYS' REPLY: DYS disputes the facts as alleged by the plaintiff.  If they are true they do not establish a claim of retaliation.  Neither does the Plaintiff have any evidence to suggest a nexus between these writeups and her complaint against Hardy.

53. Plaintiff's Additional Fact: Prior to filing her EEOC charges in July and December of 2005, the ratings on McMillan's two preceding appraisals (2003 and 2004) and subsequent appraisal (2006) were in the "Exceeds Standards' category.  The rating she received on the performance appraisal covering 2005 was in the "Meets Standards" range and continued three unsatisfactory marks (attendance, punctuality and cooperation with coworkers).  PX 13: Evaluations, 2003-2006)

DYS' REPLY: DYS disputes the facts as alleged by the plaintiff. The plaintiff's alleges these conclusory facts without additional evidence to support them other than the plaintiff's

25

declaration. The plaintiff does not offer any evidence that there is a causal link to her filing the EEOC charge and subsequent lower appraisals.

54. Plaintiff's Additional Fact: McMillan believed that reporting Hardy's harassment would result in her losing her job or in some other form of retaliation. She formed this belief from Hardy's comments on his power and influence with the "clique" on the campus; his story of how he had stifled a prior complaint of sex discrimination; and, from the numerous unaddressed instances of improper sexual relationships between staff members, and between staff members and students on the Mt. Meigs campus of DYS. (PX1: Declaration ¶ 6)

DYS' REPLY: DYS disputes the facts as alleged by the plaintiff. The plaintiff's alleges these conclusory facts without additional evidence to support them other than the plaintiff's declaration. Further, the plaintiff's statements are hearsay. Finally, the Plaintiff concedes that her belief that Hardy had power was in error. (Exhibit 1, McMillian dep. Pg. 119 line 20 - pg. 120 line 12).

55. Plaintiff's Additional Fact: DYS negligently permitted Hardy to supervise female subordinates including McMillan, even assigning responsibilities to him for conducting sexual harassment training,, with the knowledge that he had previously been accused of sexual harassment. (PX 14: Hardy Memo; PX 4: Spann Memo to Wood 7/19/05)

DYS' REPLY: DYS disputes the facts as alleged by the plaintiff. The Plaintiff has produced absolutely no evidence whatsoever of any report of sexual harassment against Hardy prior to McMillian's report.

56. Plaintiff's Additional Fact: Personnel manager Debra Spann acknowledged to Director Wood that the department's implementation of its sexual harassment policy was

ineffective, and that she was securing outside assistance to train DYS staff on the policy.  PX 4: Spann Memo to Wood 7/19/05)  Director Wood also sought assistance from the Alabama Attorney General's Office for additional training for DYS staff on retaliation prevention training following the discriminatory actions against McMillan. ( PX 15: ALJ Hearing Transcript: p. 400:1-23)

DYS' REPLY: DYS disputes that the McMillan investigation was the sole reason for the retaliation prevention training that DYS conducted.  Moreover, DYS submits that it is logically nonsensical to suggest that because the Department conducts training on the anti-discrimination policies the policies are therefore necessarily ineffective.

57. Plaintiff's Additional Fact: DYS lodged charges against Hardy for his sexual harassment and retaliation against McMillan.  He was found guilty of these acts, and his employment was terminated effective at the close of business January 6, 2006.  (PX 4: Spann Memo to Wood; PX 5: Calendar report to Wood; PX 6: termination letter to Hardy)

DYS' REPLY: Hardy was discharged for his inappropriate conduct with McMillian and his attempt to retaliate against her for filing a charge of discrimination.  He was not found guilty of anything and the Department has never suggested that his conduct satisfies all the elements of a Title VII claim against the Department for which the Department should therefore compensate McMillian.

58. Plaintiff's Additional Fact: Hardy exercised his right to appeal DYS's decision to the Alabama State Personnel Board which appointed an administrative law judge to take testimony and receive evidence on the issues in his termination. (PX 16: ALJ Report, p. 6¶3) DYS Director Wood testified specifically:

I concurred with that
7      decision and primarily for the two reasons
8      that you just enumerated.  One was that we
9      had, in the view of our personnel director, a
10     substantiated sexual abuse issue, But even
11     more important was this emerging problem with
12     what I believe was an attempt to intimidate
13     this lady and in some way retaliated for this
14     complaint being filed.  That emerged as, even
15     to me, an almost even more serious issue than
16     the initial complaint.  So based on those two
17     issues, I concurred that the employment
18     should be terminated, and this is the letter
19     that does that (PX 15: Hearing Transcript, p.407)

The charges against Hardy by DYS were upheld by the judge following two days

of testimony and post-trial briefing by the parties.  (PX16: ALJ Report, pp. 29-31)

DYS' REPLY: The Administrative Law Judge found that Michael Hardy violated the

grievance procedure and DYS' sexual harassment policy; however, the judge did not find that

McMillan was a victim of sexual harassment.  (Exhibit 5 pg. 29 of 32).  In addition the personnel

board found that McMillan was not sexually harassed but Hardy's termination was upheld based

on actions that Hardy took after McMillan filed a sexual harassment complaint (Exhibit 7 pg. 1-

2).

      **II.** *Faragher/Ellerth*.  The Defendant submits that it is entitled to the affirmative defense

under *Faragher/Ellerth*.

Tangible Employment Action.  The Plaintiff argues that she suffered a "tangible

employment action."  Under *Faragher/Ellerth*, the question is whether the employer can be held

strictly liable for the actions of a supervisory employee and whether the employer is entitled to an

affirmative defense.  The question under the *Faragher/Ellerth* affirmative defense is essentially

28

whether the plaintiff suffered an employment action that would have put the employer on notice and which the employer would have necessarily ratified.  Essentially it is an action that effects that Plaintiff's economic interests.  For example a transfer given or refused that does not change the Plaintiff's pay is not such an action.  If such an action was taken, then the employer is strictly liable and has no affirmative defense available under *Faragher/Ellerth*.  On the other hand, if the supervisor took no such action, then the affirmative defense is available.

In this case the Plaintiff claims that the affirmative defense is not available.  She is wrong.   The plaintiff alleges that the following action by Michael Hardy constitutes a tangible adverse employment action:

(1)       Refusal to permit an employee, especially a victim of sexual harassment, to request a transfer.  Obviously this is not a tangible employment action that would avoid the *Faragher/Ellerth* defense.

McMillan further muddles the issue in her brief by claiming that she suffered the following tangible employment actions as a consequence of her complaint of sexual harassment and hostile environment by Hardy[2]:

(1)      Working a double shift on the day of her complaint of sexual harassment.

(2)       DYS did not allow plaintiff to have her regular days off after plaintiff transferred to another dorm.

(3)      Plaintiff worked eight consecutive days after being reassigned to ITU.

---

[2] These actions do not relate to the claim of supervisory sexual harassment by Hardy, but relate to her general claim that her coworkers have all retaliated against her because she complained about Hardy.  These actions were all taken by co-workers and the Plaintiff claims they were taken because she complained against Hardy.  The Plaintiff has absolutely no evidence to establish a causal link between these co-workers' alleged actions and Michael Hardy.

(4)    Plaintiff was subjected to isolation and ostracized by her co-workers.

(5)    Plaintiff was subject to unwarranted surveillance at the suggestion of her supervisor.

(6)    Wrongful disciplinary actions were placed in the plaintiff's personnel folder and on her evaluation.

(7)    Plaintiff was falsely accused of failing to attend a training session for which she did not receive notice.

None of these claims could serve as a tangible employment action to avoid the *Faragher/Ellerth* defense because they were alleged to have been committed by her co-workers after Hardy was discharged.

Second, she claims that the elements of the defense are unavailable. The Plaintiff argues that the elements are: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) the plaintiff employee unreasonable failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. (Doc. 44, p. 30). The Plaintiff claimed that the Defendant had failed to show both prongs.

Prong One. The Plaintiff argued that there is no policy on sexual harassment, and no evidence regarding implementation, training, or effectiveness of the policy. She is clearly wrong, and she admitted those facts in her deposition.

In her brief, the Plaintiff argues, without factual support, that the DYS personnel manager's finding **in this case** proves that the policy and procedure was ineffective. She also argues that the Director's decision to request DYS employee training from the Attorney General

was an admission of the ineffectiveness of the policy. That argument holds no water. The DYS Personnel Manager clearly believed that Hardy had harassed the Plaintiff, and she was clearly frustrated by that, but it defies logic that the person charged with investigating allegations of harassment could so strongly uphold the policy by finding that it was violated yet at the same time prove that it is ineffective. The Personnel Director's decision, ultimately upheld by State Personnel, to discharge Mr. Hardy is conclusive proof of the **effectiveness** of the policy.

The Plaintiff then deceitfully argues that "there is evidence in this case that the defendant had knowledge that Hardy had prior accusations of sex discrimination, citing her exhibit 14. That exhibit the Plaintiff referenced does not show any prior accusation of sex discrimination against Hardy. But even if it did that would not raise a factual question whether the policy was ineffective. Rather the facts of this case, i.e. that the plaintiff mentioned to a supervisory employee that she had been sexually harassed and the policy was immediately executed with perfect efficiency and effect, show that the policy was effective.

Next the Plaintiff again deceitfully argues that she does not remember receiving any training on the policy. Her deposition testimony clears that misrepresentation up and the Plaintiff cannot contradict herself and thereby create a material issue of fact.

<u>Prong Two.</u> The Plaintiff next argues that the Plaintiff's failure to take advantage of the preventive and corrective opportunities provided by the employer was "reasonable." Again, the Plaintiff relies on the Personnel Manager's statement that "all staff should be re-trained on sexual harassment. It appears to me thinking has not changed in this department. We cannot condone telling staff to do one thing and doing something else ourselves (it is my understanding Mr. Hardy went over sexual harassment at every staff meeting.) I have contacted Maxine Wheeler to

do Sexual Harassment Training for our staff as it did not sink in with State Personnel doing it."
The Department submits that this statement by the Personnel manager does not suggest that the
Plaintiff's refusal to use the sexual harassment policy was reasonable. Rather, it shows that had
the Plaintiff chosen to use the Department's policy, the Department had a person conducting the
investigations who would certainly take swift and effective remedial action–because that is
exactly what she did.

Finally, the Plaintiff argues that "sexual misconduct was rampant on Mt. Meigs campus
and the administration did little, if anything, to correct it." That self serving and unsupported
conclusion was taken from the Plaintiff's affidavit. However the Plaintiff has submitted no
evidence of any reports of sexual harassment that were given to the Department to which the
Department failed to respond. The general claim that "sexual harassment was rampant" is quite
meaningless. It would mean something if the Plaintiff could show that allegations of sexual
harassment were reported to Debra Spann but she chose to do nothing about them, but Debra
Spann's response to THIS report of sexual harassment clearly shows that allegation is
preposterous. The reason the Plaintiff has submitted no evidence to support that outrageous
claim is because no such evidence exists.

### III. JUDICIAL ESTOPPEL

The Plaintiff claims the Department is judicially estopped from arguing that the prima
facie elements of Title VII have not been met. (Doc. 44, p. 21). First, assuming for the sake of
argument that the Plaintiff was correct, which she is not, the Department would still be entitled to
summary judgment under the *Faragher/Ellerth* affirmative defense. Second, as discussed above,
the Plaintiff cannot sue DYS and Michael Hardy separately but analyze the claims as though

Hardy and DYS were the same person.  McMillan can sue Hardy *or* DYS for sexual harassment, but not both.  Third, as more clearly discussed below, DYS has not taken an inconsistent position in any proceeding related to this case.  Simply put, discharging Michael Hardy for violating the DYS Policy on sexual harassment does equate to discharging Michael Hardy for establishing the elements of a Title VII claim.  At the hearing of the Michael Hardy discharge case, DYS made that clear.  DYS clearly stated that the issue being tried in that hearing was **not** whether Title VII had been violated.  (Exhibit 8, p. 5, lines 8-18).  In addition at the conclusion of the hearing in a letter brief to Judge Weller, DYS made it clear that the:

> ...evidence clearly shows that Mr. Hardy conducted himself inappropriately with regard to Ms. McMillan.  His termination is therefore warranted on that basis alone.  Be certain that the Agency does not argue, and does not have to prove, that the elements of a claim of sexual harassment are met as a result of Hardy's inappropriate conduct with a subordinate employee.

(Exhibit 5).

The *New Hampshire v. Maine* case cited by the Plaintiff at p. 21 of her brief establishes the factors that courts consider to determine whether judicial estoppel should be invoked . *New Hampshire*, 532 U.S. 742, at 750-51.  The factors that courts consider are in order to determine whether to invoke judicial estoppel are: (1) whether the party's later position is clearly inconsistent with its earlier position; (2) whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.  DYS is not

judicially barred by the doctrine of judicial estoppel based on the above mentioned factors.

A. <u>DYS has not taken a clearly inconsistent position with an earlier position.</u>

The plaintiff cannot establish a prima facie case of sexual harassment and hostile work environment, or retaliation, by defendant Michael Hardy. The plaintiff asserts that DYS' earlier position in Michael Hardy's termination hearing was the opposite. DYS argues that the purpose of the Michael Hardy hearing was not to determine whether Michael Hardy retaliated or sexually harassed Ms. McMillan nor was the purpose of the hearing to determine whether Ms. McMillan's allegations against Michael Hardy established a prima facie case of sexual harassment or retaliation. Please see T. Dudley Perry, Jr.'s letter to Administrative Law Judge Weller (Exhibit 5), excerpted above.  The purpose of the administrative hearing was to determine whether the DYS' decision to terminate Michael Hardy was appropriate; as a result of the administrative hearing, Judge Weller upheld DYS' decision to terminate Michael Hardy. (Exhibit 6 pg. 32) DYS does not dispute that during the hearing evidence was presented to the court to suggest that Michael Hardy violated DYS' policies, not Title VII as the plaintiff suggests.

B. <u>DYS persuaded the administrative law judge that Michael Hardy's termination should be upheld;  DYS did not persuade the judge that the plaintiff has established a Title VII claim of sexual harassment or retaliation.</u>

The administrative law judge found that Michael Hardy violated DYS' policy against sexual harassment however the judge did not find that Ms. McMillan was a victim of sexual harassment. The Hearing Officer's recommendation indicated in relevant part:

> Based on the evidence presented, the undersigned was convinced that Hardy had more than a work related relationship with McMillan and violated the DYS sexual harassment policy.  The testimony of Harris also convinced the undersigned that Hardy made comments to McMillan which were inappropriate for the

> workplace. However, the undersigned was NOT convinced that McMillan was the victim of sexual harassment. While Hardy's conduct as a supervisor was subject to disciplinary action, the undersigned does not believe that Hardy's advances were unwelcome. ... Nevertheless, that does not excuse Hardy for engaging in what he should have known could have been misconstrued as an inappropriate verbal exchange with a subordinate. Therefore, the undersigned does find that Hardy's verbal conduct supports termination.

(Exhibit 6 Recommended Order to the State Personnel Board - pg 29 of 32). In addition, the Hearing Officer did not find that Ms. McMillan's allegations against Michael Hardy establish a prima facie case of sexual harassment under Title VII nor did DYS present that issue to the court as indicated in T. Dudley Perry, Jr.'s letter to Judge Weller. (Exhibit 5)

The administrative law judge also held that Michael Hardy violated DYS' grievance procedure; however the judge did not state that Hardy's behavior established a prima facie case of retaliation under Title VII. (Exhibit 6 pg. 30-31) DYS did not persuade the judge that Michael Hardy retaliated against Ms. McMillan as the plaintiff suggests. Rather, the judge stated that Hardy's conduct "could also be potentially perceived as retaliatory;" and "whether the conduct actually reaches the level or retaliation is moot and shall not be addressed in this forum." (Exhibit 6 pg. 31).[3]

C.      DYS has not advanced an inconsistent position; thus there is no unfair advantage on the opposing party.

---

[3] The evidence clearly shows that Hardy's conduct was an *attempt* to retaliate, but that McMillan did not even know that Hardy had attempted to retaliate against her. (McMillan dep. P. 185, line 5 - 23). It is unreasonable to suggest that DYS could have successfully thwarted an attempt by a supervisor to retaliate against a subordinate, but still be liable for the supervisor's unsuccessful attempt. Generally, there is NO employer liability where the employer took immediate appropriate remedial action. *E.g. Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1257 (11th Cir.2003).

As indicated above, DYS has not advanced an inconsistent position about whether Ms. McMillan has a substantiated claim under Title VII of sexual harassment of retaliation; therefore DYS will not have an unfair advantage on Ms. McMillan in this instant case.

Each of the factor are not met in the instant case, and DYS should not be judicially barred from arguing that Ms. McMillan does not have a prima facie case of sexual harassment and hostile work environment or retaliation under Title VII.

### IV. HOSTILE WORK ENVIRONMENT STATUTE OF LIMITATIONS

The Plaintiff misunderstands the issue of the statute of limitations.  The Defendant argues in its motion for summary judgment that the Plaintiff has not shown the elements of a hostile environment claim.  The Defendant asserts that the Plaintiff's claims only establish discrete act claims.

The statute of limitations for discrete act claims is different from the statute of limitations for hostile environment claims.  It is true, of course, that if the Plaintiff had shown the elements of a hostile environment harassment claim, the entire period of time of the hostile environment would be one unlawful employment practice and the statute of limitations would not expire so long as one act occurred within the limitations period.

But since the Plaintiff's claims do not show a hostile environment claim, as shown in the Defendant's Brief, the statute of limitations did expire.

### V. PLAINTIFF'S U.S.C 1983 AND TITLE VII CLAIM MERGE_____

_____The plaintiff's claims against Hardy under 42 U.S.C. 1983 and the plaintiff's claim against DYS under Title VII merge.  The Plaintiff in this case has sued both Michael Hardy and DYS.  Those cases are separate. The plaintiff claims that Hardy utilized his position as a

36

supervisor at DYS to sexually harass and create a hostile working environment for McMillan, and retaliated against McMillan in violation of 42 U.S.C. 1983. In addition, the plaintiff alleged that DYS, or its agents, has subjected the plaintiff to retaliation for making her complaints of sexual harassment and retaliation. The Plaintiff has sued both the Department and her former supervisor Michael Hardy for sexual harassment.  However, she cannot recover from both. Either the Department or Michael Hardy must receive summary judgment.  This is true because the relief granted under Title VII is against the "employer," not individual employees whose actions would constitute a violation of the Act.  *See Clanton v. Orleans Parish School Bd.*, 649 F.2d 1084, 1099 & n. 19 (5th Cir.1981) FN7; *see also* 42 U.S.C. § 2000e(b) (1988) (definition of "employer"); 42 U.S.C. § 2000e-2 (1988) (violation for "employer" to discriminate); 42 U.S.C. § 2000e-5(g) (1988) (relief for violation of § 2000e-2).  This does not simply mean that Michael Hardy must be dismissed, but that one of the two must.  The proper method for a plaintiff to recover under Title VII is by suing the employer, **either** by naming the supervisory employees as agents of the employer or by naming the employer directly.  *See Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir, 1991).

Throughout her brief the Plaintiff speaks of Hardy and the Department as though there were no distinction between the two.   In the complaint, at paragraph 4, the Plaintiff notes that Hardy is sued in his individual capacity but not under Title VII.  That is perplexing, because the claims are all based on sexual harassment and they are either under 42 U.S.C. 1983, or Title VII. In any event, the Plaintiff cannot avoid the limitation against suing two employers and get two bites at the apple by muddling the basis of her claims.  This is true because the standard and analysis under both 42 U.S.C. 1983 and Title VII are identical.  *See, e.g. See Stallworth v. Shuler,*

777 F.2d 1431, 1433 (11th Cir .1985) ("Where, as here, a plaintiff predicates liability under Title

VII on disparate treatment and also claims liability under sections 1981 and 1983, the legal

elements of the claims are identical"); *see also, Givens v. Chambers,* Slip Copy, 2008 WL

268723, 6 (M.D.Ala., 2008) (J. Dement) (discussing the statutory interplay between Title VII and

42 U.S.C. 1983).

As a result, the claims under 1983 and Title VII essentially merge, and they must be

analyzed identically.  Therefore, in summary, the Plaintiff cannot sue both Hardy and DYS.

DYS submits that it is entitled to summary judgment.

## CONCLUSION

This Court should grant DYS' motion of summary judgment because: (1) DYS is entitled

to the Faragher-Ellerth defense; (2) the doctrine of judicial estoppel should not apply to the facts

in the instant case; (3) the plaintiff's claim is of a hostile work environment is barred by the

statute of limitations; and (4) the plaintiff's claims under 1983 and Title VII merge.

WHEREFORE the Defendant moves this Honorable Court to grant Defendant

DYS' motion for summary judgment

Respectfully submitted this 8th day of February 2008.

<u>**s/ T. Dudley Perry Jr.**</u>
T. Dudley Perry, Jr.
Bar Number: 3985-R67T
General Counsel
Attorney for the Defendant
Alabama Department of Youth Services
Post Office Box 66
Mt. Meigs, AL 36057
Telephone: (334) 215-3803
Fax: (334) 215-3872
E-Mail: dudley.perry@dys.alabama.gov

38

**s/Sancha E. Teele**
Sancha E. Teele
Assistant Attorney General
Bar Number: 0103-H71T
Attorney for the Defendant
Alabama Department of Youth Services
Post Office Box 66
Mt. Meigs, AL 36057
Telephone: 334-215-3803
Fax: (334) 215-3872
E-Mail: sancha.teele@dys.alabama.gov

### CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of February, 2008, I electronically filed the foregoing, DEFENDANT ALABAMA DEPARTMENT OF YOUTH SERVICES' REPLY TO PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT ALABAMA DEPARTMENT OF YOUTH SERVICE'S MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jimmy Jacobs
E-mail:jacobslawoffice@charter.net
Attorney At Law
143 Eastern Boulevard
Montgomery, AL 36117
Tel: (334) 215-1788
Fax: (334) 215-1198

James Eldon Wilson
Attorney at Law
4625 Lomac Street
Montgomery, AL 36106

**s/ T. Dudley Perry Jr.**
T. Dudley Perry, Jr.
Bar Number: 3985-R67T
General Counsel
Alabama Department of Youth Services
Attorney for the Defendants

# TERA A. McMILLAN v. STATE OF ALABAMA DEPARTMENT OF YOUTH SERVICES

# TERA MCMILLIAN

**January 22, 2008**

**Reagan Reporters, LLC**
**Phone: 334.262.7556**
**Fax: 334.262.4437**
**www.ReaganReporters.com**

1

1      IN THE UNITED STATES DISTRICT COURT FOR

2           THE MIDDLE DISTRICT OF ALABAMA

3                 NORTHERN DIVISION

4

5   TERA A. MCMILLIAN            )

6       Plaintiff,            )

7                              )

8    VS.                  ) CASE NO.:  2:07-CV-01-WKW

9                              )

10  STATE OF ALABAMA DEPARTMENT )

11  OF YOUTH SERVICES, and      )

12  MICHAEL HARDY,             )

13      Defendants.          )

14      The deposition of TERA MCMILLIAN, taken by the

15  Defendants, pursuant to the Federal Rules of Civil

16  Procedure, before Kimberly B. Faucette, ACCR-309,

17  Certified Court Reporter and Notary Public in and for the

18  State of Alabama at Large, at the Alabama Department of

19  Youth Services, Mt. Meigs, Alabama, on the 15th day of

20  January, 2008, at 10:30 a.m., pursuant to notice, and

21  continued on the 22nd day of January, 2008, at 9:00 a.m.,

22  pursuant to notice.

23              *    *    *    *    *

1   APPEARANCES:

2

3   FOR THE PLAINTIFF:        FOR DEFENDANT MICHAEL HARDY:

4   MR. JIMMY JACOBS        MR. JAMES E. WILSON

5   Attorney at Law          Attorney at Law

6   Montgomery, Alabama        Montgomery, Alabama

7

8   FOR DEFENDANT ALABAMA DYS:

9   MR. T. DUDLEY PERRY, JR.

10  MS. SACHA TEELE

11  Attorneys at Law

12  Mt. Meigs, Alabama

13

14  ALSO PRESENT:

15  MR. GERRY LOVE

16                  INDEX

17     EXAMINATION BY MR. PERRY............1

18        DYS EXHIBIT NO. 1............106

19     EXAMINATION BY MR. WILSON.........198

20        HARDY EXHIBIT NO. 1..........198

21        HARDY EXHIBIT NO. 2..........301

22        HARDY EXHIBIT NO. 3..........303

23

1                       S T I P U L A T I O N S

2               It is stipulated by and between counsel for

3       the parties that this deposition is taken at this time

4       by Kimberly B. Faucette, Court Reporter and Notary

5       Public, State at Large, who is to act as commissioner

6       without formal issuance of commission to her; that said

7       deposition shall be taken down stenographically,

8       transcribed, and certified by the commissioner.

9               Except for objections as to the form

10      of questions, no objections need be made at the time of

11      the taking of the deposition by either party, but may be

12      interposed by either party at the time the deposition is

13      read into evidence, which shall be ruled upon by the

14      Court on the trial of the cause upon the grounds of

15      objection then and there assigned.

16

17

18

19

20

21

22

23               *      *      *      *      *

TERA MCMILLIAN - 1/22/2008

4

1          TERA A. MCMILLIAN

2    having been first duly sworn, testified as follows,

3    to-wit:

4                    EXAMINATION

5

6    BY MR. PERRY:

7        Q    How are you, Ms. McMillian?

8        A    I am doing good.

9        Q    I guess the best place to start, obviously, we

10   know each other?

11       A    Yes.

12       Q    You are Tera McMillian?

13       A    I am.

14       Q    What is your current position with the DYS?

15       A    Youth services aid.

16       Q    And you have been with DYS since 2002?

17       A    Yes.

18       Q    Let's talk about, first of all, some of the

19   ground rules that we are going to follow here.

20       I am going to ask questions and I will try to be

21   clear.  Sometimes that is difficult and sometimes what I

22   ask doesn't make sense.

23       If I do that, would you please tell me that you

TERA  MCMILLIAN - 1/22/2008

5

1    don't understand what I am asking you?

2        A    Yes.

3        Q    Would it be fair, if you don't tell me, I am

4    going to treat your answer as though you did understand

5    what I asked?  Is that fair?

6        A    Yes.

7        Q    I promise you, I am going to be

8    straightforward, and my goal here is to communicate with

9    you, okay?  I want to know what you know, and to do

10   that, we need to communicate, okay?

11       A    Yes.

12       Q    First of all, how many times have you been

13   deposed before, total?

14       A    Deposed?

15       Q    Yes, ma'am.

16       How many times have you given a deposition?

17       A    Once.

18       Q    And that was when?  In this case or another

19   case?

20       A    Another case.

21       Q    You were also deposed once -- what case was

22   that?

23       A    With Call Points, Incorporated.

1    Q    What year was that?

2    A    '96, '97, somewhere along that line.

3    Q    Just briefly, that is the class action lawsuit

4    that was filed against your previous employer, Call

5    Points, regarding allegations of discrimination;

6    correct?

7    A    Yes.

8    Q    And I think I understand you were a class

9    representative in that case?

10   A    I was a named party.  I don't know if that is

11   the same thing or not.

12   Q    So you were a named plaintiff in a class

13   action lawsuit against Call Points; correct?

14   A    Yes.

15   Q    Do you remember whether that case was settled

16   before a hearing on class certification?

17   A    I don't know what that means.

18   Q    Do you remember whether the court ever

19   certified and agreed that there could be a class of

20   people who could sue that company?

21   A    I am sorry.  Can you repeat that?

22   Q    Do you know whether the court ever allowed a

23   class of people to sue that company, or whether it was

1    just you named plaintiffs who ultimately were the only

2    plaintiffs in the end?

3        A    I don't know.

4        Q    Do you know how many people got money in the

5    settlement in the end?

6        A    I can't say for sure.

7        Q    I am not asking for sure.  Do you know if

8    anybody besides just you named plaintiffs got money?

9    Not the specific number of people.  Was it just you

10   named plaintiffs that got money or was it people other

11   than the named plaintiffs?

12       A    I don't know.

13       Q    When did you get a monetary settlement or a

14   check in that lawsuit?

15       A    In 1997, '98.

16       Q    And you gave a deposition in that case?

17       A    Yes.

18       Q    Do you remember also giving a deposition in

19   connection with the personnel case that DYS brought

20   against Michael Hardy in connection with your

21   allegations against him?

22       A    That was a deposition?

23       Q    Do you recall giving your testimony in that

TERA MCMILLIAN - 1/22/2008

8

1   case when there was a court reporter present, but not at

2   the hearing?

3       I think we were at Mr. Stokes' office, but I'm not

4   certain, downtown, at the education department.

5       A   Yes.

6       Q   I am pretty sure that was a deposition, too,

7   but I am not testifying; you are.

8       A   Oh, I am sorry.  I thought I was just a

9   witness.

10      Q   You were a witness, but I think that you also

11  gave your deposition on that date.

12      I am just trying to get an idea of the number of

13  times that you have been deposed or given your testimony

14  under oath, before here today.

15      Did you have any other times where you gave sworn

16  testimony, in addition to those two depositions, that

17  you can remember?

18      A   No, I don't think so.  Not to my knowledge.

19      Q   Ms. McMillian, are you on any medication here

20  today?

21      A   Am I on medication?

22      Q   Yes, ma'am.

23      A   I took my medication this morning.

1    Q    What medication did you take this morning?

2    A    I took Lexapro.

3    Q    Lexapro?

4    A    Yes.

5    Q    Anything else?

6    A    A half a Xanax, blood pressure medication,

7    Norvasc.

8    Q    Norvasc?

9    A    Norvasc.

10    Q    Spell it.  Does it start with an "N" or an

11    "L"?

12    A    N-O-R- -- I don't know.

13    Q    Is there a "V" in there somewhere?

14    A    Yeah, somewhere.

15    Q    Okay.  Anything else?

16    A    No.

17    Q    Does Lexapro have any side effects that you

18    are aware of?

19    A    I don't know.

20    Q    Does it affect your memory?

21    A    Does it affect my memory?

22    Q    Yes, ma'am.

23    A    No.

TERA MCMILLIAN - 1/22/2008

10

1      Q    How about Xanax?  Does that affect your

2  memory?

3      A    Not to my knowledge.

4      Q    And the Norvasc, does that affect your memory?

5      A    Not to my knowledge.

6      Q    So is there anything else, as you are here

7  today, that could be affecting your memory, making you

8  not remember things, that you are aware of?

9      A    No.  Maybe lapsed time.

10     Q    You do recall that there was a hearing before

11  a hearing officer in the state personnel in which you

12  testified under oath, and the result of it was that

13  Michael Hardy's termination from this agency was upheld;

14  correct?

15     A    I know that now.

16     Q    No.  No.  You do remember giving that

17  testimony; right?

18     A    Yes.

19     Q    Is that something you had forgotten?

20     A    No, I hadn't forgotten.  I didn't know that

21  that resulted in his termination.

22     Q    That is not my question.  What I was asking

23  you was the number of times that you testified under

TERA MCMILLIAN - 1/22/2008

11

1    oath.  And I understand that you have given a deposition

2    in the case against Call Points, I know you gave a

3    deposition to Mr. Stokes in the Hardy termination case,

4    and then you testified at that hearing; right?

5        A    Yes.

6        Q    So that is three times.

7        Are there other times when you have given testimony

8    under oath in a case, any case?

9        A    Not to my knowledge, no.

10       Q    Have you talked with anybody, other than your

11   lawyer, about this lawsuit?

12       A    Yes.

13       Q    Okay.  I want you to name for me each person.

14       A    My mother.

15       Q    Okay.

16       A    I don't recall anyone else.

17            MR. WILSON:  I am sorry.  I couldn't hear the

18                last answer.

19            THE WITNESS:  I don't recall anyone else.

20       Q    Have you talked with anybody else, not

21   specifically about this lawsuit, but about the

22   allegations that you have made that are the substance of

23   this lawsuit?

1      A      That is possible, but I don't recall speaking

2   with anyone else.

3      Q      You don't recall a single person?

4      A      About this lawsuit?

5      Q      About the allegations that you have made that

6   are now the substance of this lawsuit?

7      A      Before the lawsuit was filed?

8      Q      No, ma'am.  Before sitting here right now

9   giving your deposition?

10     A      I can't recall.

11     Q      You can't recall anybody?

12   Who is Allen Staton?

13     A      He is the investigator.

14     Q      What investigator?  He's the DYS investigator;

15   right?

16     A      Yes, he is.

17     Q      You have talked with Mr. Staton about this,

18   haven't you?

19     A      Yes.

20     Q      Have you forgotten that?

21     A      I thought you meant people in my --

22     Q      Okay.  Who is Ms. Harris?

23     A      Veronica?

TERA MCMILLIAN - 1/22/2008

13

1    Q    Yes.

2    A    She works here at DYS.  She is a friend of

3    mine.

4    Q    You and she grew up together?

5    A    Yes.

6    Q    And you have most certainly discussed some of

7    these allegations with her, haven't you?

8    A    Yes.

9    Q    Have you forgotten that?

10    A    No.  I haven't forgotten Veronica.

11    Q    My question is, I want to know who you talked

12    with about the allegations in this lawsuit.  You said

13    you can't remember anybody.  We have now covered two

14    people.

15    Are there any other people?

16    A    Ms. Spann.

17    Q    Any others?

18    A    Ingria Williams.

19    Q    Who else?

20    A    That's about all I can think of at the moment.

21    Q    Is that everybody you have spoken with about

22    this lawsuit or about the allegations that are the

23    substance of this lawsuit, or not?

14

| | | |
|---|---|---|
| 1 | A | Ms. Rankins. |
| 2 | Q | Okay.  Who else? |
| 3 | A | Gerry. |
| 4 | Q | I am not talking -- he works with your lawyer. |

And I don't know if the privilege applies, but we assume
it does.

| | | |
|---|---|---|
| 7 | A | Okay. |
| 8 | Q | Anybody else? |
| 9 | A | Not that I can recall at the moment. |
| 10 | Q | Who is Mr. Harvest? |
| 11 | A | Mr. Harvest? |
| 12 | Q | Do you know Mr. Harvest? |
| 13 | A | I do. |
| 14 | Q | Who is he? |
| 15 | A | He works here at DYS. |
| 16 | Q | Have you spoken with him? |
| 17 | A | Yes. |
| 18 | Q | Who is Mr. Farley? |
| 19 | A | Mr. Farley, he used to work here. |
| 20 | Q | Have you spoken with him? |
| 21 | A | Not about this lawsuit. |
| 22 | Q | Okay.  I am not asking you about the lawsuit. |

I am asking you about the allegations that you have made

1    in this lawsuit, the things that you say happened.

2        A    Yes.  I spoke with Mr. Farley.

3        Q    Who else have you spoken with?

4        A    I spoke with you.

5        Q    Who else?

6        A    My brother.

7        Q    What is your brother's name?

8        A    Kelvin Montgomery.

9        Q    Where is Mr. Montgomery?

10       A    He is in Wyoming.

11       Q    I am sorry.  Where?

12       A    Wyoming.

13       Q    You said his last name, and I didn't write it

14   down.

15       A    Montgomery.

16       Q    Did you speak with him over the phone or in

17   person?

18       A    He came here last year in March, so in person.

19       Q    Whom else have you spoken with?

20       A    Roderick Cooks.

21       Q    Roderick Cooks?

22       A    (Witness nods head.)

23       Q    Who else?

TERA  MCMILLIAN - 1/22/2008

16

1    A    My therapist.

2    Q    And who is that therapist?

3    A    I have spoke with my doctor, Dr. Carter.

4    Q    What is the therapist's name?

5    A    Gail Ellerbrake was the first person that I

6    saw.

7         MR. JACOBS:  Just to clarify things, it is

8              Ellerbrake.

9    Q    Ellerbrake.  Where is Dr. Carter's office?

10    A    Jackson Family Care.

11    Q    In Montgomery?

12    A    Yes.

13    Q    And where is Gail Ellerbrake?

14    A    She works at Catholic Social Services.

15    Q    In Montgomery?

16    A    Yes.

17    Q    Whom else have you spoken with?

18    A    Dr. Langlow.

19    Q    Can you spell that?

20    A    L-A-N-G-L-O-W, I think.

21    Q    What kind of doctor is Dr. Langlow?

22    A    Psychiatrist.

23    Q    Anybody else?  I am sorry.  Where is Dr.

TERA MCMILLIAN - 1/22/2008

17

1    Langlow's office?

2        A    Birmingham.

3        Q    Whom else?

4        A    The therapist and nurse that are at Meadhaven

5    Hospital Program.

6        Q    And that is here?

7        A    I met them at the tower over behind Baptist

8    South.

9        Q    Here in Montgomery?

10       A    Yes.  On Normandie Drive.

11       Q    I didn't understand you.

12       A    On Normandie Drive.

13       Q    Is that their office?

14       A    That is where they hold the therapy sessions.

15       Q    Where is their office?  Do you know?

16       A    That, I assume, is their office.

17       Q    Do you know their names?

18       A    Lucy.

19       Q    Lucy?

20       A    Yes.

21       Q    Do you know the last name?

22       A    No.  And she was out one day and there was

23    another lady.  I'm not sure what her name was, but she

18

1    filled in for her.

2        Q    How many times have you seen her?

3        A    I was there every day for two weeks, I think.

4        Q    When?

5        A    In March of 2007.

6        Q    March of '07?

7        A    Yes.

8        Q    With whom else have you spoken about the facts

9    of this case?

10       A    Dr. Dunn.

11           MR. WILSON:  I am sorry.  I couldn't hear the

12               name.

13           THE WITNESS:  Dr. Dunn.

14       Q    D-U-N-N?

15       A    Yes.

16       Q    What kind of doctor is Dr. Dunn?

17       A    He is a psychologist.

18       Q    Where is he?

19       A    Off of Mulberry.  Fourth Street, I think.

20       Q    Whom else?

21       A    Stephanie, my counselor.

22       Q    I am sorry.  Stephanie who?

23       A    Stephanie, my counselor.  She works at Alabama

TERA MCMILLIAN - 1/22/2008

19

1    Psychiatric.

2        Q    Where?

3        A    Off of Carmichael.

4        Q    Whom else?

5        A    Stephanie just left, and I have a new

6    counselor now.  I can't think of what his name is.

7        Q    And you are continuing to talk about the

8    allegations that you made in this case with these

9    counselors, still today?

10       A    Yes.  To a degree, yes.  We talk about other

11   things, too.

12       Q    Like what?

13           MR. JACOBS:  I think that may be privileged,

14               doctor-patient.

15               I think the other things that she

16           talks to her therapist about other than

17           the things related in this case may be

18           privileged.  I will be honest with you, I

19           am not sure.  I want to be safe here.

20           MR. PERRY:  So you object on that basis?

21           MR. JACOBS:  I would object on the

22               doctor-patient privilege.

23       Q    You may answer the question.

1      A     Relationships that I have with my son.

2      Q     What else?

3      A     My goals.

4      Q     Goals like G-O-A-L-S?

5      A     Yes.

6      Q     In life?

7      A     In life and also my mental health goals.

8      Q     What else?

9      A     Talk about ways of being able to handle

10   stressful situations.

11     Q     In general?

12     A     Yes.

13     Q     What else?

14     A     What else?

15     Q     What else?

16     A     However I am feeling at that moment at that

17   day.

18     Q     Unrelated to the things you are saying in this

19   case; right?

20          MR. JACOBS:  I don't think she said that.

21          MR. PERRY:  I am sorry.  I am asking her.

22          MR. JACOBS:  Well, I understand.

23          MR. PERRY:  If you have an objection, please

1          object.

2          MR. JACOBS:  I object to the form of the

3                question.  That is not what she said.

4     Q    The things we are talking about, I am asking

5     you about things that you talk about currently in your

6     therapy sessions, other than things that are related to

7     this case.

8          I understand your relationship with your son, your

9     goals in life, your mental health goals, and methods

10    generally of handling stress, and whatever you are

11    dealing with or feeling at the moment, you will talk

12    about that.  Okay.

13         Are we together so far?

14    A    Yes.

15    Q    What other types of subjects are you seeing

16    your therapist about now?  And when I say "now,"

17    recently is what I mean.

18    A    Trust issues.

19    Q    What else?

20    A    I talk about how my medication is doing.

21    Q    Anything else?

22    A    Not that I can recall at this moment.

23    Q    This is somewhat prying, I recognize that.  I

1    want you to know that I am not asking these questions to

2    be nosy or anything.

3        You understand that I represent the Department of

4    Youth Services and you have filed this lawsuit against

5    the Department of Youth Services and one of the things

6    you have claimed is mental anguish and that is why I am

7    asking you these questions, okay.  I am not just prying.

8    I wanted you to know that.

9        How old is your son?

10   A    He is seven.

11   Q    How is he?

12   A    How is he?

13   Q    Yes.

14   A    He is fine.

15   Q    How is your relationship with him?

16   A    We have a good relationship.

17   Q    What about your relationship with your son

18   would prompt you to seek counseling?

19   A    What about my relationship with my son that --

20   Q    -- prompted you to seek counseling about that

21   relationship with your son?

22   A    My relationship with my son didn't prompt me

23   to seek counseling.

TERA  MCMILLIAN - 1/22/2008

23

1    Q    Maybe I misunderstood.  I thought you said one

2    of the things that you talk about with your counselor

3    currently is your relationship with your son.

4    A    Yes.  But that is not what prompted me into

5    counseling.

6    Q    I didn't ask you what prompted you into

7    counseling.

8        Why are you getting professional counseling

9    regarding your relationship with your son, is all I am

10   asking?

11   A    It is all-around counseling.

12   Q    What does that mean?

13   A    I talk about my entire life.

14   Q    What stress do you talk about ways to handle?

15   A    What stress do I talk about ways to handle?

16   Q    Yes.

17   A    What do you mean "what stress"?

18   Q    One of the things that you said you talk about

19   with your counselors currently, not related to this

20   lawsuit, is ways to handle stress.  At least, that is

21   what my notes say.  That may not be exactly your words.

22       But do you remember saying that one of the things

23   y'all talk about is ways to handle stress?

1      A    Yes.

2      Q    What stress are you talking about handling?

3      A    All types of stress.

4      Q    Tell me about it.

5      A    Stress from work, stress from home.

6      Q    Anything else?

7      A    At this moment, I can't think of anything

8    else.

9      Q    Are you still working two jobs?

10     A    No, sir.

11     Q    When did you stop working at Hanilehwa?

12     Would you spell that?

13     A    H-A-N-I-L-E-H-W-A.

14     Q    That is a second tier Hyundai supplier; is

15   that correct?

16     A    I don't know what tier it is, but it is a

17   supplier.

18     Q    And you worked over at the Hyundai plant;

19   correct?

20     A    I did.

21     Q    When did you stop working at that job?

22          MR. JACOBS:  Sorry.  Which job?

23          MR. PERRY:  Hanilehwa.

25

1       A    I think it was 2006.  I'm not sure.

2       Q    Why did you stop that job?

3       A    Because I wasn't spending enough time with my

4    son.

5       Q    You were working long hours.  You would leave

6    this job at six in the morning, right, and you would

7    start that other job at six-thirty in Hope Hull?

8       A    Yes.

9       Q    How long did you do that?

10      A    About eight months, I think.  I'm not sure.

11      Q    And you did that because you wanted to do

12    that; right?

13      A    I did that to help take care of my son.

14      Q    Do you remember saying that you did that

15    because you wanted to?

16      A    Yes.

17      Q    Which is true?

18      A    Both.

19      Q    You wanted to do it to help take care of your

20    son?

21      A    Yes.

22      Q    I understand.

23           Trust issues, tell me about that.  What trust

1   issues do you have for which you are getting

2   professional counseling?

3        MR. JACOBS:  That are related to the case?

4        MR. PERRY:  No.

5     A   I do not trust easily.

6     Q   I know I am prying, and I apologize.  Tell me

7   about that, if you can.

8     A   You want to know why it is hard for me to

9   trust?

10     Q   Not exactly.  As I understand it, I really

11   don't want to get into too much detail about your

12   personal issues, but I need to know maybe just generally

13   what you are talking about when you say "trust issues"

14   that you have.  I mean, just generally.

15     A   Things have happened to make me feel that way.

16     Q   At what point in your life are we talking?

17   Are we going back to childhood?  I don't want to

18   pry about the details.  Are we talking childhood?

19     A   There has been instances.

20     Q   You also talked about your current medication.

21   Who is managing your medication currently?  Do you have

22   a psychologist?

23     A   Psychiatrist.  Dr. Poff.

TERA MCMILLIAN - 1/22/2008

27

1      Q    Spell that.

2      A    P-O-F-F.

3      Q    Where is he?

4      A    He is at Alabama Psychiatric Associates, and

5  my medical doctor.

6      Q    I kind of got off track.  Let me go back to

7  where we got off on the therapists.  You listed several

8  people you have spoken with about the substance of this

9  case and I want to get back to the case now.

10      I know you have spoken with Mr. Staton, and I

11  believe those were recorded statements that you gave;

12  right?

13      A    Yes, I believe they were.

14      Q    And you told him the truth; correct?

15      A    Yes, sir, to the best of my knowledge.

16      Q    You have spoken with Ms. Harris?

17      A    Yes.

18      Q    When was the last time you have talked with

19  Ms. Harris about the allegations in this case?

20      A    It's been a while.  I can't recall when.

21      Q    Give me a ballpark.  A while, does that mean

22  several days or does that mean years?

23      Have you talked with her since the lawsuit was

1    actually filed?

2        A    Yes.  I have spoken with Ms. Harris.

3        Q    Tell me the last time y'all talked that you

4    remember.

5        A    We talked the night before last.

6        Q    What did y'all talk about?

7        A    A friend of ours was killed at the racetrack.

8        Q    I am sorry.  I asked the wrong question.  You

9    answered the question I asked.  I didn't intend to ask

10   you what y'all talked about, generally.

11       When was the last time you remember talking with

12   her about the allegations in this case?

13       A    I don't recall the date.

14       Q    I do not need a definite date.  I need an idea

15   whether it was recent or years ago.

16       A    No, it hasn't been years ago, but I don't

17   remember.

18       Q    What did y'all talk about, whenever it was?

19       A    What did we talk about?  You.

20       Q    You talked about me?  I am afraid to ask.

21           MR. JACOBS:  You might be.

22       Q    Tell me about it.  What was your conversation

23   with her about me?

TERA MCMILLIAN - 1/22/2008

29

1    A    I think we were both shocked to know that you

2    came and prepped me for the hearing and now you are on

3    the other side of the table.

4    Q    Anything else?

5    A    I am under oath.  I told her that you said you

6    were my friend.

7    Q    Anything else?

8    A    And that I didn't know if you were my friend

9    now.

10   Q    Let's just chat a minute, okay.

11   A    Okay.

12   Q    I prepped you for that hearing in connection

13   with Michael Hardy, didn't I?

14   A    Yes.

15   Q    Do you remember what time we did that?

16   A    I think it was on a Saturday night.

17   Q    It was two o'clock in the morning, wasn't it?

18   A    When you came there?

19   Q    When we started, we started at two o'clock in

20   the morning, didn't we?

21   A    No.

22   Q    What time do you remember we started?

23   A    I got to work at ten.

1        Q    Maybe we ended at two.

2        A    Yes.

3        Q    I remember it was two in the morning.  So you

4    didn't have to take any additional time; you were able

5    to do that while you were working; right?

6        A    Yes.

7        Q    You presented to the hearing officer in that

8    case your allegations about what you had said Mr. Hardy

9    had done to you, didn't you?

10        A    Yes.

11        Q    And what happened as a result of that?

12    Michael Hardy lost his job, didn't he?

13        A    He did.

14        Q    And if I understand, you and Ms. Harris

15    discussed whether I continue to be your friend because

16    now I am defending the agency because you are claiming

17    the agency owes you money now.  Am I understanding that

18    correctly?

19        A    That they owe me money?

20        Q    This is a civil lawsuit.  Am I correct in

21    assuming that you are filing this civil lawsuit because

22    you want money?

23        A    Compensation, also vindication.

TERA  MCMILLIAN - 1/22/2008

31

1    Q    That means money, doesn't it?

2    A    Yes.

3    Q    And you are suing DYS; right?

4    A    Yes.

5    Q    So I correctly understand that, don't I?

6    A    I don't know if you understand it.

7    Q    Anything else that you spoke with Ms. Harris

8    about this lawsuit or your claims in this lawsuit?

9    A    I don't know.  We talk quite a bit.

10    Q    Well, I know, and my question is, in

11    connection with this lawsuit or the allegations in this

12    lawsuit, what else did y'all talk about?  I know y'all

13    talked about me, and we covered that.  Did we cover it

14    all?  Do you understand my question?

15    A    Did we cover it all?

16    Q    Regarding your discussions with Ms. Harris

17    about me, did we cover that?

18    One of the things that I should have done -- and I

19    apologize -- when we started, I should have told you

20    that any time you need to take a break, you let me know

21    and we will break.

22    Do you need to take a break now?  That is fine.

23    Now, it's not to go and talk about your testimony,

TERA  MCMILLIAN - 1/22/2008

32

1   but if you need to take a break or something, that's

2   fine.

3       A    You said talk about it.  Talk about with who?

4       Q    With anybody.  I don't want you to go and talk

5   about questions I have asked and then come back.  I want

6   you to answer my questions.  But if you need to take a

7   break, we definitely can take a break.

8       A    We can take a break.  That is fine.

9       Q    We will do that.  Let me finish this one

10  question and then we will break.

11      Did we cover all of your discussions with Ms.

12  Harris about me?

13      A    As far as I can recall at this moment.

14      Q    But you have also talked with Ms. Harris about

15  some other things.  So let's take a break and we will

16  come back and finish that.

17          (Thereupon, a lunch break was taken.)

18      Q    Ms. McMillian, how do you spell your last

19  name?

20      A    M-C-M-I-L-L-I-A-N.

21          MR. JACOBS:  I have got it wrong on the style

22              of the case, and that is what I was

23              saying earlier.  At some point, I

TERA MCMILLIAN - 1/22/2008

33

1              concluded I had it right and everybody

2              else had it wrong.

3        Q    Ms. McMillian, we were talking about different

4    conversations you have had about the facts that are in

5    this case, and we were talking specifically about Ms.

6    Harris.  And what I want to know is what else you have

7    talked to Ms. Harris about, other than what we have

8    covered this morning, regarding this case.

9        A    Since this lawsuit was filed?

10       Q    Well, both since and before.  Basically, I

11   need to know what all you have talked with her about.

12       A    After Mr. Hardy left my home, we talked about

13   that.  I had also told her some of the things that he

14   had said and done previous to that.

15       Q    What else?

16       A    I can't recall anything else at this moment.

17       Q    What did you tell Ms. Harris that Mr. Hardy

18   had done?

19       A    I told her that he had been making advances.

20       Q    Let me ask you this:  Did you tell her that he

21   had done anything that you didn't testify to in Michael

22   Hardy's personnel case?

23       A    I don't recall.

TERA MCMILLIAN - 1/22/2008

34

1    Q    Well, why don't you recall?

2    A    It's been a while ago.

3    Q    Let me short-cut it then.

4    Is there anything you didn't testify to in his

5    personnel case that you might have told her?

6    A    I don't know, sir.

7    Q    Do you understand what I am asking?

8    A    Would you like to clarify more?

9    Q    Nope.  I want to make sure you understand what

10   I am asking.  I need to communicate.  I need to make

11   sure that we are on the same page.

12   Do you understand the question I am asking, is what

13   I am saying?

14   A    You are asking me if I spoke to her about

15   anything different that was said at his administrative

16   hearing?

17   Q    Close enough, yes.  Not necessarily different,

18   but that I didn't previously know.

19   A    That you didn't previously know?

20   Q    Right.  That is what I am trying to get at.  I

21   know what you testified to.  But I am asking if you

22   talked to Ms. Harris about things other than what you

23   have already testified to.

TERA MCMILLIAN - 1/22/2008

35

1      A    I don't know.  I don't know if I talked to her

2    about anything different.  I can't recall that.

3      Q    Was that even possible?

4      A    Was it even possible?

5      Q    Yes.  Is it possible that there are things

6    that you have talked with people about regarding what

7    Michael Hardy did that you haven't previously testified

8    to?

9      A    Not to my knowledge.  I don't recall that, no.

10     Q    You said that you spoke with Ingria Williams?

11     A    Yes.

12     Q    When did you speak with Ingria about the facts

13   that are part of this lawsuit?

14     A    While the advances were happening.

15     Q    Okay.  Have you spoken to her since then?

16     A    I spoke to her the night before last.

17     Q    Okay.  What did y'all talk about?

18     A    She is in Birmingham having a surgical

19   procedure done.

20     Q    I did it again.

21   Have you spoken to her since then about the facts

22   that are in this lawsuit, that relate to this lawsuit?

23     A    Since his advances?  Since his last advance?

TERA MCMILLIAN - 1/22/2008

36

1    Q    Yes.  In other words, if I understood your

2    first answer, you spoke to her while Michael Hardy was

3    still working here and while the facts which were the

4    subject of this case were taking place.

5        And my question is:  Since that happened, and let's

6    say since you have moved out from under Michael Hardy's

7    supervision, have you spoken to Ingria Williams about

8    the facts of this case?

9    A    Pertaining to Michael Hardy?

10   Q    Anything in this case.

11   A    Yes.

12   Q    Tell me about those discussions.

13   A    We were just having general conversations.

14   She would ask how things were going, and I would tell

15   her.

16   Q    What things?

17   A    In the dorm that I was in, ITU.

18   Q    What does that have to do with this case?

19   I am not saying it doesn't.  That is a question.

20   A    What does it have to do with this case?

21   Q    How did that relate to this case?

22   A    I was just answering your question.  You said

23   did I talk with her about anything else.

TERA MCMILLIAN - 1/22/2008

37

1    Q    I am not arguing.  I understand.

2    Are you telling me that how things are going in

3    your dorm at any particular time necessarily relates to

4    this case?

5    A    Yes.

6    Q    Explain that.

7    A    The way I was being treated at the dorm.

8    Q    By whom?

9    A    The unit manager and co-workers.

10    Q    And the unit manager is whom?

11    A    At this time?

12    Q    Well, at that time, whatever you talked with

13    Ms. Williams about.

14    A    I know that I spoke to her about Mr. Lee.

15    MR. WILSON:  I am sorry.  Mr. who?

16    THE WITNESS:  Sylvesta Lee.

17    Q    And, specifically, you have alleged that Mr.

18    Lee has retaliated against you because you made an

19    allegation against Michael Hardy; am I correct?

20    A    Yes.

21    Q    That is your allegation; right?

22    A    Yes.

23    Q    And you spoke with Ingria Williams about that;

TERA MCMILLIAN - 1/22/2008

38

1    correct?

2        A    I have spoken with her about that.

3        Q    What else have you spoken with her about?

4        A    That the Lord will let the truth come out.

5        Q    What else?

6        A    I don't recall anything else at this moment.

7        Q    Tell me, as specifically as you can regarding

8    Mr. Lee, what you said to Ingria Williams about how you

9    were being treated at that time.

10       What did you tell Ingria?

11       A    That I felt like he was treating me

12   differently than other staff.

13       Q    What did she say?

14       A    What did she say?

15       Q    Yes.

16       A    I don't recall right off.  I am sorry.

17       Q    How many of those kinds of discussions about

18   the facts of this case have you had with Ms. Williams?

19       A    I'm not exactly sure.

20       Q    More than one?

21       A    Yes.

22       Q    More than ten?

23       A    I don't know.  I don't know.

1    Q    Is that possible?

2    A    No.

3    Q    Less than ten?

4    A    Probably so.  That would probably be a better

5    answer.

6    Q    Less than ten would be a better answer?

7    A    Yes.

8    Q    So on ten occasions you have said that you

9    think Mr. Lee is treating you different from other

10   people?

11   A    Ten times to Ingria?

12   Q    Yes.

13   A    I'm not exactly sure.

14   Q    What did you say on the other occasions?

15   A    When I talked to her, we not only talked about

16   that.  We talked about other things, too.  So I can't

17   say for sure.  I am sorry.

18   Q    You understand I am only asking you about

19   discussions you have had with Ingria about the facts

20   related to this case; right?

21   A    Okay.

22   Q    That is all I'm asking you about.

23   So you think you have had ten discussions with her

1    but you don't remember what you said other than that?

2        A    I said I wouldn't say more than ten.

3        Q    Something less than ten?

4        A    Probably.

5        Q    More than five?

6        A    I can't say that for sure.

7        Q    Ms. Rankins, have you talked with Ms. Rankins

8    after you made the initial complaint to her on the date

9    that this all started?

10       A    I have.

11       Q    How many times?

12       A    I can think of once that I talked with her.

13       Q    Only once?

14       A    I'm not sure.  Maybe twice.

15       Q    Tell me what y'all talked about, about this

16   case.

17       A    My mother was ill.  I called Mr. Lee to let

18   him know that.

19       Q    That is the incident that you wanted to not

20   have to come in to work because your mother was ill?

21       A    I was already at work.

22       Q    Any other discussions with her?

23       A    I think with Mr. Bolling, who was also the

1    unit manager before Mr. Lee.  I talked with Ms. Rankins

2    because my doctor had advised me not to go to work that

3    night, and I spoke with her about that.

4        Q    About not coming in?

5        A    Yes.

6        Q    She is Mr. Lee's supervisor?

7        A    She was.

8        Q    Was, right.

9        She is retired now; right?

10        A    Yes.

11        Q    Have you talked with Mr. Farley since Mr.

12    Farley left and went to Birmingham?

13        A    No.

14        Q    Roderick Cooks, when did y'all talk about this

15    case or the facts about this case?

16        A    During the time he represented me.

17        Q    That's right.  He is a lawyer?

18        A    Yes.

19        Q    When was the time period that he represented

20    you?

21        A    2005.

22        Q    Until when?

23        About two weeks after you -- You hired him about

1    two weeks after you went to see Ms. Rankins and she sent

2    you to Debra Spann; is that right?

3        A    It was June 16th, I think.

4        Q    Maybe the 12th, maybe the 16th, somewhere

5    around there?

6        A    Excuse me?

7        Q    You hired him somewhere around the 12th

8    through the 16th, right, of July?

9        A    I think it may have been before then that I

10   spoke with him.  Maybe my mother spoke with him first.

11       Q    When did that happen?

12       A    When she spoke with him?

13       Q    Yes.

14       A    I can't recall a date.  I am sorry.

15       Q    What month?

16       A    It might have been July.

17       Q    Could it have been June?

18       A    No.

19       Q    It was in July?

20       A    I think so.

21       Q    And then how long did he represent you?  When

22   did he no longer represent you?

23       A    Sometime in 2006.

1     Q    Fall, spring, winter, or summer?

2     A    It wasn't winter.

3     Q    Before or after winter?

4     A    Before.

5     Q    Was there a period where you were

6     unrepresented?

7     A    Yes.

8     Q    How long?

9     A    I don't know.

10    Q    All right.  Let's go back to your therapy and

11    your current treatment.

12        Were you an in-patient program at Meadhaven?

13    A    No.  I was in the partial hospital program.

14    Q    The what now?

15    A    The partial hospital program.

16    Q    When did you first begin seeing a

17    psychiatrist?

18    A    Psychiatrist?

19    Q    Yes.

20    A    I think it was in 2003.

21    Q    Had you seen psychologists and/or counsellors

22    or other mental health professionals before then?

23    A    I think once when I was about twelve.

TERA MCMILLIAN - 1/22/2008

44

1    Q    In 2003, who did you see?

2    A    Dr. Carter had referred me to Dottie Skipper,

3    but I didn't see her because I couldn't afford to see

4    her.  I let her know that that wasn't going to be

5    possible, and she referred me to the Catholic Services.

6    Q    What was going on at that time for which you

7    were seeking professional mental health counseling?

8    A    The situation with Mr. Hardy.

9    Q    In 2003?  Is that right?

10    A    Yes.

11    Q    When in 2003 did you see a mental health

12    professional?

13    A    I am not exactly sure what date that was.

14    Q    Fall, winter, spring, or summer?

15    A    Probably after I had gone to Dr. Carter is

16    when I went to see the therapist at Catholic Services.

17    Q    Which had been in the fall, Dr. Carter?

18    A    I don't know.

19    Q    I think you said it was not the winter; it was

20    before the winter?  Am I remembering that right?

21    A    Did I say it was before winter?

22    Q    Is that what you said earlier?

23    You want the court reporter to look back?  Do you

TERA MCMILLIAN - 1/22/2008

45

1    need the court reporter to look back and tell whether

2    you had first seen him in the winter or before?  You

3    don't remember what you just testified to regarding that

4    time line?

5        A    I wanted to be correct.

6        Q    I do, too.  But I don't understand why you

7    can't get it correct without having her read it back.

8        Do you think you might have been seeing a mental

9    health professional about Michael Hardy in the winter of

10   '03 or before?  Is that your testimony?

11       A    Yes.

12       Q    Have you ever received a mental health

13   diagnosis?

14       A    Yes.

15       Q    Tell me what your diagnosis is.

16       A    Major depression.

17       Q    Major depression?

18       A    Yes.

19       Q    When you were at Meadhaven, were you there for

20   that diagnosis?

21       A    That is when I received the diagnosis.

22       Q    Let's talk about your work history, and we are

23   just going to talk about DYS.

46

1          When you first came to DYS, were you assigned to

2     Holloway Hall?

3          A     Yes, sir.

4          Q     What time frame?  Well, first of all, after

5     you worked at Holloway, you then went to Paige Hall?

6          A     Yes.

7          Q     And then you left Paige Hall and went to ITU;

8     correct?

9          A     Yes.  I think I was at the Trustees Hall.

10         Q     So you were there for one day or some short

11    period of time?

12         A     Yes.

13         Q     And those are the three dorms you have worked

14    in at DYS, and no others; correct?

15         A     I did Hold Dorm.

16         Q     Which is like a temporary assignment?

17         A     Yes.

18         Q     You started Holloway in 2002?

19         A     Yes.

20         Q     If I understand it correctly, the staff that

21    you worked with at Holloway were given the option of

22    transferring as a group to Paige Hall; correct?

23         A     I don't know about given an option.

1      Q    But it is correct that y'all moved as a group?

2      A    Yes.

3      Q    And not everybody moved, one or two people

4   stayed behind; right?

5      A    I think they traded out Mr. Dortch for Mr.

6   Goshay.

7      Q    When did that take place?

8      A    I'm not exactly sure.  Probably 2004.

9      Q    2004.  That did not happen in '03?

10     A    I'm not sure.

11     Q    In '03, you worked at Holloway Hall; right?

12         MR. JACOBS:  Can we go off the record for a

13             minute?

14             (Thereupon, an off-the-record

15             discussion was held.)

16     Q    Ms. McMillian, isn't it true that you had no

17   problems with Mr. Hardy during the time you worked at

18   Holloway Hall; correct?

19     A    Not the same type of issues, no.

20     Q    What do you mean?

21     A    He would call me into his office quite

22   frequently.

23     Q    He would call you in his office for what?

TERA MCMILLIAN - 1/22/2008

48

1    A    To talk.

2    Q    And you would go in and talk with him?

3    A    Yes.

4    Q    So the first time that he did something to you

5    that was sexually inappropriate was at Paige Hall, isn't

6    that true?

7    A    Yes.

8    Q    The only person that you claim in this case

9    that has acted in a way that was sexually inappropriate

10   towards you is Michael Hardy; correct?

11   A    Directly towards me, yes.

12   Q    Are you implying that you are claiming that

13   some basis of your claim is indirect treatment to you by

14   someone else?

15   A    There was joking and things of that nature,

16   but it was never directed towards me, personally.

17   Q    I know there was joking, and you actually

18   participated in that joking?

19   A    To some degree.

20   Q    That is not what I am asking.  I am asking

21   about the basis of this lawsuit.  It is not a trick

22   question.  I am trying to make sure that I am correct in

23   my understanding that Michael Hardy is the only person

TERA MCMILLIAN - 1/22/2008

49

1    that you are suing my client, DYS, for having sexually

2    inappropriately mistreated you?

3        A    Yes.

4        Q    You have claimed that lots of people have

5    mistreated you, and we will get to that.

6        Do I correctly understand that your claim is that

7    everything else that has happened has happened because

8    of Michael Hardy?

9        A    As a result of the situation that transpired,

10   yes.

11       Q    What do you mean by that, as a result of the

12   situation that transpired?

13       A    What do I mean by that?

14       Q    Yes, ma'am.  Explain what you mean.

15       A    The fact that they probably knew him better

16   and longer than me, and I am sure that they probably

17   believed some things that he was saying.

18       Q    I didn't hear the first thing that you said.

19   Something longer than you?

20       A    Probably because they knew him.

21       Q    They knew Hardy longer than they knew you and

22   they believed Hardy?  Did I understand that correctly?

23       A    Some of them, I am sure.

TERA MCMILLIAN - 1/22/2008

50

1    Q    Let's do it this way.  Tell me who you claim

2    has discriminated against you, period?

3    A    My co-workers.

4    Q    Your co-workers?

5    A    Yes.

6    Q    All of your co-workers?

7    A    I have never heard anything.  The majority of

8    them.  My supervisors.

9    Q    All of your supervisors?

10   A    Mr. Bolling, Mr. Lee.

11   Q    Any other supervisors besides Bolling and Lee?

12   A    Those were my supervisors.

13   Q    Who else?

14   A    Because of Mr. Hardy, correct, or because of

15   this?

16   Q    I am asking you why you are suing DYS.  I want

17   to know who you are claiming has discriminated against

18   you.

19   A    Co-workers, the supervisors.

20   Q    And your supervisors are Bolling and Lee?

21   A    Yes.

22   Q    No other supervisors; right?

23   A    Those are the supervisors that I had.

TERA  MCMILLIAN - 1/22/2008

51

1       Q     And you are not talking about Phyllis Rankins?

2       A     No.

3       Q     And you are not talking about Debra Spann?

4       A     No.

5       Q     You are talking about your direct immediate

6    supervisors?  That is a question.

7       A     Yes, I know.

8       Q     Am I correct?  It is not a trick question.

9       A     I didn't think it was.  I am just thinking.

10    You said because of Michael Hardy?

11       Q     I think you said because of Michael Hardy, and

12    I think I understand -- if I am wrong, you tell me --

13    that the basis of this lawsuit is what Michael Hardy did

14    and what your co-workers and your supervisors did

15    because of you telling on Michael Hardy?

16       A     Okay.

17       Q     Right?

18       A     Yes.

19       Q     And now I am trying to find out who we are

20    talking about.  I think I know, but if I file stuff,

21    your lawyer is going to say, no, you have got to have a

22    record of this.  So I am trying to get it on paper.

23       I think I understand you are talking about your two

1    immediate supervisors and your co-workers; right?

2        A    Yes.

3        Q    And you are not talking about other employees

4    or people in the supervisory chain other than those two

5    people?  Is that right?

6        A    As far as I know.

7        Q    Now, let's talk about who the co-workers are.

8    Who are they?  Who are you talking about?

9        A    When I first got to the dorm, Ms. Hall was not

10    very nice.

11        Q    Ms. who?

12        A    Vanessa Hall.  I asked her to help me fill out

13    some paperwork.  She told me she didn't know how to do

14    it.

15        Q    Has she done anything since then?

16        A    She has said things.

17        Q    What?

18        A    Something to the fact that every time she

19    turns around, they are sending people who are crazy to

20    ITU.

21        As I said, she didn't say my name even though she

22    was looking at me.

23            MR. WILSON:  I am sorry.  I couldn't hear that

1              last answer.  Would you repeat what you

2              said?

3          THE WITNESS:  I said that she said every time

4              it seems like she turns around, they are

5              sending crazy people to ITU.

6      Q    Who told you that she said that?

7      A    I was there when she said it.

8      Q    And you perceived, even though she didn't say

9  your name, that she was talking about you?

10     A    I was the last person to come in there, and

11  she was looking at me.

12     Q    So the answer is that, yes, you did perceive

13  that she was talking about you?

14     A    Yes.

15     Q    She was looking at you, but she didn't say

16  your name?

17     A    Yes.

18     Q    When did that happen?  When you first went to

19  ITU?

20     A    Yes.

21     Q    So she said you are crazy, essentially; am I

22  right?

23     A    I took it that way.

TERA MCMILLIAN - 1/22/2008

54

1    Q    What basis would she have for saying that?

2    A    She said something earlier about the fact that

3    I had taken stress leave.

4    Q    This was earlier?

5    A    In 2005.

6    Q    Anything else that she did or said?

7    A    She would come in and not speak, but that was,

8    you know, her prerogative.

9    Q    I am sorry.  She would come in and not speak?

10   A    Yes, but that was her right.

11   Q    Anything else?

12   A    Slam doors.

13   Q    I am sorry?

14   A    Slam doors.

15   Q    In ITU?

16   A    Yes.

17   Q    What doors?

18   A    The door to the control room.

19   Q    The door that goes "Bam" every time it closes?

20   A    You are talking about 41, that door does that,

21   and that third door to the front does that, also.

22   Q    So those are the doors you are saying she

23   slammed?

TERA  MCMILLIAN - 1/22/2008

55

1    A    No.

2    Q    What doors was she slamming?

3    A    41, the one to the control room.

4    Q    That door doesn't have one of those big locks

5    on it?

6    A    Does it have a big lock on it?

7    Q    Yes.  Those big locks?  Every time I go in

8    there, I hear those locks.  They slam shut with a loud

9    noise.

10   A    They don't have to slam shut with a loud noise

11   unless you allow them to.

12   Q    I guess I haven't learned that art.  Anything

13   else?

14   A    Not that I can think of at this moment.

15   Q    What other co-workers are you talking about?

16   A    Ms. Whitted was upset with me.

17   Q    Ms. who?

18   A    Ms. Whitted.  I didn't know why.

19   Q    W-H-I-T-T-E-D?

20   A    Yes.

21   Q    How do you know she was upset?

22   A    She told another co-worker.

23   Q    Did you hear her tell this co-worker?

1      A    No.

2      Q    How did you know that she told her co-workers?

3      A    Because he told me.

4      Q    Who is he?

5      A    Mr. Webster.

6      Q    Mr. Webster?

7      A    Yes.

8      Q    What did Mr. Webster say she said?

9      A    That she was upset with the administration

10    more so after she realized that it wasn't I who had

11    taken her slot; that they had taken it from her.

12     Q    So she was upset that you got her slot?

13     A    Yes.

14     Q    Anything else?

15     A    I think she was upset about her off days.

16     Q    What do you mean?

17     A    When I was transferred there, when I got her

18    slot, I also received her off days.

19     Q    You got Whitted's off days?

20     A    Yes.

21     Q    And Whitted was upset about that?

22     A    Yes.

23     Q    Anything else?

TERA MCMILLIAN - 1/22/2008

57

1      A     Not that I can think of at this moment.

2      Q     So as far as you know, those are the reasons

3    that Ms. Whitted was upset with you?

4      A     I have an idea, but that is what -- that is

5    one of the things that Mr. Webster had told me.

6      Q     That is what Mr. Webster told you she had said

7    she was upset about?

8      A     Yes.

9      Q     And you don't have any reason to doubt Mr.

10   Webster, you are saying?

11     A     Who?  Me?

12     Q     Yes.

13     A     Do I have any reason to doubt him?

14     Q     Right.

15     A     He is human.

16     Q     So that could be wrong, as far as you know?

17     A     That is possible.

18     Q     Vanessa Hall -- let me go back -- what was she

19   upset about?  Why was she saying these comments that, I

20   suppose, hurt your feelings?

21     A     I don't know.

22     Q     What does she know about or why do you think

23   she might have known -- well, I guess you may have

1    answered this -- that you took stress leave at one

2    point?

3        A    I don't know how she would have known that.  I

4    didn't tell her that.

5        Q    Okay.  You just think that she understood that

6    you were out on stress leave?

7        A    No.  I don't know what she understood.

8        Q    Well, you said she said something about you

9    taking stress leave?

10       A    She said that.

11       Q    And you had, in fact, I think you said,

12   previously taken some time off on what you call "stress

13   leave"?

14       A    I had.

15       Q    And so do you have any reason to believe that

16   that is not what she was upset about?

17       A    That that is what she was upset about?

18       Q    No.  Have you got any reason to believe that

19   it was something else that she was upset about?

20       A    I don't know what she was upset about, because

21   I didn't know her.

22       Q    What other co-workers?

23       A    Ms. Griner.

59

1    Q    Spell that.

2    A    G-R-I-N-E-R.  I didn't know her either.  So I

3    don't know.

4    Q    What did she do to you?

5    A    She and Ms. Whitted opened my paycheck stub.

6    Q    When?

7    A    I think it was August 19th.

8    Q    What year?

9    A    2005.

10    Q    That offended you?

11    A    Yes.

12    Q    What else did Ms. Griner do that offended you?

13    A    Ms. Griner rolls her eyes, and she comes in

14    and she will say, "Good morning, Mr. Webster," and the

15    two of us are sitting there.

16        That is her right, also.

17    Q    In other words, you and Mr. Webster will be

18    there together, and she will come in and speak to Mr.

19    Webster but won't speak to you?

20    A    Yes.

21    Q    Am I understanding correctly?

22    A    Yes, but that is her right.

23    Q    This happened when?

TERA  MCMILLIAN - 1/22/2008

60

1      A    All the time.

2      Q    Still?

3      A    Sometimes.

4      Q    Now, I think I understand that at some point

5   your problems with your co-workers ended; am I not

6   right?

7      A    I learned to deal with it.

8      Q    I did not ask you if you learned to deal with

9   it.  I think I understand that you had previously said

10  that your co-workers had stopped --

11     A    That things were getting better.

12     Q    Yes.  That they had stopped mistreating you;

13  Is that not correct?

14     A    That things were getting better.

15     Q    So is your testimony here today that your

16  co-workers didn't stop mistreating you?  Is that your

17  testimony here under oath today?

18     A    That things were getting better.

19     Q    So what is the answer to my question?

20     A    The answer to your question?

21     Q    Right.  Is it your testimony here today under

22  oath that your co-workers never did stop mistreating

23  you?

1     A    Totally, no.  I don't think so, totally.  But

2     things got a lot better.

3     Q    When?

4     A    Lately.

5          MR. PERRY:  Let the record reflect that the

6               Plaintiff is having a conference with her

7               counsel.

8     Q    By the way, the same rule applies.  If you

9     need to take a break, let us know.

10         No need to be any more miserable than we all have

11    to be.

12         So we have covered all Whitted and Ms. Griner.

13         Ms. Griner opened your paycheck in August of '05?

14    A    She and Ms. Whitted together.

15    Q    Rolls her eyes at you and frequently won't

16    speak to you?

17    A    Yes, but that is okay.

18    Q    That's okay with you?

19    A    That's her right.

20    Q    Do you think she does not like you?

21    A    No, I don't think so.  Not very much, no.

22    Q    I am sorry.

23         So you think she does not like you very much; is

1    that what you said?

2         A    No, she doesn't.

3         Q    No, she does not like you very much?

4         A    No.

5         Q    Y'all just have a personality conflict?

6         A    I wouldn't think so.

7         Q    You do or don't?

8         A    I don't think so.  We have never had any type

9    conversations.

10        Q    Well, why do you think she dislikes you?

11        A    I don't know.  It would be good if you would

12   ask her, but I don't know.

13        Q    Do you have anything at all to suggest a

14   reason why she would dislike you?

15        A    I know she had to go to Paige Hall, also.

16        Q    Had to go to Paige?

17        A    She was working at Paige, also.  I know she

18   didn't like that.

19        Q    When did she have to go to Paige?

20        A    When I first went to ITU.

21        Q    When you went to ITU, she had to be moved to

22   make room for you?

23        A    I don't know about making room for me, but she

1    did.

2        Q    Did she come back to ITU?

3        A    She did.

4        Q    And when she came back to ITU, y'all switched

5    days off, didn't you?

6        A    Ms. Griner?

7        Q    Is that not right?  Am I confusing that?

8        A    Ms. Whitted.

9        Q    So it was Ms. Whitted.  So Griner and Whitted

10   both left ITU when you went?

11       A    I think it was not at the same time.  I don't

12   know who went first.

13       Q    And then they both came back?

14       A    They did.

15       Q    And so you think it likely that she was put

16   out because she was moved around to accommodate you?

17       A    To accommodate me?

18       Q    Yes.

19       A    I don't know if it was to accommodate me,

20   because there was probably space for all of us there.

21       There is always a shortage.

22       Q    Well, do you have any other ideas why

23   Ms. Griner might dislike you?

1      A    I don't know.

2      Q    No idea on earth?

3      A    No.

4      Q    What other co-worker?

5      A    Mr. Dortch.

6      Q    How do you spell his name?  Do you know?

7      A    D-O-R-T-C-H.

8      Q    First of all, what did Mr. Dortch do to you?

9      A    He had a petition going around.  I didn't see

10    it.  I don't know what it said.  But I spoke with Ms.

11    Spann about it.  He had one going around on her, too.

12      Q    When was this petition going around?  Is this

13    the one that was introduced at the Michael Hardy hearing

14    that you had never seen at that time?

15      A    I don't know.  I never saw it.

16      Q    How do you know about a petition?

17      A    Because he was asking people on campus to sign

18    it.

19      Q    How do you know that?

20      A    Because someone told me.

21      Q    Who told me?

22      A    I think it might have been Ms. Harris.  I'm

23    not for sure, because I think everybody knew about it.

TERA MCMILLIAN - 1/22/2008

65

1      Q    Everybody knew about it?

2      A    The petition.

3      Q    When was this?

4      A    I think it was in 2005.  I'm not sure.

5      Q    Was this before or after Mr. Hardy was

6   terminated?

7      A    I didn't know that Mr. Hardy was terminated.

8      Q    Was it before or after the hearing?

9      A    I'm not sure.  I think it was before.  I'm not

10   sure.  I'm not sure.

11      But I told Ms. Spann about it.  I don't know if she

12   took notes on it.  She may know.

13      Q    You remember at the hearing that there was a

14   petition that was signed by certain of your co-workers,

15   and I showed you that at that hearing?

16      A    A letter, yes.

17      Q    And there were two versions of the thing that

18   had different signatures on the bottom?

19      A    Yes.

20      Q    Is that the petition you are talking about?

21      A    I don't know.  I don't know.  I never saw the

22   petition.

23      Q    Is it more than one that you are talking

1    about?  Is it a single petition or is there a petition

2    other than the one you saw at that time?

3        A    If that is the one that you said was the

4    petition, then I assume it is.

5        Q    I didn't say anything.  I am trying to find

6    out the facts.

7        A    I never saw the original petition, so I don't

8    know.

9        Q    So as far as you know, there was one petition;

10   right?  There was only one incident, one time, that that

11   happened?

12       A    He had one for me and one for Ms. Spann.

13       Q    You think he had one going on about Ms. Spann,

14   too?

15       A    Yes.  She knows about it.

16       Q    Not that she knows about it.  You think there

17   was a petition that said something about Ms. Spann?

18       A    Yes.

19           MR. JACOBS:  Let's take a break.

20           (Thereupon, a break was taken.)

21       Q    I want to show you two documents.  They are

22   marked at the bottom corner, Exhibit 3 and 4, and I

23   believe these are attached to your filing of Exhibit 19

TERA MCMILLIAN - 1/22/2008

67

1    to the summary judgment reply.  I think that was the

2    three documents of the exhibit.

3        Those two documents that I am showing you, do you

4    remember seeing those at the hearing, the Michael Hardy

5    hearing?

6    A    Yes.  I think I saw this.

7    Q    And your lawyer has submitted them to the

8    court in this case; are you aware of that?

9    A    No.

10   Q    My question to you is:  Is it your

11   understanding that those are the petitions that you are

12   talking about?

13   A    I don't know if this is what they were talking

14   about or not.

15   Q    Because you never saw it.  When did you learn

16   there was a petition of some kind?

17   A    I think he was going around from dorm to dorm

18   asking people to sign.

19   Q    Who was that?

20   A    Mr. Dortch.

21   Q    When was that?

22   A    I don't know exactly when it was.

23   Q    But it was in June or July of '05; right?

1    A    I can't say.

2    Q    Why can't you say?

3    A    Because I don't know when it was.

4    Q    Well, you have sued the department and you are

5    claiming that this is a basis for suing the department.

6    I need to know.

7        If we are talking about that, that is fine.  That

8    is all I want to know.  But if we are talking about

9    something else that you are suing the department for, I

10   need to know.

11   A    Well, he didn't ask me to sign it.  So I can't

12   be sure if that is what he had for everybody to sign or

13   not.

14   Q    When did you first learn this had even

15   happened?  At the hearing?

16   A    No.  I had heard it before then that he had

17   wanted people to sign a petition.

18   Q    How did you hear it?

19   A    I think Ms. Harris told me about it.

20   Q    Okay.  Well, I will represent to you, if there

21   is any other petition that existed, I am unaware of it.

22   And if you are aware of something other than that, I

23   need you to let me know.

TERA MCMILLIAN - 1/22/2008

69

1    A    No, I don't know, because I didn't see the

2    petition that was going around for people to sign.

3    Q    But you are suing the department as though you

4    knew it.  So, I mean, if you are going to subsequently

5    come back and say that there was something else, I need

6    to know that now.  That is all I am saying.

7    A    I don't have any evidence that there was.

8    Q    Anything else that Dortch did?

9    A    Mr. Hood told me that --

10   Q    Mr. who?

11   A    Mr. Hood.

12   Q    Head?

13   A    H-O-O-D.  I was working with him and he told

14   me the reason that people were treating me the way that

15   they were because a lot of things had come over from

16   Paige Hall, from Mr. Dortch.

17   Q    Things had come over from Paige Hall, you

18   said?

19   A    Yes.  He was saying that I was a whore, freak,

20   and I wore tight clothing and that I had had sex with

21   the boys.

22   Q    That you had had sex with the boys?

23   A    Yes.

1    Q    Hood told you that people were mistreating you

2    because you had been having sex with the boys?

3    A    He said a lot of talk had been going on,

4    before I had gotten there to ITU, about me.

5    Q    Had you heard that from anyone else?

6    A    No.

7    Q    Now, does this have to do with Rogers Dortch

8    or is this separate?

9    A    Rogers Dortch is the one that was telling

10   people.

11   Q    How do you know that?

12   A    Mr. Hood told me.

13   Q    So Hood didn't say to you -- didn't accuse you

14   of having sex with the boys; Hood told you what Dortch

15   was saying; correct?

16   A    Yes.

17   Q    Did Hood tell you that he heard Dortch say

18   that?

19   A    Did he tell me that he heard Dortch say that?

20   Q    Yes.

21   A    No.

22   Q    So how do you know he ever heard anybody say

23   that?  You just took Hood's word for it that someone

1    else said something?

2        A    Yes.

3        Q    How many times did you hear something like

4    that?

5        A    How many times did I hear something like?

6        Q    Yes.  Is that the only time you have ever

7    heard anybody say that you had had sex with the boys and

8    that you were, whatever the other things you said he

9    said, a person of ill repute, in substance?

10        A    If they said it, they probably wouldn't say it

11    to me.

12        Q    I didn't say if they said it.  I asked you how

13    many times have you heard.  Other than Hood telling you

14    that he had heard that, how many other times did you

15    hear something like that?

16        A    I guess when Mr. Smith said he had sex with

17    me.

18        Q    To whom did Mr. Smith say he had sex with you?

19        A    He didn't tell you?

20        Q    I remember him saying that you did something

21    extremely inappropriate, but I don't remember -- he may

22    have -- him saying that y'all had sex.

23        A    He said that I did something extremely

1    inappropriate?

2        Q    My recollection was that he said you grabbed

3    his penis.  You were there when he gave the testimony.

4        A    No, I wasn't.

5        Q    You weren't at the hearing?

6        A    Not when he gave that testimony.

7        Q    All right.  Have you not reviewed the

8    documents that I have produced to your lawyer in this

9    case?  There have been quite a few.

10       A    Not that one.

11       Q    Have you not read the transcript that has been

12   produced to your lawyer?

13           MR. JACOBS:  To clarify, it hasn't been

14               produced to me, and, no, she hasn't read

15               it.

16       Q    Now, Mr. Smith, you heard that he said that in

17   the hearing, or did you hear that he said that somewhere

18   else?

19       A    Well, he had been out here on the yard saying

20   some things about me that weren't very nice.

21       Q    That weren't nice?

22       A    Right.

23       Q    To whom?

73

1    A    Carl Gadston told me --

2    Q    Carl Gadston?

3    A    Yes.   -- about three other men who were

4    talking about --

5    Q    When was this?

6    A    When did Carl tell me this?  2006 or 2007.

7    Q    Where is Mr. Smith now?  Do you know?

8    A    I think he works here.  I saw him in training

9    not too long ago.

10    Q    Do you have a complaint against Mr. Hood?

11    A    No.

12    Q    Mr. Hood hasn't mistreated you; Mr. Hood told

13    you that somebody else did?

14    A    He told me about Ms. Whitted and Ms. Griner

15    opening my check.  He told me about the reason why

16    everybody was treating me in the manner in which they

17    did.

18    Q    Okay.

19    A    He told me about Mr. Dortch.

20    Q    And Mr. Smith has said things about you.  Do

21    you have idea why Mr. Smith would lie about you?

22    A    No, I don't.

23    Q    I am certain that it is your testimony that

1   that is a lie, whatever he said?

2       A    Yes, sir.  That is a lie.

3       Q    And do you have anything at all to suggest why

4   he -- what his motive was, why he would have done that,

5   what caused him to do that?

6       A    No, sir, I do not.

7       Q    No earthly idea?

8       A    No, sir.

9       Q    Do you have a complaint against Carl Gadston

10  or was it simply that he told you something that other

11  people had done?

12      A    Yes.

13      Q    No complaints against Carl Gadston?

14      A    No.

15      Q    What else?  What other co-employees?

16      A    I think Carl also told me that Percy James

17  said everybody should stay away from me because I was

18  going to get them in trouble.

19      Q    All right.  Now, Percy James said that or

20  Percy James told you that somebody else said that?

21      A    No.  Carl told me that Percy James told him

22  that, and some other men.

23      Q    What did you understand Carl to be telling you

TERA MCMILLIAN - 1/22/2008

75

1    that Percy James was doing or saying?

2        A    To stay away from me because I would get

3    people in trouble.

4        Q    How are you going to get them in trouble?

5        A    I have no idea.

6        Q    When did Gadston tell you that Percy James was

7    telling people to stay away from you because you would

8    get them in trouble?

9        A    2006 or 2007.

10       Q    Where did Gadston tell you this?  Where were

11   y'all?

12       A    I think he came to the dorm.

13       Q    So this would have been after you had made the

14   allegations against your co-workers that this lawsuit is

15   now based on; right?

16       A    Yes.

17       Q    So you accused your co-workers of

18   discriminating against you and you have sued the

19   department and part of your case is that somebody said

20   stay away from you because you will get them in trouble;

21   is that correct?

22       A    I am sorry.  Can you repeat that?

23       Q    You have claimed that your co-workers have

TERA MCMILLIAN - 1/22/2008

76

1    discriminated against you; correct?

2        That is what we are sitting here talking about;

3    right?

4        A    Uh-huh.

5        Q    And you made that claim before Carl Gadston

6    told you that Percy James said this about you; right?

7        A    Yes.  I have never worked with Percy James

8    before.

9        Q    But you had certainly accused your co-workers

10   of discriminating against you, and now you have sued the

11   department because of what you say those co-workers have

12   done to you; right?

13       A    Yes.

14       Q    And part of your case now is that your

15   co-workers, after you made that claim, said stay away

16   from you, you will get them in trouble?  I have got that

17   pretty clear, don't I?

18       A    Yes.  But I do not work with Percy James.

19       Q    Who else?

20       First of all, let me go back.  When you say it is

21   likely -- Assuming Gadston was telling you the truth and

22   assuming Mr. James did say people should stay away from

23   you because you will get them in trouble, isn't it

1    likely that he is talking about your claims against your

2    co-workers, in general, mistreating you?

3         MR. JACOBS:  Object to the form.

4         MR. PERRY:  Go ahead and answer.  You can

5            answer.

6    A    I wouldn't have thought that Percy James would

7    have known about that.

8    Q    You wouldn't have thought that Percy James

9    would have known that you have accused all of your

10   co-workers of mistreating you and you have caused these

11   investigations to all take place and all your co-workers

12   to be investigated and you wouldn't think your

13   co-workers would know about that?

14   A    Percy James doesn't work with me.  And I was

15   told that these things were confidential.

16   Q    Mr. Staton goes and interviews all these

17   people and asks them a bunch of questions and you think

18   they are not going to say, Dang, let's stay away from

19   her?

20   A    If he tells them that they shouldn't talk

21   about it, I would think they wouldn't.

22   Q    Who else?  What other co-workers?

23   A    Mr. Lee.

1    Q    Now, Mr. Lee is a supervisor.  I think we

2    started saying that Mr. Lee and Mr. Bolling were the

3    supervisors that you are making claims against.  I am

4    now talking about your co-workers.  Any other

5    co-workers?

6       A    I can't think of anyone else at this moment.

7       Q    So we have got Vanessa Hall, Whitted, Griner,

8    Dortch, Smith, and Percy James.  Is that it?

9       A    Yes, but I have never worked with Percy James

10   before.

11      Q    I understand.  Your complaint against Percy

12   James is that you heard what he said?

13      A    Yes.

14      Q    Carl Gadston said that he said stay away from

15   you, you will get them in trouble?

16      A    Yes, but I have never worked with him before.

17      Q    And other than Carl Gadston saying that, you

18   never heard that otherwise?

19      A    No.

20      Q    Are there any other bases of your co-workers

21   having mistreated you for which you are suing DYS?

22      A    Not helping me to fulfill my job duties when I

23   needed help.

TERA  MCMILLIAN - 1/22/2008

79

1    Q    Who specifically?

2    A    I'm not for sure that -- I had asked Ms. Hall

3    that morning.  I'm not sure who else came in with her,

4    but I think I asked the people that were on that shift

5    and nobody knew how to fill out the paperwork.

6    Q    That is the incident you referenced earlier

7    when you asked her how you fill out the paperwork and

8    she wouldn't tell you?

9    A    Yes.

10   Q    So we have already actually covered that?

11   A    Yes.

12   Q    Anything else?

13   A    The fact that they were watching me closely

14   and giving information to Mr. Lee.

15   Q    Giving Lee information?

16   A    Yes.

17   Q    Tell me on what basis, what facts lead you to

18   the conclusion that they were watching you closely and

19   giving Mr. Lee information.

20   A    The memos.

21   Q    Which memos?

22   A    That are in the evidence.

23   Q    You are talking about when you were late, or

1    whatever?  Is that what you are talking about?

2        A    Well, I was late three times.

3        Q    No.  No.  I am asking you if that is what you

4    are talking about?  Or is there something else?  What

5    memos are you talking about?

6        You said the memos that are in evidence, and I

7    don't know what you are talking about.

8        A    The 26 --

9        Q    Look and see if it is in there.  Those are

10   copies of the exhibits that your lawyer has submitted.

11       That is Exhibit Number 8?

12       A    Yes.

13       Q    You are looking at the daily time and

14   attendance sheets.  There is a contact with staff,

15   signed by Mr. Lee, a memo from -- who is that?

16       A    Jacob Hammond.

17       Q    Who is Jacob Hammond?

18       A    I work with him.

19       Q    Flip to the next one, if you would.  This is a

20   memo.  This is dated 2/1/06.  Whose signature is that?

21       A    That is Mr. Washington.

22       Q    The next is a memo from whom?

23       A    Mr. Lee.

TERA  McMILLIAN - 1/22/2008

81

1    Q    And then the next is what?

2    A    That is Mr. Lee's handwriting.

3    Q    What is this?

4    A    Felicia Whitted.

5    Q    That is Ms. Whitted.

6    And who is this?

7    A    That looks like Mr. Lee's handwriting.

8    Q    Felicia Whitted.  Who is this?

9    A    That looks like Mr. Lee's handwriting.

10   Q    And then this?

11   A    Felicia Whitted.

12   Q    I am not going to go through each of these.

13   Let me ask you this:  When did you become aware of these

14   documents?

15   A    Just recently.

16   Q    Just recently.  These documents were produced

17   to your lawyer in this lawsuit; right?

18   A    Yes.

19   Q    You didn't know anything about these memos

20   until this was filed?

21   A    Yes.

22   Q    So, obviously, the fact that those memos were

23   written isn't something that created any pain and

1    suffering on your part, for example, because you didn't

2    know about them; right?

3        A    No.  I had suspected and now we have evidence

4    of it.

5        Q    You suspected that --

6        A    That I was being monitored more closely than

7    my peers.

8        Q    How does that show that you were monitored

9    more closely than anyone else?

10        A    Because I was late three times and there is a

11    record that shows that there were people who were late

12    more than three times who weren't counseled the way that

13    I was.

14        Q    Now, why do you think they were watching you

15    closely?

16        A    I don't know.

17        Q    Do you have any idea to suggest the answer to

18    that question, why would they do that?

19        A    No.

20        Q    You don't have any evidence whatsoever to

21    suggest an answer to that question?

22        A    No.

23        Q    Other than the people whose names are on those

1   memos and the people we have covered, is there anyone

2   else that you are suing DYS, for their actions?

3       A   I think when I made the allegations, they

4   could have been investigated more thoroughly.

5       Q   Now, who are you talking about?

6       A   Mr. Staton, the investigator.

7       Q   You are not talking about the initial

8   investigation which Debra Spann did, are you?

9       A   I didn't know about it when it happened.

10      Q   That is not my question.  I asked you if there

11  is anybody else that you are suing the department

12  because of something they did.  And your answer was that

13  you are apparently suing the department because the

14  department investigated your allegations.  And my

15  question is -- I think you know Ms. Spann investigated

16  some; Mr. Staton investigated some.

17      My question is:  Are you suing the department

18  because of Ms. Spann's investigation, or are you just

19  talking about Mr. Staton?

20      A   I think it all could have been handled

21  differently.

22      Q   So you are suing the department for both Ms.

23  Spann and Mr. Staton?

TERA MCMILLIAN - 1/22/2008

84

A    I am suing the department because I was
treated unfairly and I was discriminated against because
of the complaint that I made.

Q    I understand that.  That is general.  I am
trying to be specific.  I am trying to find out if you
have a complaint about Ms. Spann, too?

A    No, I don't.

Q    So when you say it could have been handled
differently, the answer is, you are talking about what
Mr. Staton did, not what Ms. Spann did?

A    Exactly.

Q    That is all you had to say.

Ms. Spann concluded that Mr. Hardy had done
something wrong, didn't she?

A    Yes.  I have seen that lately.

Q    I beg your pardon?

A    I have seen that lately.  I didn't know until
recently.

Q    You didn't know?  You and I met at two o'clock
in the morning and you had to go testify because the
department fired Mr. Hardy, and he appealed his
termination and you testified?

A    Yes.  But you did not tell me anything about

TERA  MCMILLIAN - 1/22/2008

85

1   what Ms. Spann said.  You told me that you believed

2   everything that I had said.

3       Q    I don't remember telling you that I believed

4   everything you said, but we certainly presented a good

5   case, didn't we?

6       A    Yes.  Because you said if you lost that one,

7   that would be the worst defeat of your career.

8       Q    And we didn't lose it either, did we?

9       A    No.

10      Q    I don't think I told you it was the worst

11  defeat I would have ever had.  I think I told you I

12  would have been very surprised to lose it.

13      So I would appreciate if you are going to say what

14  I said that you be correct.

15      A    That is what I remember you saying, sir.

16      Q    All right.  Is there any other co-workers that

17  we haven't covered?  Have you thought of anybody else?

18      A    Not at this moment.  I am sorry.

19      Q    Other than Mr. Staton, is there anybody else

20  other than your co-workers or your two supervisors?

21      A    Not at this moment.

22      Q    Mr. Lee, what is it that you claim that he has

23  done?  First of all, what is it that you claim he did?

1        A     Mr. Lee, like I said, had people monitoring me

2    very closely.  I was late three times, but there were

3    other people that were late more than three times.  He

4    did not counsel them the way that he did me.

5        Mr. Lee wrote me up for insubordination when my

6    mother was sick.

7        Q     That is the "you must be tripping" comment,

8    right, the insubordination write-up?

9        A     The insubordination write-up, when my mother

10   was sick.

11       Q     That is the "you must be tripping" comment;

12   right?

13       A     "Are you tripping?"

14       Q     Right.  What else?

15       A     Mr. Lee called my home and accused me of

16   cursing the nurse.

17       Q     Accused you of what?

18       A     Cursing Nurse Gray.

19       Q     When did this happen?

20       A     I'm not sure of the date.  I think it was

21   August 14th.

22       Q     What year?

23       A     2006, if I am not mistaken.

TERA  MCMILLIAN - 1/22/2008

87

1     Q     What else?

2     A     On numerous occasions, I have called Mr. Lee;

3     he would not return my phone calls.  I called his

4     supervisor, Mr. White, who told me that he needed to

5     find out why Mr. Lee was doing that.

6     Q     Who told you that?

7     A     Mr. White.

8     Q     Who is Mr. White?

9     A     Mr. Lee's supervisor.

10    Q     He is a specialist?

11    A     Yes.  Because he is on call twenty-four hours

12    a day, seven days a week.

13    Q     So you called Mr. Lee; Mr. Lee wouldn't return

14    your calls?

15    A     Yes.

16    Q     So you called Mr. White, Mr. Lee's supervisor,

17    and he told you to find out why Mr. Lee wouldn't return

18    your calls?

19    A     He was going to.

20    Q     He told you he will?

21    A     He was going to figure out what was going on,

22    because it wasn't the first time.

23    Q     The first time what?  That you had called Mr.

1    White?

2    A    That Mr. Lee would not return my phone calls.

3    Q    How many times did you call Mr. White?

4    A    I think I spoke with Mr. White twice.

5    Q    What year was this?

6    A    2007.

7    Q    What else?

8    A    Also, him advising my co-workers to watch me

9    closely.  I think that wasn't right.

10    Q    How do you know that he advised them to watch

11    you closely?

12    A    The memos that they wrote.

13    Q    Because they wrote memos, you think he told

14    them to watch you?

15    A    Yes.

16    Q    All right.  Anything else?

17    A    He wrote me up for not going to a staff

18    meeting.

19    Q    That was a staff meeting in which there was a

20    mandatory training taking place; right?

21    A    I don't know.

22    Q    Anything else?

23    A    I guess the harsh manner in which he speaks to

TERA  MCMILLIAN - 1/22/2008

89

1    me, and it is only reserved for me.

2        Q    You don't think he speaks harshly to anybody

3    but you?

4        A    I think that there is a difference in the way

5    that he speaks to me than the way he does to others.

6        Q    But you would not go so far as to say that he

7    doesn't have a harsh tone?

8        A    A harsh tone?

9        Q    Mr. Lee.

10       A    I know that he has a harsh tone with me.

11       Q    Well, he has a harsh tone with other people

12   too, doesn't he?

13       A    I don't know.  All I can say is he has a harsh

14   tone with me.

15       Q    You have never heard him talk with other

16   people?

17       A    Yes.  But he has never talked to them in front

18   of me in that manner.

19       Q    Anything else?

20       A    That is all I can think of at this point.

21       Q    Do you have any idea to suggest an answer why

22   he would do this?

23       A    No, sir, I don't.

1      Q    And since you don't have any idea, you

2    certainly don't have any evidence either, do you?

3      A    Of what?

4      Q    To answer the question why, assuming he has

5    done all of these things, why he has done them?

6            MR. JACOBS:  Object to the form of that,

7                    whether there is evidence or not.  You

8                    can answer it if you can.

9      A    Sir, I don't know.

10      Q    You don't know what?

11      A    Why he does the things that he does.

12      Q    And you are not aware of any evidence to

13    answer that question, are you?

14      A    Any evidence of what?

15      Q    To answer the question why he has done this?

16      A    No.  I don't know why he did this.

17      Q    Now, these things took place -- Are you aware

18    of anything at all, anything to connect Mr. Lee to

19    Michael Hardy?

20      A    No.  I don't know who knows who.

21      Q    You don't have any reason to suggest there is

22    a connection between Michael Hardy and Mr. Lee, do you?

23      A    The only thing I can think of is when I

1    mentioned the clique.  And like you said, it is known

2    that there is a clique on the campus.

3        Q    You say I said that?

4        A    Yes, sir.  You told me that night you were

5    prepping me, that it is known there is a clique on the

6    campus and there are dorm cliques, and you also told me

7    that cliques in facilities like these are naturally

8    occurring phenomenon.

9        Q    Are you testifying that your evidence in this

10   case is something that I have said to you?

11       A    I thought that when you said it, you were

12   confirming.

13       Q    Do you have any idea, assuming that there are,

14   in your words, cliques -- I am pretty sure I have never

15   used that word -- that naturally occur, that Mr. Lee and

16   Mr. Hardy were in a similar clique; that they ever

17   worked together; that they had any kind of relationship?

18   Do you have any idea of that?

19       A    I don't know, sir.

20       Q    So the answer to that is, no, you don't know

21   that that is true?  You don't have any reason to believe

22   that is true; that there is a connection between the

23   two?

TERA  MCMILLIAN - 1/22/2008

92

1      A    I don't know, sir.

2      Q    You don't know what?

3      A    I don't know about their personal

4    relationships, because I wasn't personally involved with

5    them.

6      Q    Well, why are you suing the department in this

7    lawsuit for what you say Mr. Lee has done?

8      A    Because time after time after time I have

9    complained about Mr. Lee, but Mr. Lee continued to do.

10     Q    So that gives you a federal right to a

11   lawsuit?

12     A    Mr. Lee continued to abuse me, sir.

13     Q    I understand.  And that gives you a federal

14   right to a lawsuit?

15          MR. JACOBS:  Calls for a legal conclusion.

16     Q    I am just asking.  I think we clarified at the

17   beginning that the reason you have sued this department

18   is because of what Michael Hardy did to you that was

19   sexually inappropriate and what other people have done

20   because you complained about Michael Hardy.

21          And you are telling me now that you don't have any

22   idea that there's any connection between these people

23   and Michael Hardy; am I correct?

TERA MCMILLIAN - 1/22/2008

93

1    A    I thought that you would be able to make him

2    stop.

3    Q    You thought that I would be able to make --

4    A    The administration.  The people who were --

5    Q    So you filed a federal lawsuit because nobody

6    can make your co-workers like you?

7         MR. JACOBS:  I object to the form of that.

8    Q    Is there any evidence that you are aware of to

9    connect any of this, what you have talked about, any of

10   these things that you have talked about, the reason you

11   are suing this department, to Michael Hardy?

12   A    Sir, I didn't know any of these people.

13   Q    It is a simple yes or no question.  If you

14   don't, that is fine.

15   A    Do I have evidence?

16   Q    Anything?  Even an idea.

17   A    Yes.  I think it has to do with that.

18   Q    And on what facts do you base that on now?

19   A    Like I said, I didn't know any of these

20   people, and all of this started happening.

21   Q    It all started happening after you accused

22   your co-workers of mistreating you; right?

23   A    No.  After I told about Mr. Hardy.

1        Q    All right.  We didn't cover Bolling.

2        What did Bolling do to you?

3        A    I was at Mr. Bolling's staff meeting, and when

4   I got to the staff meeting, I sat down, and everybody

5   else who was sitting next to me got up out of their

6   seats and took seats in other places.  Mr. Bolling was

7   standing with his back to me and he turned and gave me a

8   look of disgust.

9        Q    This was when?

10       A    This was the first staff meeting that I had

11  gone to in that dorm.  I'm not sure of the date.

12       And then when I realized what was happening, I felt

13  physically ill.  I asked Mr. Hood where the restroom

14  was, and he told me and I went to the restroom, because

15  I had never toured the building.  And when the staff

16  meeting was over, Mr. Bolling told me that, basically,

17  he didn't want any mess in his dorm.

18       When I couldn't go to work that day, he said he was

19  going to call Ms. Cole on me.  And after that, when I

20  came back to work, I went to take my excuse to Ms.

21  Spann, and he had just left her office, telling her he

22  didn't want me in his dorm.

23       Q    Did Ms. Spann tell you that he had told her

1    that?

2        A    Yes, sir.

3        Q    Did she tell you what he said?

4        A    That he didn't want me in his dorm; that she

5    had been fighting real hard trying to keep me in the

6    dorm.

7        Q    What else did Mr. Bolling do?

8        A    Shortly after that, Mr. Bolling got another

9    job.

10       Q    And then Mr. Lee came in; right?

11       A    Yes.  And Mr. Bolling trained Mr. Lee for

12   about three weeks and then left.

13       Q    So have we covered everybody that you claim

14   have mistreated you in this lawsuit?  Anybody else?

15       A    I feel like you have mistreated me.

16       Q    You think I have?

17       A    Yes, sir.

18       Q    In what way?

19       A    Like I said earlier, you told me that you

20   believed me.  You told me that I was your friend; that I

21   didn't have to worry about the other people out here not

22   liking me for telling the truth, because not only were

23   you my friend, but I had other friends in high places.

1    I trusted you with my thoughts while you were prepping

2    me, and now it seems that you don't believe me anymore.

3        Q    What is it that you think I don't believe?

4        A    The fact that these people have not treated me

5    fairly.

6        Q    In the first place, we did not try what these

7    other people had done.  And I did not prep you in

8    connection with any of that, did I?

9        What I prepped you in connection with was Michael

10   Hardy; isn't that true?

11       A    Yes, sir, but we talked about them, also.

12   There were a lot of people down there at the hearing,

13   but I think you made a motion for them not to testify.

14       Q    I think everybody testified anyway.

15       I want to make sure that we are clear.  What is it

16   that you think that I have led you to believe that I

17   believed that I now don't?

18       A    I thought you believed that Mr. Hardy was

19   wrong in what he did.

20       Q    Do you think I would have gone and presented

21   that case and had him fired if I didn't believe he had

22   done something that he shouldn't have done?

23       A    I don't know.

TERA  MCMILLIAN - 1/22/2008

97

1    Q    Do you think I am sitting here on the opposite

2    side of the table from you, as you put it, because I

3    don't believe anymore that he did anything that he

4    shouldn't have done?

5    A    (Witness nods head.)

6    Q    What has given you that idea?

7    A    Because these people have basically done the

8    same thing, and I have been coming and telling about

9    what they have been doing since it started, and I have

10   no reason to lie on them.

11   Q    You have talked to Mr. Staton two times,

12   haven't you?

13   A    Yes.

14   Q    And Mr. Staton recorded what you said, and

15   then he went and investigated them, didn't he?

16   A    One time.

17   Q    One time?

18   A    Yes.

19   Q    I will tell you that he did it twice, and I am

20   going to cover that with you.

21        You think I am mistreating you by defending this

22   lawsuit that you have brought against DYS, don't you?

23   A    No.  Because that is your job to defend DYS.

TERA MCMILLIAN - 1/22/2008

1    Q    So what are you saying?

2    A    What I am saying is that I wouldn't have

3    thought it would have been you.

4    Q    Defending DYS?

5    A    Yes, sir.  I thought maybe it would have been

6    somebody else.

7    Q    That is what I thought you were saying.  I

8    don't know what is the difference between that and what

9    I just asked you.

10    Anything else?

11    A    Not that I can think of at the moment, sir.

12    Q    Quickly, Mr. Farley.  If I remember right,

13    there was something that Michael Hardy did and you got

14    right up and went out and you said you told Mr. Farley

15    what had happened.  Is my memory right?

16    A    No, it isn't.

17    Q    What was it that you told Mr. Farley?  Let me

18    back up.  Who am I thinking about?

19    A    Rushton Farley?

20    Q    The instance where Mr. Hardy did something and

21    then you went outside and had a conversation with one of

22    your co-workers and said, Can you believe what he did?

23    A    I was already outside.  They were coming from

1    the dining hall.  Mr. Farley.

2       Q    That was Farley.  I thought so.  And you are

3    aware that Mr. Farley said that didn't happen?

4       A    No, I didn't read any of that.  I wasn't privy

5    to any of the transcripts.

6       Q    Well, he did.  Are you aware of any reason why

7    Mr. Farley would lie?

8       A    No, sir.  I am not aware of any reason why he

9    would lie.  Maybe he is afraid for his job.

10      Q    What do you mean?

11      A    I am afraid for my job right now.

12      Q    Because you are suing the department and you

13   work for the department and you are afraid the

14   department is going to --

15      A    I have been afraid for my job since 2003.

16      Q    You know -- Well, we will cover all of this.

17      Ms. Spann, you talked with Ms. Spann on the day you

18   made this first complaint.  Did you tell Ms. Spann or

19   did your mother tell Ms. Spann that she heard Michael

20   Hardy ask you to go to a hotel on that telephone

21   conversation?

22      A    We only had one phone in the house.  I still

23   only have one phone in my house now.  And my mother was

TERA  MCMILLIAN - 1/22/2008

100

1    sitting at the table.  She actually answered the phone.

2        Q    I know that.

3        A    Oh, you do?

4        Q    My question is:  Did you tell or did your

5    mother tell Ms. Spann that your mother heard that said?

6        A    Heard him say it?

7        Q    Heard him say that.

8        A    No.  That must have been a miscommunication,

9    because I told her.  She heard what I was saying.

10       Q    And your mother nodded her head; is that

11   right?

12       A    What do you mean?

13       Q    Ms. Spann heard what you were saying, your

14   mother heard what you were saying and your mother said

15   on the telephone he asked you to go to a hotel, and your

16   mother nodded her head?

17       A    I'm not sure.  I can't say.  I don't remember.

18       Q    But in any event, your mother didn't actually

19   overhear that; she was sitting present when the phone

20   call took place and when you hung up, you told her that

21   that is what was said?

22       A    Yes.  She only heard what I said.

23       Q    And then the only way she knew that Mr. Hardy

TERA  MCMILLIAN - 1/22/2008

1   had asked you to go to a hotel in that conversation is

2   that you told her that?

3       A    Yes.  She heard me telling him on the phone.

4   She heard me talking to him.  She didn't hear what he

5   was saying to me.  And when I got off the phone, I

6   re-played the conversation to her.  Not on a tape, but I

7   told her verbally.

8       Q    Now, Exhibit 1 to the documents that you have

9   filed in this case in response to the summary judgment

10  motion of the department is a declaration by you, Tera

11  McMillian; it is a nine-page affidavit.

12      You signed it on the back and you say, you declare

13  under penalty of perjury that the foregoing is true and

14  correct.  Do you remember signing this?

15      A    Thank you.  Yes, sir.

16      Q    That is your signature on the last page?

17      A    Yes, sir.

18      Q    And look at that and tell me whether that is

19  your affidavit?

20      A    Yes, sir.

21      Q    Now, on, I believe, the second page, you make

22  a statement there that Mr. Hardy frequently told you

23  that he liked big titties?

TERA MCMILLIAN - 1/22/2008

1      A    Yes.

2      Q    He told you that once, didn't he?

3      A    He told me that once?

4      Q    Right.

5      A    No.

6      Q    Have you ever told anybody else in all of the

7   statements that you have made before that, on any other

8   occasion other than the time you say he came up behind

9   you and grabbed you, that he made that statement?

10     A    Did I tell someone else?

11     Q    Yes.

12     A    I'm not sure if I told someone else or not.

13     Q    Well, you say there that he did it frequently?

14     A    Yes.

15     Q    When did he do that?  How frequently?

16     A    Quite a bit.

17     Q    What does that mean?

18     A    He was making remarks almost every time I saw

19   him, and if they weren't verbal, there were other subtle

20   things that he would do other than verbalize stuff.

21     Q    All right.  You also mention in that affidavit

22   something about many instances of sexual relationships

23   among employees and between students and employees at

TERA MCMILLIAN - 1/22/2008

103

1    Mt. Meigs.  Do you remember making that statement?

2    A    On page 4?

3    Q    Do you see it?

4    A    Yes, sir.

5    Q    Is that true?

6    A    The examples that are down here?

7    Q    No.  Is it true that you are aware of many

8    instances of sexual relationships between staff and

9    students at Mt. Meigs?

10    A    There have been many.

11    Q    I am sorry?

12    A    There have been many and some of them are

13    still together today.

14    Q    You know that?

15    A    Yes.  It has happened.

16    Q    How do you know that?  I guess I am going to

17    have to do this one at the time.

18    First of all, you are aware of more than one

19    instance of a sexual relationship between a staff at Mt.

20    Meigs and a student at Mt. Meigs; is that correct?

21    A    More than one?

22    Q    Yes.

23    A    Yes.

TERA  MCMILLIAN - 1/22/2008

104

1      Q    Tell me every one that you are aware of.  You

2    put it in the affidavit.

3      A    Yes.

4      Q    And now you are hesitating to testify?

5      A    No, I am not.

6      Q    I want to know.  You said you know more than

7    one.  Tell me.  Why are you hesitating?

8      A    Ms. Lawford that worked in pre-CAPS was fired

9    because she was caught having sex with a student.

10     Q    Who was?

11     A    I know of that incident.

12     Q    That was whom?

13     A    Ms. Lawford from pre-CAPS.

14     Q    And she was fired?

15     A    Yes, she was.

16     Q    And who else?

17     A    Student "D" (redacted) has a child with a

18   former employee at the ITU right now.

19         MR. PERRY:  Put in the record the initials,

20             not the student's name.

21     Q    When was this?

22     A    They are together now.

23     Q    Is he a student now?

TERA  MCMILLIAN - 1/22/2008

105

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | How old is he? |
| 3 | A | I'm not sure. |
| 4 | Q | How many years ago was he here as a student? |
| 5 | A | I was working here when he was a student here. |
| 6 | Q | So it has been since 2002? |
| 7 | A | Yes. |
| 8 | Q | And you are telling me -- How do you spell it? |
| 9 | A | "D" (redacted). |
| 10 | Q | And her name, again? |
| 11 | A | I can't think of it at the moment.  I am |

sorry.  But I have it written down.

| | | |
|---|---|---|
| 13 | Q | Where do you have it written down? |
| 14 | A | In my car.  I am sorry.  I just didn't think |

you were going to ask that.

| | | |
|---|---|---|
| 16 | Q | Well, you put it in the affidavit. |
| 17 | A | Yes, uh-huh. |
| 18 | Q | Who else? |
| 19 | A | Do you mind if I get my notes? |
| 20 | Q | Not a bit.  Do you want to go get them? |
| 21 | A | Yes. |
| 22 | | (Thereupon, a break was taken.) |
| 23 | Q | Ms. McMillian, I noticed that you came back in |

1      and you don't have anything in your hand.

2             MR. JACOBS:  I have it, Dudley, and I have

3                    something she has used to -- actually,

4                    she has prepared it for me, but we are

5                    going to waive privilege over this one

6                    document since she can't remember that

7                    person's name.

8      Q     You happened to have one document in your car,

9      and that is the one?

10            MR. JACOBS:  It has that name on it that she

11                   couldn't remember.

12     Q     Is that true, you have one document in your

13     car and that is the document?

14     A     This is the document.  That is why it was

15     folded like this.

16     Q     It was what?

17     A     That is why it is folded like that.

18     Q     It was actually where?

19     A     In the whatever you call that thing that you

20     put lotion and stuff in.  The console.

21     Q     This document, let me mark this as an exhibit.

22     I guess this will be the first one.

23            (Thereupon, DYS Exhibit No. 1

1                    was marked for identification.)

2        Q    I see that this says "C" (redacted) or "C"

3    (redacted).  Is it --

4            MR. JACOBS:  Why don't you let her have it

5                    back, and she can tell you.

6        Q    May I come around and look over your shoulder?

7        A    Sure.

8        Q    What is that one?

9        A    That is nothing.  It's been a while.  His name

10    is -- We called him "D" (redacted).

11        Q    And who is Ms. Hardin?

12        A    She worked in ITU.

13        Q    Are you saying that "D" and Hardin had a

14    relationship?

15        A    Yes.  They have a baby now together and are

16    together now.

17        Q    And you have Stufurgen?

18        A    Stufurgen.  She worked in Thaggard Hall.  The

19    child's name was "CC" (redacted).

20        Q    And he was in for bank robbery?

21        A    Well, they did a bank robbery together.

22        Q    They did a bank robbery together?

23        A    Yes.

1    Q    Were they caught?

2    A    Yes.  That is how we know they did a bank

3    robbery together.

4    Q    And Honeycomb?

5    A    That is not his real name.

6    Q    Who is Honeycomb?

7    A    One of the students.

8    Q    So these are the many instances that you were

9    referring to in your affidavit?

10   A    Yes.  That is some of them.

11   Q    Are there more?

12   A    I am sure that there are.

13   Q    How do you know?

14   A    It is an ongoing situation.

15   Q    It is an ongoing situation.  And you are aware

16   of that?

17   A    Everybody that works out here is aware of

18   that.

19   Q    I work out here and I ain't aware of it

20   A    You don't come behind the fence very often.

21   Q    Well, I am fixing to be.  How do you know or

22   when did you first know anything about "D" (redacted)

23   and Hardin?

1        A    Ms. Griner and Ms. Hardin are friends.

2        Q    Ms. Griner and Ms. Hardin are friends?

3        A   Yes.

4        Q    How does that answer my question?  When did

5    you first learn about it?

6        A    When did I first learn about it?  I'm not

7    sure.  How many years ago?

8        Q    Yes.

9        A    I can't really tell you how many years, or

10   what exact time frame.

11       Q    Was "D" (redacted) a student at the time?

12       A    Yes.

13       Q    At the time "D" (redacted) was a student, you

14   knew that there was supposedly a sexual relationship

15   between these people?

16       A    Yes.

17       Q    When did you learn about the Stufurgen and "C"

18   (redacted)?

19       Well, first of all, you are also saying, not only

20   did they rob a bank, but you are saying they had a

21   sexual relationship, are you not?

22       A    From my understanding, yes.

23       Q    What is that understanding based on?

1      A    Ms. Johnson.  That may be misspelled.

2      Q    Were you aware -- I am sorry.

3      So you have an understanding that they had a

4  relationship.  Is it your understanding that that

5  relationship started while he was a student and she was

6  a staff?

7      A    Yes.

8      Q    What was that relationship based on?

9      A    Ms. Johnson told me about the bank robbery

10  couple.

11      Q    So Ms. Johnson told you this?

12      A    Uh-huh.

13      Q    And Ms. Thomas, it is your understanding that

14  she had a sexual relationship with this child?

15      A    Ms. Johnson also told me about that.

16      Q    When did my Ms. Johnson tell you this?

17      A    2007.

18      Q    Do you have any information, firsthand, about

19  any of this?

20      A    Of the two of them, the bottom two?

21      Q    Yes.

22      A    No.

23      Q    What about the first one?

1      A    It is evident, you know.

2      Q    How is it evident?

3      A    I didn't see them actually, but there was

4    rumors of that and they moved in together.

5      Q    They moved in together when he left?

6      A    Yes.

7      Q    Do you know -- Well, obviously -- Have you

8    told anybody until you are telling me now about this?

9    Have you filed any incident reports or any kind of

10   report about this?

11     A    No, sir.  No one has.

12     Q    Why not?

13     A    Because we want to keep our jobs.  We have

14   families, and we want to keep our jobs.

15     Q    Explain that.

16     A    I have a seven-year-old son.  He is standing

17   right out there.

18     Q    No.  No.  No.  You do know there is a policy,

19   and in fact, there is a criminal statute that says that

20   if you have a sexual relationship with someone in DYS

21   custody, you can go to jail?  You are aware of that,

22   aren't you?

23     A    They should go to jail.

TERA  MCMILLIAN - 1/22/2008

1    Q    And you know that, don't you?

2    A    I didn't know it precisely, but I think they

3    should go to jail.

4    Q    And you know as a fact --

5    A    That they should go to jail, yes.

6    Q    No.  And you know as a fact, if word gets up

7    here, those people are going to be fired, don't you?

8    The people who have a sexual relationship with students

9    at this campus, you know for a fact that they will lose

10   their job, don't you?

11   A    I would hope they would.

12   Q    You certainly would.  And you have an

13   obligation, don't you, to report that if you know about

14   it?

15   A    It was rumor.

16   Q    I didn't ask you that.

17   A    I wasn't --

18   Q    You know that you have that obligation, don't

19   you?

20   A    Yes.  But I wasn't in ITU while they were

21   having their affair.

22   Q    My question is:  Why have you not told anybody

23   until you put it in an affidavit in this lawsuit?  Why

TERA MCMILLIAN - 1/22/2008

113

1    have you not told anybody?

2        A    Why hasn't anyone else, sir?  Everybody knows

3    about this.

4        Q    Well, not I, okay.

5        And you have never told me, have you?

6        You have never told anybody, have you?

7        A    I have talked about it with people that work

8    out here.

9        Q    You have talked about it with who that works

10   out here?

11       A    With other people that work out here.

12       Q    What people?

13       A    As I said, Ms. Johnson.

14       Q    You have talked about it with your co-workers?

15       A    Yes.

16       Q    Do you know whether or not Ms. Johnson has

17   filed anything?

18       A    No one has, that I know of.

19       Q    No one has told anybody?

20       A    No.  I think there are some things that people

21   are aware of.  Like the woman in pre-CAPS who got fired

22   for getting caught having sex with a child.  Ms. Lawford

23   got fired for that.

TERA  MCMILLIAN - 1/22/2008

114

Q    Right.  I am trying to understand how you
think.  I really am.  You told on Michael Hardy, and
Michael Hardy immediately no longer supervised you and
Michael Hardy got fired.

You are telling me that you know of some people who
had some inappropriate sexual relationships with people
and you know they got fired, all right.  But you are
sitting here telling me that you don't want to tell
anybody because you don't want to get fired?

A    No, sir.  I don't want to get fired.

Q    I don't understand that.  Help me understand
that.

A    I have responsibilities.

Q    Help me understand your thinking.

A    My thinking is that I need to take care of
myself and my son.

Q    Let me suggest to you that if you know of
something like that, that what your obligation is, is to
tell this agency, okay?

A    Yes, sir.  That was rumor.

Q    I am not talking about rumors.  But you put in
an affidavit that you know about sexual relationships
between students and staff at this agency, and that is

TERA  MCMILLIAN - 1/22/2008

115

1    the first knowledge that I had of it, all right.

2        I am explaining to you that your obligation as an

3    employee of this agency and everybody else's too, and

4    you might tell this when you hear one of these rumors.

5    You better tell, okay?  Because that will not be

6    tolerated, and I think you know that.  I think you know

7    that.

8        The first person you mentioned was somebody who you

9    said was fired for having a sexual relationship?

10       A    The first person I mentioned was Ms. Hardin

11   and "D" (redacted).

12       Q    Well, then, it was the second?

13       A    The second person wasn't on there.

14       Q    Lawford, who is Lawford?

15       A    She worked at pre-CAPS.

16       Q    And she got fired, you said; right?

17       A    Who?

18       Q    You said she got fired because she had an

19   inappropriate sexual relationship with a student?

20       A    Yes, sir.

21       Q    Right?

22       A    Yes.

23       Q    So my question is:  Why is her name not on

TERA  MCMILLIAN - 1/22/2008

1    here?

2        A    Because someone just told me that the other

3    day.

4        Q    Someone told you what the other day?

5        A    About Ms. Lawford.

6        Q    Who told you?

7        A    I think they were talking about it at the

8    dorm.

9        Q    Who was talking about it at the dorm?

10       A    Two people that have been there longer than

11   myself.

12       Q    I am sorry.  Who?

13       A    Longer than myself, because I didn't know Ms.

14   Lawford.

15       Q    What are the names of the people who were

16   talking about it?

17       A    Mr. Stinson and Ms. Johnson, and I think Mr.

18   Webster was there, also.

19       Q    Anybody else?

20       A    That is all I can think of.  I think that is

21   all the people that were there.

22       Q    You do know that is against policy?

23       A    About what?

TERA MCMILLIAN - 1/22/2008

117

1    Q    That relationships between staff and students

2    is against policy?

3    A    It should be, yes.

4    Q    You know that even fraternizing with students

5    is against policy?

6    A    Yes, sir.

7    Q    You are trained on that, aren't you?

8    A    Exactly.

9    Q    And you do understand that you are required to

10   report that?

11   A    If I see that, yes.

12   Q    Well, if you know it.  You have put it in an

13   affidavit that you know it is true.

14   A    I knew it after the child was here no longer.

15   Q    You have never witnessed personally any

16   inappropriate sexual conduct that you haven't reported,

17   have you?

18   A    No, sir.

19   Q    Mr. Hardy did some things that were offensive

20   to you, didn't he?

21   A    Yes, sir.

22   Q    When he asked you to suck his "D," did you

23   really say to him, "I just can't see myself doing that"?

TERA McMILLIAN - 1/22/2008

118

1      A    I didn't say that to him.  I said something to

2    the effect of, "Oh, Lord, Mr. Hardy, I can't do that."

3    I think that was a mental thought.

4      Q    It is true that before that happened -- I am

5    not comparing the two.  But before that happened, you

6    had engaged in banter, sexual talk, in the office?

7      A    Yes, that was not directed toward me.  There

8    were jokes, but none of that was directed towards me

9    personally.

10      Q    When you told him you couldn't do that, he

11    said something like "Stop acting crazy and get over

12    here;" right?

13      A    Yes, sir.

14      Q    And I believe you said you looked at him and

15    then you looked at the floor and you just said, "I

16    couldn't do that"?

17      A    Yes.

18      Q    How come you didn't knock the daylights out of

19    him?

20      A    Because I wanted to keep my job.  I really

21    did.  I still need my job after I leave here.

22      Q    You have got your job.

23      A    If I leave here today or tomorrow, I still

1    want to be able to work and provide for my child.

2        Q    Now, Mr. Hardy at one point told you that he

3    had been accused of sexual harassment.  Do you have any

4    reason to believe that that ever happened?

5        A    I don't know whether it happened or not.

6        Q    Did anybody ever tell you that that had

7    happened, other than Hardy?

8        A    One day after he had said that, Mr. Dortch,

9    Mr. Smith, and I think Mr. Miles was there, Mr. Hardy

10   was there also, and they started talking about a lady

11   named Ms. May who had said that Mr. Dortch and, if I am

12   not mistaken, Mr. Hardy had sexually harassed her, but

13   they had gotten together and written some fictitious

14   stuff about her that led to her being terminated.

15       I think Ms. Taylor was involved in that also.  Ms.

16   Taylor, Mr. Smith, Mr. Hardy, and Mr. Dortch.

17       Q    You have never seen a report on that, have

18   you?

19       A    No, sir.

20       Q    Sitting here today -- You know, you talked a

21   good deal in this affidavit about how powerful Michael

22   Hardy was?

23       A    I thought he was.

TERA  MCMILLIAN - 1/22/2008

120

1      Q    You thought, past tense?  You nod your head.

2    Is that a yes?

3      A    At the facility, yes.

4      Q    Now, we have talked about this before, you

5    don't have the slightest doubt in your mind that he

6    didn't have the power he convinced you that he had, did

7    he?

8      A    I don't have a doubt that he didn't have it?

9      Q    It is perfectly clear now that that was not

10   correct, isn't it?

11     A    I think some people have backed off to keep

12   their jobs, too.

13     Q    You better believe it.

14     And you believed it at the time?

15     A    Yes, sir.

16     Q    But it was kind of a fairy tale that he

17   created, wasn't it?

18         MR. JACOBS:  Object to the form.

19     Q    Do you understand my question?

20     A    Yes, sir.

21     Q    That is right, isn't it?

22     A    I don't know if it was a fairy tale, but he

23   had -- he was man of the hour while he was out here.

121

1    Q    You think so?

2    A    He had a lot of friends.

3    Q    Do you?

4    A    Do I have a lot of friends out here?

5    I wouldn't say friends, but I am friendly with

6    people.

7    Q    I am going to jump over to another subject.

8    There is something that I am puzzled about.  If I

9    understand what you just said, you are friendly to

10   people?

11   A    I am friendly with people, yes.

12   Q    But what you are saying in this lawsuit is

13   that people aren't friendly to you; right?

14   A    Some of them.

15   Q    Right.  The people that we have talked about.

16   And you are saying in this lawsuit that it makes you so

17   miserable, that you suffered so greatly --

18   A    Yes, I have.

19   Q    -- that you are entitled to significant money

20   damages because of that?

21   A    I have suffered greatly, sir.

22   Q    And you are claiming that you want to be

23   compensated in money for that suffering?  I understand

1   that correctly; right?

2       A    Yes, sir.  I have suffered greatly mentally

3   and physically.

4       Q    But at the same time, every one of those

5   people, they work here on this campus.  You do know that

6   you have had the opportunity, if you wanted, just say

7   the word, and you could transfer, if you want to?

8       A    Transfer, what do you mean?

9       Q    You could leave this campus if you want to and

10  go work at Autauga, for example?  You know that?

11      A    Why would I want to go work at Autauga?

12      Q    I didn't ask you that.  On one hand, it is

13  your testimony that the people here mistreat you so

14  badly that you have had to have all kinds of treatment

15  and therapy and everything else, and now you want a lot

16  of money, and you also know, on the other hand, that you

17  have the opportunity, if you want, to go work somewhere

18  else?  That is your choice?

19      A    I have not done anything to anyone.

20      Q    No.  No.  You understand that, don't you?

21      A    I do understand that.

22      Q    Right.  I really am curious about that.  And I

23  have got to tell you, unless I was trying to just figure

1   out a way to say, "You have got to pay me some money,"

2   if I was really being mistreated by my co-workers, I

3   would want to go somewhere else if I could.  I don't

4   understand why you don't.  Can you answer that?

5        A   Yes, I can.  I have done nothing wrong.  I

6   have told the truth.  I was asked to tell the truth.  I

7   did that.  I have done nothing to anyone.  I don't feel

8   like I should have to go to Autauga because someone else

9   wants me to.

10       Q   So do you think all of your co-workers ought

11  to be sent to Autauga?

12       A   No.  I didn't say that.

13       Q   I know you didn't.  So what is the answer?

14       A   I have done nothing wrong.

15       Q   What is the answer?

16       A   I shouldn't have to --

17       Q   What is the answer?  What is it that you --

18          MR. JACOBS:  Would you stop badgering her?

19       Q   What is it that the department did wrong?

20       A   Letting this go on for so long without

21  stopping it.

22       Q   What is the answer?

23       A   Maybe better training.  Maybe --

1      Q    Better than bringing out the attorney general

2   or a representative from the attorney general's office?

3   Better than that?

4      A    I had no knowledge of that until recently.

5      Q    What else?

6      A    I think Mr. Lee needs some management

7   training.

8      Q    What else?

9      A    And the rest of us could use some sensitivity

10   training towards ourselves and towards the students.

11      Q    So training, you think?  You think we can

12   train your co-workers and they are going to like you

13   better?

14      A    It doesn't matter to me that they don't like

15   me.  You can not like a person but treat them with

16   respect and dignity.

17      Q    The incident where Mr. Hardy came to your

18   house and Ms. Harris was there, this was after Christmas

19   2005; correct?

20      A    2004.

21      Q    2004?

22      A    Yes.

23      Q    And you and Ms. Harris had been to Toys "R"

TERA  MCMILLIAN - 1/22/2008

125

1     Us; right?

2          A     Yes, sir.

3          Q     This was a Saturday?

4          A     Yes, sir.

5          Q     The very next Saturday after that Christmas?

6          A     I guess.

7          Q     And you were having drinks at your house?

8          A     Yes, sir.

9          Q     The next day was a work day for you; right?

10         A     Yes, sir.

11         Q     Mr. Hardy called you on the phone, and after

12    you had been home for about ten minutes, he showed up;

13    right?

14         A     I'm not exactly sure how many minutes it was.

15         Q     Do you remember testifying in the hearing on

16    Michael Hardy on May 8th that, roughly, maybe about ten

17    minutes went by?

18         A     Roughly.

19         Q     You remember that?

20         A     Roughly.  I don't know exactly how many

21    minutes.

22         Q     And you had a couple of drinks?

23         A     That night, not before he got there.

TERA  MCMILLIAN - 1/22/2008

126

1      Q      Not obviously in the ten minutes before he got

2  there?

3      A      Exactly.

4      Q      And when he showed up, what you were drinking

5  were Long Island Teas?

6      A      No.  She and I were drinking Belvedere.

7      Q      Belvedere?

8      A      Vodka.

9      Q      You just happened to have some Long Island Tea

10  at the house?

11      A      Yes.

12      Q      How frequently do you drink Long Island Tea?

13      A      Whenever I get the taste for it.

14      Q      How frequently?

15      A      I don't know.

16      Q      Do you have any now?

17      A      Do I have any now?  I don't have anything

18  now.

19      Q      When is the last time you had Long Island Tea

20  in your house?

21      A      I don't know.  Sometime in 2005, probably.

22      Q      Now, he knocks on the door, and you knew it

23  was he; correct?

TERA  MCMILLIAN - 1/22/2008

127

1    A    No, not necessarily.  Because I told him when

2    he got to the sign to call me and I would give him

3    directions.

4    Q    But he told you he already knew where you

5    lived; right?

6    A    No.  He didn't tell me that.

7    Q    But you knew he already knew?

8    A    Well, obviously.  He was the one who was

9    knocking on the door.

10   Q    And you didn't go to the door; Ms. Harris went

11   to the door?

12   A    She did.

13   Q    Why would you invite him in your house?  If

14   this man has done all of these terrible things to you,

15   why would you let him in your house?

16   A    I didn't want him to think I was mad with him.

17   I was trying to get along, trying to keep my job.  Just

18   trying.

19   Q    Now, he's snuck up behind you, grabbed your

20   breasts?

21   A    Yes, sir.

22   Q    He has asked you for oral sex?

23   A    Yes, sir.

1    Q    And he is coming to your house, and you just

2    invite him right in because you don't want him to be

3    mad?

4    A    No, I did not want him to be mad.

5    Q    You didn't think about going outside?

6    A    Did I think about going outside?

7    Q    Yes, instead of inviting him in.

8    A    No, sir, I did not.  Because we weren't there

9    alone; Ms. Harris was there, too.

10    Q    So you invited him in --

11    A    No.  She answered the door and invited him in.

12    Q    And he asked you to use the restroom?

13    A    He did.

14    Q    And, then, when he came back, you asked him to

15    sit down?

16    A    Yes.

17    Q    And, then, you sat down there with him?

18    A    Yes, I sat there.

19    Q    And y'all chitchatted?

20    A    We all did.

21    Q    And at that point, Ms. Harris left y'all

22    alone, didn't she?  You were sitting there in your

23    living room, or whatever room that is, with this man who

1    has done these things to you and y'all are drinking

2    alcohol on the Saturday after Christmas?

3        A    He wasn't drinking at that point.

4        Q    Well, so good point.

5        Ms. Harris, who is your childhood friend and knows

6    about what is going on, leaves you alone with this man?

7            MR. JACOBS:  Object to the form of the

8                question.

9        Q    Right?  I understand that correctly, don't I?

10       A    We weren't alone, because Ms. Harris was in

11   the kitchen.  The kitchen and the den are connected.

12       Q    So she leaves you and goes to the other room

13   so you are in the room alone with Mr. Hardy?

14       A    She went to make her another drink.

15       Q    And you volunteer and offered that man a

16   drink?

17       A    Yes.

18       Q    And it just so happens that the only drink

19   that he enjoys you happened to have in your house at

20   that time?

21       A    Yes, sir.  I didn't know he even drank.

22       Q    So he is drinking.  You are drinking.  Y'all

23   are alone.  And y'all continued to chat?

TERA  MCMILLIAN - 1/22/2008

130

1      A    The three of us, yes.

2      Q    The three of you?

3      A    Yes.

4      Q    Now, Ms. Harris had left y'all alone?

5      A    The kitchen and den are connected.

6      Q    I understand.  So she is drinking in the other

7  room; y'all two are in this room drinking?

8      A    No.  She was putting the presents in boxes and

9  putting some paper on them.

10     Q    But she was in a different room?

11     A    With no door.

12     Q    Your house has two rooms with an open --

13     A    Yes.

14     Q    Then he did some really strange things and

15 raised his shirt and asked you to lick his chest; right?

16     A    Yes, sir.

17     Q    But, now, Ms. Harris, she didn't see that;

18 right?

19     A    Yes.  She saw him with his shirt up.  That is

20 why she asked me if I wanted her to leave.

21     Q    And in your affidavit there, I think you

22 changed what you said.

23     A    What did I say?

1      Q    In your affidavit you said you said, "Hell

2    no," but what you really said was, "Hell, fucking no"?

3      A    "Hell mother-fucking no."  I didn't want to be

4    so vulgar, but yes.

5      Q    But that is what you said?

6      A    Yes.

7      Q    I am not saying it to be vulgar either, but

8    that is what you said you said?

9      A    Yes, sir.  That is what I said.

10      Q    Now, I got that right; correct?  I understand

11    that situation and what happened?

12      A    Yes.

13      Q    Now, even after this, you still didn't intend

14    to complain about him, did you?

15      A    No, sir.

16      Q    But, now, you did eventually complain, and at

17    the time you talked to Phyllis Rankins, we have

18    established the day -- what was the date?

19      A    June 16th.

20      Q    June 16th or June 25th?

21      A    June 16th.

22      Q    On that date when you went to see Phyllis, you

23    didn't go to see Phyllis for the purpose of complaining

TERA MCMILLIAN - 1/22/2008

132

1    about Michael Hardy, did you?

2        A    No, sir.

3        Q    You went to see Phyllis because you were going

4    to try to get her to help you get transferred to a

5    different dorm?

6        A    Yes, sir.

7        Q    And ITU was one of the dorms you wanted to be

8    transferred to?

9        A    No.  I didn't specify a dorm to her.

10       Q    I will come back to that.

11           Now, when you talked to Ms. Rankins, Ms. Rankins,

12   you do know she did exactly what she was supposed to do?

13   You would agree with that, wouldn't you?

14       A    Now I do, yes.

15       Q    You knew it at the time?  You were aware of

16   the policy at the time?

17       A    I didn't want any backlash.

18       Q    I understand that.  That is not my question.

19           When you told Ms. Rankins that Michael Hardy had

20   made advances to you of a sexual nature, you do agree

21   with me that Ms. Rankins did exactly what she should

22   have done pursuant to DYS policy?

23       A    Yes.

1    Q    She did what she was trained to do and she did

2    what she should do and sent you straight to personnel,

3    didn't she?

4    A    She did.

5    Q    And she even called personnel and followed up

6    on that, didn't she, while you were here?

7    A    She called me to tell me where to go that

8    night.

9    Q    And, therefore, knew you were in there,

10   because she spoke with you on the phone?

11   A    Yes, she did.

12   Q    Now, everything that you said that made this

13   -- Your belief of the power of Michael Hardy was the

14   reason you say you didn't complain before?

15   A    Yes.

16   Q    And the reason you say you were so afraid?

17   A    Yes, sir.

18   Q    But it is a fact that Phyllis Rankins said to

19   you that he wasn't that powerful, didn't she?

20   A    She said, "You think he is invincible, don't

21   you?"  And I said, "Yes, ma'am."  She said, "Well, he is

22   not, and I am going to show him the power of Phyllis

23   Rankins."

1    Q    She made it absolutely clear that she would

2    protect you, didn't she?

3    A    No, sir.  She sent me to personnel.

4    Q    Now, Phyllis then called you -- What you had

5    wanted from Phyllis was a transfer to a different dorm;

6    right?

7    A    Yes, sir.

8    Q    And then she called you and told you to go to

9    a different dorm?

10   A    She did.

11   Q    She did exactly what you asked her to do,

12   didn't she?

13   A    She did exactly what I wanted to do to get

14   away from him.

15   Q    Now, you have said or your lawyer has said, or

16   maybe it was in your statement here, that you were tired

17   and beat down and that you had worked previously that

18   day and then you had to work another shift that same

19   night.  Now, are you complaining or suggesting that -- I

20   know you are not complaining about Phyllis Rankins,

21   because we covered that.

22       Are you suggesting in your affidavit that Phyllis

23   Rankins mistreated you?

TERA MCMILLIAN - 1/22/2008

135

1    A    Mistreated me?

2    Q    Yes.

3    A    To have me working eight days in a row?

4    Q    No, to have you go -- I think you went to

5    Trustee that night?

6    A    I did.

7    Q    To have you go to Trustee that night?  You

8    wanted to get out of that dorm immediately.  Did you say

9    to her, "I don't want to work tonight"?

10    A    Of course not.

11    Q    Because you wanted to go out of that dorm and

12    go somewhere else, didn't you?

13    A    I wanted to keep my job.  After I told her

14    what had happened, I knew it wouldn't be long before

15    everybody else knew.  I wanted to do everything that I

16    needed to do.

17    Q    Here's the point.  You don't really have a

18    problem with Phyllis Rankins having immediately sent you

19    to work the next shift to go work at Trustees Hall, do

20    you?

21    A    I didn't have any say in it.  I just did it.

22    Q    That is not my question.

23    A    Yes, I should have been off, but I wasn't

TERA MCMILLIAN - 1/22/2008

136

1    going to tell her, no, I am not going to do it.

2        Q    Did she even know when your previous shift had

3    been?

4        A    I don't know.

5        Q    You don't have any reason to think that she

6    did know that, do you?

7        A    I don't know.

8        Q    You wanted to immediately go to another dorm

9    and she did that, didn't she?

10       A    She did that.

11       Q    And you didn't tell her, Look, I just got off

12   another shift, put me on another shift?  You didn't say

13   anything like that, did you?

14       A    No, I did not.  Whatever she would have told

15   me to do, I was going to do.

16       Q    Now, what is it -- you just said something

17   about working eight days.  What are you talking about?

18       A    I did.

19       Q    When?

20       A    I got off that morning.  I went to work that

21   night.  I went to work the next night, the next night.

22       Q    So you had eight days on after that?

23       A    In order to be off on my off days, which were

TERA MCMILLIAN - 1/22/2008

137

1    Sunday and Monday.

2       Q    Sunday, Monday were your off days?

3       A    They became my off days.

4       Q    When did they become your off days?

5       A    When I went to ITU.

6       Q    I see.  How many days did you actually work at

7    Trustee?

8       A    One.

9       Q    And then you went to ITU the very next night?

10      A    I think so.  I am not for sure.

11      Q    Okay.  So you went to ITU -- Do Trustee and

12   ITU have the same shifts?

13      A    I don't know.

14      Q    So after you went to Trustee, you went to ITU

15   and then you worked until Sunday came around and then

16   you got --

17      A    Until Sunday morning.

18      Q    So as a result of you going to Trustee, the

19   effect was that you worked eight days?  Am I correct?

20      A    For me going to Trustee?

21      Q    Right.  Because you worked at Trustee for at

22   least one day?

23      A    Yes.  I worked there one day and the rest of

1    the days were at ITU.

2        Q    And as soon as your regular off day came

3    around --

4        A    My regular off day was that morning that I

5    went to see Ms. Rankins.

6        Q    And Ms. Rankins sent you to Trustee that

7    night?

8        A    Yes.

9        Q    Did your regular off days change?  When you

10   were at, I guess it was Paige, the day that you went to

11   see Ms. Rankins, were your off days at that time Sunday

12   and Monday?

13       A    No.

14       Q    What were your off days?

15       A    I think they were Thursday and Friday.  I

16   don't know.  If I am not mistaken, it was Thursday and

17   Friday, but I am not sure.  Whatever day that was

18   started my off day.

19       Q    So, essentially, the result of asking for a

20   change to a different dorm, you worked eight days and

21   then when your regular off days came up, you began

22   taking those off days as they came around; correct?

23       A    Yes.

1    Q    Now, you don't suggest that Ms. Rankins did

2    that to punish you for having filed a complaint against

3    Michael Hardy?

4    A    I don't know what Ms. Rankins was thinking.

5    Q    You don't?

6    A    I should hope not.

7    Q    I mean, you know better than that.  She sent

8    you straight to personnel.  She said to you, I will show

9    you he is not invincible, and then she did, didn't she?

10    A    Eventually, yes.

11    Q    So you are not suggesting that Phyllis Rankins

12    somehow mistreated you or did something to you because

13    you filed this complaint against Michael Hardy?  The

14    opposite is true, isn't it?  She did something to

15    Michael Hardy?

16        MR. JACOBS:  Object to the form of the

17            question.

18    Q    Isn't that true?

19        MR. JACOBS:  Object to form.

20    A    I don't know what she did to Mr. Hardy, but I

21    had to work those eight days.

22    Q    You are not suggesting that having to work

23    those eight days was some kind of punishment, are you?

TERA MCMILLIAN - 1/22/2008

140

1      A    In this environment, it is hard to say.

2      Q    Well, let me ask it another way.  What

3    evidence do you have to suggest that you had to work

4    eight days because you complained against Michael Hardy?

5      What can you tell me that could possibly lead to

6    that conclusion?

7      A    I don't know.

8      Q    Do you blame that on anybody, for example?

9      Was it somebody's fault?

10     A    I guess somebody should have been keeping up

11   with it.

12     Q    I didn't ask you that.  Is it your testimony

13   that somebody, in particular, is at fault for that?  Or

14   are you just saying that that happened, so, therefore,

15   it must be because I complained against Michael Hardy?

16   Is that what you are saying?  Are you suggesting there

17   might really be a basis to believe that?

18        MR. JACOBS:  Object to the form of the

19            question.

20     A    I don't know, Mr. Perry.

21     Q    Don't know what?

22     A    Whether it has something to do with that or

23   not.

1      Q    You say in your affidavit that you have since

2    learned about additional retaliatory actions.  What are

3    you talking about?

4      A    Those memos that he wrote, I had no idea about

5    them.  Those write-ups, I didn't know.

6      Q    What write-ups?

7      A    That my co-workers were writing.  I didn't

8    know they were doing that.

9      Q    What else?

10     A    I didn't know -- I believe I would have been

11   more guarded if I had known that you would be asking me

12   these questions today.

13     Q    What do you mean?

14     A    Previously.

15     Q    I don't understand what that meant.  You would

16   had been more guarded about what?  When?

17     A    If I had known then that you were going to be

18   the one here asking me these questions.

19     Q    My question was what additional retaliatory --

20   You said in your affidavit that you have since learned

21   about additional retaliatory actions.  And the reason I

22   am asking you this is, because that is an open-ended

23   statement.  I am aware of a lot of facts in this case.

1    I need to be aware of all the things that you are saying

2    somebody did to retaliate against you because you

3    complained about Michael Hardy, and I know that you have

4    said the memos and the write-ups from your co-workers.

5    So what else?

6        A    The lowering of my evaluation.  I think that

7    had to do with the situation.

8        Q    You are talking about when you got a 25

9    instead of the 27 that you had gotten before?

10       A    Yes, sir.

11       Q    And the reference to the failure to attend

12   that training session?

13       A    I went to training, sir.

14       Q    I am sorry.  You went to training?

15       A    Yes, sir.

16       Q    Now, I am pretty sure that in your affidavit

17   you said -- I may be wrong about this -- that you

18   weren't told about that training?

19       A    The trainings that I was told about, I went to

20   them.  If I wasn't told about it, then I couldn't have

21   been there.  But the ones that I was told about, I

22   always went to training, the ones that I knew about.

23       Q    You do know there is an "A" and a "B"; right?

TERA  MCMILLIAN - 1/22/2008

143

1        A    Yes.

2        Q    A mandatory "A" and a mandatory "B"?  Right?

3        A    Yes.

4        Q    You knew at the time that you did not have

5    both "A" and the "B," didn't you?

6        A    No, sir, I did not know that.

7        Q    How could you not know it?

8        A    He said he had a make-up training.

9        Q    Had a what?

10        A    He said that he had a make-up training and

11    that is why he wrote me up.

12        Q    Right.

13        A    But I had thought I had gone to all of the

14    trainings that were posted for me to go to.

15        Q    You knew that you didn't have your mandatory

16    training?

17        A    He said that I didn't go to training.

18        Q    No.  I am sorry.  Answer my question.  You

19    knew that you did not have your mandatory training,

20    didn't you?

21        A    For 2006?

22        Q    During the time period that you are claiming

23    that your evaluation was lowered to a 25.

TERA  McMILLIAN - 1/22/2008

144

1      A    It was supposed to have been 2005.  That is

2    when he said I didn't go to training; not 2006.

3    January, that is the beginning of the year.  It starts

4    over in January.

5         He wouldn't have had a make-up in January of 2006,

6    because it starts over in January.

7                    (Thereupon, a break was taken.)

8      Q    We were talking about the write-up that you

9    got for not attending training.

10         Now, you told Mr. Staton that you had attended your

11    training; right?

12      A    Yes, sir.

13      Q    But you say here in your affidavit that you

14    were written up for not attending training that you were

15    not told about?

16      A    I attended all of the training that I was

17    supposed to go to.

18      Q    No, you didn't.  You did not have your "A" and

19    your "B," and you know that, don't you?

20      A    No, sir.

21      Q    Do you not know how much training you have

22    had, on a year-to-year basis?  Each year you are

23    required to get "A" and "B"; right?

1      A    Forty hours.

2      Q    And are you telling me that you don't know at

3  any time how much training you have had?  You just say,

4  if somebody says go train, you go train, but you don't

5  keep up with it?  You don't know how much you have had?

6      A    Honestly, then, no, I didn't.

7      Q    Period?  You didn't know how much training you

8  had had?

9      A    No.

10     Q    You are aware and you have been aware, it has

11  always been the policy, that it is required, to continue

12  to work here, if you want to keep your job, you have to

13  get that mandatory training every year?  You know that?

14     A    Yes, sir.

15     Q    That is a requirement for you to keep your

16  job?

17     A    Yes, sir.

18     Q    And you are sitting here telling me under oath

19  that you didn't know how much training you had; you just

20  went when somebody said go get training and you would go

21  and get trained?

22     A    No.  Somebody else schedules me for training,

23  sir.

TERA MCMILLIAN - 1/22/2008

146

1     Q     That is not what I asked.  You are telling me

2     under oath that you never knew how much training you had

3     already gotten?

4     A     At that time, I thought I had all of my

5     training.

6     Q     You know now that you did not, don't you?

7     A     No, sir, I don't know that.

8     Q     You don't?

9     A     No, because I still think that I went to all

10    of my training.

11    Q     Why do you say here, unlike you said to Mr.

12    Staton, you say in this affidavit that you weren't told

13    about the training?

14    A     About which training?

15    Q     You don't say that you attended it.  You say

16    you didn't attend it because you weren't told?

17    A     If there was another training, I wasn't told.

18    Q     Why did you change what you said?  Why did you

19    change your complaint?

20    A     I didn't change it, because I feel like I did

21    go to my training.  But if there was another training, I

22    wasn't made aware of it.

23    Q     It is true that Mr. Lee simply posts notices

TERA MCMILLIAN - 1/22/2008

147

1    of the training, isn't it?

2        A    To my knowledge, yes.

3        Q    And the other employees whose names were put

4    on that board, they attended the training, didn't they?

5        A    Whose names were put on the board?

6        Q    Right.  You were the only employee who did not

7    attend that mandatory training session, weren't you?

8        A    I don't know.

9        Q    Now, is it your testimony that you were

10   reprimanded in connection with this training issue?

11       A    He tried to.

12       Q    He tried to reprimand you?

13       A    Yes.  I don't know if it was for that or not,

14   but he tried to.

15       Q    You know the difference between a reprimand

16   and a warning, don't you?

17       A    Yes.

18       Q    What is the difference?

19       A    The reprimand is when they take seven points

20   off of your next score.

21       Q    Take seven points off, don't they?

22       A    Yes, sir.

23       Q    Necessarily knocks you out of a pay raise,

1    doesn't it?

2         A    I am sure most times it can.

3         Q    A warning does not, does it?

4         A    I don't think so.

5         Q    Now, this was in December of 2005; correct?

6         A    When?

7         Q    This reprimand for training, you attached it

8    to your summary judgment response as Exhibit 22?

9         A    I guess.

10        Q    And that is what we are talking about, isn't

11   it, this business about the 25 that you received on your

12   evaluation?

13        A    Is this when he gave me the letter of warning?

14        Q    Yes.  That is my question.

15        A    That is your question?

16        Q    Yes.

17        You say you are complaining about your evaluation;

18   right?

19        A    Yes.

20        Q    That is your testimony, isn't it?

21        A    Yes.  I think I also complained to you about

22   it.

23        Q    To me?

1     A    Yes, sir.

2     Q    You mean Mr. Staton?

3     A    No.  You told me as long as he didn't take any

4     money from me, I shouldn't worry about it.  I was in

5     control force training at the time, and I saw you on the

6     steps.

7     Q    Did he take any money from you?

8     A    No.  I didn't get a demotion in pay.

9     Q    Somewhere, I remember you had said, either in

10    your complaint or in your affidavit, that you have been

11    denied pay raises or money; is that true?

12    A    He didn't give me a raise.  I think he had on

13    there something about punctuality, and not getting

14    along --

15    Q    Because you were late three times?

16    A    Correct.

17    Q    But you were late three times?

18    A    Yes, but there were other people who were late

19    more than three times.

20    Q    And you got a 28 when he scored you for being

21    late three times, didn't you?

22    A    When he scored me for being late three times?

23    Q    Yes.  Isn't that correct?

TERA  MCMILLIAN - 1/22/2008

150

1      A    Yes.  This is what I was saying about --

2      Q    You are looking at something with your lawyer.

3   What is it that you are looking at?

4          MR. JACOBS:  It is Exhibit 13 you have in your

5              book.  It is an evaluation.  This one

6              says 2006.  It is the wrong year.

7      Q    What does it say right there?

8      A    Late three times.  This is the correct one.

9          MR. JACOBS:  I am sorry.

10     Q    You got a 28 on that one, didn't you?

11     A    Yes.

12     Q    You didn't lose any pay raise, did you?

13     A    No.

14     Q    So what are you talking about?

15     A    I got one for --

16     Q    You got one for?

17     A    The 25 one, do you have a copy of that?

18     Q    I have it.

19   You got a pay raise for that too, didn't you?

20     A    I did.  What do you get for that?  A one step?

21     Q    You got a step raise, didn't you?

22     A    A one step?

23     Q    Yes.  Didn't you?

1      A    Yes.

2      Q    And this was the period of time during which

3   you failed to attend mandatory training, among other

4   things; correct?

5      A    I don't remember.  May I see it?

6      Q    Yes, ma'am.

7      A    Thank you.  I think this is the one that he

8   wanted to give me the reprimand on that Ms. Rankins

9   wrote me a letter about.  It says, Refused to sign.  See

10  attached.

11     Q    I guess that would be my question to you.

12     A    Well, there is nothing attached.

13     Q    You are talking about the refused to sign

14  part, where it says, "see attached"?  What were you

15  pointing to that says "see attached"?

16     A    It was supposed to be attached.

17     Q    I am asking you:  What are you referring to

18  that says attached?

19     A    It says, See attached.

20     Q    Right here, it says, "Refused to sign.  See

21  attached."

22     You refused to sign that, didn't you?

23     A    Of course.

TERA  MCMILLIAN - 1/22/2008

152

1      Q    Of course?

2      A    Yes, I didn't agree with it.

3      Q    You do know that the personnel department will

4  uphold termination of state employees for refusing to

5  sign their performance appraisals, don't you?

6      A    Ms. Spann told me that if I didn't agree with

7  it, I didn't have to sign it.

8      Q    Ms. McMillian, was that an answer to my

9  question?  You do know that the state personnel

10  department will uphold termination of employees if an

11  employee refuses to sign their performance appraisal,

12  don't you?

13          MR. JACOBS:  Object to the form of the

14              question.

15      A    In certain departments, yes.  This isn't

16  one --

17      Q    In any department?

18      A    In this department too?

19      Q    If this department did it.  You are aware that

20  you are required to sign your performance appraisal,

21  aren't you?

22      A    I was told by human resources that I didn't

23  have to sign it.

TERA MCMILLIAN - 1/22/2008

153

1    Q    You were told by DYS Human Resources; right?

2    A    Yes.

3    Q    Did you call state personnel?

4    A    Did I call them?

5    Q    Yes.

6    A    I didn't feel like I should have to call them

7    after I went to human resources.

8    Q    You do know that it is a rule that you are

9    required to sign this, don't you?

10   A    No, sir, but he did show a tape that he

11   brought in.

12   Q    You don't know that that is a rule?

13   A    No, I did not know that it was a rule, because

14   when I went to personnel, they told me --

15   Q    Isn't it a fact that Mr. Lee intended to

16   discipline you for failing to sign this?

17   A    I didn't know that.

18   Q    Then why were you talking to Ms. Spann?

19   A    Because I had gotten the 25, and I didn't

20   think that I deserved a 25.

21   Q    You weren't talking to Ms. Spann about -- You

22   didn't just tell me that you were talking to Ms. Spann

23   about refusing to sign and understanding, at this

TERA  MCMILLIAN - 1/22/2008

154

1    agency, this agency won't take action against you for

2    refusing to sign?

3        A    That came up --

4        Q    You didn't just say that?

5        A    That came up --

6        Q    No, ma'am.  Did I not understand that you just

7    said that?

8            MR. JACOBS:  You are badgering her.  If you

9                want her to answer, give her time to

10               answer.

11           MR. PERRY:  She needs to answer my question

12               and stop arguing with me.

13       Q    Just please answer the question I asked and

14   don't give an excuse for why.  She is making a record,

15   and when I ask you a question, I have to get an answer

16   to it, and then you can explain something or ask me.

17   But answer my questions.

18       I clearly understood that you had a conversation

19   about the fact that you had refused to sign this

20   performance appraisal.  You had that conversation with

21   Ms. Spann, didn't you?

22       A    Yes, I spoke with her about that.

23       Q    Because Mr. Lee understood correctly that it

TERA  MCMILLIAN - 1/22/2008

155

1    is against the rules to fail to sign this thing; isn't

2    that true?

3        A    I don't know what Mr. Lee understood.

4        Q    You do know that it is correct that it is a

5    state rule that you are required to sign this, don't

6    you?

7        A    I did not know that at the time.

8        Q    Well, you learned it, didn't you?

9        A    When he brought the tape in.

10       Q    What tape?

11       A    I don't know.  It was a tape of a lady giving

12   instructions about performance appraisal.

13       Q    And the tape said you have to sign them?

14       A    The tape said that.

15       Q    So he taught you that?

16       A    That was after that.

17       Q    So what money did you lose?

18       A    What money did I lose?

19       Q    Yes, ma'am.

20       A    It wasn't about losing money.  No money.

21       Q    Thank you.

22            You haven't lost any money in connection with any

23   of this, have you?

1          Any of the things that you are claiming, you

2     haven't lost any money in connection with any of this,

3     have you?

4          A    I have lost things that are more valuable than

5     money.

6          Q    Please answer my question.

7          A    I am sorry.

8          Q    You haven't lost any money in connection with

9     any of this, have you?

10         A    I could have gotten more money --

11         Q    No.  No.

12         A    Yes, I have lost money.

13         Q    What money have you lost?

14         A    If he had not given me a 25, I could have

15    gotten more money.

16         Q    You could have gotten two steps if your

17    performance appraisal had been higher?

18         A    Yes, sir.

19         Q    And on what basis do you understand that this

20    25 was given?  Doesn't it say here "compliance with

21    rules is unsatisfactory"?

22         A    What rules was I not complying with?

23         Q    That is my question:  You understand what that

TERA  MCMILLIAN - 1/22/2008

157

1    is about, don't you?

2       A    No, sir.  I was complying with the rules of

3    DYS.

4       Q    Except that you didn't have your mandatory

5    training, did you?

6       A    Yes, sir, to my knowledge, I had all of the

7    mandatory training I was supposed to have.

8       Q    And this was during the period of time which I

9    think you just testified that you didn't know how many

10   hours you had?  Did I understand that correctly?

11      A    I didn't count up the hours.  I just went by

12   what I was supposed to go to.

13      Q    So on what basis can you possibly give

14   testimony under oath here today in contradiction to what

15   you previously said, that you did, in fact, have all of

16   your mandatory training?

17      A    I had all of my mandatory training.

18      Q    On what basis can you say that?  You say on

19   the one hand, you didn't know how much you had, and now

20   you say you had it all.  How can you say that?  What

21   facts do you base that on?  Any?  Or is it just you say

22   it --

23          MR. JACOBS:  Dudley, she has answered that

1           question about five times.  You are

2           arguing with her because you are not

3           getting the answers you want.

4      Q    What facts are you aware of to conclude that

5  you did have all of your training?

6      A    The fact that I know that I went to the

7  training, sir.

8      Q    What training did you go to?

9      A    All of the training that I was scheduled to go

10  to.

11      Q    Anything else?  Any other facts?  Any?

12  If there is, you can say so.

13      A    I went to all of the training that I was

14  scheduled to go to that I knew about.

15      Q    You have already said that.  I asked you if

16  there is any other facts.  You can say no.

17      A    I don't know if there are any other facts

18  because I haven't gone down there to research.

19      Q    Well, Mr. Staton did, because you told him you

20  did have it all.  Now, in your affidavit, you say, you

21  weren't told.

22      A    If I didn't go to one, I wasn't aware of it.

23      Q    Now, in your affidavit, you say that he has

1    asked you on a daily basis to suck his "D."  That is not

2    true, is it?

3        A    Everytime I was in his presence, there was

4    something sexual in nature.

5        Q    Let me ask the question again:  In your

6    affidavit, you say that he has asked you on a daily

7    basis to suck his "D"?

8        A    At some points, yes.

9        Q    You said that in your affidavit; right?

10       A    Yes.

11       Q    That is not true, is it?

12       A    Yes, sir.

13       Q    Then why did you testify previously --

14           MR. JACOBS:  Dudley, would you identify where

15              in the affidavit that is?

16       Q    It is not in your affidavit.  It is in your

17   EEOC charge, which is also an affidavit.

18           MR. WILSON:  It is page 2 of the charge of

19              discrimination.

20       Q    The charge of discrimination on 7/12/05.

21       I have just shown you what your lawyer has attached

22   as Exhibit 3 to your response to the summary judgment

23   motion?

TERA MCMILLIAN - 1/22/2008

160

1      A    Yes, sir.

2      Q    You have seen that, haven't you?

3      A    Yes, sir.

4      Q    That is your signature on that?

5      A    Yes, sir.

6      Q    And you swore to that document, didn't you?

7      A    Yes, sir.

8      Q    Do you see where you say that on an almost

9    daily basis he asked you to suck his "D"?

10     A    Yes, on an almost daily basis.

11     Q    That is not true, is it?

12     A    That is true, sir.

13     Q    You remember giving your testimony on May the

14   8th of 2006 in the Michael Hardy case, don't you?

15     A    I remember being down there.

16     Q    Do you remember being asked about Mr. Hardy

17   asking you for oral sex?

18     A    Do I remember it?

19     Q    Yes.  Do you remember being asked about that?

20     A    No, but I am sure I was asked.

21     Q    You said, Well, he didn't ask me for oral sex.

22   Let me just show you your testimony on page 75.  Look at

23   that and refresh your recollection.

1        And he asked you:  Did you have any more

2    discussions about that subject?  Do you remember that?

3        A    This says he didn't actually say oral sex.

4        Q    Right.  Because what he actually said was suck

5    his "D"?

6        A    Yes.

7        Q    That's right, isn't it?

8        A    Yes.

9        Q    That is what you were saying, isn't it?

10       A    Yes.

11       Q    You said here, No, he didn't ask me to do that

12   anymore, and then you went on?

13       A    I don't know.  When we did this, I had not

14   slept, no break.

15       Q    I beg your pardon?

16       A    But this is true.

17       Q    What is true?

18       A    I see that this is in here.

19       Q    Right.

20       And that is different from what your affidavit

21   says, isn't it?

22       A    That is different.

23       Q    Because that happened one time, didn't it?

1       A    No, sir.

2       Q    So now you are back to saying it did happen

3   more than once?

4       A    "You were talking about the day when he asked

5   you for oral sex, and you said, no, and y'all went

6   outside.  Did you have any more discussions about this

7   subject outside?"

8       Outside, meaning outside the dorm, I think.

9       Q    And he said, "Or anywhere"?

10      A    Or anywhere.

11      Q    What you are trying to say is that now, once

12  again, you are back to saying, yes, it happened more

13  than once?

14      A    It did.

15      Q    Tell me about that.

16      A    Mr. Perry, this happened a lot.  I can't give

17  you any instances or dates.

18      Q    I notice here in your affidavit, which you

19  have submitted as Exhibit 1, you say, in paragraph 4,

20  Mr. Hardy requested on one occasion that I, quote, suck

21  his "D."  Is that true?

22      A    Yes, he asked me to do that.

23      Q    On one occasion?

TERA MCMILLIAN - 1/22/2008

163

1    A    No.  I think you may be reading that the wrong

2    way.

3    Q    You think?

4    A    On one occasion, meaning I am telling about an

5    incident.

6    Q    Read that first sentence on paragraph 4.

7    A    Mr. Hardy on one occasion requested that I

8    suck his... yes.  That doesn't mean that it happened

9    more than once.

10    Q    Which is true?

11    A    I meant that Mr. Hardy, on one occasion,

12    requested.

13    Q    This was the last, most recent statement that

14    you have given about these incidents; right?

15    A    Yes, sir.

16    Q    Let's turn quickly to a different subject.

17    You are familiar with the DYS policy on sexual

18    harassment, aren't you?

19    A    Yes.

20    Q    You are?

21    A    Yes.

22    Q    You were trained on that policy early in your

23    employment, weren't you?

1        A    In the first year of my employment, yes.

2        Q    And throughout the time that Michael Hardy was

3    interacting with you in a sexually inappropriate way,

4    you were familiar with that policy?

5        A    Yes.

6        Q    And you knew that the policy said that you

7    should go and complain to personnel?

8        A    Yes.

9        Q    You had a copy of that policy with you?

10       A    With me?

11       Q    Yes.  At that time, didn't you?

12       A    Where?

13       Q    You had in your possession during that period

14   of time that policy?

15       A    They have a policy book in the dorm.

16       Q    And you actually physically went through that

17   policy and you had actually physically been over that

18   policy yourself in the dorm?

19       A    Yes, sir, when I was in Holloway Hall, I did.

20       Q    And, again, you had had training on more than

21   one occasion, actually, on that policy?

22       A    Yes.

23       Q    And there was no doubt in your mind, was

1    there, that your procedure would be to go and complain

2    about that to Debra Spann?

3       A    Sir, I didn't want to start any problems.

4       Q    I didn't ask you that.  There was not any

5    doubt in your mind what the policy was and what you were

6    to do?

7       A    Yes.  I knew what the policy was.

8       Q    And you chose not to do anything about it?

9       A    I chose to keep my job.

10      Q    You still have your job now.  You chose not to

11   complain and follow that policy, didn't you?

12      A    I chose to keep my job, sir.

13      Q    How is that an answer to my question?  You

14   subsequently were forced to follow that policy, weren't

15   you?

16      A    Yes.

17      Q    And you are sitting here with a job, aren't

18   you?

19      A    Yes.

20      Q    And the fellow you complained about is not, is

21   he?

22      A    Well, I don't know if he has a job or not.

23      Q    He doesn't have a job here, does he?

TERA  MCMILLIAN - 1/22/2008

166

1      A    No.

2      Q    So hold that thought.  Why do you sit here and

3   argue with me and refuse to answer my question and say

4   simply, I chose to keep my job?  You chose not to follow

5   the policy, didn't you?

6      A    I chose not to follow the policy because I was

7   afraid.

8      Q    Fine.

9      At the time you made that complaint, you talked

10  with Phyllis and then you went to see Debra, you were

11  working the twelve to eight shift at that time?

12     A    Yes, sir.

13     Q    Now, Mr. Hardy claims, as you know, that you

14  made this allegation because you knew that it would get

15  sent up and because you wanted to be able to work a

16  different shift.  You remember that; right?

17     A    That that is what he said?

18     Q    Yes.  You do remember that that was his claim;

19  right?

20     A    I didn't have privilege to the things Mr.

21  Hardy had said.

22     Q    Let me ask you this:  I know that at the time

23  you made that complaint, you were not working at

1     Hanilehwa?

2         A     No, sir.

3         Q     But you subsequently did take a job at

4     Hanilehwa?

5         A     Yes, sir.

6         Q     And it is a fact that if you had continued to

7     work the shift that you were working at the time you

8     made that complaint, you would not have been able to

9     work that job at Hanilehwa?

10        A     No, I wouldn't.

11        Q     Because the shifts overlapped, didn't they?

12        A     Exactly.

13        Q     ITU is one of the few dorms that has a shift

14    that ends at six in the morning; correct?

15        A     Yes, sir.

16        Q     I think maybe CAPS has that shift too; right?

17        A     I'm not for sure.  Hanilehwa wasn't

18    established at that time.

19        Q     When you went up to see Ms. Spann, you were

20    not afraid to talk to her, were you?

21        A     No.

22        Q     And within two weeks of doing that, you had

23    already hired a lawyer to represent you to sue this

1    department?

2        A    It was two weeks?

3        Q    I am asking you.  Isn't that true?

4        A    I don't know how long it was.

5        Q    Is that about right?

6        A    I don't know how long it was, sir.

7        Q    Pretty short period of time, wasn't it?

8        A    It was a pretty short time when they started

9    to whacking in on me.

10        Q    Now, let's back up.  You previously testified

11    that all the way back in 2003, you began seeing health

12    care professionals because of Michael Hardy?

13        A    Yes.

14        Q    So that had been happening since 2003, and you

15    hadn't told anybody, had you?

16        A    No, sir, I hadn't.

17        Q    Because it was your testimony that you were

18    afraid?

19        A    I was and I still am.

20        Q    Well, you weren't when you talked to Ms.

21    Spann, were you?

22        A    No, I wasn't.  She made me feel comfortable.

23        Q    And until you talked to Ms. Rankins about a

1    transfer, the only people you had talked to were, first,

2    Derrick Bolling and then Michael Hardy, right, about a

3    transfer?

4        A    Yes.

5        Q    And, in fact, you understood that there were

6    openings available at ITU when you talked with Mr.

7    Bolling, didn't you?

8        A    From Mr. Hood.

9        Q    And that was on the two to ten shift?

10       A    Yes.

11       Q    But you didn't want the two to ten shift, did

12   you?

13       A    Yes.  I had told him that was fine.

14       Q    You don't remember testifying that what you

15   wanted was the six to two shift?

16       A    Yes, that was the first preferable shift.  But

17   when he said he didn't have that available, he had a two

18   to ten, I said that would be fine.

19       Q    But, then, you never put in any kind of a

20   request for a transfer, did you?

21       A    Where do you go put them in?

22       Q    The only thing you did was nothing; right?

23       A    I felt like I could do nothing.  Oh, you just

1    want me to say yes or no.  I am sorry.

2    Q    I want you to answer the question and not tell

3    me what you felt or why, but if the answer is you didn't

4    go see anybody or didn't do anything, the answer is

5    that.  You did not, did you?

6    A    No.

7    Q    And, then, immediately(attorney snaps his

8    fingers), when you talked to Ms. Rankins and Ms. Spann,

9    you got what you wanted, didn't you?

10    A    Yes.  I had no idea that would happen the way

11    that it did.

12    Q    And once you made that complaint, you were

13    moved out from under Mr. Hardy and he was no longer able

14    to sexually harass you, was he?

15    A    He didn't.

16    Q    He wasn't able to?  You didn't have any

17    contact with him, did you?

18    A    I didn't have any contact with him, but he

19    knew where I lived, remember.

20    Q    I guess for that matter, he could find you

21    today, couldn't he?

22    A    I hope not.

23    Q    But I am saying, as far as on this job, you

TERA MCMILLIAN - 1/22/2008

171

1    were separated from him so he could no longer sexually

2    harass you?  That is a fact, isn't it?

3        A    Yes, sir.

4        Q    Immediate, that very day; right?

5        A    Yes.  But he had access to this campus.

6        Q    He had access to the campus until he got

7    fired?

8        A    Yes, he did.

9            MR. JACOBS:  Can we go off the record just a

10               minute?

11               (Thereupon,an off-the-record

12               discussion was held.)

13        Q    And then when you changed on that date of your

14    complaint your dorm, your duties and responsibilities,

15    though, didn't change?  You continued to work in the

16    same position that you did before?

17        A    The same job title, you mean?

18        Q    Yes.

19        A    Yes, sir.

20        Q    And you are a youth services aid?

21        A    Yes, sir.

22        Q    Do you have a degree?

23        A    No, sir.

1    Q    And your pay didn't change?

2    A    No.

3    Q    Your benefits didn't change?

4    A    No.

5    Q    Your duties and responsibilities didn't

6    change?

7    A    No.

8    Q    You simply changed from one dorm to another

9    inside this same campus, inside this same facility?

10    A    Yes, sir.

11    Q    And, now, let's back up.  During the time that

12    Hardy was your supervisor, before you made this

13    complaint, there was a time when Mr. Hardy changed your

14    shift; correct?

15    A    Yes.

16    Q    And as I understand it, you were given the

17    option of either -- there were two people, one of whom

18    he was going to change, you and -- what is the teacher's

19    name?

20    A    Ingria.

21    Q    That was Ingria Williams?

22    A    Yes.

23    Q    And he could only give one of you the choice;

TERA MCMILLIAN - 1/22/2008

173

1    right?

2        A    Yes, sir.

3        Q    And the other one was going to have to move,

4    and he gave you that choice, didn't he?

5        A    He did.

6        Q    And when you made that shift change, your

7    duties and responsibilities didn't change, your pay

8    didn't change, nothing changed with regard to your

9    employment, did it?

10       A    No.

11       Q    No, nothing changed?  That's correct?

12       A    No, just the hours that I worked.

13       Q    Now, coincidentally, that happened in January

14   -- Was it '05?

15       A    Yes.

16       Q    And, coincidentally, with that change, it is

17   also true that from that point on, you had very little

18   contact with Michael Hardy, period?

19       A    We had contact.

20       Q    At work?

21       A    No.  Well, there were a couple of times that

22   he scheduled me for days, but, usually, he called on the

23   phone.

174

1    Q    Scheduled you for what?

2    A    Days.

3    Q    So you would work a day shift?

4    A    Every now and then.

5    Q    Which shift did Hardy work?

6    A    He worked days.

7    Q    So there were a couple of times when you

8    worked after January the same shift with Hardy?

9    A    Yes, sir.

10   Q    During that period of time, did Hardy do

11   anything of a sexual nature?

12   A    During the time that I worked the twelve to

13   eight?

14   Q    After January, when you went to the night

15   shift but on a couple of occasions worked a day shift

16   with him, during those periods of time you worked on the

17   day shift with him, did he do anything that was sexually

18   inappropriate?

19   A    Yes.  He would make comments.

20   Q    What kind of comments?

21   A    About how you look in your clothing, things of

22   that nature.

23   Q    I correctly understand that when you went to

TERA  MCMILLIAN - 1/22/2008

175

1    the night shift, you were fine with that?

2        A    Yes.

3        Q    Because you didn't have any more contact with

4    him?

5        A    Yes.  The contact would be limited.

6        Q    Now, under Hardy, you always got good

7    evaluations?

8        A    Yes.

9        Q    Actually, after your initial -- I think you

10   got a low evaluation during your six-month probationary

11   period; correct?

12       A    I did.

13       Q    But then after that, you don't have any

14   complaints about the evaluations that you received from

15   Michael Hardy, do you?

16       A    No.  He let me do them myself.

17       Q    And you always got pay raises?

18       A    Yes.

19       Q    You never lost any benefits?

20       A    No.

21       Q    Never lost anything that would transfer or

22   translate into money or cash terms, did you?

23       A    No.

TERA  MCMILLIAN - 1/22/2008

176

1    Q    Now, there was a couple of times that I think

2    you said that Hardy did some things to you.  Like, I

3    think he sent you over to the Hold Dorm one day and

4    threatened to reprimand you about something that went

5    on; maybe even twice.  But Hardy never reprimanded you,

6    did he?

7    A    No.

8    Q    Have we talked about Mr. Harvest?  We have

9    not.

10   The incident that I think was the straw that broke

11   the camels back, on the day that you made your

12   complaint, Mr. Harvest told you that you were fucking up

13   his shift.  Do you remember that?

14   A    Yes, he did.

15   Q    Am I correct in understanding that what that

16   was about was a Father's Day card a kid wanted to send

17   and it would have required a violation of policy to do

18   it, but following policy would actually prevent the kid

19   from sending his Father's Day card?  Is that what I

20   understand?

21   A    Is it actual policy or is it a rule that is in

22   place?  I am not sure.

23   Q    Well, whichever.  In other words, doing it the

1  way it is supposed to be done, would have, if I

2  understand, prevented that kid from sending his Father's

3  Day card out; right?

4      A    Yes.

5      Q    And you wanted to be able to help the kid send

6  his Father's Day card out?

7      A    Yes.

8      Q    But you don't deny that to send the card out

9  would have required doing it the wrong way?

10     A    No, I do not deny that, but we have done it

11 many times.

12     Q    With the supervisor's knowledge?

13     A    Who?  Mr. Hardy?

14     Q    No, Mr. Harvest.

15     A    He is a supervisor?

16     Q    Wasn't he?  He is the one that said you can't

17 do it, isn't he?

18     A    I don't think it was --

19     Q    Who was it?

20     A    It was Mr. Harvest.  Was he a supervisor?

21     Q    I don't know.  But Harvest is the one who you

22 said, said to you, you're fucking up my shift --

23     A    Yes.  He had been on the shift way longer than

1    me.

2        Q    So he was not a supervisor.  Was he not a

3    shift leader?

4        A    I don't know.

5        Q    What is Mr. Harvest's position?

6        A    I thought he was a youth services aid.

7        Q    So he is a co-worker and you got annoyed

8    because here is another co-worker saying something rude

9    to you?

10        A    No, I didn't get annoyed.  I thought it was

11    very disrespectful.

12        Q    Have we talked about everybody here today that

13    you claim have retaliated against you in any way?

14        A    I don't know.  As far as I -- I don't know.

15    As far as I can tell at this moment.

16        Q    You can't think of anybody, sitting here, that

17    we haven't talked about?

18        A    No.

19        Q    In your complaint -- and I know you didn't

20    write it, your lawyer wrote it -- you sued Michael Hardy

21    and you sued DYS?  You know that; right?  You have two

22    defendants in this case?  You know that; right?

23        A    Yes, sir.

1        Q    Now, I represent DYS.  I don't represent

2    Michael Hardy.

3        What did DYS do, in your mind, to retaliate against

4    you?

5        A    They let the retaliation go on for way too

6    long, even after the many times I complained about what

7    was going on in that dorm.

8        Q    Anything else?

9        A    Allowing that to happen.

10       Q    Allowing that to happen.  You said that.

11   Anything else?

12       A    The investigation wasn't as thorough as it

13   should have been.

14       Q    Because he said that you hadn't gotten all of

15   your training?

16       A    No.  Because he said that my co-workers -- he

17   had talked to my co-workers.

18       Q    And they denied the things that you said?

19       A    No.  No.  He said they denied what I said.

20       Q    That is true?

21       A    I had to ask him, Well, have you talked to

22   them since then, since I made this other complaint?  And

23   he told me that they said that I was paranoid.  And of

1    course, I asked them had they spoken with him, and they

2    said, no, they had only spoken with him once.

3        Q    Who did you ask?

4        A    Mr. Hammond and Mr. Webster.  Those are the

5    people that I work with.

6        Q    So you think that Mr. Staton should have gone

7    and taken another recorded statement because you made

8    another similar complaint?

9        A    I read somewhere where it says that everytime

10   I made a complaint, it was investigated.

11       Q    And your complaint is, in connection with that

12   investigation, he did not go and once again call those

13   people in and make them sit down and give him another

14   recorded statement; am I correct?

15       A    That would have been thorough.

16       Q    Am I correct, is that what you are complaining

17   about?

18       A    That is one.

19       Q    Anything else?

20       A    I did say about Mr. Lee and his treatment,

21   didn't I?  That was the first thing I said?

22       Q    I am sorry.  About who?

23       A    Mr. Lee.

TERA MCMILLIAN - 1/22/2008

1      Q    I think we talked about Mr. Lee.

2      Really, I was asking about Mr. Staton.

3      A    Mr. Staton?

4      Q    Yes.  You said that his investigation was not

5      complete, or something to that effect.  I am asking you

6      what do you think he should have done, and you said he

7      should have taken some more statements from your

8      co-workers again.  And I am asking you:  Is that with

9      regards to Staton?

10     A    And the fact that even though I don't think he

11     knew Mr. Lee, he said the only reason Mr. Lee acted the

12     way he did was because he was ex-military, and I didn't

13     think that had anything to do with him doing his job

14     fairly.

15     Q    Okay.  Well, you do understand that you

16     yourself don't have any evidence that any of this was

17     retaliatory in connection with Michael Hardy?

18     You got a lawyer.  What would you expect Staton to

19     do?

20     A    I don't know what Mr. Staton's job is to do.

21     Q    And, obviously, you are not complaining -- you

22     are not suing DYS for the retaliatory actions that

23     Michael Hardy attempted to take which you never even

TERA  MCMILLIAN - 1/22/2008

182

1    knew he did, are you?

2      A    He did do other things before he wrote that

3    letter you told me about.

4      Q    Let's back up.  Let's try this again.  You are

5    not -- correct me if I am wrong.  You are obviously not

6    suing DYS for the things that Michael Hardy tried to do

7    to you that you didn't even know he had tried to do?

8    Those are not the things you are suing DYS for, are

9    they?

10     A    I am sorry.  You are saying I am not suing DYS

11   for things that I didn't know about?

12     Q    I am asking you is that correct?

13     A    Yes, that's correct.  If I didn't know about

14   it, how could I?

15     Q    Right.  You didn't know that he had gotten

16   some of the staff to sign a petition, did you?

17     You didn't even know that had happened?

18     A    When?

19     Q    When you made this complaint?

20     A    In July?

21     Q    Yes.  You didn't even know that had had

22   happened until you got to the Hardy hearing, did you?

23     A    No.  I hadn't seen it.

TERA MCMILLIAN - 1/22/2008

183

1    Q    So you are certainly not suing DYS --

2    A    I hadn't seen it, but I had heard about it.

3    Q    You testified that you didn't even know it.

4    A    I didn't know about it until you showed it to

5    me, but I had heard the rumor.

6         If I didn't see it, it is just a rumor.

7    Q    But you are not suing DYS for Michael Hardy's

8    actions in that matter, are you?

9    A    In the matter that he retaliated against me?

10    Q    In connection specifically to the petition

11    that --

12    A    Dortch put out?

13    Q    Well, I think it was Dortch.  I am only aware

14    of the petition, the documents, that you have seen here

15    that you saw in that hearing.

16         And that was the first time you learned about it.

17    And since you didn't know about it, surely you are not

18    suing DYS for something that Hardy did that you weren't

19    even allowed to know had happened?

20    A    That was the first time I had seen them.

21    Q    Is it correct or not?  Just tell me yes or no.

22    Are you suing DYS for that?

23    A    They should have stopped Mr. Dortch from doing

TERA  MCMILLIAN - 1/22/2008

184

1    that.

2        Q    So are you suing DYS for that?

3        A    Just for the fact that all of this could have

4    been prevented.

5        Q    So you are not suing DYS in connection with

6    that, that petition that you didn't know about?  You are

7    not suing DYS; is that correct?

8        A    I knew about the petition.  I just had never

9    seen it.

10        Q    Is that correct or not?  Just yes or no?

11        Are you suing DYS for something that you didn't

12    know had happen, or not?

13        A    I knew it had happened.  I just didn't --

14        Q    Are you suing DYS for something that you

15    didn't know had happened, or not?

16        A    I wouldn't sue them about something they

17    didn't do, but -- If they weren't responsible, I

18    wouldn't.

19        Q    There were some other things that you learned

20    that Michael Hardy tried to do.  Do you remember?

21        A    Like what?

22        Q    Do you remember that there was an issue about

23    a meeting that he had attempted to call?  Did you not

1    know that?

2        A    No.

3        Q    You may never have known that.

4        A    No.

5        Q    So the things that -- What about the

6    grievance?  Are you aware that he had attempted to file

7    a grievance against you?

8        A    I had heard that.  The first time, you told me

9    that if you didn't get him on the sexual harassment, you

10   would get him on this piece of paper that you had.

11       Q    Did I tell you what it was?

12       A    No, you didn't tell me what it was, but I

13   learned later.

14       Q    You learned later.  How did you learn?

15       A    Through the grapevine.

16       Q    And that would have been after the hearing,

17   wouldn't it, the hearing of Michael Hardy?

18       A    I think so.

19       Q    All right.  And, again, please answer this

20   quickly.

21       I assume, tell me if I am wrong, that you are not

22   suing DYS for Michael Hardy's having tried to do that

23   since you didn't even know it?  Am I correct?

TERA  MCMILLIAN - 1/22/2008

1      A    Well, he was employed by DYS when he did that.

2      Q    Are you suing DYS for that or not?  Yes or no?

3  One word.  One word.

4      A    Well, DYS is responsible for Michael Hardy.

5      Q    That's a lot of words.  That's a lot of words.

6  One word.

7           MR. JACOBS:  Object to the form.

8      Q    Are you suing DYS for that or not?  Is that a

9  basis of this lawsuit?  I am entitled to know that.  It

10  is a simple question.

11      A    I am sorry.  I have done forgot the question.

12      Q    Are you suing DYS for Michael Hardy attempting

13  to file a grievance which was never sent?

14      A    Attempting?

15      Q    Yes.

16      A    Well, I can't sue somebody for attempting to

17  do something.

18      Q    So the answer to that question is no; right?

19      A    Well, DYS was responsible for Michael Hardy

20  because they employed him.

21      Q    And DYS didn't allow any grievance against

22  you, did it?

23      A    Not to my knowledge.

TERA  MCMILLIAN - 1/22/2008

187

1    Q    Not to your knowledge.  Do you know why that

2    is not to your knowledge?

3    A    Because I didn't do anything.

4    Q    Because it didn't happen.  You did not have to

5    answer any grievance, did you?

6    A    No.  I don't think so.

7    Q    In fact, the only thing that happened was that

8    he had to answer the allegations that you raised, isn't

9    that true?

10    A    Yes, because they were true.

11    Q    So you are certainly, therefore, not suing DYS

12    for the grievance, are you?

13        MR. JACOBS:  Object to the form.

14    A    Mr. Perry, I am tired and you are leading me

15    on.  I am sorry.

16    Q    You are not answering my questions.  I guess

17    we can sit here until the morning.  If you don't want to

18    answer the question, then --

19    A    I want to answer the question to the best of

20    my ability.  I want to.

21    Q    Just let me -- Since you have refused to

22    answer this question, let's see if I can reconstruct it.

23    A    I don't refuse to do anything.

1          Q     You absolutely do.  Let me see if I can

2     reconstruct it.  I believe you said your testimony is

3     you certainly wouldn't sue DYS for something you didn't

4     know about; right?

5          A     Something that I didn't know about?

6          Q     Right.

7          A     If I found out about it and it wasn't right.

8          Q     You didn't know about that grievance, did you?

9     You didn't even know it had happened, did you?

10         A     No, not at the time he gave it to you guys.

11         Q     You did say to Mr. Lee, Man, you must be

12    tripping, on the telephone?

13         A     I said, You are tripping.  Yes, I did.

14         Q     And that was because he told you to produce a

15    doctor's excuse?

16         A     No, sir.

17         Q     You didn't call him because you said your

18    mother was in the hospital?

19         A     Yes.  But that is not why I said that.

20         Q     Why did you say it?

21         A     Because when I called him, he told me that he

22    didn't have anything to do with that.

23         Q     To do with what?

1        A    To do with the fact that my mother was sick.

2    All he knew was that he wasn't coming out there.

3        Q    And so you said, You must be tripping?

4        A    You're tripping.  That is what I said.

5        Q    What did you mean?  What does that mean?

6        A    He must be kidding.

7        Q    Tripping means kidding?

8        A    Yes.

9        Q    And you didn't get a reprimand, did you?

10        A    Well, he tried to and Ms. Rankins sent a

11    letter to me stating that she thought the department

12    would uphold the reprimand for that.

13        Q    You didn't get a reprimand for that, did you?

14        A    No, I didn't.

15        Q    Now, you told Mr. Staton that Mr. Lee wouldn't

16    give you three days off in a row.  Do you remember that?

17        A    Yes.

18        Q    That is not correct, though, is it?  You

19    actually got three days off in a row three different

20    times, didn't you?

21        A    Just three different times?

22        Q    When you made that complaint, you had had

23    three different occasions where you got three days off

TERA  MCMILLIAN - 1/22/2008

190

1    in a row?

2        A    Well, there were others that had that a lot

3    more.

4        Q    You know that is correct, don't you?

5        A    No, I don't.

6        Q    When you told Mr. Staton that he wouldn't give

7    you three days off in a row, that wasn't true, was it,

8    because you had gotten three days off?

9        A    I can't say that, because I don't recall that.

10       Q    If the records show that, you wouldn't

11   disagree with that, would you?

12       A    Well, you know, there has been a time where I

13   have given copies of schedules to Ms. Spann and she had

14   the requested copies from someone else who had them and

15   they were different.  So I really can't say, Mr. Perry.

16       Q    Now, you produced in your case some schedules

17   here as evidence.  Are you suggesting that the schedules

18   don't say what they're supposed to say?

19       A    I am saying that has happened.

20       Q    Are you saying that you shouldn't have

21   submitted those because they don't mean anything?

22       A    No.  I am saying that when I gave her the copy

23   of the schedule that I got from the dorm and she

1    requested the same copies, they were different?

2        And I don't have the capacity of making copies of

3    the schedules or have a computer like that to print any

4    of them out.

5        MR. JACOBS:  If you want us to stipulate that

6            some of the records are wrong, we will

7            probably do that.

8    Q    Your retaliation claim, the problem with your

9    co-workers, you wanted to be excused from meetings with

10    your co-workers and otherwise being around your

11    co-workers, because their dislike for you made you

12    physically sick; is that correct?

13    A    I was physically ill on an occasion.

14    Q    Is what I said correct?

15    A    What did you say?

16    Q    Your claim about your co-workers, essentially,

17    you wanted special treatment, you wanted to not have to

18    attend meetings, you wanted to be excused from meetings,

19    and you wanted to not have to attend training because

20    being in their presence made you sick, isn't that true?

21        MR. JACOBS:  Object to the form.

22    A    No, sir.  That is not true.  There was one

23    time when I asked to be excused from a meeting, and I

1    did not ask for special treatment.

2        Q    Well, everybody else had to be in the meeting,

3    didn't they?

4        A    I don't know if all of them came or not.

5        Q    You gave Ms. Spann some schedules to show you

6    didn't get three days off in a row.  Do you remember

7    that?

8        A    I don't remember it, but it is possible.

9        Q    But you didn't give her all of the schedules,

10    did you?

11        A    All of the schedules?

12        Q    Yes.

13        A    No, I didn't have access to all of the

14    schedules.

15        Q    Is there any additional basis that you can

16    come up with --

17        A    Not at this moment.

18        Q    Let me finish my question.  -- to suggest that

19    any of your co-workers or supervisors or anybody else or

20    anything anybody did was the result of anything

21    connected with your claim against my client?

22        A    Mr. Perry, I am tired, and not at this moment,

23    I can't recall because I have a headache.

TERA MCMILLIAN - 1/22/2008

193

1    Q    Well, do you want to finish this or not?  Do

2    you want to wait?  Your lawyer wants to go forward.

3    A    I am trying to finish it now.

4    Q    Then, I need your responses.

5    If you are not able to respond, then tell me.  I

6    will be happy to either finish this or come back.  It is

7    your lawyer saying he wants to finish it.

8    A    Yes, I want to finish, too.

9    Q    So my question is:  Have you thought of or

10   come up with any ideas, any additional way that would

11   show that any of the things that you are claiming about

12   what other people did, besides my client, were the

13   result of your complaint about Michael Hardy or somehow

14   connected to it?

15   A    Anything else?

16   Q    Yes.

17   A    Not at this moment, sir.

18   Q    Mr. Lee had been your supervisor -- he didn't

19   become your supervisor until almost six months after

20   this complaint about Michael Hardy, isn't that true?

21   A    I don't know how long it was.

22   Q    It was more than three months, wasn't it?

23   A    When did he come?  In September?

1    Q    I am actually not sure.  You don't remember?

2    A    No, sir.

3    Q    What do you want in this case?

4    A    Vindication.

5    Q    What does that mean?  I need specifics.

6    A    I want it to be known that I was telling the

7    truth; I was not lying.

8    Q    You don't think that Michael Hardy having been

9    fired based on what you said and personnel upholding

10   that?

11   A    No, sir.  Because the people back there seem

12   to think he and I were having a relationship.

13   Q    So you want us to go tell everybody that you

14   and Michael Hardy didn't have a relationship?

15   A    If you would like to do that, that would be

16   good.

17   Q    Anything else you want out of this lawsuit?

18   A    Like what do you mean?

19   Q    That's it?  You are going to go tell the jury

20   that all you want out of the lawsuit is for your

21   co-workers to be told that you told the truth and that

22   will solve everything?

23   A    I think I need some more of that psychological

TERA  MCMILLIAN - 1/22/2008

195

1    counseling because I can't afford it.

2        Q    You need psychological counseling for what?

3        A    For the mental abuse that I have experienced

4    while working here.

5        Q    How much is that?

6        A    I don't know.

7        Q    Have you had to pay for any psychological

8    counseling out of your pocket?

9        A    I had to pay the co-pay, I think.

10       Q    How much?

11       A    I don't know.  I don't remember.

12       Q    A ballpark figure?

13       A    I know the department recently set up for us

14   to have three sessions with a psychologist.

15       Q    So I think you know what I am trying to ask

16   you.

17       What do you want out of this case?  You are asking

18   for damages.  What do you want?

19       A    Compensation.

20       Q    Well, how much?  What do you want?  What do

21   you intend to ask for?  What do you think it is worth?

22       A    It is worth a whole lot more than what you are

23   willing to give me.

1    Q    How do you know that?

2    A    I know, because I have lost a lot, Mr. Perry.

3    My dignity.

4    Q    So no matter what anybody is willing to give

5    you --

6    A    It still wouldn't be enough.

7    Q    -- is not enough, is it?

8    A    No, sir.

9    Q    What would be enough?

10    A    At this moment, I don't know what would be

11    enough.

12    Q    But you want a whole lot of money?

13    A    If you would like to give me a whole lot of

14    money, I will accept it.  But money can never give me

15    back what I have lost.

16    Q    Well, what do you understand you will ask a

17    jury to give you?

18    A    What will I ask a jury?  I don't know, sir.  I

19    don't know what I will ask them.

20    Q    You are just going to leave that up to your

21    lawyer, and get the most you can possibly get, period;

22    is that correct?

23        What you want out of this case is the very most you

1    can possibly get?

2        A    I don't know, Mr. Perry.

3        Q    Is there anything else you want out of this

4    lawsuit?

5        You have said you wanted your co-workers to know

6    you told the truth, you have said you want counseling,

7    and you have said you wanted a whole lot of money, the

8    most you can get?

9        A    You said I wanted a whole lot of money.  I

10   didn't say that.

11       Q    Well, what do you want?  Why don't you answer

12   it?

13       A    At this moment, I don't know what exactly I

14   want.  I just know that I have been treated unfairly,

15   and whatever you feel that I deserve, I probably do

16   deserve it, whatever that is, whether it is money, or --

17   Can you restore my dignity?  Can you restore my faith in

18   people?  Can you help me to not be frightened when I get

19   in my car?

20       Q    Anything else you want out of this lawsuit?

21       A    Not that I can think of at the moment.  I want

22   to keep my job, too.  Can you help with that, please?

23           MR. PERRY:  That is all I have got.

TERA MCMILLIAN - 1/22/2008

198

1        MR. JACOBS:  Thank you very much.

2              *     *     *     *     *

3    DEPOSITION ADJOURNED @ 6:45 P.M., JANUARY, 15th, 2008

4              *     *     *     *     *

5    DEPOSITION RECONVENED @ 9:00 A.M., January 22nd, 2008

6

7              *     *     *     *     *

8

9                    EXAMINATION

10

11   BY MR. WILSON:

12       Q    Before we go into the deposition, I have

13   marked as Hardy Defendant Exhibit 1, the notice of the

14   deposition and placed that in the record.  You have been

15   sent a copy or should have received a copy through your

16   attorney.  You did receive a copy, did you not?

17              (Thereupon, Hardy Exhibit No. 1

18              was marked for identification.)

19       A    Yes.

20       Q    For the record, would you state your name,

21   please?

22       A    Tera McMillian.

23       Q    Ms. McMillian, would you spell your last name?

TERA  MCMILLIAN - 1/22/2008

199

A    M-C-M-I-L-L-I-A-N.

Q    All right.  My name is Jim Wilson, and I am
the attorney that is representing Mr. Hardy in this
case, and in that respect, I represent him only, and
will be asking you some questions in the form of a
deposition.

In light of the fact that you just sat through a
lengthy deposition last week, I am sure you are familiar
with the process we go through.  I want to remind you if
you do not understand any question that I ask, please
stop me and tell me and I will be glad to repeat the
question or rephrase it, as is appropriate.

I am not going to ask you any trick questions.  My
desire here is to get the elements and to get the truth.
You will be under oath and are under oath and that is
what I am asking you to testify to is to answer my
questions.

I anticipate this deposition will take several
hours.  It will not take as long as the one did on
Tuesday.  As an accommodation to you and the court
reporter and myself, we are going to stop about every
hour and take a little short break.

Do you have any questions?

1    A    No, sir.

2    Q    You are the plaintiff in this lawsuit that is

3    now pending against the Alabama Department of Youth

4    Services and my client, Mr. Hardy; is that correct?

5    A    Yes, sir.

6    Q    Ms. McMillian, I would like for you to tell me

7    in your own words how this came about.

8        How did this involvement with Mr. Hardy of which

9    you are now complaining, how did it start?

10    A    It started with Mr. Hardy making comments.

11    Q    Now, are those the comments in which he asked

12    you to perform oral sex on him?

13    A    It started before that.

14    Q    When did it first start?

15    A    Around May.

16    Q    Of what year?

17    A    2005.

18    Q    2005?

19    A    2003, I am sorry.

20    Q    Around May of 2003?

21    A    Yes, sir.

22    Q    And at that time, what was your job?

23    A    I was a youth services aid.

1      Q     In which dormitory were you working?

2      A     Paige Hall.

3      Q     And were you on the same shift with Mr. Hardy?

4      A     No, sir.  The shifts coincided, but he worked

5      the days and I worked either two to ten or four to

6      twelve.

7      Q     And you say it is during that time frame that

8      this series of events started; is that correct?

9      A     Yes, sir.

10     Q     Is that your testimony?

11     A     Yes, sir.

12     Q     Tell me what the first event was.

13     A     In the beginning, he would just make comments

14     about how I dressed, how I looked, and things of that

15     nature.

16     Q     And you considered those to be inappropriate?

17     A     No, sir.  Not at first.

18     Q     Tell me about the inappropriate comments that

19     you are talking about.

20     A     They started around that time, when he started

21     saying that he -- some attributes that he liked about

22     women.

23     Q     And what did he say?

1        A    He liked big titties.

2        Q    Is it your testimony that in the year 2003, he

3    told you that he liked big titties?

4        A    Yes, sir.  He liked big titties.

5        Q    And what did you say to him when he said that

6    on the first time?

7        A    At first, I really didn't know what to say.

8        Q    My question is:  What did you say to him?

9        A    I am sorry.  I said, Excuse me.  And he

10   repeated that he liked big titties.

11       Q    Give me a month.  What month was it that he

12   did that?

13       A    It may have been in the summer.

14       Q    The summer?

15       A    The summer of 2003.

16       Q    Summer starts on the 21st of June.  So it was

17   after the 21st of June?

18       A    I'm not exactly sure.

19       Q    Was it in June?

20       A    I'm not exactly sure, but I know it was

21   summertime.

22       Q    When did he tell you that he wanted you to

23   suck his dick?

1    A    That was in -- I think it was in 2004.

2    Q    When in 2004?

3    A    It was in the summer or fall of that year.

4    Q    The summer.  What do you mean by "summer"?

5    A    What do I mean by summer?

6    Q    Yes.  June?  July?  August?  September?

7    A    I'm not exactly sure what month it was, but it

8    was in that time frame.

9    Q    Was this the date that he allegedly asked you

10   or sent a message for you not to go to the dining

11   facility?

12   A    Yes, sir.

13   Q    Tell me what happened on that date.

14   A    We were getting the children ready for dinner.

15   Q    Who is "we"?

16   A    The staff.

17   Q    Who are "we"?  Who are you talking about?

18   Give me names.

19   A    I know myself, Mr. Miles, Mr. Farley, and I'm

20   not exactly sure who else.

21   Q    And this was at Paige Hall?

22   A    Paige Hall.

23   Q    Tell me what happened next.

TERA MCMILLIAN - 1/22/2008

204

1     A   We were getting the children ready for dinner.

2  I went to the front of the line.  Mr. Miles was at the

3  end of the line.  He told me Mr. Hardy needed to speak

4  with me.  I said, okay, and I walked back.

5     Q   And what happened to the children?

6     A   They went to the dining hall.

7     Q   And then you went where?

8     A   Back into the dormitory.

9     Q   Into a room or where in the dormitory?

10    A   We were actually in the -- I guess you would

11  call it the dayroom.  And he asked me to come to his

12  office.

13    Q   Meaning Mr. Hardy?

14    A   Mr. Hardy.

15    Q   What happened in his office?

16    A   When we were in his office, he said that --

17  Well, Ms. Moton had left and she was the one who was

18  helping him with the ACA accreditation paperwork.

19    Q   Ms. who?

20    A   Moton.

21    Q   How do you spell that?

22    A   M-O-T-O-N.

23    Q   All right.

TERA  MCMILLIAN - 1/22/2008

205

1      A    And he asked me if I would help him with it,

2   and I told him yes.

3      Q    And for the benefit of those who don't know,

4   what is this paperwork that you are talking about?

5      A    The paperwork is all of the files that have to

6   be up to date that he has in his office.  Well, that he

7   has in the file cabinet, on the students.

8      Q    And you told him you would help him?

9      A    Yes.

10     Q    What else did he say?

11     A    He told me if I helped him, there would be

12  perks to doing that.

13     Q    Was this all in this one conversation?

14     A    Yes, sir.

15     Q    What else did he say?

16     A    He said that I would be allowed to come into

17  work early and also to leave early.

18     Q    Do you think these would be appropriate perks

19  for doing this extra duty?

20     A    No, sir.

21     Q    You don't?

22     A    No, sir.

23     Q    In other words, if he is asking you to do the

1    extra paperwork, you don't think it would be appropriate

2    for him to let you have a little flexibility on when you

3    came to work, through extra time?

4        A    No, sir.  We all helped if somebody needed

5    help.  If Mary needed help with it, I would help her.

6        Q    Are you telling me there was some other motive

7    for him to give you these perks?

8        A    Yes, sir.

9        Q    And what were those motives?

10       A    If I came in early, I would probably be there

11   when he was there.

12       Q    What difference does it make whether he is

13   there or not if you are doing the paperwork?

14       A    He would be present in the dormitory.

15       Q    Did he say, "I am going to give you these

16   perks if you perform sex on me"?

17       A    No, sir, he didn't.

18       Q    He said there would be perks associated with

19   your doing the paperwork, did he not?

20       A    Yes, he did.

21       Q    What else happened then?

22       A    He started talking about the Lord.

23       Q    The Lord?

TERA  MCMILLIAN - 1/22/2008

207

1      A     Yes, sir.

2      Q     Did he say something sexual about the Lord?

3      A     No, he didn't say anything sexual about the

4   Lord.

5      Q     What did he say about the Lord?

6      A     He said that -- He started quoting scriptures,

7   and he told me that -- he asked me was I a believer, and

8   I told him yes.  He said he could sense that.  And he

9   said that he felt like the Lord was giving him the power

10  to prophesize.

11     Q     Now, this is the same conversation?

12     A     Yes, sir.

13     Q     And how much time had taken place between the

14  time he was talking about your doing paperwork and he is

15  talking about the Lord?  Was it like two minutes or ten

16  minutes or an hour or what?

17     A     It wasn't an hour, but I can't say for sure

18  how many minutes.

19     Q     But it was all in that same conversation?

20     A     Yes, sir, it was.

21     Q     What did he say next?

22     A     He said the Lord was giving him the power to

23  prophesize.  He said he had some yoke stuff.

TERA  MCMILLIAN - 1/22/2008

208

1    Q    Had some what?

2    A    He still had some yokes.

3    Q    What did he mean by yoke?  What did you

4  understand him to mean?

5    A    I understood that to mean -- I am not sure

6  what exactly he meant, but my understanding of it was he

7  had some things he had to work out with the Lord.

8    Q    What else?

9    A    He did tell me that he loved his wife Linda,

10  and he said that he also had a fantasy.

11    Q    What else?

12    A    And he said would you like to hear it.

13    Q    And what did you say?

14    A    I said sure.

15    Q    Why didn't you say no?

16    A    Because I thought maybe he was talking about

17  having a fantasy of having a large church, because he

18  said he wanted to be a pastor.

19    Q    So at this point in the conversation, am I to

20  understand that he had said nothing sexual?

21    A    No, sir, he hadn't.

22    Q    So you thought it was going to be something

23  about the Lord?

1       A    Yes, I did.

2       Q    What did he say then?

3       A    He said that he had a fantasy and would you

4   like to hear it, and I said, sure.  He said, well, my

5   fantasy is for you to suck my dick while they're at the

6   dining hall.

7       Q    And what happened next?

8       A    I looked at him and I told him, Mr. Hardy, I

9   am sorry.  I can't do that.

10      Q    What was said next?

11      A    He told me to stop acting crazy and come on

12  over here.

13      Q    Now, I take it you were not sitting side by

14  side?

15      A    No, sir.

16      Q    Where were you sitting or standing?

17      A    I was sitting on a loveseat in his office.

18      Q    And he was sitting where?

19      A    Behind his desk.

20      Q    And when he said that, what did you say?

21      A    I said, I am sorry.  I just can't do that.

22      Q    And what happened next?

23      A    I asked him could I be excused.

1        Q    And what did he say?

2        A    He said, okay.  Where are you going?  I said I

3    wanted to go out into the dayroom.  When we got out into

4    the dayroom, I still felt very uncomfortable,

5    frightened.

6        Q    Wait just a second.  That is what you said.

7    What did he say?

8        A    What did he say?

9        Q    Yes.

10       A    He said, Okay.

11       Q    And then what did you do?

12       A    I went out of the office into the dayroom.

13       Q    What did he do?

14       A    He came out, also.

15       Q    Did he come out immediately or did he wait for

16   a while?

17       A    He came out immediately.

18       Q    So you didn't say, "Get away from me," did

19   you?

20       A    No, sir, I didn't.

21       Q    You didn't say, "That is obscene, and I do not

22   want to hear that again," did you?

23       A    No, I didn't.

TERA  MCMILLIAN - 1/22/2008

211

1      Q    You didn't say, "I can't believe you said that

2  to me, Mr. Hardy"?  "What's wrong with you?"  You didn't

3  say any of those things?

4      A    No, sir, I didn't want to upset him.

5      Q    No.  I asked you:  You didn't say any of those

6  things, did you?

7      A    No, sir.

8      Q    Why do you think you would have upset him?

9      A    Because --

10     Q    The man just asked you to do oral sex,

11  according to your testimony.  Why would you have upset

12  him if you said something along that line?

13     A    Because he had already told me about the

14  campus being his power base, and I needed to keep my

15  job, sir.

16     Q    So you are now relating this back to some

17  other time when he had a different conversation with you

18  that had nothing to do with sex; is that correct?

19     A    Those had something to do with sex.

20     Q    I am asking you.  You were talking about his

21  ability to influence the campus.  That had nothing do

22  with sex, did it?

23     A    I don't know.

TERA  MCMILLIAN - 1/22/2008

212

1       Q     But you are putting that together in your mind

2    that it had something to do with sex?  Is that right?

3       A     I am putting the ability that he had to

4    possibly get me fired in my mind.

5       Q     Let me make sure I am clear for the record.

6    According to your testimony, your boss makes a sexual

7    approach to you, which is overt, using the language

8    "suck my dick," and you do not rebuff him?

9       A     Yes, I did rebuff him.  I told him I couldn't

10   do that.

11      Q     Beyond that, you didn't say anything else?

12      A     No, sir.  I did not get angry.

13      Q     He didn't get angry either, did he?

14      A     I was angry but did not show it.

15      Q     Did he get angry?

16      A     He seemed very disappointed.

17      Q     Disappointed or angry?

18      A     Disappointed.

19      Q     But he didn't raise his voice to you, did he?

20      A     He did not.

21      Q     He didn't throw anything at you, did he?

22      A     He did not.

23      Q     He didn't threaten you, did he?

TERA  MCMILLIAN - 1/22/2008

213

1       A    He did not.

2       Q    You got up and walked out of the room?

3       A    Yes, sir.

4       Q    And according to your testimony, he then came

5    out of the room?

6       A    He did.

7       Q    Where did you go?

8       A    After that, I told him that I needed to go

9    outside to smoke a cigarette.

10      Q    And what happened?

11      A    I went outside and began to smoke a cigarette,

12   and he came out there also.

13      Q    When you say "outside" for those who aren't

14   familiar --

15      A    On the porch.

16      Q    Let met finish.  -- what are you talking about

17   outside?

18      A    Outside the dormitory on the porch at Paige

19   Hall.

20      Q    Is that a covered porch or just an open area?

21      A    It is a small covered porch.

22      Q    Is it the porch to the entryway, where people

23   come and go to get into the building?

1      A    Yes, sir.

2      Q    You went outside to smoke a cigarette and he

3   went out.  What happened then?

4      A    What happened then was that -- at first, we

5   didn't say anything to each other.  I started smoking a

6   cigarette.  And I asked him, Is this what you and Ms.

7   Moton were doing when she was helping you?

8      Q    You asked him?

9      A    Yes, sir.

10     Q    He didn't say anything to you; you asked him?

11  Is that correct?

12     A    Yes, sir.

13     Q    What did he say?

14     A    He said, no, he would never ask her to do

15  anything like that.

16     Q    And what happened next?

17     A    After that, we saw the line coming back

18  towards the dorm.

19     Q    The line of what?

20     A    Children and staff.

21     Q    Who were the staff who were with the children

22  on that date?

23     A    To my recollection, it was Mr. Farley, Mr.

1    Miles.  Those are the two that I recall.

2        Q    Tell us what happened next.

3        A    He said that he was about to leave and he

4    actually left before they got there.

5        Q    So he departed the area?

6        A    Yes, he did.

7        Q    Did he say anything else to you of a sexual

8    nature?

9        A    Not at that point, no.

10        Q    When he departed the area, then the students

11    came up; is that correct?

12        A    Yes, sir, they did.

13        Q    And the other members of the staff came up?

14        A    Yes, sir.

15        Q    Did you have any conversations with anybody,

16    either the students or the staff members, about what had

17    happened?

18        A    Yes, sir.

19        Q    Who?

20        A    Mr. Farley.

21        Q    Who else was present when you had this

22    conversation?

23        A    No one.

1      Q    Well, where did the students go?

2      A    Inside of the building.

3      Q    What about the other staff members?

4      A    Inside of the building.

5      Q    So they went in and I take it the door was

6   shut?

7      A    Yes, sir.

8      Q    And you remained outside with Mr. Farley?

9      A    Actually, Mr. Farley went inside first and

10  then he came back.  He asked me was I okay, and I told

11  him, yes.  He went inside the building, but he came

12  back.

13     Q    Why did he ask you if you were okay?

14     A    I don't know.  Maybe because of the look I had

15  on my face.

16     Q    Were you still smoking your cigarette?

17     A    No.

18     Q    When he came back out, what happened?

19     A    Asked me what had happened, and I told him.

20     Q    What did you tell him?

21     A    That Mr. Hardy just asked me to suck his dick.

22     Q    And what did he say?

23     A    He started laughing.

TERA MCMILLIAN - 1/22/2008

217

1    Q    And what did he say after he laughed?

2    A    He said he couldn't believe that he would do

3    that.

4    Q    And what did you say?

5    A    He did it.

6    Q    And then what was said?

7    A    Nothing much.  We sat there for a little

8    while, quietly, and we got up and went back into the

9    dorm.

10   Q    Now, I thought you were standing outside,

11   smoking a cigarette?

12   A    I was sitting on the steps.

13   Q    Sitting on the steps.  So your testimony is he

14   asked you what happened, you told him what Hardy said,

15   and he laughed and said he couldn't believe Hardy would

16   say that; is that correct?

17   A    He said he couldn't believe that he did that.

18   Q    That he did that.  And you didn't say anything

19   else beyond other than, "He did"?

20   A    Yes, sir.

21   Q    And Mr. Farley didn't say anything else to

22   you?

23   A    No, not at that point.  No.

1     Q    And then you went on your way?

2     A    We went back into the dorm.

3     Q    On that date in question, this is the day you

4 said it was after Ms. Moton had left; right?

5     A    Yes, sir.

6     Q    Did you have any other contact with Mr. Farley

7 on that date?

8     A    We worked together that evening.

9     Q    Did you say anything else to him about this

10 incident?

11    A    We talked about it a little bit.

12    Q    On that date?

13    A    Yes, on that date.

14    Q    What did you tell him or what did he tell you,

15 or both?

16    A    He asked me what was I going to do.  I told

17 him that I am going to try to stay away from him.

18    Q    Ms. McMillian?

19    A    Yes, sir.

20    Q    You had been working for the department of

21 youth services about how long when this incident

22 occurred?

23    A    Maybe a year and a half or so.

1    Q    And you had had some previous training on the

2    procedures that if somebody was sexually harassed what

3    to do, had you not?

4    A    Yes, sir.

5    Q    And we heard testimony last week that you had

6    been involved in a previous discrimination lawsuit of

7    another nature, had you not?

8    A    Yes, sir.

9    Q    And you knew when Mr. Hardy said those things,

10   if he said those things, you knew right then you could

11   have filed a complaint on him, did you not?

12   A    Yes, sir.

13   Q    But you elected not to?

14   A    Of course I elected not to.  I needed my job.

15   Q    And your explanation is that you were afraid

16   you would lose your job; right?

17   A    Yes, sir.

18   Q    And, therefore, you took no action against him

19   whatsoever?

20   A    That's right, sir.

21   Q    Do you think he thought you were encouraging

22   him?

23         MR. JACOBS: Object to the form of the

1          question.

2     A    No, sir.  I don't think I was encouraging him.

3     Q    But you elected not to file a complaint, for

4  whatever reason?

5     A    Yes, sir.

6     Q    Even after you discussed this later with Mr.

7  Farley, you still didn't file a complaint, did you?

8     A    No, sir.

9     Q    No one heard this conversation that you have

10  reported, did they?

11     A    No, sir.

12     Q    So it is your word against his word?

13     A    Yes, sir.

14     Q    And all of the reports of this conversation,

15  whether it be in Ms. Spann's notes or whoever else's

16  notes it may be, came from you; is that correct?

17     A    Yes, sir.

18     Q    Now, I want to make sure I got this time frame

19  right.  You said he started talking to you about sexual

20  things in 2003, but the first overt offer to you, so to

21  speak -- that's my term -- or approach to you was on

22  this date; is that right?

23     A    Yes, sir.

1      Q    Now, between the time that you say this

2   started, in this event, what other sexual things had he

3   said to you, in your opinion?

4      A    He liked the way my pants fit.

5      Q    Is that sexual?

6      A    Yes, sir.

7      Q    I mean, how did this come up?  Tell me about

8   it.  Did he just come out one day and say, I like the

9   way your pants fit?

10      A    Yes, sir.  There wasn't a conversation about

11   my clothing.

12      Q    How did this conversation come about?

13      A    He brought it up.

14      Q    What did he say?

15      A    He told me that he liked the way my butt

16   looked in the pants.

17      Q    That your what?

18      A    Butt.

19      Q    When did this conversation occur?

20      A    That conversation occurred, I am sure,

21   sometime in 2003.

22      Q    Where was it?

23      A    At Paige Hall.

TERA MCMILLIAN - 1/22/2008

222

| | | |
|---|---|---|
| 1 | Q | And who was present? |
| 2 | A | There were people in the dorm, but I'm not |
| 3 | | sure if anyone heard this. |
| 4 | Q | And you considered this to be sexual? |
| 5 | A | I considered that to be inappropriate. |
| 6 | Q | Did you tell him? |
| 7 | A | Yes, sir. |
| 8 | Q | What did you tell him? |
| 9 | A | Mr. Hardy, that is inappropriate. |
| 10 | Q | And what did he say? |
| 11 | A | He laughed. |
| 12 | Q | What else did he say to you that was sexual? |
| 13 | A | He told me that he liked big titties. |
| 14 | Q | How many times did he tell you that? |
| 15 | A | A lot of times. |
| 16 | Q | What do you mean a lot? |
| 17 | A | More than once. |
| 18 | Q | More than ten? |
| 19 | A | I'm not sure. |
| 20 | Q | More than two? |
| 21 | A | Yes. |
| 22 | Q | More than three? |
| 23 | A | I am sure it was. |

1       Q     More than five?

2       A     I don't know, sir.

3       Q     Come on now.  One, two, three.  Five?  You

4   don't know whether it was more than five or not?

5       A     I'm not exactly sure how many times, the

6   number of times.

7       Q     Was it more than two?

8       A     I'm sure that it was more than two.

9       Q     Was one time inappropriate to you?

10      A     Yes, sir.

11      Q     Was two times inappropriate to you?

12      A     Yes, sir.

13      Q     Why didn't you do something about it after the

14  second time?

15      A     Because I needed my job, sir.

16      Q     Is that going to be your excuse for

17  everything --

18      A     And I was afraid of him.

19      Q     -- that you didn't do anything because you

20  needed your job?

21      A     I was afraid of him.  And the atmosphere where

22  I work, people lose their job for a lot less.

23      Q     They may lose their job for a lot less, but

1    who else is receiving these kinds of comments, in your

2    knowledge?  Anybody else?

3        A    I don't know, sir.

4        Q    But you were receiving them?

5        A    Yes, I was.

6        Q    You don't think it is appropriate to follow

7    the process that DYS has and report sexual harassment?

8        A    I know of other people who have reported

9    sexual harassment, sir, and nothing was done about it.

10       Q    So you just decided on your own that you

11   weren't going to do anything about it; right?

12       A    I decided on my own that I wanted to keep my

13   job.

14       Q    Ma'am, the question is:  You decided you were

15   not going to report it; is that right?

16       A    I decided I wanted to keep my job, sir.

17       Q    Did you or did you not report it?

18       A    I did not report it, because I wanted to keep

19   my job.

20       Q    You did not report it, period; right?

21       A    Not at that time.

22       Q    How many times between 2003 and this instance

23   that you have testified about where he, quote, allegedly

1    asked you to suck his dick, did he tell you he liked big

2    titties?

3        A    I'm not sure how many times, but he did tell

4    me that on numerous occasions.

5        Q    And numerous to you means more than two times,

6    but you don't know how many?

7        A    I wasn't counting how many, sir, because I did

8    not know this would go this far.

9        Q    It has gone this far and we have a right to

10   know what your testimony is going to be at trial.  If

11   you get up there and say, He has done it numerous times,

12   I want to know what numerous means to you.

13       You have now filed at least one document, a

14   declaration, that has appeared in here in the last six

15   weeks in which you are talking about on numerous

16   occasions you were subjected to this unwelcome offensive

17   sexual harassment, and I want to know how many times

18   between when it started in 2003 and this date that you

19   have otherwise testified about that that he supposedly

20   said these things.

21       A    I don't have a specific number, sir, because I

22   was not counting, but there were numerous occasions.

23       Q    You didn't write it down somewhere?

1      A    No, sir, I did not.

2      Q    You didn't think it was appropriate to keep a

3    log of this type of alleged inappropriate behavior?

4      A    I was hoping he would stop.

5      Q    You didn't keep a log, did you?

6      A    No, sir, I didn't.

7      Q    You didn't even make any kind of notations,

8    did you?

9      A    No, sir, I didn't.

10      Q    You didn't put it in a notebook?

11      A    No, sir.

12      Q    You didn't write it down -- do you keep a

13    diary?

14      A    No, sir, I don't.

15      Q    You didn't write it down anywhere?

16      A    No, sir.

17      Q    And you didn't think it was appropriate to go

18    report this?

19      A    That would have been the right thing to do,

20    but I was afraid, sir.

21      Q    You were afraid?

22      A    I am afraid now, sir.

23      Q    You don't have to be afraid now, because all

1    you have to do is answer the questions honestly and

2    truthfully.  And you have given, I believe, five

3    statements under oath, and the declaration may be six,

4    and they will all be considered by the jury, I am sure.

5        What else did he say to you between 2003 and this

6    alleged incident that you testified about in Paige Hall?

7    What else did he say to you beyond he liked big titties?

8        A    He asked me on occasion to go with him.

9        Q    Now, you are talking about before this date

10   that he asked you to suck his dick, he asked you to go

11   with him?

12       A    Yes.

13       Q    Where did he ask you to go?

14       A    Away from Montgomery.

15       Q    Where away from Montgomery?

16       A    I think it was to Birmingham.

17       Q    You think it was to Birmingham?

18       A    Yes.

19       Q    How many conversations did he ask you to go to

20   Birmingham with him?

21       A    Only one that I can think of.

22       Q    When did this occur?

23       A    It occurred sometime in 2003.

1    Q   And where did it occur?

2    A   It occurred in the yard at Paige Hall.

3    Q   And who was present?

4    A   The kids were out there and there were other

5  staff out there, but I am sure they didn't hear that

6  because he had called me to his truck.

7    Q   To his truck?

8    A   Yes.

9    Q   And what did he say?

10   A   That he wanted me to go away with him to

11 Birmingham.

12   Q   Was this on a business trip?

13   A   I don't know.

14   Q   What did you say to him?

15   A   I told him that would be impossible.

16   Q   And what did he say?

17   A   He said that, you know, maybe not this time,

18 but there may be another time I could go.

19   Q   Did you consider this to be sexual?

20   A   I considered it to be inappropriate.

21   Q   Did you consider it to be sexual?

22   A   I considered it to be inappropriate.

23   Q   I am going to ask you the question one more

1    time, and your answer is either yes or no.

2        Did you consider it to be sexual?

3        A    Yes, sir.

4        Q    Why didn't you say something to him about not

5    doing it?

6        A    I did tell him on numerous occasions not to

7    say some of the things that he said to me.

8        Q    But, yet, you didn't report any of this to

9    anybody?

10       A    No, sir.

11       Q    And the reason is because you were afraid?

12       A    Yes, sir.

13       Q    How many times were you going to let him say

14   these things to you before you took some action?

15       A    I have no idea, sir.  I did not intend to tell

16   anyone.  I intended to continue to go to work.

17       Q    The truth is, you thought it was sort of cute,

18   didn't you?

19       A    No, sir, I did not.

20       Q    You were actually sort of impressed that he

21   was paying attention to you, weren't you?

22       A    No, sir, I was not.

23       Q    Are you sure?

1    A    I am positive.

2    Q    Did you ever tell your girlfriend that?

3    A    No, I did not.

4    Q    Are you sure you didn't?

5    A    I am positive.

6    Q    What else between this 2003 start date and

7    this other date that we have had that you have testified

8    about that you say was sexual or inappropriate?

9    A    There were numerous times, sir, but I can't

10   recall at this moment.

11   Q    Numerous times that he did what?

12   A    Said things that were inappropriate.

13   Q    What did he say?

14   A    I can't recall at this moment, but there were

15   numerous times.

16   Q    I take it on these numerous times, you didn't

17   report it to anybody?

18   A    No, sir, I did not.

19   Q    I take it that all of these times it was just

20   him with you and nobody could witness it?

21   A    During that time frame, yes, sir.

22   Q    In other words, not one other person that can

23   be called to either corroborate you or say it didn't

TERA  MCMILLIAN - 1/22/2008

231

1    happen or that they heard it and could be identified?

2    It is just you and him; right?

3        A    To my knowledge, sir.

4        Q    Well, you would know, wouldn't you?  I mean,

5    you are testifying about a man that supposedly,

6    according to your statements now, on a continuing,

7    almost daily basis, made a sexual approach to you?  Is

8    that what you are telling the court?

9        A    Yes, sir.  He did that.

10       Q    He did that on a daily basis?

11       A    On an almost daily basis.

12       Q    Almost daily basis.  But, yet, there are no

13   other witnesses; right?

14       A    During that time frame, no, sir.

15       Q    And the only other witness that you have to

16   anything is that you say you told Farley after this

17   other -- this event occurred about sucking his dick,

18   that you told him he had said that?  Is that the only

19   other potential witness?

20       A    I told Ms. Harris about it.

21       Q    Oh, your girlfriend, your buddy; right?

22       A    Yes.

23       Q    You knew her in high school; right?

TERA  MCMILLIAN - 1/22/2008

1    A    I did.

2    Q    This was your friend, your running buddy, your

3    social friend; right?

4    A    Yes, sir.

5    Q    You told her.  What did Ms. Harris tell you?

6    A    She couldn't believe it.

7    Q    What did she tell you to do?

8    A    She didn't tell me to do anything.

9    Q    You mean you told your friend this and your

10   friend didn't give you any advice?

11   A    No, sir.

12   Q    All right.  I want to make sure we understand

13   ourselves.  What other things of a sexual nature did he

14   say to you between the start date of 2003, whenever it

15   was, and this incident involving the suck-my-dick

16   situation?  What other things did he say to you?

17   A    He told me about relationships he had had with

18   other people.

19   Q    With who?

20   A    He said he was having an ongoing relationship

21   with Ms. Clemens.

22   Q    Ms. Clemens?

23   A    Yes.

TERA MCMILLIAN - 1/22/2008

233

1    Q    Who is Ms. Clemens?

2    A    She works here at DYS.

3    Q    Is she still here?

4    A    Yes, sir.

5    Q    When did he tell you about this?

6    A    Probably at the end of 2003 or the beginning

7    of 2004.

8    Q    Who else did he tell you about?

9    A    He had told me that there were -- there was no

10   need for me to tell anyone because --

11   Q    Tell anyone about what?

12   A    About him and his behavior.

13   Q    And what did you tell him?

14   A    I listened.

15   Q    You listened to all of these different things

16   that he told you and you didn't say a thing to him about

17   it?

18   A    No.  I didn't say there was someone I could go

19   to because I didn't feel that there was someone.

20   Q    You knew there was someone.  You knew there

21   was an official policy on reporting this type of alleged

22   behavior, did you not?

23   A    Yes, there was a policy on it, but that policy

1   was not working very well.

2       Q    And you were familiar with the policy?  The

3   policy was not working very well?

4       A    No.  If it had been, others would have been

5   prosecuted for what they had done.

6       Q    But you didn't test the policy; you didn't

7   even try it, did you?

8       A    No, sir.  I was afraid to.

9       Q    Because you would lose your job?

10      A    Yes, sir.

11      Q    You thought that DYS would fire you because

12  you reported sexually inappropriate behavior, alleged;

13  right?

14      A    Not necessarily DYS, but people who work at

15  DYS, yes.

16      Q    How long were you going to let this go on?

17      I mean, according to your testimony right now, this

18  started in 2003 and ran all the way up through this

19  other incident, and you are testifying that it was on an

20  almost daily basis?

21      A    Yes, sir.

22      Q    Is that what you told the folks when you first

23  reported this incident?

TERA MCMILLIAN - 1/22/2008

235

1     A    To Ms. Rankins?

2     Q    Whoever you reported it to.  Is that who you

3  reported it to?

4     A    I went to Ms. Rankins.

5     Q    Did you tell Ms. Rankins this?

6     A    I'm not exactly sure if I told her that or

7  not.

8     Q    Could it be because you are making it up now?

9     A    No, sir, it cannot be.

10     Q    Did you tell Ms. Spann?

11     A    Yes.  I told Ms. Spann the things that had had

12  happened.

13     Q    Did you tell her it was on a daily basis

14  starting in 2003?

15     A    No, I did not tell her it was on a daily

16  basis.  I think the records show, as I said, an almost

17  daily basis.

18     Q    Did you tell that to the investigator from the

19  legal office?

20     A    He didn't talk to me at that time.

21     Q    He talked to you later on, did he not?

22     A    He did.

23     Q    Did you tell him that?

1      A    I told him that it was frequent.

2      Q    And your testimony is it was on an almost

3   daily basis beginning in 2003 and certainly continuing

4   up to this date that he allegedly said he wanted you to

5   suck his dick?

6      A    Yes, sir.

7      Q    Let me ask you this:  If it had been on an

8   almost daily basis, why would you go back in a private

9   room with him on the job there without a witness?

10   Wouldn't you have enough common sense to know that he

11   was going to say something to you?

12      MR. JACOBS:  Object to the form of the

13        question.

14      A    No, sir.  I did not think that he was going to

15   say that, sir.

16      Q    You didn't think he was going to say anything

17   sexual, I mean, based on the fact that you have

18   testified that he has said it literally hundreds of

19   times, if I understand your testimony?

20      MR. JACOBS:  Object.

21      Q    Well, that is an exaggeration, because you

22   can't tell me beyond two times how many times, but you

23   say it's numerous; right?

1        A    Yes, sir.

2        Q    And you didn't expect he was going to say

3    another sexual thing to you when you went back there

4    private with him in his office?

5        A    I was hoping he would stop, sir.

6        Q    You were hoping?

7        A    Yes.

8        Q    Couldn't you have done something to stop that

9    by not going in there?

10       A    I tried to do as asked, sir.

11       Q    Could you have stopped it by not going in

12   there?

13       A    By refusing to do as he had asked me?

14       Q    Go into the room with him privately, yes.

15       A    The door was open, sir.

16       Q    Why didn't you take a witness in with you?

17   Why didn't you take one of the gentlemen that was

18   working with you?

19       A    He had already broken policy by letting the

20   two of them go with the children.

21       Q    I am not worried about the policy, ma'am, with

22   the children.  I am worried about the facts right now,

23   what was said.  Why didn't you take one of those men

1    back there with you if you were so worried about sexual

2    comments?

3       A    Because they took the children to the dining

4    hall.

5       Q    Then why didn't you go on with them to the

6    dining hall?

7       A    Because he asked me not to.  He was my

8    supervisor.

9       Q    So that made it okay for you to go on and put

10   yourself in harm's way again; right?  Right?

11      A    I had to do as asked, sir.

12      Q    All right.  After this date in time that he

13   allegedly asked you to suck his dick, what is the next

14   thing that happened?

15      A    The next day --

16      Q    You say this was in the summer of '04?

17      A    In the summer of '04?

18      Q    When was this alleged event where he said he

19   wanted you to suck his dick and you went outside and

20   told Farley?  When did that happen?

21      A    I'm not exactly sure of the date.

22      Q    But you are sure he was asking you on that

23   date to do this paperwork; right?

TERA MCMILLIAN - 1/22/2008

239

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And this lady had left; right? |
| 3 | A | Yes. |
| 4 | Q | What was her name again? |
| 5 | A | Mary Moton. |
| 6 | Q | She was another female worker there in Paige |
| 7 | Hall? | |
| 8 | A | She was. |
| 9 | Q | What is the next event? |
| 10 | A | The next day he called me at home. |
| 11 | Q | The next day? |
| 12 | A | Yes, he did. |
| 13 | Q | Why would he be calling you at home at all? |
| 14 | Did y'all communicate with each other by telephone? | |
| 15 | A | He communicated with all of his employees by |
| 16 | telephone. | |
| 17 | Q | So him calling you at home was not something |
| 18 | out of the ordinary compared with him calling other | |
| 19 | employees; is that right? | |
| 20 | A | I don't know how often he called other |
| 21 | employees. | |
| 22 | Q | But he did call? |
| 23 | A | I assumed he did if there were changes in the |

TERA  MCMILLIAN - 1/22/2008

240

1    schedule.

2        Q    Was there like a roster with the phone numbers

3    listed or something?

4        A    Yes, sir.

5        Q    I take it you had to provide some type of

6    number?

7        A    Yes, sir.

8        Q    Did you have like a cell phone or a home

9    number or what?

10       A    Yes.

11       Q    Which?

12       A    Both.

13       Q    You provided both numbers?

14       A    Yes, sir.

15       Q    What did he call you on, the cell phone or on

16   your home number?

17       A    On my home phone.

18       Q    What happened?

19       A    He asked me what was the problem.

20       Q    What was the problem?

21       A    Yes.  Why I didn't want to do as he had asked;

22   was there another man?

23       Q    And what did you say?

TERA  MCMILLIAN - 1/22/2008

241

1    A    I told him, no, there wasn't another man.  I

2    just felt that that was inappropriate.

3    Q    Did you tell him to stop saying these things

4    to you?

5    A    Of course I did.

6    Q    Did you tell him to stop saying these things?

7    A    Yes, sir, I did.

8    Q    You said those words?

9    A    I told him that I thought it was

10   inappropriate.  And he said, Why do you think that?  I

11   said, Because you are a married man and I don't think

12   that you should be doing that.

13   Q    And what did he say?

14   A    He said, Well, maybe we need to go to a hotel

15   and talk about it.

16   Q    And you say this was the next day after this

17   happened?

18   A    The next day.

19   Q    And what happened?  What did you say then?

20   A    I said, no, sir, I can't go to a hotel with

21   you.

22   Q    Did you report him then after that, this being

23   the umpteenth time this had happened?

1      A    No, sir, I did not.

2      Q    But you knew on that date you could report it,

3  just like you knew the many times before; right?

4      A    Yes, sir.  I did not want trouble on the job

5  or trouble with him.

6      Q    Why didn't you want trouble with him?  If you

7  reported him, don't you think they would have taken him

8  out of the equation?

9      A    They hadn't taken him out before then.

10     Q    You hadn't reported it?  To this point in

11  time, you had never reported him to the appropriate

12  authorities, had you?

13     A    Yes, sir.  There have been others who have

14  reported and no one has been taken out.

15     Q    I didn't ask you, Ms. McMillian, about others.

16  I asked you did you report him.

17     A    No, I did not, sir.

18     Q    Are you going to tell the court that there are

19  others that have reported Mr. Hardy?

20        MR. JACOBS:  Object to the form.  The court is

21            not here.

22     Q    Well, whoever may read this deposition, be it

23  the court, the jury, or some lawyer late at night, are

1   you going to tell the reader of this deposition that

2   others had reported Mr. Hardy?

3       A    Others have reported incidents that happened

4   to them.  There was nothing done about it.

5       Q    Have others reported Mr. Hardy, to your

6   knowledge?

7       A    To my knowledge?

8       Q    At that point in time?

9       A    No.  I didn't have knowledge of that at that

10   time.

11       Q    That's right.  All right.

12       What else happened after this conversation?

13       A    What else happened?

14       Q    Yeah.  I mean, you are right in the middle of

15   a conversation.  What happens?  What was said next?

16       A    I got off of the phone with him.

17       Q    Now, let me ask you:  All of this time, 2003

18   up until this conversation -- I take it, you said it is

19   the next day after he allegedly asked you to suck his

20   dick; is that right?

21       A    Yes, sir.

22       Q    Did he ever take any kind of negative action

23   against you and your job?

TERA  MCMILLIAN - 1/22/2008

244

1        A     No, sir, he didn't.

2        Q     He didn't punish you in any way for anything,

3    did he?

4        A     There were times when I was supposedly written

5    up, and he said he would write me up.

6        Q     Now, wait a minute.  That was for incidents of

7    different kinds; right?

8        A     Yes.

9        Q     I am talking about for you not doing whatever

10   it is he wanted sexually, he never wrote you up, did he?

11       A     No, sir.

12       Q     He never deprived you of your pay and a raise

13   or anything like that, did he?

14       A     No, sir.

15       Q     He never made you work one extra minute?  He

16   didn't do anything, did he?  Did he?

17       A     Yes, he did.

18       Q     What did he do negative to you, that was

19   negative, other than according to your statements?

20       A     My child was sick.

21       Q     Your child was sick?

22       A     Yes, sir.

23       Q     When was your child sick?

TERA  MCMILLIAN - 1/22/2008

245

1       A    I am not exactly sure when it was, but he was

2    sick.  He couldn't urinate.

3       Q    Was this before or after he asked you to suck

4    his dick, Mr. Hardy?

5       A    After.

6       Q    How far after was it?

7       A    I am not sure.

8       Q    Was it after the alleged Christmas shopping

9    event?

10      A    Yes, sir, it was.

11           MR. WILSON:  Let's take a break.

12               (Thereupon, a break was taken.)

13      Q    We pretty well finished with the incident,

14    alleged, where he asked you to suck his dick, and you

15    were about to tell me about something to do with a

16    child, and we stopped at that point.

17      Tell me about it.

18      A    Mr. Hardy was supposed to be on call

19    twenty-four hours a day, seven days a week.  I worked

20    eight to eight Saturday and Sunday.

21      My brother called me around three and said my child

22    had not urinated all day.  I asked was he sure, and he

23    said, yes, I am watching him.

TERA  MCMILLIAN - 1/22/2008

1       I said, Okay, and I called his pediatrician.  She

2    said to get him to the hospital so they could

3    catheterize him.

4       Q    When did this happen?

5       A    I'm not exactly sure, sir, the date.

6       Q    What year did it happen?

7       A    Then I was on the twelve to eight, so it was

8    after 2004, in 2005.

9       Q    Mr. Hardy wasn't even on that same shift, was

10   he?

11      A    The eight to eight?  No, it was on the

12   weekend.  8:00 a.m. to 8:00 p.m.

13      Q    And you actually had another supervisor you

14   were supposed to call, didn't you, for your shift?

15      A    He was the supervisor I was supposed to call.

16   There was a shift supervisor there.

17      Q    Let me make sure I understand this.  Were you

18   on the same shift with Mr. Hardy at the time this

19   incident occurred with your child?

20      A    This was on the weekend.  He doesn't work on

21   the weekend.

22      Q    What is it that you are complaining about that

23   Mr. Hardy did on the weekend?

1        A    He would not allow me to leave to take my

2    child to the hospital.

3        Q    Did you talk to him?

4        A    Yes, sir, I did.

5        Q    And you think he should have allowed you?

6        A    Yes, sir.

7        Q    Why did he say he would not allow you?

8        A    He said he couldn't find anyone.  He wasn't

9    coming.

10        Q    He didn't have to come, did he?

11        A    Yes, sir.

12        Q    Oh, really?

13        A    Yes, sir.

14        Q    Is there some rule that says that if an

15    employee calls in and wants off, the supervisor has to

16    just drop what he is doing and run out there and replace

17    them?

18        A    If your child is sick like that, yes, sir.

19        Q    You just think that is what he should have

20    done?

21        A    Yes, sir.

22        Q    But there is no rule that DYS has that says he

23    had to do that; right?

TERA  MCMILLIAN - 1/22/2008

248

1      A    I don't know, but I know that he is on call

2    twenty-four hours a day, seven days a week.  So if there

3    is a problem at the dorm, he should be there.

4      Q    Didn't you think this had something to do with

5    his sexual offers to you?

6      A    Yes, sir.

7      Q    Did he say that?

8      A    No, sir.

9      Q    You just think it; right?

10     A    Yes, sir.

11     Q    You are the one that decided that; it is not

12   Mr. Hardy; right?

13     A    I don't know what he decided, sir.

14     Q    I mean, he didn't say, okay, now it is pay

15   back time because you wouldn't have sex with me, or

16   anything like that, did he?

17     A    No, he did not.

18     Q    He simply said he couldn't find anyone?  Did

19   he try to find someone?

20     A    No, sir, he didn't.

21     Q    And he said that you just had to finish your

22   detail; right?

23     A    Yes, sir.

TERA  MCMILLIAN - 1/22/2008

249

1      Q     That was his prerogative to do that, wasn't

2  it?

3      A     Not if you are on call twenty-four hours a

4  day, seven days a week and there is a problem in your

5  dorm.

6      Q     So you think he was supposed to drop it and

7  come because you wanted off?

8      A     I don't know what he was doing, sir.

9      Q     No, ma'am.  Let me rephrase that.  You think

10  he should have come out there and replaced you; right?

11      A     If I needed to take my son to the hospital,

12  yes, sir.

13      Q     So if there is some personal emergency that

14  somebody has, you think he has automatically got to come

15  out there and let them go do whatever they want to do

16  and fill in for them; right?

17      A     I could have brought him a doctor's excuse.

18      Q     That's not my point.  He had the prerogative

19  to not let you off, did he not?

20      A     No, sir, he did not.  He was on call

21  twenty-four hours a day, seven days week.

22      Q     That is your opinion that he had to come out

23  there; right?

1        A    He is on call twenty-four hours a day, seven

2    days a week.

3        Q    On call?  What does on call mean?

4        A    That means that he is supposed to be handling

5    all of the problems or issues that come in that time

6    frame.

7        Q    Well, he handled it, didn't he?  He told you

8    not to leave?

9        A    He did that.

10        Q    So he handled it.  He had that prerogative,

11    did he not?

12        A    He is on call twenty-four hours a day, seven

13    days a week, sir.

14        Q    And he had the right to make a decision one

15    way or the other, did he not?

16        A    He was supposed to make a decision.

17        Q    And he made one?

18        A    He did.

19        Q    What happened to your child?

20        A    I took him to the hospital when I got off, my

21    brother and myself.

22        Q    How long was it until you got off from when

23    you called Hardy?

251

1       A    It was eight o'clock when I got off.

2       Q    Eight o'clock p.m.?

3       A    Yes, sir.

4       Q    What time did you call Hardy?

5       A    At three, when my brother called me, around

6    that time.

7       Q    So you had to work the other half of your

8    shift is what you are telling us?

9       A    That was over half of my shift.

10       Q    Well, four hours, five hours.  You don't have

11    a lunch break; right?

12       A    No, sir.  No breaks.

13       Q    Did you tell Mr. Hardy that you would get

14    somebody to replace you?

15       A    It is not my job to find someone to replace

16    me.

17       Q    That is not my question, ma'am.  Did you tell

18    him you would try to get someone to replace you if he

19    would let you off?

20       A    No, sir.  It is not my job to do that.

21       Q    What did you say to him when he refused to let

22    you off?

23       A    I said, okay, thank you.

TERA  MCMILLIAN - 1/22/2008

252

1      Q    That is all?

2      A    Yes, sir.

3      Q    So now you come in and testify that you

4    believe that that was sexually related; right?

5      A    I didn't say it was sexually related.  I said

6    it had to do with the situation that was going on at the

7    time.

8      Q    How old is your brother?

9      A    How old is he?

10      Q    Yes.

11      A    At this point, I think he is twenty-nine.

12      Q    Did he have a car?

13      A    Did he have a car then or does he have a car

14    now?

15      Q    Did he have a car then?

16      A    I'm not sure.

17      Q    What was he doing at your house?

18      A    He was keeping my child for me.

19      Q    Why didn't he take him to the doctor?

20      A    I don't know, sir.  Maybe he was afraid and he

21    called the child's mother.

22      Q    He was afraid?  Was he afraid of Mr. Hardy?

23      A    No, he was afraid that the child was sick.

1    Q    Why didn't he take the sick child to the

2    emergency room?

3    A    He called the sick child's mother.

4    Q    Why didn't you call him back and say, Take him

5    to the emergency room?

6    A    Because I wanted to be there with my child.

7    Q    Why didn't you have your brother take him?

8         MR. JACOBS:  Asked and answered.

9    Q    Let's try one more time.

10   Why did you not have your brother take him?

11   A    Because my brother called the sick child's

12   mother.

13   Q    So this was all Hardy's fault?

14   A    That he didn't let me off to take my child to

15   be catheterized at the hospital.

16   Q    And that he somehow kept your brother from

17   calling a cab and taking your son to the emergency room?

18   A    My brother probably didn't have any money.

19   Q    Well, you have painted a terrible picture

20   here, ma'am, that Mr. Hardy is some kind of ominous

21   figure that controls all and that he had a duty to let

22   you off and because he made a management decision not to

23   let you off, that he was condemning your son.  That is

TERA  MCMILLIAN - 1/22/2008

254

1    not true, is it?  You had alternatives?

2        A    What were they?

3        Q    How about your brother?

4        A    He may not have had money for a cab.

5        Q    Oh, really.  How do you know?  Did you ask

6    him?

7        A    He didn't have a job.

8        Q    The truth of the matter is, is you just wanted

9    to get off, and when Hardy elected not to let you off,

10   now you are complaining about him; right?

11           MR. JACOBS:  Object to the form of the

12               question.

13       A    No, sir.

14       Q    Did you report Mr. Hardy to anyone for not

15   letting you off on this date?

16       A    No, sir.

17       Q    Did you tell anybody about this before today?

18       A    Yes, sir.

19       Q    Who did you tell?

20       A    I told Mr. Staton, Ms. Spann.

21       Q    Who else lives with you?

22       A    My mother.

23       Q    How about your mother?  Why didn't she take

1    him?

2         A    She wasn't there.

3         Q    Where was she?

4         A    At this time, I don't know, but she was not

5    there.

6         Q    So your brother was there?

7         A    Yes.

8         Q    And you left your 29-year-old brother --

9         A    He wasn't twenty-nine at the time.  He is

10   twenty-nine now.

11        Q    How old was he?

12        A    I'm not sure.

13        Q    Was he twenty-five?

14        A    I am not sure.

15        Q    Was he more than twenty-one years of age?

16        A    He was.

17        Q    Was he an adult?

18        A    He was.

19        Q    You left him there, obviously, as a

20   responsible person for your child; right?

21        A    To a degree, yes.

22        Q    You are not telling me you would leave him if

23   he wasn't responsible?

TERA MCMILLIAN - 1/22/2008

256

1     A    I didn't think he would be ill.  If he is ill,

2    I want to be the one there.

3     Q    The simple answer to all of this is Hardy made

4    a management decision not to let you off, and now you

5    are throwing that in the mix; right?

6     A    No, sir.

7        MR. JACOBS:  Object to the form of the

8           question, if it was a question.

9        MR. WILSON:  It was a question.

10       MR. JACOBS:  I thought it was a speech.

11       MR. WILSON:  We get so many speeches, don't

12          we?

13       MR. JACOBS:  Uh-huh.

14    Q    What else did Hardy do to you?  This is

15   getting good.

16       Were there any other instances in which he took

17   advantage of you because of your refusal to have sex

18   with him?

19       I'm waiting for an answer.

20    A    I'm not sure at this moment, sir, but I am

21   sure there were.

22    Q    You're what?

23    A    I am not sure at this moment.

TERA  MCMILLIAN - 1/22/2008

257

1       Q    I take that's a no then?

2       A    I'm not sure at this moment.

3       Q    Are you ever going to be sure?

4       A    Yes, sir.

5       Q    Do you have to go back and check notes to

6    determine that?

7       A    I don't.

8       Q    You don't have any notes, do you?

9       A    No, sir.

10      Q    How could you ever be sure of anything?

11      A    I can be sure, sir.

12      If you weren't so angrily asking me these

13   questions, it may be easier for me to answer.

14      Q    I am not angry.  I have a client who lost his

15   employment, a senior manager, a gentleman that says none

16   of this happened, and I am very concerned and I want

17   some answers to some questions.  It is easier if I get

18   them today than to get them in front of a judge and

19   jury.  But one way or the other, we are going to get

20   them.

21      When you say you don't know, we have a right to

22   know, either it is yes or no, is the answer on these

23   questions.

1          Now, is there any other instance in which he took

2    advantage of you because of your refusal to have sex

3    with him, alleged refusal, that is?  And the answer is,

4    yes, there is, or no, there isn't.

5          A    I can't recall at this moment, sir.

6          Q    When is the next event in all of this series?

7    What is the next thing that happened?

8          We got over the suck-my-dick story.  Now you have

9    jumped ahead to what, when did you say, 2005, with your

10    child?

11          A    That is the first thing that I thought of.

12          Q    What is this deal about him coming to your

13    house and your friend, Ms. Harris, being there?  Tell me

14    what happened then.

15          A    We went to a sale at Toys "R" Us.

16          Q    You went from where to that sale?

17          A    Work.

18          Q    Work here?

19          A    Yes, sir.

20          Q    What date was it?

21          A    It was right after Christmas.

22          Q    It was after Christmas day?

23          A    It was an after-Christmas sale.

1      Q    Was it after Christmas day?  It wasn't the

2    25th?

3      A    I'm not exactly sure, whenever they had

4    their --

5      Q    Let's stop.  The 25th is Christmas day.  It

6    was after Christmas; right?

7      A    It was an after-Christmas sale at Toys "R" Us.

8      Q    Was it on the next day or the next day or

9    when?

10      A    I'm not exactly sure.

11      Q    Your testimony is that you and Ms. Harris had

12    worked out here that day?

13      A    Yes, sir.

14      Q    What happened?

15      A    We went to the sale.

16      Q    Together?

17      A    Yes.

18      Q    In separate vehicles or the same car?

19      A    The same car.

20      Q    How did you come to work that morning?

21      A    We rode together.

22      Q    Whose car did you come in?

23      A    Ms. Harris's car.

1      Q      You went from here.  What time did you get

2   off?

3      A      At four.

4      Q      Four p.m.  Was it dark when you got off?

5      A      No.

6      Q      Was it dark when you got down to Toys "R" Us?

7      A      No.

8      Q      How far is it to Toys "R" Us from here?

9      A      It is right down Atlanta Highway.

10     Q      Is that the way y'all went?

11     A      Yes.

12     Q      How long were you at Toys "R" Us?

13     A      I am not exactly sure how long we were there.

14     Q      What did you do at Toys "R" Us?

15     A      We shopped.

16     Q      And what did you buy?

17     A      Toys.

18     Q      How many?

19     A      We had quite a few.

20     Q      Did you have a basket full?

21     A      We had both our things in the same basket.

22     Q      Who were you buying for?

23     A      Children.

TERA  MCMILLIAN - 1/22/2008

261

1      Q    Which children?

2      A    Family members.

3      Q    These were not toys for your child for

4    Christmas?

5      A    Some of them were.

6      Q    You had not already had Christmas?

7      A    I worked Christmas, so I wasn't with my child

8    during Christmas.

9      Q    So you hadn't had the Christmas celebration

10   yet with your child?

11     A    No.  I wanted him to have toys when he came

12   back home.

13     Q    Where had he been?

14     A    He had been down to Camden, Alabama.

15     Q    With whom?

16     A    With my mother, my grandmother, and my great

17   grandmother.

18     Q    He hadn't been with his father?

19     A    No, sir, he hadn't.

20     Q    Who is his father?

21     A    Anthony Wills.

22     Q    Were you married when you had your child?

23     A    No, sir, I wasn't.

262

1    Q    Have you ever been married?

2    A    No, sir.

3    Q    Is this your only child you have?

4    A    Yes, sir.

5    Q    How old is your child?

6    A    Seven.

7    Q    How old was he when this occurred?

8    A    I guess about five.

9    Q    We are talking about what year?  What year did

10   this happen in?

11   A    2004.

12   Q    What happened?  You bought the toys and then

13   what happened?

14   A    We bought the toys and we left the store and

15   proceeded to my house.

16   Q    What happened there?

17   A    We got to the driveway.  My cell phone rang.

18   It was Mr. Hardy.

19   Q    And what did Mr. Hardy say?

20   A    He said that he needed to speak with me.  I

21   told him that I was off.

22   Q    What did he need to speak to you about?

23   A    He said it was something detrimental to my

1    future career here at DYS.

2        Q    You have heard his testimony that he was

3    bringing you a check or a check stub, haven't you?

4        A    Yes, sir.

5        Q    He brought the check stub, didn't he?

6        A    No, sir.

7        Q    He didn't bring it?

8        A    No, sir.

9        Q    He didn't bring anything?

10        A    No, sir.

11        Q    You are saying he made all of that up?

12        A    Yes, sir.

13        Q    That was a lie?

14        A    Yes, sir.

15        Q    He didn't bring any kind of statement?

16        A    No, sir.

17        Q    So he called you and said he needed to speak

18    to you?

19        A    Yes, sir.

20        Q    Now, this is the same Mr. Hardy who has asked

21    you to suck his dick, according to you, numerous times,

22    and had been saying things sexual to you, and he is

23    calling and saying to you he wants you to let him come

1    to your house; right?

2        A    He said he needed to speak with me about

3    something detrimental to my future career here at DYS.

4        Q    Did you say, I will talk to you when I see you

5    at work?

6        A    I tried to tell him that I was at home and I

7    told him maybe we could discuss it later.  He said that

8    he needed to talk to me about it then.

9        Q    So what happened next?

10       A    I told him that I was at home.  And he said --

11   and I asked him what it was about.  He said something to

12   the effect of -- something that Mr. McCollum had said.

13       Q    So what did you tell him?

14       A    He asked me had Mr. McCollum disrespected me

15   at work, and I told him no.

16       Q    Then what did he say?

17       A    He said he needed to speak with me; it was

18   important.  And I told him okay.

19       Q    Did you tell him how to get to your house?

20       A    I didn't get a chance to.

21       Q    What do you mean, you didn't get a chance to?

22       A    I told him that I lived in Spring Valley, and

23   I told him when he got to the sign in Spring Valley, I

TERA  MCMILLIAN - 1/22/2008

265

1    would give him directions.

2        Q    Did he know what street you lived on?

3        A    Obviously so.

4        Q    Had he ever brought you home before?

5        A    No, sir.

6        Q    Had he ever been to your house, to your

7    knowledge, before?

8        A    No, sir.

9        Q    So what happened?

10       A    We went into the house with bags.

11       Q    You and Mr. Hardy?

12       A    Ms. Harris.

13       And she said, do you really think he is going to

14   come, and I said, no, I really don't think he is going

15   to come.  So we put the bags on the table with the

16   wrapping paper and tape and stuff.

17       She said, Do you think it will be okay if we go

18   ahead and have a drink?  And I told her, Sure, because

19   this is my house and I don't think he is coming anyway.

20       Q    So what did you do, make some drinks?

21       A    Yes, we did.

22       Q    And he hadn't shown up at that point; right?

23       A    While we were in the process of doing that,

1    someone knocked on the door.  She answered the door, and

2    it was him.

3         Q    How long did it take him to get over there?

4    Fifteen minutes?  Twenty minutes?

5         A    I am not exactly sure.  It wasn't a very long

6    time.

7         Q    What time of day would this have been?

8         A    Evening.

9         Q    Evening.  So this was after you had finished

10   your shopping and approximately the time you came home?

11        A    Yes.

12        Q    So sometime between what, six and seven?

13        A    It may have been before that.  I'm not sure.

14        Q    Was your son back home yet?

15        A    No, sir.

16        Q    And the other person there was Ms. Harris?

17        A    Yes.

18        Q    Ms. Veronica Harris, your friend?

19        A    Yes.

20        Q    What happened?

21        A    He came in.

22        Q    How was he dressed?

23        A    He had on a sweater and some slacks.

TERA MCMILLIAN - 1/22/2008

267

1        Q    I take it, it must not have been very cold

2    that night?  He didn't have a jacket on?

3        A    I don't recall if he had a jacket on.

4        Q    Did you let him in the house?

5        A    Ms. Harris opened the door and let him in.

6        Q    Why didn't you meet him at the door and just

7    talk to him outside?

8        A    I wasn't the one who answered the door.  She

9    answered the door and allowed him in.

10       Q    But wait a minute.  This is your house?

11       A    Yes.

12       Q    When the doorbell rang, you knew it was him,

13   didn't you?

14       A    No, I did not, because I didn't know he knew

15   where I lived.

16       Q    So Ms. Harris let him in?

17       A    Yes.

18       Q    Ms. Harris's fault?

19       A    Her fault?

20       Q    That she let him in the house?

21       A    No, I don't think it was her fault at all.

22       Q    Ms. Harris let him in.  What happened next?

23       A    He came into the house, said that it was

TERA  MCMILLIAN - 1/22/2008

268

1    really nice and would it be okay if he used the

2    restroom.

3        Q    And?

4        A    He went to the restroom.

5        Q    Basically, he just came in.  Did he even sit

6    down, or did he just ask to use the restroom?

7        A    He didn't even sit down.  He asked to use the

8    restroom.

9        Q    Which restroom did he use?

10       A    He used the restroom for the public in my

11   home.

12       Q    Was it in the front room or something?

13       A    Yes, it is next to the front.

14       Q    What did you do while he was using the

15   restroom?

16       A    I continued to get the bags out of the floor

17   and put the rest of them on the table, take the stuff

18   out of the bags.

19       Q    When he finished in the restroom, what did he

20   do?

21       A    He came out and I asked him to sit down.

22       Q    You asked him to sit down?

23       A    Yes.

TERA  MCMILLIAN - 1/22/2008

269

1      Q     And then what happened?

2      A     We started to chitchat, myself, him and Ms.

3    Harris, about the goings on at the campus.  We had a

4    drink by that time.

5      Q     We had a drink?

6      A     Yes, myself and Ms. Harris.

7      Q     All right.  What happened?

8      A     I asked him if he would like a drink.

9      Q     And?

10     A     He said yes.

11     Q     And what happened?

12     A     And he asked us what were we drinking and I

13   told him.  And he said he only drank Long Island Iced

14   Tea when he was in New Orleans.

15     Q     Didn't he tell you he hadn't had a drink in

16   ten years?

17     A     No, sir, he did not.

18     Q     He didn't tell you that?

19     A     No, sir.

20     Q     He just told you he drank Long Island Iced

21   Tea?

22     A     That is what he said.

23     Q     How did New Orleans come into this?

1      A    He brought that up; not me.

2      Q    So you happened to have Long Island Iced Tea?

3      A    Yes, sir.

4      Q    How do you make a Long Island Iced Tea?

5      A    I bought it from the liquor store already

6    made.

7      Q    So what did you do?  Did you go make him a

8    drink?

9      A    I did.

10      Q    And he did what, sat there and talked to Ms.

11    Harris?

12      A    Yes.

13      Q    Did he make any sexual offers to her?

14      A    I don't know.

15      Q    She didn't report any to you?

16      A    No, she did not.

17      Q    What happened then?

18      A    I gave him the drink and I sat back down.

19      Q    And?

20      A    We resumed talking.

21      Q    About what?

22      A    Just stuff, whatever was going on in the

23    dorms, things like that.

TERA  MCMILLIAN - 1/22/2008

271

1     Q    Did he ever get around to this topic you say

2  he called you about?

3     A    No.

4     Q    You mean, he never talked to you about the

5  gentleman disrespecting you?

6     A    No.

7     Q    This turned in to just a social visit, didn't

8  it?

9     A    Basically.

10     Q    Why didn't you tell him to get up and leave?

11     A    I was still waiting on him to talk about what

12  had happened.

13     Q    What did Ms. Harris do?

14     A    Ms. Harris got up and she went into the

15  kitchen.

16     Q    Which is located where in relationship to

17  where you were sitting?

18     A    The next room.

19     Q    And what was she doing in the kitchen, if you

20  know?

21     A    I think she may have made another drink for

22  herself, and she started wrapping some of the gifts.

23     Q    What about Mr. Hardy, did he have more than

1    one drink?

2        A    He had only one.

3        Q    What happened then?

4        A    What happened then was he said he felt like he

5    was hot and he proceeded to pull his sweater up around

6    his neck.

7        Q    And did he have on anything under the sweater

8    like a shirt, T-shirt?

9        A    He did.  He had on an A-line T-shirt.

10       Q    What is an A-line T-shirt?  Is that like a

11   man's undershirt?  A round neck T-shirt or what?

12       A    A man's T-shirt with no sleeves.  And he said

13   he was hot, and he pulled that up, revealing his chest.

14       Q    Was this after he had had a drink?

15       A    Yes.

16       Q    How much of his drink did he consume?

17       A    He drank the entire glass.

18       Q    He drank the entire glass?

19       A    Yes.

20       Q    How large a glass was this Long Island Tea in?

21       A    It was actually in a wine glass.

22       Q    Is this a pre-mixed quantity of Long Island

23   Tea or you pour out whatever you want?

TERA  MCMILLIAN - 1/22/2008

273

1      A    It is pre-mixed.

2      Q    See, I am not a Long Island Tea drinker, so

3  you are going to have to help me here.  Is it pre-mix

4  and you have got to put water with it?

5      A    No, you don't put anything with it.

6      Q    You just pour it over ice?

7      A    Yes.

8      Q    Is that what you did?

9      A    Yes.

10     Q    Has it got some amount of liquor in it

11  already?

12     A    Yes.

13     Q    How much booze does it have in it?

14     A    I don't know.

15     Q    My impression of a Long Island Tea is that it

16  would knock you down pretty good.  Is that a pretty good

17  drink?

18     A    I don't know, because I have never been

19  knocked down by a drink.

20     Q    How many Long Island Teas does it take to give

21  you a buzz?

22     A    I am not sure.

23     Q    How many have you drank at one time?

TERA  MCMILLIAN - 1/22/2008

274

1       A     How many Long Island Teas have I drank?

2       Q     Yes.

3       A     In a wine glass, maybe two.

4       Q     Maybe two.  He had one.  It was after he

5   consumed it that he said he got hot, wasn't it?

6       A     That is what he said.

7       Q     You said he pulled his T-shirt up or just his

8   sweater?

9       A     His sweater and then he pulled his T-shirt up.

10      Q     And what did he do?

11      A     He rubbed across his chest with his hand and

12  he asked me to lick his chest.

13      Q     He asked you to lick it?

14      A     Yes.

15      Q     And what did you say?

16      A     No, sir.  I can't do that.

17      Q     Did he say that in a normal voice where Ms.

18  Harris could hear him?

19      A     No, he did not, but Ms. Harris saw him and she

20  came out.

21      Q     What kind of voice did he say it in?  Did he

22  whisper it?

23      A     No.  He didn't whisper it.  He said, Why don't

1   you lick my chest.

2       Q    This guy's sneaky, isn't he?  He says it in a

3   voice where Harris can see it but not hear it; right?

4   Is that your testimony?

5       A    I am not sure whether she heard him or not.

6       Q    You know whether she heard it or not?

7       A    I do?

8       Q    You haven't discussed it with her?

9       A    Not to that degree.  I don't know if she heard

10  him or not.

11      Q    So he says, Lick my chest?

12      A    Uh-huh.

13      Q    What did you say?

14      A    I said, no, sir.

15      Q    Did you say get up and get out?

16      A    No.  I didn't say get up and get out.

17      Q    Did you say anything other than, no, sir?

18      A    That is what I said and Ms. Harris came in,

19  and she asked me did she need to leave.

20      Q    And you said what?

21      A    Hell, mother-fucking no, because he is about

22  to leave.

23      Q    Why did you say that?  Was it the booze

TERA  MCMILLIAN - 1/22/2008

276

1    talking at that time?

2        A    No, sir.

3        Q    Why did you say those three words?

4        A    Because I was afraid of him.

5        Q    Why didn't you tell him to get up and get out

6    while you had a witness there?

7        A    He did leave while the witness was there.

8        Q    The witness went and took a nap, didn't she?

9        A    After this.

10       Q    Are you testifying that he left while she was

11   still standing there?

12       A    No.  He didn't leave while she was still

13   standing there.

14       Q    The truth is, she went off in another room and

15   disappeared, didn't she?

16       A    She went to the living room.

17       Q    She went to the bedroom and then went to sleep

18   in your bed, too, didn't she?

19       A    Yes.

20       Q    She was out of sight and out of hearing range,

21   wasn't she?

22       A    Yes.

23       Q    And you stayed in there with him for a

1    substantial period of time?

2        A    Substantial, no, sir.

3        Q    More than five minutes?

4        A    Yes, sir.

5        Q    More than ten minutes?

6        A    I am not sure how many minutes it was because

7    that is when he started telling me how he wasn't going

8    to protect me anymore.  He said he had been protecting

9    me since I had been working at DYS and that he wasn't

10   going to be protecting me anymore.

11       Q    This was sexual, you thought?

12       A    Sexual was him asking me to lick his chest.

13       Q    And besides that, you said, no; right?

14       A    Of course.

15       Q    This was not done on duty, was it?  He was at

16   your house and had been invited into your house?

17       A    He was.

18       Q    You had served him a drink?

19       A    I had.

20       Q    Were y'all playing Christmas music or

21   rock-and-roll music or something there in your house?

22       A    No, sir.

23       Q    Wasn't music being played?

TERA McMILLIAN - 1/22/2008

278

1    A    I don't remember.

2    Q    Did y'all have the radio on or music?

3    A    I don't recall.

4    Q    This was a social occasion, right, afterhours?

5    A    For myself and Ms. Harris.

6    Q    Well, obviously, you had let him into your

7    presence?

8    A    We did.

9    Q    You had served him a drink?

10   A    I did.

11   Q    You had offered him a sit-down?

12   A    Hospitality, yes.

13   Q    That's right.  And he had stayed almost an

14   hour or hour and a half, didn't he?

15   A    I'm not sure exactly what time it was.

16   Q    What time did he leave?

17   A    I'm not sure exactly what time it was.

18   Q    Y'all had a long conversation, didn't you,

19   after Ms. Harris left the room?

20   A    No, because he had gotten visibly very angry.

21   Q    He did?

22   A    Yes, sir.

23   Q    What did he say to you?

1    A    He said, like I said, that he had been

2    protecting me since I had been working out at DYS.

3    Q    How many times did he say that?

4    A    He said that once.

5    Q    Then what did he say?

6    A    He said that he would no longer be doing that,

7    and that the relationship that I had with Farley will

8    change.  And he said that if he didn't get me, then the

9    clique would.

10   Q    If he didn't get you, the clique would?

11   A    Yes.

12   Q    Am I understanding that this was all because

13   you wouldn't lick his chest?

14   A    I don't know what he was thinking.

15   Q    Why did he choose this?  Had he given you an

16   ultimatum to go with him to a motel again?

17   A    That day?

18   Q    Yes, that day.

19   A    No, sir.

20   Q    Had he asked you to suck his dick again?

21   A    That day, no, sir.

22   Q    Had he said anything else sexual to you, other

23   than lick my chest?

TERA  MCMILLIAN - 1/22/2008

280

1        A     That was enough.

2        Q     No.  I am asking you:  Had he said anything

3     else other than that?

4        A     No, sir.

5        Q     So, suddenly, he becomes very aggressive in

6     terms of telling you that he is not going to protect

7     you; right?

8        A     Yes, sir.

9        Q     Why did he do that?

10        A     I don't know.

11        Q     But he did protect you at a later time from

12     other things, didn't he?

13        A     Did he?

14        Q     I am asking you.  I am not the witness.

15        A     Not to my knowledge.

16        Q     He never took care of you on different

17     situations in your dorm operation?

18        A     Took care of me?

19        Q     Yes.  Took your side on certain issues that

20     might have come up or anything like that?  He never did

21     anything else to benefit you; is that what you are

22     telling me?

23        A     Not anything that a supervisor wouldn't do.

TERA  MCMILLIAN - 1/22/2008

281

1    Q    He did what a supervisor would do, though, and

2    helped you out on other occasions, didn't he?

3    A    Helped me out?

4    Q    Other occasions, as a supervisor, in the next

5    year?  He was still your supervisor, wasn't he?

6    A    Yes.  He did what a supervisor was supposed to

7    do.

8    Q    He didn't abandon you, did he?

9    A    Abandon me?

10   Q    Abandon you.  He didn't ignore you when you

11   made requests to him for different things in terms of

12   whatever you need from a supervisor in 2005, did he?

13   A    I don't understand what you are saying.

14   Q    How long was he your supervisor in 2005?

15   A    Up until June.

16   Q    Six months.  Other than this occasion you have

17   testified about previous that he wouldn't let you off

18   when you wanted to go because your son hadn't urinated,

19   did he ever take another negative action against you in

20   that 2005 period?

21   A    Did he ever take another negative action?

22   Q    Right.  As a supervisor, did he ever deny you

23   time off?  Deny you a raise?  Did he ever do that?

282

1    A    No.

2    Q    Did he ever make you work some time you

3    weren't supposed to be working?

4    A    No.

5    Q    Did he ever make you work someplace you

6    weren't supposed to be working?

7    A    Someplace I wasn't supposed to be working?

8    Q    Yes.  Some extra duty that is above and beyond

9    whatever your normal duties are?

10    A    No.

11    Q    He didn't do anything to you other than what

12    was normal; is this right?

13    A    What a supervisor should have done.

14    Q    In fact, you went to him and asked him for a

15    transfer, did you not?

16    A    I did.

17    Q    And you told him that you had another job,

18    didn't you?

19    A    I did.

20    Q    Which was a bald-faced lie at that point?

21    A    Exactly.

22    Q    That's right.

23    A    I would have told him anything to --

TERA MCMILLIAN - 1/22/2008

283

1        Q    I didn't ask you what you would have done.  I

2    asked you, you told him a lie, didn't you?

3        A    Yes, sir, I did.

4        Q    And when did you do that?

5        A    I am not exactly sure of the date.

6        Q    Where did you do it?

7        A    Where did I tell him I had the job?

8        Q    Yes.

9        A    At a McDonald's.

10       Q    At a McDonald's?

11       A    Yes, sir.

12       Q    How did he come to go to a McDonald's with

13   you?

14       A    Because I called him.

15       Q    You called him?

16       A    Yes, I did.

17       Q    And you went to a McDonald's?

18       A    Yes, sir.

19       Q    Where?  Which McDonald's?

20       A    McDonald's East-South Boulevard.

21       Q    Why that McDonald's?

22       A    Because that was closer to where he was coming

23   from.

TERA  MCMILLIAN - 1/22/2008

284

1    Q    How did you know that?

2    A    Because he told me.

3    Q    Did you ask him to go to McDonald's?

4    A    I did.

5    Q    In fact, you bought him some food, didn't you?

6    A    No, I did not buy him food.

7    Q    You didn't buy him a drink or hamburger or

8    something?

9    A    No, I did not.

10    Q    What did you do?

11    A    I told him I wanted to be transferred from his

12    dorm.

13    Q    No.  No.  No.  What did you do?  Did you go

14    inside the McDonald's or stay in the car?

15    A    We went inside the McDonald's.

16    Q    You sat down?

17    A    Yes, sir.

18    Q    Did you purchase any food?

19    A    No, sir.

20    Q    You just sat down in McDonald's to talk;

21    right?

22    A    Yes, sir.

23    Q    You told him what?

1          A    I told him that I wanted to transfer from his

2     dorm --

3          Q    And what did he tell you?

4          A    -- and I was told by Mr. Bolling that I should

5     confer with him first.

6          Q    And what did he say?

7          A    He said, So you went to him first without

8     telling me?  I told him, yes, but I am here to tell you

9     now that I want to transfer.

10         Q    What else did you tell him?

11         A    I told him that I had another job and that I

12    wanted to transfer because my hours would conflict.

13         Q    And what did he say?

14         A    He told me it would take me two years to get a

15    transfer, and if I didn't believe him, he would send me

16    to Mr. Tyler.

17         Q    And that was based upon what length of time it

18    took for people to get transferred?

19         A    Two years?

20         Q    What explanation did he give you for it being

21    two years, is what I am asking?

22         A    He didn't give any explanation.

23         Q    Did you ask him why two years?

TERA MCMILLIAN - 1/22/2008

286

1        A    I did.  He said, well, if you don't believe

2    me, I am going to send you to Mr. Tyler.

3        Q    Who is Mr. Tyler?

4        A    Mr. Tyler is specialist here.

5        Q    That is language I don't understand.  What do

6    you mean a "specialist"?

7        A    Mr. Tyler would be the next position above

8    his.

9        Q    So he was sending you to someone else other

10   than himself that supposedly would know about this;

11   right?

12       A    That it would take two years?

13       Q    Yes.

14       A    Yes.

15       Q    Did you go see Mr. Tyler?

16       A    I told him, no, thank you.

17       Q    Anything else in that conversation?

18       A    I think that was it.  The last thing he said

19   to me was, I'm not out to get you.

20       Q    Did you tell him he was a good man?

21       A    Did I tell him he was a good man?

22       Q    Or a good boss, or something to that effect?

23       A    At that time?

TERA MCMILLIAN - 1/22/2008

287

1    Q    Yes.

2    A    That day?

3    Q    Uh-huh.

4    A    It is possible.  I didn't want him to be mad

5    with me.

6    Q    All right.  Did that happen on or about May

7    27th, 2005?

8    A    I don't know.

9    Q    Did it happen in 2005?

10   A    Yes.

11   Q    When did you report all of this alleged sexual

12   harassment that Mr. Hardy was allegedly perpetrating?

13   When did you report this?

14   A    In June.

15   Q    Why did you report it?

16   A    My goal was not to report it.  My goal was to

17   go down there to get a transfer.

18   Q    This was a transfer for the same reasons you

19   had asked Hardy for earlier; right?

20   A    No, sir.  I did not have a job.

21   Q    I am sorry.  I misstated.  Excuse me.

22   I am saying, you were still trying to get a

23   transfer?

1       A    Yes, sir.

2       Q    And, really, you were upset because Mr. Farley

3   wouldn't let you transfer, wasn't it, or was there

4   another person?

5       A    Mr. Farley?

6       Q    Maybe I am wrong.  You had another supervisor

7   over you at that point in time, didn't you?

8       A    Who?

9       Q    I am asking you.

10      A    No.

11      Q    You didn't have another supervisor directly

12  over you?

13      A    Oh, Mr. Smith.

14      Q    Mr. Smith.  And you had asked Mr. Smith to be

15  able to transfer, hadn't you?

16      A    No, sir.

17      Q    You hadn't, okay.  So you have now talked to

18  Hardy and you go and you file a complaint, and your goal

19  is, as you say, to get a transfer?

20      A    Yes, sir.

21      Q    Why did you think filing a complaint would get

22  you a transfer?

23      A    I didn't file a complaint.  I didn't go to

1    file a complaint.  I went to get a transfer.

2        Q    Who did you go to see?

3        A    When I went down there, I was told that all of

4    the administrators had gone to a seminar in Eufaula, and

5    there were two people there, Mr. Tyler and Ms. Rankins.

6        Q    And you didn't speak to Mr. Tyler?

7        A    No, sir.

8        Q    And that is the man that Hardy had told you to

9    see, wasn't it?

10       A    Exactly.

11       Q    So you chose to see who?

12       A    Ms. Rankins.

13       Q    Ms. Rankins is who, for the record?

14       A    She is a specialist, too.

15       Q    So you went in and this is the same Ms.

16   Rankins that ultimately got you to tell her that Mr.

17   Hardy was allegedly committing sexual harassment; is

18   that right?

19       A    Yes, sir.

20       Q    But that wasn't your goal to report it when

21   you went in there?

22       A    Exactly.

23       Q    Who suggested there was sexual harassment, you

1    or Ms. Rankins?

2        A    I told her.

3        Q    You told her.  How did this come about?  Tell

4    me what happened.

5        A    When I went in there, I told her I wanted to

6    transfer to another dorm.  And she asked me why, and I

7    told her I just wanted a different environment.  She

8    asked me what do I mean by different environment.  I

9    told her I had worked at Paige for a while and I wanted

10    to go to another dorm.  She continued to say, there has

11    to be something else going on.  Tell me what it is.

12    What else is going on?

13        Q    Then what was said?

14        A    I told her there was nothing going on.

15    Everything was fine.  And she said, No, there has to be

16    something.  Why do you want to leave?  Why do you want

17    to leave?

18        Q    You were not even on the same shift with Hardy

19    at this point, were you?

20        A    No, sir.

21        Q    So you basically weren't even seeing Hardy,

22    except occasionally you would see him, but it was rare,

23    wasn't it?

1       A    I didn't see him as much, but I talked with
2    him on the phone.  He would call me.

3       Q    Did you ever call him?

4       A    I called him that one time.

5       Q    How many times did he call you?

6       A    I'm not sure of the number of times.

7       Q    Was it like to give you duties or
8    responsibilities?

9       A    No, sir.

10      Q    It was social calls?

11      A    Yes, sir.

12      Q    Why didn't you put a stop to that?

13      A    I didn't want to make him mad, sir.

14      Q    You were afraid for your job; right?

15      A    Exactly.  I just wanted to get away from him.

16      Q    All right.  So what happened?  What did
17   Ms. Rankins do?

18      A    She said, So you think Mr. Hardy is
19   invincible, don't you?  And I told her yes.

20      Q    And?

21      A    And she said, Well, she was going to show
22   Mr. Hardy the power of Phyllis Rankins.

23      Q    It sounds like she had something against

TERA MCMILLIAN - 1/22/2008

292

1    Mr. Hardy?

2        A    I don't know.

3        Q    What do you think she meant when she said

4    that?

5        A    I don't know.

6        Q    But she bragged that she was going to show

7    Mr. Hardy; am I correct?

8            MR. JACOBS:  Object to the form of the

9                question.

10        Q    The question is:  Did she brag to you, I am

11    going to show Mr. Hardy the power of Phyllis Rankins?

12            MR. JACOBS:  Object to the form of the

13                question.

14        A    No, she said --

15        Q    What did she say?

16        A    I am going to show him the power of Phyllis

17    Rankins.  She didn't say anything about bragging.

18        Q    I am saying to you, wasn't she bragging to

19    you?

20        A    I didn't take it that way.

21        Q    But she did say the following words or words

22    to the effect, that she, Phyllis Rankins, was going to

23    show Mr. Hardy the power of Phyllis Rankins?

1    A    She did.

2    Q    What does that mean?

3    A    I don't know.

4    Q    You had no idea what that meant?

5    A    No, sir.

6    Q    It sounds a little braggadocios to me.

7    Doesn't it sound like she had something against

8    Mr. Hardy?

9    A    I don't know, sir.

10    Q    What did Phyllis Rankins then tell you to do?

11    A    First, she told me she needed me to write down

12    what had happened, and then she said, no, don't worry

13    about that.  I want you to go up front to speak with

14    Debra Spann.  Do you know where she is?

15    Q    And as a result of that, you did what?

16    A    I went to see Ms. Spann.

17    Q    Was that the last time Mr. Hardy was your

18    supervisor?

19    A    Yes.

20    Q    When you left that office and you returned to

21    whatever duty you returned to, you went to a different

22    dorm, did you not?

23    A    Yes, sir.

1      Q      Mr. Hardy has had nothing else to do with you

2   from a professional point of view since that point in

3   time, has he?

4      A      Exactly.

5      Q      He hasn't taken any action against you in any

6   way, has he?

7      A      Yes, he has.

8      Q      Oh, has he?

9      A      Uh-huh.

10     Q      How has he done that?

11     A      He has had others write things about me that

12  weren't true.

13     Q      How do you know he had them to do it?

14     A      Because that woman doesn't know me.

15     Q      What woman?

16     A      The one that wrote the statement, that she

17  came to the dorm and I was saying that he was such a

18  nice person.

19     Q      How do you know that he had her write that

20  statement?  Is that your assumption?

21     A      Yes, sir.

22     Q      You don't know that for a fact, do you?

23     A      How would she know to write it?

1        Q     Maybe his lawyer contacted her.  Could that

2    have happened?

3        A     Maybe.

4        Q     Maybe a friend of his, without even

5    coordinating with him.  That could have happened,

6    couldn't it?  You don't know that it didn't, do you?

7        A     That's possible.

8        Q     You just think because this woman wrote the

9    statement that somehow Hardy had influence over her to

10   make her write the statement, didn't he?

11       A     I didn't say he had influence over her.

12       Q     Well, caused her to write the statement.  Are

13   you saying that that woman, whoever that is, wrote a

14   false statement?

15       A     I didn't read her entire statement.

16       Q     What is the name of this woman?

17       A     I forgot.

18       Q     You forgot.  What else did he do to you since

19   he ceased to be your supervisor?  What other detrimental

20   things has he done to you?

21       A     I know that he got -- well, I guess Mr. Dortch

22   did that, the petition that they had going around.

23       Q     That's right.  Mr. Dortch did that, didn't he?

1    You know yourself that Mr. Hardy didn't do that; Mr.

2    Dortch did that?

3        Answer my question, please.

4            MR. JACOBS:  Object to the form of the

5                question.

6    Q    You just said Mr. Dortch did it, didn't you?

7    A    I am sure he probably had him to do it.

8    Q    You are guessing now, aren't you?  Because you

9    don't know one way or the other, do you?

10   A    I don't know for sure.

11   Q    Who is Mr. Dortch?

12   A    He was a fellow co-worker at Paige Hall.

13   Q    He is another supervisor?

14   A    No.

15   Q    He is a fellow co-worker, in terms of your

16   position?

17   A    Yes.

18   Q    I didn't go into all of those technical things

19   about your job, because a lot of that was gone in to on

20   Tuesday.  But just for the record, what is your job?

21   A    I am a youth services aid.

22   Q    And you have been in that same job the whole

23   time; right?

1    A    Yes.

2    Q    And you get annual raises and reviews?

3    A    Yes.

4    Q    Did you get raises during that time?

5    A    Yes.

6    Q    Did you ever get held back from a raise by

7    Mr. Hardy?

8    A    No.

9    Q    Do you know what you make today, what is your

10    salary today?

11    A    It is about a little over two thousand dollars

12    a month.

13    Q    And I believe your testimony last week was you

14    have a college degree?

15    A    No, sir.

16    Q    I have forgotten.  Are you close -- Did you

17    not go to college?

18    A    Yes, sir.

19    Q    And did you not go for two or three years?

20    Refresh my memory.  How much college do you have?

21    A    I have two classes short of a Bachelor's

22    degree.

23    Q    You said two classes.  Six hours or eight

TERA MCMILLIAN - 1/22/2008

298

1    hours, somewhere in there?

2        A    Yes, sir.

3        Q    All right.  I want to make sure I understand

4    what your testimony is about, about your going to a

5    psychologist or any other medical doctor associated with

6    anything.  Are you testifying that all of this started

7    after Hardy started saying sexual things to you?

8        A    Yes, sir.  It started in 2003 at some point.

9        Q    And you had never been to a psychiatrist

10   before then?

11       A    Not for anything of this nature, no.

12       Q    What had you been to one for?  Had you been to

13   one before?

14       A    When I was about twelve years old.

15       Q    And how long were you under a psychiatrist's

16   treatment then?

17       A    Not very long.

18       Q    And you had not been to one since then?

19       A    No, sir.

20       Q    Who referred you to the psychiatrist?

21       A    My family doctor.

22       Q    And that occurred in 2003?

23       A    Yes, sir.

TERA  MCMILLIAN - 1/22/2008

299

1      Q    And your family doctor was who?

2      A    Dr. Carter.

3      Q    What is Dr. Carter's first name?  Is that the

4  female Dr. Carter?

5      A    Yes.

6      Q    The one that died?

7      A    No, sir.  She is at Jackson Family Care.

8           (Thereupon, a break was taken.)

9      Q    Ms. McMillian, is there anything else of a

10  sexual nature now that Mr. Hardy allegedly did from

11  2003, 2004, and 2005 time frame, other than what you

12  have testified about?

13     A    During April of 2005, he asked me to go to a

14  hotel with him to talk, and I said, no.

15     Q    How did he ask you to do that?  By phone or in

16  person?

17     A    This was in person.

18     Q    And you said, no.  And what did he say?

19     A    He said that would give us a chance to talk.

20  Maybe we could have some drinks.

21     Q    Well, was that anything more than simply

22  asking you to go to a restaurant in a motel and have a

23  drink?  Is that what he basically asked you to do?

TERA  MCMILLIAN - 1/22/2008

300

1        A      He asked me to go to a hotel with him.

2        Q      Like check in to the hotel?  That is what you

3    thought he meant?

4        A      Yes.

5        Q      Did he say that?

6        A      No.

7        Q      What did he say?

8        A      He asked me to go to a hotel with him so that

9    we could talk, maybe have some drinks.

10       Q      And you said no?

11       A      Yes, sir, I said, no.

12       Q      And he said what?

13       A      He said we could just go there and talk, you

14   know.

15       Q      And that was the end of it?

16       A      Yes.

17       Q      Anything else?

18       A      Not that I can think of, sir.

19       Q      And then you filed your discrimination charge

20   on July the -- I am trying to find the date on this

21   thing -- on or about July 25th; is that correct?  I am

22   sorry.  July the 12th, that is when you filed?  July

23   12th, 2005?

TERA  MCMILLIAN - 1/22/2008

301

1          A     Yes.

2          Q     And by that time, you had already discussed

3     this with Ms. Rankins; right?

4          A     Yes.

5          Q     Did you have legal counsel when you did this?

6          A     Yes.

7          Q     And that was not your current counsel; that

8     was another lawyer; right?

9          A     Yes, sir.

10         Q     I am going to make this Charge of

11    Discrimination our Exhibit Number 2.  I am going to put

12    it over at the bottom down here.  This is a copy from

13    another file, so it is not a totally clear copy.  Pass

14    that to counsel.  I am sure you have seen it before.

15               (Thereupon, Hardy Exhibit No. 2

16                was marked for identification.)

17         Q     Did you provide this information that is in

18    this document?  Did you provide that information to your

19    attorney?

20         A     Yes.

21         Q     Was that information correct and accurate when

22    you provided it?

23         A     Yes, sir.  There was a mistake that my

1    attorney made.

2       Q    What is the mistake?

3       A    The suck his dick, he asked me that.  The oral

4    sex part was said numerous times, but there was an

5    occasion when he asked me to suck his dick.  I spoke

6    with my attorney about that, because I was upset at the

7    time this was done.  He and his assistant typed this up

8    for me.  I signed it after I read it.

9       Q    You signed it, though?

10      A    I was upset at that time, yes.

11      Q    Why were you upset?

12      A    Why was I upset?

13      Q    Yes.  You were upset at Mr. Hardy?

14      A    I was mentally and physically upset, yes.

15      Q    So what is the error in that statement?

16      A    Almost on a daily basis, he requested I suck

17   his dick.  He didn't say actually, "suck my dick" but

18   that one time, but he did mention oral sex.

19      Q    Any other change?

20      A    That was it.  And my attorney was supposed to

21   have that changed, Roderick Cooks.

22      Q    But he didn't and this is what was filed?

23      A    I assume.

TERA  MCMILLIAN - 1/22/2008

303

1          MR. WILSON:  Make that part of the record,

2              please.

3      Q    I am going to have marked as Number 3 for

4  Mr. Hardy a copy of the Declaration of Tera McMillian,

5  which is Document 44-2.  I think your attorney filed it

6  here recently.  I believe it was filed in opposition to

7  a pleading from DYS.  I will show you a copy of this.

8          MR. WILSON:  I will mark it as Defendant's 3,

9              and I believe you have a copy, counsel.

10         MR. JACOBS:  Yes, I have read it.

11             (Thereupon, Hardy Exhibit No. 3

12             was marked for identification.)

13     Q    The record will reflect the witness is reading

14  the statement.

15     Are you through reading it?

16     A    No.  I was just going through it.  I wasn't

17  reading it.

18     Q    Are you familiar with that statement?

19     A    Yes, sir.

20     Q    Is it correct and accurate?

21     A    Yes, sir.

22     Q    And you have signed it?

23     A    Yes, sir.

TERA MCMILLIAN - 1/22/2008

304

1    Q    And it was under oath?

2    A    Yes, sir.

3         MR. WILSON:  We will offer that as Number 3.

4              It will go in the record.

5    Q    I have a question for you about this first

6    incident that you brought up again about "suck my dick."

7         Who were the employees you were working with that

8    day, the ones that you say, you know, were going to

9    gather the students up in a line?

10   A    Myself, Mr. Farley, and Mr. Miles, that I can

11   recall.

12   Q    And this was ACA paperwork; is that correct?

13   I see ACA on the wall here.  It was ACA paperwork?

14   A    Yes.

15   Q    And that paperwork had been handled by who?

16   A    Ms. Moton.

17   Q    And she had left?

18   A    Yes, sir.

19   Q    All right.  Did Mr. Hardy do anything else to

20   you other than ask you to go to a motel and have some

21   drinks with him?  Anything else that you can think of?

22   A    In 2005?

23   Q    In 2003, 2004, and 2005, other than what you

TERA  MCMILLIAN - 1/22/2008

305

1    have testified to today.  We have sort of been down

2    through the whole slide.

3        A    I hope I have given you all of the

4    information.

5        Q    Since that last reported incident that you

6    said he asked you to go to a hotel, he hasn't had any

7    contact with you, has he?

8        A    That next day he told me I had lost my

9    foundation there at DYS.

10       Q    And that was sexual?

11       A    That was threatening, sir.  I took it to be.

12       Q    This was before you reported all of this

13   trying to get a transfer; right?

14       A    Yes, sir.

15       Q    Has he done anything since you reported this,

16   to you?

17       A    No, sir.

18       Q    Haven't had any contact with him?

19       A    No, sir.

20       Q    You are aware he has lost his job?

21       A    Yes, sir.

22       Q    In fact, you testified against him at his

23   hearing did you not, the termination hearing appeal?

TERA  MCMILLIAN - 1/22/2008

306

1        A    Yes.  Mr. Perry asked me to testify.

2        Q    The question is:  You testified against him,

3    didn't you?

4        A    Yes, sir.

5        Q    What do you want from Mr. Hardy?

6        A    What do I want from Mr. Hardy?

7        Q    Right.  You have a lawsuit going against him.

8    What do you want from him?

9        A    Whatever the people of Montgomery County feel

10    like I deserve.

11        Q    This is not a TV quiz show now.  What do you

12    want from him?

13        A    Whatever the people of Montgomery County think

14    that I deserve.

15        Q    What do you think you deserve?

16        A    Whatever they feel like is appropriate.

17        Q    So if they decide nothing is appropriate, that

18    is what you would like to have?

19        A    If they decide that is what is appropriate.

20        Q    But you will not tell me what you want?  Is

21    that correct?

22        A    There is nothing that he can give me that can

23    restore what I have lost.

TERA MCMILLIAN - 1/22/2008

307

1    Q    Well, do you want money from him?  Is that

2    what this is about?

3    A    I have never asked for money.

4    Q    So you don't want money?

5    A    If the jury feels like that is what is

6    appropriate.

7    Q    So if the jury feels like him losing his job

8    and being out of work and not being able to find a job

9    and having his reputation totally ruined, which has

10   happened, all of the above, then that would be fine with

11   you?

12   A    Mine has been ruined, too.

13   Q    Yours has been ruined?

14   A    Yes, sir.

15   Q    Why?

16   A    I have been called a whore, freak.

17   Q    Mr. Hardy hasn't called you that, has he?

18   A    Mr. Hardy started the whole thing.

19   Q    Mr. Hardy has not called you those terms, has

20   he?

21   A    He has not called me that.  He has made this

22   possible.

23   Q    You think he's still got this massive

1    influence out here amongst all of the employees?  Is

2    that what you are telling this deposition?

3         A    I don't know what his level of control is.

4         Q    The man has lost his job.  He hasn't set foot

5    out here in a year, maybe two years, maybe more.  He is

6    unemployed.

7         A    He shouldn't have done what he did.

8         Q    What kind of influence does he have?

9         A    I don't know, but he shouldn't have done what

10   he did.  It was wrong.

11        Q    Then why didn't you report it when it was

12   going on?

13        A    Because I was afraid, just like I am now.  I

14   need to keep my job.

15        Q    Why didn't you stop it before it got out of

16   control?

17        A    I asked him to stop.  I asked him to stop.

18        Q    Why did you invite him into your house and

19   serve him drinks and sit there and talk with him a year

20   and a half after this supposedly started?  Why did you

21   let it go on and on?

22        A    Because I didn't want him to be mad with me,

23   sir.

TERA MCMILLIAN - 1/22/2008

309

1    Q    Why did you invite him out to McDonald's and

2    ask him for a transfer and lie about having another job?

3    A    Sir, I would have told him anything to get

4    away from him and his dorm.

5    Q    It sounds like you -- I will withdraw that.

6    Is there anything else you can think of that you

7    want from Mr. Hardy, other than what the jury might

8    decide will be appropriate, if anything?

9    A    That's it, sir.

10   Q    You cannot articulate what your damages are?

11   And let me explain that.  I mean, you can't tell me

12   in your own words what your damages are, can you?

13   A    My damages are mental and also physical.

14   Q    Mental.  How are they physical?

15   A    Because the mental and physical are connected.

16   Q    Anything else?

17   A    No, sir.

18   MR. WILSON:  Those are all the questions I

19        have.

20   MR. JACOBS:  Thank you, sir.  I don't have

21        any.

22   MR. PERRY:  Thank you very much.  This

23        concludes the deposition.

1              END OF DEPOSITION

2            *    *    *    *    *

3        FURTHER DEPONENT SAITH NOT

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1    REPORTER'S CERTIFICATE

2    STATE OF ALABAMA

3    MONTGOMERY COUNTY

4          I, Kimberly B. Faucette, Certified Court

5    Reporter and Notary Public for the State of Alabama at

6    Large, do hereby certify that the foregoing

7    transcript, pages 1 through 310, is a true and correct

8    transcript of the testimony and proceedings taken at

9    said times and place; and that the same was taken down by

10   me in stenograph shorthand, and transcribed by me

11   personally or under my personal supervision.

12         I further certify that I have no interest in

13   this matter, financial or otherwise, or how it may

14   develop or what its outcome may be.  I further certify

15   that I am not of counsel or litigants or associated with

16   anyone connected with this cause to my knowledge.

17         Witness my hand this 3rd day of February,

18   2008.

19

20   _____

21   Certified Court Reporter and Notary

22   Public, State at Large

23   ACCR-309

# McMILLAN
# V
# DYS AND
# HARDY

# DEFENDANT'S
# EXHIBIT 2

**State of Alabama**
**Department of Youth Services**
**POLICY AND PROCEDURES**

Related Standards:    3-JCRF-1D-03, 1-JBC-1D-07

Chapter:              Training and Staff Development

Subject:              Training for New Employees

Policy Number:        4.2

I.    POLICY

It is the Department of Youth Services policy that all new employees shall receive a minimum of 40 hours of training prior to being independently assigned to a particular job. Pre-Service training shall include, at a minimum, the following:

- historical perspective of agency/facility
- program/agency philosophy
- goals and objectives
- program rules and regulations
- use of discipline regulations
- legal responsibilities of staff
- juvenile rights and responsibilities
- juvenile rules and sanctions
- chain of command
- suicide precautions
- emergency procedures
- security procedures
- first aid, cardiopulmonary resuscitation
- report writing
- supervision of juveniles

II.   DEFINITIONS

Not applicable.

EXHIBIT
Defendent
2

Effective Date:  June 21, 2007   Issued By: _____   Page ___1___ of ___2___

## State of Alabama
## Department of Youth Services
## POLICY AND PROCEDURES

**Related Standards:**    3-JCRF-1D-03, 1-JBC-1D-07

**Chapter:**    Training and Staff Development

**Subject:**    Training for New Employees

**Policy Number:**    4.2

III.    PROCEDURES

The administrator of each facility shall ensure that each employee receives a minimum of 40 hours training prior to being independently assigned to a particular job. The training should include, at a minimum, an orientation to the purpose, goals, policies, and procedures of the department and their particular facility, and an overview of the juvenile justice and correctional field. Additionally, the employee may receive job specific training for their particular job. Upon completion of the training, the employee shall sign or initial a statement of training received.

IV.    APPLICABILITY

This policy applies to all Department of Youth Services personnel and facilities and to facilities and programs operated for DYS by contract providers.

**Effective Date:** June 21, 2007    **Issued By:** _____    Page ___2___ of ___2___

# TERA A. McMILLAN

## v.

# ALABAMA DEPARTMENT OF YOUTH SERVICES and MICHAEL J. HARDY

## DEBRA  SPANN

### January 10, 2008

**Reagan Reporters, LLC**
**Phone: 334.262.7556**
**Fax: 334.262.4437**

1

1    IN THE UNITED STATES DISTRICT COURT FOR

2    THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4

5    TERA A. McMILLAN,

6        Plaintiff,

7    vs.                    CASE NO.

8                    2:07:CV-01-WKW

9    ALABAMA DEPARTMENT OF

10   YOUTH SERVICES and

11   MICHAEL J. HARDY,

12       Defendants.

13

14   *    *    *    *    *

15   DEPOSITION OF DEBRA SPANN,

16   taken pursuant to notice and stipulation

17   on behalf of the Plaintiff, at the State

18   of Alabama Department of Youth Services,

19   Mt. Meigs campus, before Nicole Paulk,

20   Certified Court Reporter and Notary Public

21   in and for the State of Alabama at Large,

22   on January 10, 2008, commencing at

23   approximately 1:45 p.m.

2

1     APPEARANCES

2

3     FOR THE PLAINTIFF:

4            Jimmy Jacobs, Esquire

5            4137 Carmichael Road, Suite 100

6            Montgomery, Alabama 36106

7     FOR THE DEFENDANT ALABAMA DEPARTMENT OF

8     YOUTH SERVICES:

9            J. Dudley Perry, Jr., Esquire

10           Sancha Teele, Esquire

11           General Counsel

12           State of Alabama

13           Department of Youth Services

14           Post Office Box 66

15           Mt. Meigs, Alabama 36057

16    FOR THE DEFENDANT MICHAEL HARDY:

17           James Eldon Wilson, Esquire

18           Attorney at Law

19           4265 Lomac Street

20           Montgomery, Alabama 36106

21    ALSO PRESENT:

22           Jerry Love

23

DEBRA  SPANN - 1/10/2008

3

1    STIPULATIONS

2          It is hereby stipulated and

3    agreed by and between counsel representing

4    the parties that the deposition of DEBRA

5    SPANN is taken pursuant to notice and

6    stipulation on behalf of the Plaintiff;

7    that all formalities with respect to

8    procedural requirements are waived; that

9    said deposition may be taken before Nicole

10   Paulk, Court Reporter and Notary Public in

11   and for the State of Alabama at Large

12   without the formality of a commission;

13   that objections to questions, other than

14   objections as to the form of the

15   questions, need not be made at this time

16   but may be reserved for a ruling at such

17   time as the deposition may be offered in

18   evidence or used for any other purpose as

19   provided for by the Civil Rules of

20   Procedure for the State of Alabama.

21          It is further stipulated and

22   agreed by and between counsel representing

23   the parties in this case that the filing

DEBRA  SPANN - 1/10/2008

4

1    of the deposition of DEBRA SPANN is hereby

2    waived and that said deposition may be

3    introduced at the trial of this case or

4    used in any other manner by either party

5    hereto provided for by the Statute,

6    regardless of the waiving of the filing of

7    same.

8            It is further stipulated and

9    agreed by and between the parties hereto

10    and the witness that the signature of the

11    witness to this deposition is hereby

12    waived.

13    *    *    *    *    *

14    I N D E X

15    Examination                    Page

16    By Mr. Jacobs                      6

17    Plaintiff's Exhibits            Page

18    1 - DYS Prohibition of Sexual        17

         Harassment Policy

19

      2 - DYS Sexual Conduct Policy        24

20

      3 - Ms. Spann's handwritten notes      40

21       on interview with Ms. McMillan

22    4 - Ms. Spann's handwritten notes      48

         on interview with Ms. Harris

23

1       on interview with Ms. Williams
2       6 - Ms. Spann's handwritten notes        51
            on interview with Mr. Hardy
3
        7 - Ms. Spann's handwritten notes        55
4           on interview with Mr. Ellis
5       8 - Ms. Spann's handwritten notes        57
            on interview with Mr. Harvest
6
        9 - List of questions for Mr. Hardy      59
7           prepared by Ms. Spann
8       10- Typed notes from Ms. Spann's         60
            interview with Ms. McMillan
9
        11- Memo to Ms. Spann from Mr. Hardy,    62
10          dated 7/14/2005
11      12- Memo to Whom It May Concern from      63
            Paige Hall staff, dated 6/21/2005
12
        13- Memo to Whom It May Concern from      63
13          Mr. Harvest and Mr. Ellis, dated
            6/21/2005
14
        14- EEOC Charge of Discrimination        65
15          filed by Ms. McMillan, dated
            7/12/2005
16
        15- EEOC Charge of Discrimination        67
17          filed by Ms. McMillan, dated
            12/11/2005
18
        16- Memo to Ms. Spann from Mr. Hardy,    73
19          dated 1/18/2000
20      17- Memo to Mr. Samuel from Mr. Hardy,  75
            dated 1/18/2000
21
22      *      *      *      *      *
23              DEBRA SPANN, of lawful age,

DEBRA SPANN - 1/10/2008

6

1    having first been duly sworn, testified as

2    follows:

3    EXAMINATION

4    BY MR. JACOBS:

5    Q.    Would you state your name for the record

6    for us?

7    A.    Debra Spann.

8    Q.    Okay.  Ms. Spann, I'm Jimmy Jacobs, in

9    case they didn't tell you that, and I

10    represent Ms. McMillan.  You know Ms.

11    McMillan, don't you?

12    A.    Yes.

13    Q.    Tera?  Okay.  I have a few questions for

14    you that are -- I was going to say

15    primarily, but as far as I know are going

16    to focus on Ms. McMillan's case and

17    Mr. Hardy's actions and some of the

18    information regarding sex discrimination

19    and harassment and policies and procedures

20    and so on here at DYS.

21    A.    Yes.

22    Q.    If I ask you a question that makes no

23    sense, would you please let me know that?

DEBRA SPANN - 1/10/2008

7

1    I may ask you a question out of ignorance

2    totally innocently.  I'm not going to try

3    to ask you any trick questions or anything

4    of that nature, so if I ask you something

5    that's not clear, would you tell me that

6    and ask me to clarify it?

7    A.    Yes, sir.

8    Q.    Okay.  I'm going to assume that you've

9    given a deposition before; is that true?

10   A.    Yes.

11   Q.    Have you given more than five depositions,

12   do you think?

13   A.    Probably.

14   Q.    Okay.  So you're pretty familiar with this

15   whole process and how it works?

16   A.    Yes.

17   Q.    What's your current address?

18   A.    4 West Rosemary Road.

19   Q.    Okay.  Is that --

20   A.    In Montgomery.

21   Q.    And what's your current position,

22   employment?

23   A.    I'm the personnel manager for the

DEBRA SPANN - 1/10/2008

8

1    Department of Youth Services.

2    Q.    How long have you been in that position?

3    A.    Since August of '98.

4    Q.    All right.  Where were you employed prior

5    to August of '98?

6    A.    I was with the State of Alabama Department

7    of Rehabilitation Services.

8    Q.    How long were you at Rehab?

9    A.    From '93 until '98.

10    Q.    All right.  What was your position at

11    Rehab Services?

12    A.    I was their personnel manager.

13    Q.    Were you at the State office on the

14    by-pass?

15    A.    Yes, sir.

16    Q.    Was I there when you were there?

17    A.    I'm not certain.  I don't remember you,

18    but that's not to say you weren't there.

19    Q.    Okay.  What office did you work in?  This

20    doesn't have anything to do with this

21    case; I'm just curious.  Did you work with

22    -- what was her name, Ramona?

23    A.    Lamona was there.

DEBRA SPANN - 1/10/2008

9

1  Q.    Lamona, yes.

2  A.    She was the director.  And Jim Hare -- I

3  took Jim Hare's place.

4  Q.    Oh, okay.

5  A.    He left, and then Lynn Ann Windsor --

6  well, Palmer, Windsor -- was there.

7  Q.    Okay.  Yeah, I was there at that time.  I

8  was there when Jim retired.  I think I

9  went to his retirement party.  Okay.  I

10  just didn't remember.  I was with children

11  services around '94 or '95, so we were all

12  there together.

13  A.    Okay.  You were across the street.

14  Q.    Oh, okay.

15  A.    Uh-huh.  You know, across the parking lot.

16  That's what we called across the street.

17  Q.    Okay.  All right.  That's right, I was.

18  A.    Uh-huh.

19  Q.    Okay.  So you were personnel manager there

20  from '93 to '98?

21  A.    Right.

22  Q.    Where were you employed prior to that?

23  A.    I was with the Department of Revenue, the

DEBRA  SPANN - 1/10/2008

10

1    State Department of Revenue.  I was the

2    personnel manager there.  I was the

3    assistant chief of personnel and training.

4    Q.    Okay.  And approximately how long were you

5    for?

6    A.    I was with revenue from '85 to '93.  I was

7    the assistant chief from '88 to '93.

8    Q.    So you've been in business with the State

9    for 33 years?

10   A.    Oh, yes.

11   Q.    Or more?

12   A.    Yes.

13   Q.    Are you going to retire?

14   A.    I have thought about it, days like today.

15   Q.    I'll talk with you when you get through.

16   You may be losing money coming to work.

17   But I know you're smart enough to figure

18   that out.  Okay.  Could you tell me

19   generally what your duties are in the job

20   here as personnel manager?

21   A.    Well, I'm over all -- essentially, all

22   personnel functions for the department, to

23   include hiring, separations for the

DEBRA  SPANN - 1/10/2008

11

1   department, maintenance of personnel

2   files, benefits.  You know, it is hard

3   when people ask you what you do, but those

4   types of things.  Any kind of human

5   resource function typically falls under

6   me, those types of actions.  I also have

7   done, of course, sexual harassment

8   investigations.  Pretty much all

9   disciplinary types of actions would at

10  least flow through me because I do

11  separations of employees.

12  Q.    Understanding that there might be some

13  variation from business to business and so

14  on, would you generally do the same thing

15  as a director of human resources in some

16  businesses?

17  A.    Yes.

18  Q.    Okay.  It's an equivalent kind of job?

19  A.    Yes.

20  Q.    Okay.  Who do you report to in that job?

21  A.    Allen Peaton.  He's our deputy director

22  for administration.

23  Q.    Okay.  And then -- and I'm going to assume

DEBRA SPANN - 1/10/2008

12

1   you would know, but he would report to

2   Mr. Wood?

3   A.    Yes.

4   Q.    Okay.  Are there any departments -- and if

5   I'm not using the right word -- I don't

6   know if it would be divisions or

7   departments or offices -- that report

8   directly to you at DYS?

9   A.    No.

10  Q.    Okay.  Do you supervise other employees?

11  A.    Yes.

12  Q.    Approximately how many?

13  A.    Two.

14  Q.    Two, okay.  Are they both administrative,

15  clerical type persons?

16  A.    Yes.

17  Q.    In your employment with Rehab Services

18  before you came here, did you have any

19  responsibility for doing investigations of

20  complaints or claims of discrimination?

21  A.    Yes.

22  Q.    Did you have that throughout the time you

23  were at Rehab?

1   A.    Yes.

2   Q.    How about when you were with Revenue?

3   A.    No.

4   Q.    You didn't have that responsibility there?

5   All right.  That was in '93.  What is your

6   educational background, Ms. Spann?

7   A.    I have a bachelor's in psychology and a

8   master's in criminal justice.

9   Q.    In criminal --

10  A.    Justice.

11  Q.    -- justice?  Okay.  Have you had any

12  non-degreed training in personnel

13  management or anything of that sort?

14  A.    No.

15  Q.    When did you get your bachelor's in

16  psychology?

17  A.    '76.

18  Q.    And your master's in criminal justice?

19  A.    '77.  Now, let me -- may I clarify

20  something?

21  Q.    Sure.

22  A.    I do attend ongoing training that is

23  offered and what is offered by the State

DEBRA  SPANN - 1/10/2008

14

1    personnel department.  I haven't -- just

2    not gone to school since then.

3    Q.    All right.  I was going to ask you that

4    and sort of I guess in my mind it was a

5    two-stage thing, like I was wondering if

6    you had gone and pursued some coursework

7    in human resources that just wasn't a

8    degree program, and I think the answer to

9    that is no?

10   A.    Right.

11   Q.    Okay.  Then your training in personnel

12   management has been -- and this, again, is

13   not a trick question, but would it be fair

14   to say that it has been primarily on the

15   job?

16   A.    That's correct.

17   Q.    And that's been primarily through the

18   State Personnel Department?

19   A.    Yes.

20   Q.    All right.  What specific training have

21   you had on discrimination issues in

22   employment?

23   A.    I have been to several of the EEO

15

1    seminars.  They do conduct seminars on a

2    yearly basis.

3    Q.    Okay.  And I don't want to interrupt you,

4    but who conducts?

5    A.    The EEOC.

6    Q.    Okay.

7    A.    I have been to several of those.  And

8    State Personnel does put on some seminars,

9    and I have been to those.  And they do put

10   on, of course, sexual harassment seminars,

11   and I've been to those.  I do try to stay

12   abreast of those.  We also have a

13   personnel manager's counsel where we meet

14   on a monthly basis.  And we have speakers

15   that come, and they try to keep us up on

16   what's going on in the marketplace arena,

17   what have you, and I do attend those, so I

18   do try to stay current.

19   Q.    Is that counsel part of State government?

20   A.    Yes.  It's State personnel managers and

21   Ms. Graham attends and updates us and,

22   Alice Ann Byrne, their general counsel,

23   comes and usually presents those or Sandy

DEBRA  SPANN - 1/10/2008

16

1    Speakman presents, so we usually have a

2    legal update.

3    Q.    And you have those at least --

4    A.    We meet every month.

5    Q.    Oh, you meet every month for those?

6    A.    Yes, sir.

7    Q.    Would it be -- would there be a component

8    of that that dealt with sexual harassment

9    every month, or is that --

10   A.    If it's necessary, but not --

11   Q.    No?  It's just whatever -- I'll use the

12   term the "hot topic" is?

13   A.    Exactly.

14   Q.    Okay.  The EEO conferences that you've

15   gone to, the EEOC sponsored conferences

16   that you've attended -- and I may just not

17   be remembering it right, but did you say

18   those were on an annual basis?

19   A.    They have them on an annual basis.  I do

20   not go on an annual basis, but they do

21   have them.

22   Q.    Do you recall the last one of those you

23   attended?

DEBRA  SPANN - 1/10/2008

17

A.    No, sir, I don't, but it's been several

years.

Q.    Okay.  Do you think it was before this

incident with Mr. Hardy arose?

A.    Yes.

Q.    Did you ever run into an attorney up there

named Chuck Guerrier?

A.    I don't remember.

Q.    You don't remember?  Okay.  If you had,

you would remember.  He was the regional

attorney at one time.  So it would be fair

to say that you -- the last EEOC-sponsored

training that you went to was sometime

prior to 2005?

A.    Yes, sir.

Q.    Okay.  Let me show you what we'll mark as

Plaintiff's Exhibit 1.  I know you're

familiar with this policy.

        (The referred-to document was

    marked for identification

as   Plaintiff's Exhibit No.

1.)

A.    Yes, sir.

DEBRA  SPANN - 1/10/2008

18

1  Q.    And actually, I believe I put two policies

2  together here, the first two pages and

3  then the third page.

4  A.    All right.

5  Q.    Is this the policy of DYS?

6  A.    Yes, sir.

7  Q.    What responsibility do you have for this

8  policy?

9  A.    Typically, when I get a sexual harassment

10  complaint, I will ask or submit the

11  complaint to the director and ask him does

12  he want me to investigate -- I will tell

13  him that I have gotten a complaint; does

14  he want me to investigate or does he want

15  to assign the complaint to someone else,

16  and he will make a decision as to who he

17  wants to investigate.  And at that point,

18  whoever he decides he wants to investigate

19  will investigate.  If it's me, I proceed,

20  or if he wants someone else, then I will

21  hand off the information I have to whoever

22  he assigns it to.

23  Q.    Are all complaints of sexual harassment

DEBRA  SPANN - 1/10/2008

19

1   directed to you?

2   A.    I'm not going to say all of them because I

3   don't know that all of them are.

4   Q.    Okay.  As I read the policy, it says a

5   complaint should be made to the

6   departmental personnel manager, and that's

7   you.  According to the policy, should all

8   complaints be made to you?

9   A.    According to the policy, yes.

10   Q.    Okay.  And I understand that that may not

11   always be the case; is that correct?

12   A.    That is correct.

13   Q.    Okay.  What specific training have you had

14   to conduct an investigation of a sexual

15   harassment or sex discrimination claim?

16   A.    I have basically had on-the-job training

17   more so than anything else.  When I was at

18   Rehab, they told me, you have to go do

19   this investigation.  So my friend had been

20   in the military and that was all she had

21   done was investigations, Title 7 sexual

22   harassment.  And she worked for another

23   State department and that's what she did,

DEBRA SPANN - 1/10/2008

1   so she trained me on how to do that.  And

2   then I went and started doing them at

3   Rehab because I basically got -- and I'm

4   -- but this is the truth -- I got thrown

5   into it.  But I felt like I had a good

6   background because she gave me materials

7   on how to do it and she trained me very

8   well on how to do it.

9   Q.    Okay.  I don't think I will have any

10  follow-up to this, but could you tell me

11  who that was?

12  A.    Maxine Wheeler.

13  Q.    Okay.  And I will ask you again about her

14  later.  Did you get any other training

15  after that?

16  A.    Yes, I did.  Before I did the first one,

17  that's how I learned.

18  Q.    That's how you did it?

19  A.    Uh-huh.  Then after that I did attend a

20  seminar on how to do it, and it was what

21  she had taught me to do, only she had

22  really taught me in more detail and in

23  depth.

DEBRA  SPANN - 1/10/2008

21

1    Q.    That was my question -- my next question

2    was going to be did they teach you

3    anything different when you went to a

4    seminar than Ms. Wheeler had taught you?

5    A.    No.

6    Q.    Okay.  And the process that she taught

7    you, is that what you still utilize?

8    A.    Yes.

9    Q.    Okay.  Who besides you at DYS would

10   conduct an investigation of sexual

11   harassment or discrimination?

12   A.    We have an investigation section, and our

13   special investigator would do these if

14   need be.

15   Q.    Would that be Mr. Staton (phonetic)?

16   A.    Yes.

17   Q.    Is there anyone else other than Mr. Staton

18   that you know of that would do an

19   investigation?

20   A.    I don't know.

21   Q.    Is he the only other person other than you

22   that you're aware of that's ever done an

23   investigation?

DEBRA SPANN - 1/10/2008

22

1    A.    Of sexual harassment?

2    Q.    Yes.

3    A.    Yes.

4    Q.    Okay.  Do you know what training

5    Mr. Staton has?

6    A.    No.

7    Q.    The third page of this exhibit that I gave

8    you has a different policy number, 3.24.

9    What is this policy for?

10   A.    As it states, the subject is sexual

11   conduct, and it just states that sexual

12   conduct between staff and/or students --

13   Q.    -- is prohibited?

14   A.    Right.

15   Q.    If there were allegations of sexual

16   conduct between staff and/or students or

17   volunteers or contract personnel, would

18   that be reported to you?

19   A.    Not if it was with students.  Typically I

20   don't handle anything with students.

21   Q.    Okay.  If it involves staff, would that

22   come to your attention?

23   A.    Between staff?  If it is on the grounds,

DEBRA  SPANN - 1/10/2008

23

1    yes, usually.

2    Q.    Do you have responsibility for maintaining

3    personnel files?

4    A.    Yes.

5    Q.    If a person violates a policy and is

6    disciplined, is that placed in that

7    personnel file?

8    A.    Yes.

9    Q.    And would that come to you to be placed in

10   their personnel file?

11   A.    Yes.

12   Q.    Okay.  If someone were to violate this

13   policy, that should ultimately end up in

14   your office; is that correct?

15   MR. PERRY:  Which policy are you

16   talking about?

17   MR. JACOBS:  3.24.

18   MR. PERRY: 3.24?

19   MR. JACOBS:  Yeah.  We can make

20   that a separate exhibit.

21   It's the third page.

22   THE WITNESS:  Between staff.

23   MR. PERRY:  Between staff and/or

DEBRA  SPANN - 1/10/2008

24

1    students, volunteered or

2    contract personnel and

3    students.

4    MR. JACOBS:  If you'll hand that

5    one back, I'll put a sticker

6    on it.  We'll mark that last

7    page as Plaintiff's Exhibit

8    2.

9            (The referred-to document was

10        marked for identification

11    as   Plaintiff's Exhibit No.

12    2.)

13    A.    Could you repeat the question?

14    Q.    I will attempt to.  We may have to call on

15    the court reporter.  I wish I were smart

16    enough to remember all the questions I

17    ask.

18    THE REPORTER:  Do you want me to

19    --

20    MR. JACOBS:  I'm going to try it,

21    and if I'm really off, if

22    you'd let me know -- or

23    maybe you would let me know.

DEBRA  SPANN - 1/10/2008

25

1   Q.   I think the last question I asked you was

2   if this policy was violated and there was

3   some action or discipline to go into the

4   personnel file, that ultimately would come

5   to you, wouldn't it, to go into the file?

6   A.   If discipline were taken, it should go

7   into the personnel file.

8   Q.   Okay.  Well, let me give you a

9   hypothetical, if I could.  Let's suppose

10   that -- I don't know the names of all the

11   buildings here, but let's suppose that two

12   staff members in one of these buildings

13   back here behind us were involved in some

14   sexual conduct that would be in violation

15   of this policy and that was reported in

16   some fashion -- the manager became aware

17   of it or perhaps somebody external brought

18   it to somebody's attention -- would there

19   be any written record made of that?

20   MR. PERRY:  Object to the form of

21   the question.

22   A.   If there were disciplinary action taken,

23   it would go in the file.

DEBRA SPANN - 1/10/2008

26

1    Q.    Okay.  If an employee violated a policy,

2    what action is supposed to occur?

3    MR. PERRY:  Object to the form of

4    the question.

5    A.    If disciplinary action were taken, it

6    would go in the folder.

7    Q.    Are managers trained on the policies to

8    your knowledge?

9    A.    Yes.

10   Q.    Are managers charged with enforcing the

11   policies?

12   A.    Yes.

13   Q.    All right.  If a manager has knowledge

14   that a policy has been violated, should

15   there be a record made of that?

16   A.    Could you repeat that again?

17   Q.    If a manager has knowledge that a policy

18   has been violated, should there be a

19   record made of that?

20   MR. PERRY:  Object to the form of

21   the question.

22   A.    Well --

23   Q.    Let me rephrase it.  What's a manager

DEBRA  SPANN - 1/10/2008

27

1   supposed to do if they become aware that

2   an employee has violated a policy?

3   MR. PERRY:  Objection to the form

4   of the question.

5   A.    Managers are charged with enforcing the

6   policies and procedures.

7   Q.    Okay.  And I understand from what you told

8   me previously that if there were any

9   disciplinary action taken because a policy

10  was violated -- or a procedure -- then

11  that would come to your office.  Is there

12  a -- I don't know the word to use, so I'll

13  say a practice where a manager could have

14  awareness that a policy was violated but

15  they wouldn't impose any discipline?

16  A.    I don't know.

17  Q.    Okay.  That's fair enough.  I notice under

18  Roman Numeral 3, procedures, on this

19  policy, it says that each facility will

20  maintain written policies to ensure

21  adherence to this policy --

22  MR. WILSON:  Excuse me.  Is that

23  Exhibit 1 or 2 you're

DEBRA  SPANN - 1/10/2008

28

1   referring to?

2   MR. JACOBS:  That's Exhibit 2,

3   Roman Numeral 3.

4   Q.    Do you have any involvement in developing

5   or implementing those policies at the

6   facility level.

7   A.    No.

8   Q.    Do you have any awareness as to whether

9   the various facilities have such policies

10  or not --

11  A.    No.

12  Q.    -- or procedures.  I'm sorry, not

13  policies, but procedures?

14  A.    No.

15  Q.    Do you have anyone to assist you when you

16  do an investigation of a sexual

17  discrimination or harassment complaint?

18  A.    No.

19  Q.    On Exhibit 1, the prohibition of sexual

20  harassment, does DYS have any -- well, how

21  does DYS implement this policy?

22  A.    How do they implement it?

23  Q.    Yes?

DEBRA  SPANN - 1/10/2008

29

1    A.    We have training, what they call mandatory

2    training.  They have Mandatory Part A and

3    Mandatory Part B.  Now, please know I'm

4    not involved in this training, but it is

5    my understanding that this is included in

6    that training.  In addition, this is also

7    covered in our pre-service training, which

8    all new staff go to.  And this Mandatory

9    Part A and B, staff go to that once a year

10   also.  So this is covered in the

11   pre-service and also once a year, so staff

12   get that at least once a year.

13   Q.    Okay.  Is there a formal presentation of

14   any kind in the pre-service training?

15   A.    It's my understanding that there is.  Now,

16   there again, I don't do it personally, but

17   it's my understanding that there is.

18   Q.    Do you know who is responsible for doing

19   the training on the sexual harassment

20   policy?

21   A.    They have -- the orientation and training

22   section does that, and whichever trainer

23   is assigned to do it.

30

1  Q.    Within the organization of DYS, where is

2  the organization and training section

3  located -- and I don't mean physically,

4  but in the organization?

5  A.    It's located in the administration

6  section.

7  Q.    Okay.  Do you know who that individual or

8  those individuals would report to?

9  A.    They would report to Mr. Peaton.

10  Q.    Okay.  Do you know the name of any of the

11  individual or individuals who conducts

12  that training?

13  A.    Aaron Chambers is over the section.

14  Q.    Is there more than one person in the

15  section?  You say he's over it.

16  A.    Yes.

17  Q.    Do you know what training any of those

18  individuals have in prohibition of sexual

19  harassment?

20  A.    No, sir, I don't.

21  Q.    Have they ever sought your advice or input

22  into the training that they provide to

23  staff?

DEBRA SPANN - 1/10/2008

31

1    A.    No.

2    Q.    Do you know if there is any requirement

3    that staff, either new staff or continuing

4    staff, acknowledge that they have been

5    trained on the sexual harassment policy?

6    A.    I don't know.

7    Q.    The reason I ask is oftentimes I see a

8    form where people are required to sign.

9    A.    Right.

10   Q.    I haven't seen that in any of the files

11   I've looked at here.  You don't require

12   that as part of the personnel file?

13   A.    No.

14   Q.    Okay.  As personnel manager, do you have

15   any way of verifying that an individual

16   actually has been trained on sexual

17   harassment?

18   A.    No.

19   Q.    Is there any separate training that is

20   given to supervisors on sexual harassment

21   that's different from that that's given to

22   regular staff?

23   A.    I think so.  I think State Personnel

1  provides different training to supervisors

2  than it does to regular staff.

3  Q.   Okay.  Do you know if any record is

4  maintained of that training?

5  A.   State Personnel keeps a record of it, but

6  I don't -- I don't know if our training

7  section keeps a record or not.

8  Q.   Is there any provision to make a record

9  that training has been done in the

10  individual staff member's personnel file?

11  A.   The campuses all have training

12  coordinators, and they keep records.

13  Q.   Okay.  So, for example, we're here at Mt.

14  Meigs.  There would be records here of the

15  training that had been done in not just

16  sexual harassment, but you think any

17  training?

18  A.   They tell me there is.

19  Q.   Okay.  So it's your understanding that

20  staff, DYS staff, as opposed to management

21  people, are trained by the -- and I'm

22  sorry, I've forgotten the name, but

23  Mr. Chambers' group --

DEBRA  SPANN - 1/10/2008

33

1    A.    Uh-huh.

2    Q.    -- and then the supervisors, the

3    management staff, are trained by personnel

4    from the State Personnel Department?

5    A.    Well, everyone can go to State Personnel,

6    but their focus is different.  They have

7    different focuses.

8    Q.    Well, this may clarify it.  I'm

9    understanding that everybody -- I'm sorry.

10   My understanding is that all staff people,

11   non-management people, would receive

12   training at pre-service and on an annual

13   basis on sexual harassment from within

14   DYS --

15   A.    Right.

16   Q.    -- from DYS staff.  And then I was

17   understanding that supervisory staff,

18   persons who had responsibility for other

19   staff, would get some additional training?

20   A.    That's correct.

21   Q.    All right.

22   A.    But if we need regular, quote/unquote

23   staff, they can also go to the State

DEBRA  SPANN - 1/10/2008

34

1    Personnel.

2    Q.    Okay.  But that's an optional thing?

3    A.    Yes.

4    Q.    I guess somebody would make a decision

5    that they needed it?

6    A.    Exactly.

7    Q.    Okay.  How often does that State Personnel

8    training for supervisors occur?

9    A.    They have training every quarter, and I'm

10   not certain of their schedule, but I do

11   know it is offered every quarter.

12   Q.    Is sexual harassment a part of that

13   training every quarter?

14   A.    Yes.

15   Q.    It is, okay.  Who within the Department of

16   Youth Services has responsibility for

17   implementing this policy on the

18   prohibition of sexual harassment?

19   A.    I'm not sure I understand the question.

20   Q.    Okay.  And I'll try to explain it.  I'll

21   have to lay a little groundwork, I guess,

22   but -- and I won't say this happens all

23   the time, but if you have an organization

DEBRA SPANN - 1/10/2008

35

1   and there's something that's supposed to

2   get done, if that responsibility generally

3   gets assigned to somebody to see that it

4   gets done and they're accountable for

5   it -- so what I'm asking is who in the

6   Department of Youth Services would have

7   the responsibility for seeing that the

8   prohibition of sexual harassment policy is

9   implemented?

10  MR. PERRY:  Objection to the form

11  of the question.

12  A.    Well, I don't know.

13  Q.    Okay.  Describe for me, if you would, the

14  procedure that you use when -- I

15  understand a complaint is made and it

16  comes to you and then you send that to

17  Mr. Wood?

18  A.    Right.

19  Q.    And Mr. Wood may designate either you or

20  Mr. Staton to investigate.  Assume that he

21  says Ms. Spann, I want you to investigate

22  this.  Describe for me the procedure that

23  you would use to do that.

DEBRA SPANN - 1/10/2008

36

1    A.    Typically, I will interview the person who

2    made the complaint, and if they have any

3    witnesses they want me to interview, I'll

4    interview the witnesses.  I'll interview

5    the person they've made the complaint

6    against and then any witnesses that they

7    want me to interview.  And if I haven't

8    been able to catch up with the people on

9    either side, I'll try and tie up any loose

10    ends.  I do try to do all of this -- I try

11    to get this taken care of -- I literally

12    will drop what I'm doing and get started

13    on it right away as soon as I get the

14    complaint and the assignment, and I try to

15    get it done in just a few days and catch

16    up with all the witnesses and try to get

17    it out of the way.  I might -- after I've

18    interviewed everybody, I do like to, you

19    know, look over everything and leave it

20    for a day or two to kind of think on it

21    and then try to make sure I'm making an

22    appropriate conclusion and then forward my

23    recommendation to Mr. Wood for his

37

1    decision as to what he feels is

2    appropriate to do.

3    Q.    All right.  So you've interviewed the

4    complainant, the person who's making the

5    complaint.  Do you take notes during the

6    course of that meeting with them?

7    A.    Yes.

8    Q.    Do you keep those notes?

9    A.    Yes.

10   Q.    Okay.  Do you -- and I have some we're

11   going to look at, but do you -- I don't

12   know the word I want to use --

13   reconstitute -- do you redo those notes at

14   a later time?

15   A.    Yes.  Usually I just kind of briefly do an

16   outline while they're talking, and then

17   when they leave, I try to flesh them out

18   on my computer or whatever --

19   Q.    And type it up?

20   A.    Yes.  And then I'll interview somebody

21   else or whatever.

22   Q.    Okay.  Are there any sort of guidelines

23   that you use to conduct your

DEBRA  SPANN - 1/10/2008

38

1    investigation?

2    A.    I basically go by the complaint, what

3    their complaint was, do the who, what,

4    when, where, why, and how.  And that's

5    pretty much common sense.  I try to stick

6    to the facts.  I don't try to get into a

7    lot of other issues.  I try to stay away

8    from he said she said.  I like to do the

9    what happened here, what was the incident,

10   and, you know, why do you think that this

11   happened, what -- you know, what

12   precipitated it and what did you do, how

13   did that make you feel, whatever.  That's

14   it.  I don't try to get into this other

15   stuff, just -- just the facts.  So -- I

16   don't -- I don't like all that other

17   stuff.

18   Q.    Are you aware of the EEOC's guidance for

19   conducting investigations of sexual

20   harassment?

21   A.    Yes.

22   Q.    Do you follow those guidelines?

23   A.    I haven't looked at them in so long, I

DEBRA SPANN - 1/10/2008

39

1    really don't remember.

2    Q.    Do you keep records of all of the

3    complaints that are made in DYS?

4    A.    Yes.

5    Q.    All right.  Are those located in your

6    office?

7    A.    Yes.

8    Q.    And I think perhaps a little earlier we

9    established that you have a record of all

10   of the complaints that have been sent to

11   you, but there may be some that were never

12   sent to you.  Is that --

13   A.    That's correct.

14   Q.    Okay.  During the -- I think it's almost,

15   what, nine years that you've worked with

16   DYS?

17   A.    Uh-huh.

18   Q.    Have you ever become aware of an incident

19   or a complaint of sexual harassment that

20   had not been brought to you, that you

21   learned about later?

22   A.    Yes.

23   Q.    Okay.  And would that have been an

DEBRA  SPANN - 1/10/2008

40

1   incident that some other DYS management

2   staff would have been aware of and handled

3   on their own?

4   A.   Yes.

5   Q.   Okay.  I think we'll look at the notes.

6   Let me show you what I've marked as

7   Plaintiff's Exhibit 3.  And that is a

8   document that I received that I believe

9   was an exhibit -- and you don't have to

10  know this or not know it, and I may be

11  wrong, but I believe it was an exhibit

12  that Mr. Hardy used in one of his hearings

13  and that's why it has that down at the

14  bottom.  Is this a copy of some notes that

15  you made?

16         (The referred-to document was

17      marked for identification

18  as   Plaintiff's Exhibit No.

19  3.)

20  A.   Yes.

21  Q.   I'm going to assume that you're trained in

22  shorthand since I can't read some of this.

23  I would like to ask you, first of all, at

DEBRA  SPANN - 1/10/2008

41

1  the top -- the copy I had is cut off a

2  little bit.  But I have dash 14, dash 05,

3  sexual harassment.  Is that the date that

4  you --

5  A.    Yes.

6  Q.    -- believe you took this?

7  A.    Yes, it was June 14.

8  Q.    Got it.  I'm not sure how important it is,

9  but there's just some question about when

10  Ms. McMillan came to see you.  And you'll

11  see that in a minute, why part of that

12  confusion exists.  But on that day you

13  wrote down 6-14-05?

14  A.    Right.

15  Q.    Okay.  The third line there has some wavy

16  lines in it, and I think I probably know

17  what that says, but could you tell us what

18  it says when it says "wants"?

19  A.    Wants to go to another dorm.

20  Q.    And beneath that?

21  A.    Is in Paige Hall.

22  Q.    Okay.  The next line just has one little

23  mark in it between sexual --

DEBRA SPANN - 1/10/2008

42

1    A.    Sexual advances for two years.

2    Q.    Okay.  And then the next line?

3    A.    Told her he wanted her to suck his dick

4    while the kids went to the dining hall.

5    Should be finished when the kids come

6    back.

7    Q.    Okay.  The next line?

8    A.    Came behind the desk and grabbed her

9    breasts.

10   Q.    Okay.  The next line?  Asked her friend --

11   A.    -- how much money to get her.

12   Q.    Okay.  The next line?  Talked with her --

13   A.    -- about the website, black P.

14   Q.    And I assume the parentheses explains what

15   that is?

16   A.    Yeah.

17   Q.    Okay.  The next line starts, Hardy knew --

18   is that where her house was?

19   A.    Yeah.

20   Q.    What's the symbol in there?

21   A.    He came to talk about her career.

22   Q.    Okay.

23   A.    This was after Christmas.  When she told

DEBRA  SPANN - 1/10/2008

43

1    him she lived in Spring Valley and she was

2    going to tell him how to get there, he

3    said he knew where she lived.  By the time

4    they hung up the phone, he was in her

5    driveway.

6    Q.    Okay.

7    A.    Her friend was there.  They had drinks and

8    talked.  He pulled his t-shirt over his

9    head.

10   Q.    Okay.  The next line, put her --

11   A.    On the 12 to 8 shift and three others

12   wanted it.  Bowling had a transfer.

13   Q.    I'm sorry, I didn't understand.  Bowling?

14   A.    Bowling.  That's the name of a unit

15   manager in another dorm.

16   Q.    Had a transfer?

17   A.    Uh-huh.

18   Q.    Oh, okay.  And is that related to him

19   putting her on the 12 to 8 shift?

20   A.    Uh-huh.

21   Q.    Okay.  Hardy told her it would --

22   A.    It will take her two years to transfer out

23   of his dorm.  The only reason Chriske got

DEBRA SPANN - 1/10/2008

44

1  out was because he was white.

2  Q.   I don't think there's any shorthand in the

3  next two lines.  Beginning with Ingria

4  Williams --

5  A.   She's not interested in men and Dortch

6  sexually harassed her until he figured it

7  out.  And she bought $300 worth of

8  merchandise from him, meaning Hardy.

9  Q.   And that reference to bought the

10 merchandise, is that reference to Ingria

11 Williams or to Tera McMillan?

12 A.   Ingria Williams.

13 Q.   Okay.  The next two lines don't appear to

14 have any shorthand.

15 A.   Right.

16 Q.   Then there appears to be just an isolated

17 reference to Greta Johnson and Carl

18 Gadson.

19 A.   Right.

20 Q.   The writing below that, does that go with

21 Greta Johnson and Carl Gadson, or is that

22 separate?

23 A.   No, that's separate.

DEBRA SPANN - 1/10/2008

45

1   Q.    Okay.  Could you fill in the blanks for

2   me, then, where it says, said would give

3   her --

4   A.    He said he would give her a monthly salary

5   if she would be his side woman, and mom

6   heard him ask -- ask her to meet -- well,

7   ask him to meet her at a hotel.  And then

8   --

9   Q.    Next line?

10  A.    She has heard he tried to go with --

11  should be Bernice Howard and Mary Moten,

12  who are former employees.  And then Eugene

13  Smith got moved because of a rumor about

14  Mr. Hardy.  Nobody believed it, but it was

15  true.  Mr. Hardy told her himself it was

16  true.

17  Q.    And I think there's a little bit on the

18  next page.  No, this is a separate

19  interview.  Okay.  Are those the notes

20  that you took in your initial meeting with

21  Ms. McMillan?

22  A.    Yes.

23  Q.    What did you do after you met with her?

1    A.    I asked Mr. Wood did he want me to do an

2    investigation or did he want to assign it

3    to anybody else, and he told me to do it.

4    Q.    And how did Ms. McMillan come to you?

5    A.    She had been on campus to see Ms. Rankins,

6    a specialist down there, and Ms. Rankins

7    told her to come and see me.

8    Q.    Okay.  Do you remember when Ms. McMillan

9    came to see you?  I realize it was, what,

10   two years ago now?

11   A.    Uh-huh.

12   Q.    When she came to see you, was she angry?

13   MR. PERRY:  Objection to the form

14   of the question.

15   A.    I don't remember if she was angry.

16   Q.    Was there anything about her emotional

17   condition or state that stuck in your mind

18   that you remember today?

19   A.    No.

20   Q.    Okay.  Do you remember approximately how

21   long this interview with her took?

22   A.    It took a -- it took a while.

23   Q.    Do you think more than an hour?

DEBRA  SPANN - 1/10/2008

47

1    A.    Yes.

2    Q.    More than half a day?

3    A.    No, no, no.  But longer than an hour.

4    Q.    Okay.  After Mr. Wood told you that he

5    wanted you to do the investigation, what

6    was the next thing that you did?

7    A.    Well, I tried to arrange interviews with

8    the people that she had mentioned that she

9    felt like may be good to talk with, Ms. --

10   she had told me her friend that was there

11   when Mr. Hardy came to her house.  She had

12   told me the lady's name, Ms. Veronica

13   Harris, so I tried to get in contact with

14   her.  I tried to get Ms. Ingria Williams,

15   and I tried to contact Ms. Bernice Howard

16   and Mary Moten to talk with them to see if

17   they could provide any information.  And I

18   did talk with Ms. Veronica Harris, and she

19   was the one that said that Mr. Hardy said

20   that he asked her what would it take to

21   get her or how much money would it take to

22   get her, and she said -- I'm sure you

23   probably have it; I've got it in my notes.

48

1  He said, you know, you probably just --

2  it's in my notes.

3  Q.   Let's go ahead and mark that and get you

4  to look at that.  There's no sense in

5  trying to get you to do that blind when

6  we've got your notes.

7  A.   And it has been a while.

8  Q.   Right, and I understand that.  Here's

9  Exhibit 4.

10         (The referred-to document was

11     marked for identification

12  as   Plaintiff's Exhibit No.

13  4.)

14  A.   Right.  How much would it take for her,

15  Mr. Hardy asked her.  And she said -- she

16  said, I really do not know, Mr. Hardy; if

17  you are trying to date her, then I think I

18  know pretty well -- he did not give her a

19  response and just said hmmm -- on campus,

20  and it's been a while now.  Ms. Moten was

21  still here when that happened.  McMillan

22  called right after Ms. Harris left and

23  said the lady was afraid for her job and

DEBRA SPANN - 1/10/2008

49

1    she just told her to tell the truth.

2    Q.    Was she referring to Ms. Harris?

3    A.    Yes.

4    Q.    Do you have any difficulty in doing these

5    investigations because people are afraid

6    to talk?

7    A.    It is very difficult when the people still

8    work here, because our staff do have

9    control over the schedules and

10   disciplinary actions and evaluations, so

11   it doesn't seem like much to an outside

12   person looking in, but it's these people's

13   livelihoods.  And particularly for the

14   females, it's -- it's very difficult for

15   them to come forward and also to testify

16   against some of the others or for some of

17   the others.

18   Q.    On Plaintiff's Exhibit 4 there, Veronica

19   Harris -- I see 6/23 at the top.  Is that

20   the date that you talked with her?

21   A.    Yes.

22   Q.    6/23 of '05, I believe it would have been?

23   A.    Uh-huh.

DEBRA SPANN - 1/10/2008

50

1   Q.    What is the reference to Ms. Moten there?

2   A.    Because I asked her when that was, and she

3   said it was when Moten was still here.

4   Q.    When Hardy approached her about how much

5   it would take?

6   A.    Uh-huh.

7   Q.    Okay.  I didn't understand that.  Let's go

8   ahead and mark Plaintiff's Exhibit 5.  And

9   this one has Ingria Williams at the top.

10          (The referred-to document was

11      marked for identification

12   as   Plaintiff's Exhibit No.

13   5.)

14   A.    Okay.

15   Q.    And this one is dated 6/22.

16   A.    Okay.  And Ms. Williams said that

17   Mr. Hardy would help McMillan with her car

18   if she would -- I've got if she would be

19   with her -- if she would be with him.  And

20   she meant McMillan and Hardy.  And she

21   said that McMillan told her that at her

22   house, meaning McMillan, he took his shirt

23   off and he fondled his nipples.  And she

DEBRA  SPANN - 1/10/2008

51

1   said that when she, meaning Ms. Williams,

2   was on probation, Dortch used to harass

3   her a lot.  She said Dortch was real

4   messy, but she said he stopped all that.

5   Q.    What did you understand the reference to

6   "messy" to be?  Was that talking about

7   harassing her messy or --

8   A.    No, he's -- he's real -- he likes to start

9   stuff and keep something stirred up all

10  the time, and Ms. Williams is not that

11  way.  And so he found out she's not that

12  way, and so he just left her alone.  And I

13  asked her did she ever -- did she know

14  that Mr. Hardy allegedly sold merchandise

15  and did he ever ask her -- or did she know

16  that, and she said yeah.  And she bought

17  about $300 worth of sweat suits and

18  purses, and she felt like she kind of had

19  to, but she had never done it since then.

20  Q.    Okay.  Would that have been a violation of

21  any policy that you're aware of?

22  A.    I don't know.

23  Q.    Okay.  The next one I have has got Michael

1    Hardy at the top.  I think the first line

2    says unit manager at Paige Hall

3    approximately ten years?

4           (The referred-to document was

5        marked for identification

6    as    Defendant's Exhibit No.

7    6.)

8    A.    Ten years, uh-huh, right.  And Ms.

9    McMillan has worked for him about two

10   years.  He was over at Holloway for a

11   while and then he went back to Paige Hall,

12   and she went with him at the same time

13   that he went back to Paige Hall.

14   Q.    Okay.  This line that has -- looks like Z

15   one else?

16   A.    No one else has talked to her about this.

17   He did not tell anyone to or no one else

18   had talked to her about it.  In May of

19   '05, she asked to come in early, said she

20   had a second job and -- you know, this has

21   gotten cold -- something to do with FMLA.

22   But anyway, she had talked with

23   Mr. Bowling a couple of months about a

DEBRA SPANN - 1/10/2008

53

1    transfer, and --

2    Q.    Okay.  What's this down here about two

3    years?

4    A.    He did not tell her it would take two

5    years to transfer; he told her there was a

6    waiting list for transfer.  And he doesn't

7    have any idea why she made the statement

8    about Chriske.  He thinks this has to do

9    with the transfer to a particular dorm,

10   ITU, which is where Bowling was at that

11   time, with a particular shift of 10 to 6.

12   Now, as far as the Eugene Smith

13   falsification and his -- the rumors and

14   all that, apparently there was some

15   letters of falsification and Hardy did not

16   support him and that's what the issue is,

17   but Hardy says that it is not true.  And

18   as far as Ms. Moten and Ms. Howard, no, he

19   emphatically denied that.  He had no

20   relationship with them.  And as far as

21   falsifying the books, he said no to

22   falsifying the books or phone logs.  He

23   may have had -- Ms. McMillan may have had

DEBRA SPANN - 1/10/2008

54

1    the book, the Chemical Book, for a couple

2    of days after she left or went on the

3    other shift, not a couple of months.  She

4    makes stuff up.  She is lying.

5    Q.    Okay.  And then one and a half --

6    A.    For the past one and a half to two years

7    he keeps to himself.  He's trying to have

8    growth and focus.  He found where he does

9    that with the death of his mom and his

10   grandma.  He is not concerned with a

11   promotion.  And I had asked him about the

12   Mt. Meigs clique, but he does not know

13   what she's talking about as far as writing

14   well.  The Mt. Meigs part came in with the

15   writing well part.  And the black P may

16   not have anything to do with him, and

17   that's Mr. McCollum that she's talking

18   about there, doesn't have anything to do

19   with him.

20   Q.    Was there a Mr. McCollum that was an

21   employee?

22   A.    There was at that point in time, uh-huh.

23   Q.    Okay.

DEBRA SPANN - 1/10/2008

55

1   A.    The next thing, absolutely not, she is

2   fishing.  He may file a suit against her.

3   Okay.  And as far as her transferring and

4   anything of that nature, she's going back

5   to the beginning.  In order to leave, they

6   have to file some type of harassment

7   charge.  And as far as him asking her to

8   go to a hotel, that's -- that was not it.

9   Prior to May 27, the numbers that they had

10  for her were inoperable.  And the question

11  about sucking his dick, absolutely not.

12  He emphatically denied that.  And he asked

13  me to talk with Mr. Harvest and Mr. Ellis

14  on the 12 to 8 shift because he told them

15  that -- or they told him that she would

16  get -- she told them that she would get

17  Mr. Hardy.

18  Q.    Okay.  And that one was 6/28, June the

19  28th of '05?

20  A.    Yes, sir.

21  Q.    Okay.  I have two more of these that are

22  pretty short -- at least I think that

23  there are just two.

DEBRA SPANN - 1/10/2008

56

A.    Okay.

Q.    This is going to be Plaintiff's 7, and

that one has Jonathan Ellis at the top.

        (The referred-to document was

    marked for identification

as   Plaintiff's Exhibit No.

7.)

A.    Okay.

Q.    Is that your interview with Mr. Ellis?

A.    Yes.

Q.    And this is one of the persons that

Mr. Hardy referenced as a witness.  Did

you ask Mr. Hardy if there was anybody

else you could talk to, or did he

volunteer these people?

A.    He volunteered them.  And I asked him did

he want me to talk with Mr. Dortch, and he

told me no.

Q.    Okay.  Mr. Ellis.

A.    Okay.  Mr. Dortch and Mr. Harvest wrote

the memo; he did not write the memo.  He

absolutely did not write the memo and had

no input into the memo, but he did not see

1   how it is possible, the situation was

2   possible, knowing the individuals.  He

3   didn't see how it was possible.

4   Q.    The situation here, Hardy's harassment of

5   McMillan?

6   A.    Yes.  He did not know Ms. McMillan had

7   another job.  McMillan said she was going

8   to leave the dormitory.  About a week

9   before she left the dorm, she said she was

10  going to leave the work area, period, and

11  Mr. Ellis had worked with McMillan since

12  February or March '05, and this was July

13  1, '05.  He said there was no sexual

14  harassment in the dormitory, no sexual

15  harassment on campus, but he had heard

16  about the situation in trustees with the

17  students and the staff.  He was aware

18  there was a Mt. Meigs clique.  He didn't

19  know who was in it, and he knew that there

20  were several cliques.

21  Q.    Okay.  With the memo that he's referencing

22  here?  Is that one of the memos that --

23  well, we'll come to it later.  Plaintiff's

DEBRA SPANN - 1/10/2008

58

1    8, Arthur Harvest at the top.

2           (The referred-to document was

3        marked for identification

4    as   Plaintiff's Exhibit No.

5    8.)

6    A.    Mr. Harvest.  On the week of the 13th,

7    they had a confrontation about a work

8    procedure she had done wrong, and Harvest

9    changed schedules in April or May and she

10   had been upset ever since.

11   Q.    Okay.  Who had he had a -- who had a

12   confrontation?

13   A.    Mr. Harvest and McMillan.

14   Q.    Okay.  Did Mr. Harvest work in Paige Hall?

15   A.    Yes.

16   Q.    Do you recall which week of the 13th he

17   was referring to?  Was that July or --

18   A.    I'm thinking it was April.

19   Q.    Okay.  And who changed their schedule in

20   April or May?

21   A.    Mr. Hardy.

22   Q.    Okay.  I'm just trying to be sure I'm

23   clear.  Is this Mr. Hardy changed her

DEBRA  SPANN - 1/10/2008

59

1    schedule in April or May or Mr. Harvest's

2    schedule?

3    A.    Harvest's.

4    Q.    Okay.  And she had what ever since?

5    A.    She had been upset ever since.

6    Q.    Okay.  And is this your writing down here

7    with Phyllis or --

8    A.    No, that's not mine.

9    Q.    Okay.

10   A.    Let me back up.  I'm not sure that it is

11   Harvest --

12   Q.    I'm not either, so...

13   A.    I thought it was, but I'm not sure.

14   Q.    It was a long time ago.  I don't believe

15   from what I know, if it's helpful at all,

16   that Ms. McMillan's schedule was changed

17   around that time.  It was changed, I

18   believe, in January or February and then

19   she moved.

20   A.    Uh-huh.  Yeah.

21   Q.    This would be Plaintiff's Exhibit 9, a

22   list of questions.

23         (The referred-to document was

DEBRA  SPANN - 1/10/2008

60

1        marked for identification

2    as   Plaintiff's Exhibit No.

3    9.)

4    A.    Right.

5    Q.    They appear to be questions for Mr. Hardy.

6    Is that something you prepared before you

7    talked to him?

8    A.    Right.

9    Q.    Did you prepare a list of questions like

10   this before you interviewed all of these

11   individuals or just Mr. Hardy?

12   A.    Just Mr. Hardy.  Just him.

13   Q.    Okay.  And then Plaintiff's 10.  Can you

14   tell me what that is?

15        (The referred-to document was

16        marked for identification

17    as   Plaintiff's Exhibit No.

18    10.)

19   A.    That's where I typed Ms. McMillan's

20   interview with me.

21   Q.    Okay.  So is that something where you

22   would have sat down with those notes we

23   looked at earlier and typed this from your

DEBRA SPANN - 1/10/2008

61

1    notes?

2    A.    Yes.

3    Q.    And I notice that has the date of the 15th

4    on it.

5    A.    Right.

6    Q.    Is it your memory you did that the next

7    day?

8    A.    Right.

9    Q.    Do you have any recollection of about what

10   time of day it was that Ms. McMillan came

11   to see you from Ms. Rankins?

12   A.    Mid-morning.

13   Q.    All right.  Do you know what time Ms.

14   McMillan got off that day or if she had

15   worked the previous day?

16   A.    I don't know.

17   Q.    You don't know?  Do you know if she worked

18   at all that day?

19   A.    I don't know.

20   Q.    Do you recall Ms. Rankins calling her

21   while she was with you and telling her to

22   report to work?  Do you remember that?

23   A.    She said she had Ms. McMillan in her

DEBRA  SPANN - 1/10/2008

62

1   office and said, she's going to come right

2   up to see you.

3   Q.    But you don't recall now that Ms. Rankins

4   called her while she was in your office,

5   interviewing?

6   A.    Oh, that she called when Ms. McMillan was

7   in my office?

8   Q.    Yeah.

9   A.    Oh, no, I don't remember.

10  Q.    You don't remember that?  Okay.

11  MR. JACOBS:  Would you like to

12  take a short break?

13  THE WITNESS:  If you don't mind.

14  MR. JACOBS:  I would, so let's

15  take a short break.

16          (Brief recess.)

17  Q.    That's Plaintiff's 11.  That's a memo

18  directed to you from Mr. Hardy.  And then

19  obviously, you received that; that is

20  correct?

21          (The referred-to document was

22      marked for identification

23  as   Plaintiff's Exhibit No.

DEBRA  SPANN - 1/10/2008

63

11.)

A.    Yes.

Q.    Did you respond to Mr. Hardy?

A.    No.

Q.    What did you do with it?

A.    I forwarded it to the legal division.

Q.    Okay.  When you talked with Mr. Hardy, did
you talk with him any about retaliation or
retaliatory activities --

A.    No.

Q.    -- in regard to Ms. McMillan's claim?

A.    No.

Q.    Okay.  Show you two more memos that I've
marked Plaintiff's 12 and 13 to this
deposition.  Have you seen those before?

        (The referred-to document was

    marked for identification

as

            Plaintiff's Exhibits Nos. 12

            and 13.)

A.    Yes.

Q.    All right.  How did you become aware of
those memos?

DEBRA SPANN - 1/10/2008

64

1    A.    I received these in the mail, and this is

2    the one that I was referring to in --

3    Mr. Ellis was referring to in his -- when

4    he and I were talking in the

5    investigation.

6    MR. WILSON:  Which exhibit are

7    you referring to?  No, the

8    one you just had in your

9    hand.

10    THE WITNESS:  Both of them.  He

11    said he had nothing to do

12    with either of them; he just

13    signed them.

14    MR. WILSON:  Those are 11 and 12?

15    THE WITNESS:  12 and 13.

16    Q.    These are both dated June 21st.  You had

17    already received them by the time you

18    talked with Mr. Hardy, these second two?

19    A.    Yes.

20    Q.    Do you recall when you concluded your

21    investigation?

22    A.    It was about the middle of July.

23    Q.    Okay.  And there was a memo that you wrote

DEBRA  SPANN - 1/10/2008

65

1   to Mr. Wood with a recommendation?

2   A.   Yes.

3   Q.   And you concluded in that recommendation

4   that Mr. Hardy had violated the policy

5   against sexual harassment; is that

6   correct?

7   A.   Yes.

8   Q.   Okay.  When you talked with Ms. McMillan

9   initially on June the 14th or -- assuming

10  that was the date -- did you talk to her

11  any about what her legal rights were,

12  relative to Title 7 and what had happened

13  -- or what she was alleging had happened

14  with Mr. Hardy?

15  A.   No.

16  Q.   I'll show you Plaintiff's 14, which is --

17  I'll just state for the record that it's

18  an EEOC charge of discrimination filed by

19  Ms. McMillan, and it's dated July the 12th

20  of 2005.  Did she speak with you at all

21  about this charge before she filed it?

22       (The referred-to document was

23       marked for identification

DEBRA SPANN - 1/10/2008

66

1    as   Plaintiff's Exhibit No.

2    14.)

3    A.    No.

4    Q.    Have you ever seen this charge before

5    today?

6    A.    Yes.

7    Q.    All right.  Do you recall when you first

8    saw it?

9    A.    No.

10   Q.    Do you recall if you saw it before

11   Mr. Hardy's hearing with Ms. Calendar?

12   A.    No.

13   Q.    Is that no, that you didn't see it before

14   then, or that you don't recall whether you

15   did or not?

16   A.    I don't recall when I saw it.

17   Q.    Okay.  When a charge of discrimination

18   such as this, regarding sexual harassment

19   or sex discrimination, comes to DYS, does

20   it get forwarded to you?

21   A.    Will you repeat that again?

22   Q.    Yeah.  When a charge of discrimination

23   such as this one, an EEOC charge, is filed

DEBRA SPANN - 1/10/2008

67

1  and it is sent to DYS, does that come to

2  you?

3  A.    Not always.  Sometimes they go directly to

4  legal, and sometimes they come to me.

5  Q.    Has any procedure been established with

6  the EEOC office in Birmingham about who

7  they should send the charge to?

8  A.    I don't know.

9  Q.    But you do know that some come directly to

10  you and some go directly to the legal

11  office?

12  A.    Yes.

13  Q.    Do you recall if this charge came to you

14  first or to legal?

15  A.    I don't know.

16  Q.    You don't remember.  All right.  Did you

17  see this charge before you wrote your

18  recommendation to Mr. Wood?

19  A.    I don't remember.

20  Q.    You don't remember?  Okay.  Show you what

21  I have marked as Plaintiff's 15 to this

22  deposition, and it is another charge of

23  discrimination from Ms. McMillan, and it's

DEBRA  SPANN - 1/10/2008

68

1    dated December the 11th of 2005.  Have you

2    seen this charge before today?

3            (The referred-to document was

4        marked for identification

5    as   Plaintiff's Exhibit No.

6    15.)

7    A.    No.

8    Q.    Were you involved at all in any

9    investigation of the allegations of

10   retaliation in this charge?

11   A.    No.

12   Q.    How effective is DYS's policy about

13   prohibiting sexual harassment?

14   MR. PERRY:  Objection to form of

15   the question.

16   A.    Well, I'm not sure I understand the

17   question, to be perfectly honest.

18   Q.    Well, what's the purpose of the policy?

19   A.    Well, I'm not sure I understand that

20   question either.

21   Q.    Okay.  You have a policy that says

22   prohibition of sexual harassment.  What's

23   your understanding as personnel manager of

DEBRA SPANN - 1/10/2008

69

1    the purpose of that policy?

2    A.    The same as the purpose of any policy.  I

3    mean...

4    Q.    Is it supposed to prevent sexual

5    harassment?

6    A.    Yes.

7    Q.    Do you think the policy that you are

8    charged with here is effective at doing

9    that?

10   A.    I don't know.

11   Q.    Have you ever participated in a meeting or

12   a discussion where the topic of that

13   discussion was the effectiveness of the

14   policy in carrying out its stated goal of

15   prohibiting or preventing sexual

16   harassment?

17   A.    No.

18   Q.    Have you ever been in a meeting or

19   received any report or memorandum in which

20   the topic or the subject was the

21   effectiveness of the training that was

22   being done on sexual harassment?

23   A.    Yes.

DEBRA SPANN - 1/10/2008

70

1   Q.    Okay.  What have you seen in that regard

2   or participated in?

3   A.    Well, the feedback from staff has been

4   good.

5   Q.    Okay.  Just general feedback from

6   individuals?

7   A.    Yes.

8   Q.    Okay.  What individuals have given you

9   some feedback about the policy and its

10  effectiveness?

11  A.    The individuals attending the training.

12  Q.    Okay.  You don't do any of the training --

13  A.    I have.

14  Q.    You have, okay.  When did you participate

15  in training?

16  A.    It's been several years ago, and we've

17  gotten other people to do it.

18  Q.    I had understood earlier that you didn't

19  have any responsibility for the training

20  and weren't involved in it, so that's why

21  I asked.

22  A.    Oh, I understand.

23  Q.    But several years ago you were involved in

DEBRA  SPANN - 1/10/2008

71

1    the training?

2    A.    Uh-huh.

3    Q.    And when you say "the feedback," are you

4    referring to the feedback you got at the

5    training from the people?

6    A.    Yes.

7    Q.    Is there some formal evaluation of the

8    training that's done?

9    A.    Yes.

10   Q.    Okay.  Do you know if that's still done?

11   A.    I don't know.

12   Q.    Have you participated in any meetings with

13   anyone in the administration of DYS in

14   which the opinion was expressed that the

15   training was not effective?

16   A.    Yes.

17   Q.    Have you ever participated in such a

18   meeting with Mr. Wood?

19   A.    Yes.

20   Q.    I recall -- and I don't want to misstate

21   it, and I can pull it up if we need to --

22   but I recall in your memo to Mr. Wood

23   about Mr. Hardy with your conclusions, you

DEBRA SPANN - 1/10/2008

72

1  made a reference that you wanted to or had

2  called Ms. Wheeler to come and do some

3  additional training?

4  A.    Right.

5  Q.    Did she in fact come in and do some

6  training?

7  A.    No.  We never could work out her schedule

8  versus our schedule.

9  Q.    Do you know where she works now?

10  A.    Now she's at transportation.

11  Q.    At that time was she in another

12  department?

13  A.    She was with the ABC Board.

14  Q.    And is your understanding that those

15  agencies would loan her out to do training

16  for other agencies?

17  A.    Right.

18  Q.    Had you used her in the past to train here

19  at DYS?

20  A.    Yes.

21  Q.    Was a substitute found to conduct that

22  training?

23  A.    We have used, obviously, Charlene Smith to

DEBRA  SPANN - 1/10/2008

73

1    do our training, and we've had

2    conferences, and Charlene Smith has done

3    sexual harassment training for us at our

4    conferences.

5    Q.    Did Charlene come out and do any training

6    after the incident with Mr. Hardy?

7    A.    No, but we did send numerous staff

8    downtown to State Personnel and to various

9    State Personnel training sites around the

10   state.

11   Q.    Okay.  So the -- I guess what I'm trying

12   to follow up on is, you indicated that you

13   wanted to bring Ms. Wheeler and that

14   didn't work out, and subsequently no one

15   came here to do training just for DYS?

16   A.    Right.

17   Q.    But do I understand that you're telling me

18   that some of the staff went somewhere else

19   for training after that point?

20   A.    Yes.

21   Q.    Okay.  Did you have any responsibility for

22   setting up that training?

23   A.    No.  It doesn't typically go through me.

DEBRA SPANN - 1/10/2008

74

1   Q.   Okay.  Would that have been Mr. Chambers'

2   group?

3   A.   Mr. Chambers or Ms. Neighbors (phonetic)

4   in our programs section.  She handles some

5   of the Mt. Meigs training schedule.

6   Q.   Okay.  Let me show you what's been marked

7   as Plaintiff's Exhibit 16.  This is a

8   memorandum to you from Mr. Hardy.  It goes

9   back a while.  Do you recall this memo?

10         (The referred-to document was

11      marked for identification

12   as   Plaintiff's Exhibit No.

13   16.)

14   A.   Sort of.

15   Q.   Do you recall the memo?

16   A.   Yes.

17   Q.   Okay.  What was this memo about?  I mean,

18   the title says "sex discrimination

19   creating a hostile work environment."

20   A.   I think he had his titles confused here.

21   I think it was supposed to be to

22   Mr. Samuel, and Ms. Portis and Mr. Samuel

23   had some type of personal relationship,

DEBRA  SPANN - 1/10/2008

75

1    and Mr. Hardy wanted to get it on the

2    record that he felt like there was a

3    hostile work environment there.  But I

4    didn't -- I don't recall if I did anything

5    about this or not in 2000, to be perfectly

6    honest.

7    MR. PERRY:  Ms. Spann, just

8    answer his question.  He

9    hasn't asked you that.

10   THE WITNESS:  I'm sorry.

11   MR. JACOBS:  What was the number

12   on that?

13   THE WITNESS:  16.

14   MR. WILSON:  For the record, do

15   we have a date?

16   MR. JACOBS:  It's January the

17   18th of 2000.

18   MR. WILSON:  Thank you.

19   Q.    Let me show you Plaintiff's Exhibit 17,

20   which doesn't have your name on it.  Have

21   you ever seen that memo before?

22          (The referred-to document was

23      marked for identification

DEBRA SPANN - 1/10/2008

76

1    as   Plaintiff's Exhibit No.

2    17.)

3    A.    Yes.

4    Q.    Okay.  Could you tell me generally what

5    that memorandum is supposed to be about or

6    what it's about?

7    A.    It's about a grievance procedure.

8    Q.    Do you recall there was a -- there either

9    was or there was a report of a

10   relationship between Mr. Samuel and some

11   staff member?

12   A.    Uh-huh.  Yes, apparently.

13   Q.    Okay.  And who was Ms. Portis?

14   A.    She was a staff member on campus.  I'm not

15   certain what her class was.

16   Q.    All right.  When the statement was made,

17   Ms. Portis has acknowledged a personal

18   relationship exists between you and he --

19   MR. LOVE:  I think he's back to

20   the first one.

21   MR. JACOBS:  Yeah, I'm sorry.

22   Back to 17.

23   Q.    Ms. Portis has acknowledged a personal

DEBRA SPANN - 1/10/2008

77

1    relationship existed between you and she.

2    Is the you in that you, or is it

3    Mr. Samuels?

4    A.    It's got to be Mr. Samuels, because it's

5    not me.

6    Q.    Okay.  Well, I was curious.  You can

7    understand why I was having trouble

8    interpreting it, and it wasn't consistent

9    with anything else that I knew or thought,

10   so -- okay.  Do you recall if any

11   investigation ensued as a result of this

12   memorandum?

13   A.    Not to my knowledge.

14   Q.    About how many sexual harassment

15   complaints do you get in the course of a

16   year?

17   A.    It varies from year to year.

18   Q.    Is there a year that goes by that you

19   don't have one?

20   MR. PERRY:  I'm going to object

21   to the form of the question

22   and specifically the scope

23   of your -- she's the -- as

DEBRA SPANN - 1/10/2008

78

1    you know, the director for

2    the entire agency.

3    MR. JACOBS:  I know.  The policy

4    is for the whole agency.

5    But I'm not even going to

6    try to get into specifics.

7    Q.   I'm just wondering, since you've been

8    here, has there been a year that you

9    didn't have one?

10   A.   No.

11   MR. PERRY:  My objection is to

12   the extent that you may use

13   this to imply that you're

14   talking about the scope

15   that's relevant to this

16   lawsuit.

17   MR. JACOBS:  And we don't even

18   need to argue about this,

19   but the policy is effective

20   for the whole agency --

21   MR. PERRY:  I understand.  I'm

22   not objecting to questions

23   about the policy.  I'm

DEBRA SPANN - 1/10/2008

1   objecting -- you understand

2   what I'm objecting to.

3   MR. JACOBS:  I do.  I understand

4   clearly.

5   Q.    Would it be typical to have four or five

6   in a year?

7   MR. PERRY:  Objection to the

8   form.

9   Q.    Is that too much?

10  MR. PERRY:  Objection to the

11  form.

12  A.    I'm never at a loss for work, let me just

13  put it that way.

14  Q.    Okay.  Are you familiar with an employee

15  named Erica Judge?

16  A.    Yes.

17  Q.    Do you know if Ms. Judge made a complaint

18  of sexual harassment at the Autauga

19  facility in the last year, specifically in

20  January of '06?

21  MR. PERRY:  I can't help you.  If

22  you know, you know; if you

23  don't, you don't.  All

80

1    you're supposed to answer is

2    what you know.

3    Q.    Let me rephrase.

4    A.    Okay.

5    Q.    Have you been involved in investigating a

6    complaint of sexual harassment by Erica

7    Judge?

8    A.    No.

9    Q.    Okay.  Other than being involved in an

10   investigation of a complaint by Ms. Judge,

11   are you aware that she has made a

12   complaint of sexual harassment?

13   A.    Yes.

14   Q.    Okay.  Do you know if she has made one

15   complaint or more than one complaint?

16   A.    I don't know.

17   Q.    You don't know.  Okay.  Were you aware of

18   any allegations that Mr. Hardy and Ms.

19   Howard were having sex in the dorm?

20   A.    Yes.

21   Q.    Did you do any investigation into that?

22   A.    Yes.

23   Q.    Did you find out anything about it?

DEBRA SPANN - 1/10/2008

81

1    A.    No.

2    Q.    You were not able to confirm that?

3    A.    Correct.

4    Q.    Okay.  Were you involved in or aware of a

5    complaint, an incident involving an Olisa

6    May, who later became Olisa Alexander, and

7    Mr. Hardy?

8    A.    No.

9    Q.    How about Ms. May or Ms. Alexander and

10    Mr. Dortch?

11    A.    No.

12    Q.    Are you aware of any complaints of sexual

13    harassment or discrimination involving

14    Mr. Dortch?

15    A.    Yes.

16    Q.    Do you recall who made those complaints?

17    A.    I don't remember.

18    Q.    Was Ms. Howard one of the individuals?

19    A.    I don't remember.

20    Q.    Would you have records of those complaints

21    in your office?

22    MR. PERRY:  Objection to the

23    form.

DEBRA SPANN - 1/10/2008

82

1    A.    I don't know.

2    Q.    Just in case I didn't ask it earlier -- I

3    think I did -- do you keep a record, a

4    written record, of every complaint of

5    sexual harassment that comes in?

6    A.    Yes.

7    Q.    Okay.  Are you aware of any allegations of

8    sexual harassment or discrimination

9    involving Mary Moten?

10   A.    No.

11   Q.    Do you recall if Ms. Howard was fired?

12   A.    I don't remember.

13   Q.    After you completed your investigation and

14   sent your recommendation to Mr. Wood, did

15   you have any additional involvement in Ms.

16   McMillan's complaint of sexual harassment?

17   A.    No.

18   Q.    Were you called to offer any testimony at

19   the administrative hearing in November

20   before Ms. Calendar?

21   A.    No.

22   Q.    And you weren't called to testify at the

23   personnel hearing on Mr. Hardy's appeal

DEBRA SPANN - 1/10/2008

83

1    either, were you?

2    A.    No.

3    MR. JACOBS:  I think I'm very

4    nearly through if we could

5    take a short break and let

6    me talk with my assistant.

7            (Brief recess.)

8    Q.    Ms. Spann, do you have any knowledge as to

9    why either Lisa Alexander or Lisa May left

10   the employ of DYS?

11   A.    No.

12   Q.    What is the purpose of a Mt. Meigs campus

13   incident report?

14   A.    To document that something happened.

15   Q.    Okay.  Is that the form that a complaint

16   of sexual harassment would be made on?

17   A.    I don't know.  I -- I don't know.

18   Q.    Okay.  Is there any particular form that's

19   supposed to be used to make a claim of

20   sexual harassment?

21   A.    No.

22   Q.    Is there any kind of incident or report

23   that you're aware of that a manager would

DEBRA  SPANN - 1/10/2008

84

1    have ten days to respond to?

2    A.    Well, just in our grievance procedures.  A

3    manager would have ten days to respond in

4    those, but other than that, I couldn't

5    think of anything.

6    Q.    Okay.  I just wondered what procedure or

7    report or whatever would require ten days

8    for the response, and I think that's it.

9    MR. JACOBS:  Okay.  I think

10   that's all I have.  I don't

11   know if Mr. Perry wants to

12   ask you any questions or

13   not.

14   MR. WILSON:  I have no questions.

15   MR. PERRY:  And I don't either.

16          (The deposition of DEBRA SPANN

17       concluded at

18   approximately

19          3:42 p.m. on January 10,

20          2008.)

21

22

23

```
1    * * * * * * * * * * * *

2    REPORTER'S CERTIFICATE

3    * * * * * * * * * * * *

4

5    STATE OF ALABAMA

6    COUNTY OF MONTGOMERY

7

8         I, Nicole Paulk, Certified

9    Court Reporter and Notary Public in and

10   for the State of Alabama at Large, do

11   hereby certify that the foregoing is a

12   true and accurate transcript of the

13   proceedings as taken stenographically by

14   me at the time and place aforementioned.

15

16

             Nicole Paulk

17           Certified Court Reporter

             ACCR #426-Expires 9/30/08

18

19

20

21

22

23
```

# McMILLAN
# V
# DYS AND
# HARDY

# DEFENDANT'S
# EXHIBIT 4

### State of Alabama
### Department of Youth Services
## POLICY AND PROCEDURES

**Related Standards:**    3-JTS-1C-07, 3-JTS-1C-08, 3-JCRF-1C-04, 3-JTS-1C-07-1

**Chapter:**    3 0 Personnel

**Subject:**    Prohibition of Sexual Harassment

**Policy Number:**    3 13 2

---

I    POLICY

Harassment on the basis of sex is a violation of Sec 703 of Title VII  The Department of Youth Services will take any steps possible to prevent sexual harassment by its employees or on its premises  If such harassment occurs the department will take immediate and appropriate corrective action

II    DEFINITIONS

Sexual Harassment is defined. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (A) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment,  (B) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (C) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment

III    PROCEDURES

Complaint should be made to the Departmental Personnel Manager.  S/he will request that the Executive Director designate a non-biased investigator  Written records will be kept of the complaint and investigation  The complainant and accused will be interviewed  If no violation is found both parties are notified and complainant is advised that if dissatisfied with the decision they have additional

---

Effective Date: _DEC. 5, 1996_    Issued By: _James Dupree Jr._    Page _1_ of _2_

EXHIBIT
Defendant
4

**State of Alabama**
**Department of Youth Services**
## POLICY AND PROCEDURES

**Related Standards:**    3-JTS-1C-07, 3-JTS-1C-08, 3-JCRF-1C-04, 3-JTS-1C-07-1

**Chapter:**    3 0 Personnel

**Subject:**    Prohibition of Sexual Harassment

**Policy Number:**    3 13 2

internal and external appeal routes   If sexual harassment is suspected or probable cause of violating the sexual harassment policy is found, refer complaints to the Executive Director for a hearing before him or his designee   The two parties may resolve the problem in a written statement of agreement acceptable to both Appropriate disciplinary or personnel action may be taken

IV    APPLICABILITY

This policy applies to all DYS personnel and facilities

Effective Date: <u>DEC. 5, 1996</u>    Issued By: _James Dupree, Jr._    Page <u>2</u> of <u>2</u>

# McMILLAN
# V
# DYS AND
# HARDY

# DEFENDANT'S
# EXHIBIT 5



*State of Alabama*

# Department of Youth Services

*Post Office Box 66*
*Mt. Meigs, Alabama 36057*



BOB RILEY
GOVERNOR

J. WALTER WOOD, JR
EXECUTIVE DIRECTOR

August 11, 2006

Hon. Julia Weller
Administrative Law Judge
State Personnel Department
64 North Union Street, Room 300
Montgomery, AL 36130

RE:    Michael Hardy v. DYS
       Employee's Brief of Evidence

Dear Judge Weller:

In this letter I respectfully request an opportunity to respond briefly to the Employee's voluminous Brief of Evidence. At the conclusion of the hearing I stated that it was not necessary for the Agency to file a brief. I still feel it is unnecessary. However, I do believe the following response to the Employee's Brief of Evidence may be helpful.

The bulk of the Employee's brief consists of red herrings and straw men. As I predicted, the Employee attempted to set up the investigation and the pre-termination hearing process and attack them instead of the evidence. The Employee literally argued that the issues in the case are NOT the grounds for which the Employee was terminated, but the true issues are "much broader and justice demands equity." (Employee's brief, p. 10). The Employee revealed this tactic early in the case and the undersigned addressed them. (See, Alabama Department of Youth Services Motion in Limine and Motion to Excuse Certain Witnesses.) No further response is necessary because the evidence presented at the hearing speaks for itself. That evidence clearly shows that Mr. Hardy conducted himself inappropriately with regard to Ms. McMillian. His termination is therefore warranted on that basis alone. Be certain that the Agency does not argue, and does not have to prove, that the elements of a claim of sexual harassment are met as a result of Hardy's inappropriate conduct with a subordinate employee.

Moreover, on page 11 of his Brief, the Employee makes an absurd argument to which I would like an opportunity to respond. He argues that Ms. Spann "conceded and refuted the issue surrounding the filing of [Mr. Hardy's] grievance. . ." No good faith reading of Ms. Spann's testimony or the other evidence supports the Employee's argument. Two facts brush aside the argument and show that it could not have been made in good faith. First, no "grievance" was filed by the Employee against McMillian. A grievance pursuant to DYS policy 3.3 is initiated



EXHIBIT
Defendant
5
tabbies

with the supervisor, yet Mr. Hardy filed his so called "grievance" with the personnel director. Second, as Director Walter Wood, Jr. explained, under no circumstances could the Employee file a grievance under DYS policy (a) against a subordinate employee, or (b) on the basis he filed THIS so-called grievance–the sexual harassment complaint McMillian filed against *him*.[1] While it is true that Ms. Spann stated generally an employee has a right to file a grievance, and that general statement is correct, it does not follow logically that a supervisor can therefore file a grievance against a subordinate employee because the subordinate filed a sexual harassment complaint against the supervisor. As the undersigned stated at the hearing, such a policy interpretation would certainly be retaliatory, by definition! It is amazing that the Employee argues, with an apparent straight face, that McMillian's sexual harassment complaint against Hardy was a "break-down in communication in a job-related situation and filing a grievance was an applicable option implemented by policy and properly exercised by Hardy." (Employee's Brief of Evidence, p. 11). The argument should be dismissed and the termination should be upheld on the basis of retaliation.

Moreover, it is telling that in the section of the Employee's Brief of Evidence that discusses retaliation (Employee's Brief, p. 36-38), the Employee fails to even mention any of the evidence supporting retaliation other than the so-called "grievance." In addition to the fact that the Agency did not allow the Employee to turn the table on McMillian and cause her to be investigated, Director Wood testified that he also took action to protect Ms. McMillian, and he testified about the memo writing campaign Mr. Hardy engineered to retaliate against McMillian. The Director thus ordered the termination of this Employee not simply to protect the agency from liability, but because it was the right thing to do under the sorry circumstances this Employee created. His attempts to retaliate against McMillian for filing her sexual harassment complaint, though unsuccessful because thwarted by the Agency, clearly warrant termination.

Yours very truly,

T. Dudley Perry, Jr.
Deputy Attorney General

TDPJr/pic

---

[1] Apparently the Employee's recollection of Wood's testimony is different from mine. The Employee's Brief of Evidence, p. 11-12, states that Wood testified that the Employee *could* file a grievance against his subordinate employee on the basis of her sexual harassment complaint. You are the trier of fact and I respectfully submit this issue for your consideration.

2

# McMILLAN
# V
# DYS AND HARDY

# DEFENDANT'S EXHIBIT 6

## BEFORE THE STATE PERSONNEL BOARD
## IN THE MATTER OF

| | |
|---|---|
| **MICHAEL HARDY,** | ) |
| | ) |
| **Employee, appellant,** | ) |
| | ) |
| **v.** | ) **Case No.: 06-004-JJW** |
| | ) |
| **ALABAMA DEPARTMENT OF** | ) |
| **YOUTH SERVICES,** | ) |
| | ) |
| **Appellee.** | ) |

## <u>RECOMMENDED ORDER TO THE STATE PERSONNEL BOARD</u>

The undersigned conducted a hearing on May 8, 2006 and June 10, 2006 at

the offices of the Alabama State Personnel Department in Montgomery, Alabama.

Theron Stokes, Esq. and Monica Arrington, Esq. appeared as counsel on behalf of

Michael Hardy (hereinafter "Hardy" or "the Employee"). T. Dudley Perry, Esq.

appeared on behalf of the Department of Youth Services (hereinafter "DYS").

Following the hearing, the parties requested permission to file post-trial briefs.

Briefs were filed on or about July 25, 2006. The parties also requested a transcript

of the proceedings which was provided to the undersigned around April 10, 2007.

DYS introduced seven exhibits numbered 1-7. The Employee introduced

30 exhibits numbered 1-30.[1]

---

[1] Employee's Exhibit 14, which are the private personnel records of another employee, were excluded. Furthermore, the exhibits in this cause contain unredacted confidential and privacy protected information. Accordingly, **all exhibits in this case, both those submitted by**

**EXHIBIT**
Defendant
6

DYS called as witnesses:

    (1) the Employee;

    (2) Tera McMillian, a DYS employee;

    (3) Birdie Montgomery, (by deposition), McMillian's mother;

    (4) Veronica Harris, a Youth Services Aide at DYS; and

    (5) Walter Wood, Director of DYS.

The Employee called as witnesses:

    (1) Eugene Smith, a DYS Employee;

    (2) Rashin Farley a DYS Employee; and

    (3) Rogers Leon Dortch, a DYS Employee.

## I. PROCEDURAL HISTORY AND CHARGES

The Department of Youth Services employed Hardy beginning in 1987 as a Youth Services Child Care Worker. He became a Youth Services Counselor I in 1994. He remained in that position until his dismissal, which was effective on January 6, 2006. He received an "Exceeds Standards" performance appraisal rating every year, except for two wherein he received a "Meets Standards" rating.

---

the Employee and the Department, are placed **UNDER SEAL** and may not be viewed by the public for any reason absent the appropriate court order. Also in the Employee's exhibits are the depositions of witnesses Debra Spann, Derrick Bolling, Vanessa Hall, Sylvesta Lee, Reginald Boswell and Elijah Hood, Jr.

Tera McMillian, one of Hardy's subordinates, filed a complaint alleging that

Hardy sexually harassed her and later retaliated against her after she filed a

complaint. DYS investigated this complaint. In a letter to Hardy, Director Wood

advised:

Dear Mr. Hardy:

I have received a recommendation that disciplinary action be
taken regarding your employment as a Youth Services Counselor I.
The recommendation reveals the following alleged inappropriate
conduct and work performance as the reason for the recommendation:

Violation of the <u>Rules of the State Personnel Board</u> 670-X-19-
.01(1g)- (disruptive conduct); and/or violation of the <u>Rules of the
State Personnel Board</u> 670-X-19-.01(2e) (use of abusive or
threatening language) and/or violation of the <u>Rules of the State
Personnel Board</u> 670-X-19-.01(2j- serious violation of any other
department rule); and/or violation of *DYS Policy* 3.13.2 - Prohibition
of Sexual Harassment: Specifically, you were alleged to have made
sexual advances and/or to have created a hostile working environment
for a subordinate employee, Tera McMillian, who filed a harassment
complaint against you. In response to Ms. McMillian's harassment
complaint you are alleged to have attempted, among other things, to
cause an investigation against her for having filed a complaint against
you. ...[2]

DYS held the pre-disciplinary conference on or about  November 15, 2005,

giving the Employee  an opportunity to present any relevant or mitigating

circumstances regarding his proposed  termination.

_____

[2] Employee Exhibit 11.

On December 8, 2005, Marcia Calendar, Executive Assistant to Director

Walter Wood wrote memorandum summarizing the matter:

ALLEGATIONS

An administrative Fact Finding Hearing was held on November 15, 2005, at the Central Office at Mt. Meigs for Michael Hardy. You requested the hearing to determine whether disciplinary action is warranted based upon the followed alleged inappropriate work conduct:

Violation of Rules of the State Personnel Board (670-X-19-.01(1g)-disruptive conduct) and or violation of the Rules of the State Personnel Board (670-X-19-.01(2e)-use of abusive or threatening language) and/or violation of the Rules of the State Personnel Board (67–X-19-.01 2j) serious violation of any other department rule), and/or violation of DYS Policy 3.13.2 Prohibition of Sexual Harassment): Specifically, you were alleged to have made sexual advances and/or to have created a hostile working environment for a subordinate Tera McMillian, who filed a harassment complaint against you. In response to Ms. McMillian's harassment complaint you are alleged to have attempted to, among other things, to cause an investigation against her for having filed a complaint against you.

On June 14, 2005, Ms. Tera McMillian made a complaint of sexual harassment against Mr. Hardy. Mr. Hardy supervises Ms. McMillian. You assigned Ms. Spann to investigate the allegation. Ms. Spann concluded, based on corroborating evidence, as a matter of fact that the complaint was valid. Ms. Spann recommended disciplinary action. Attached hereto is a copy of Spann's finding and recommendation.

**In addition, in response to Ms. McMillian's complaint against Mr. Hardy, Mr. Hardy sought to have Ms. McMillian [sic] investigated. Mr. Hardy filed with Ms. Spann a "grievance" against Ms. McMillian [sic] contrary to the grievance procedure. Moreover, the subject of the "grievance" was not an issue covered by the grievance procedure. Attached hereto is a copy of the "grievance" filed by Mr. Hardy against Ms. McMillian. ...[3]**

FINDINGS:

The following findings were determined based upon a review of the testimony, documents presented during the hearing, a review the employee's personnel file, and additional efforts to verify the testimony of the witnesses. All allegations against Mr. Hardy are found to be substantiated.

RECOMMENDATIONS:

Upon a review of the evidence presented during the hearing and a review of Mr. Hardy's personnel file including past performance evaluations, the following recommendation is made:

Terminate Mr. Hardy's employment as a Youth Services Counselor I for the stated allegations which were found to be substantiated. This employee was the complaining party's supervisor. He was aware of the prohibitions against sexual harassment and was well aware of the anti-retaliation policy.

The employee denies that he sexually harassed Ms. McMillian as Ms. Spann concluded. He argues that Ms. McMillian was working a second job with a Hyundai supplier and that her second job shift began before her DYS shift ended. He argues that she had a motive to fabricate the allegation and thereby acquire more favorable working hours. Ms. Spann investigated his defense and found this not credible, based in part on Ms. McMillian's denial that she had a

---

[3] Bold emphasis supplied.

second job. I now have reason to doubt Ms. McMillian. Specifically,
I was recently informed by Ms. Spann that she <u>does</u> have a second
job, but stated that it began within the past two months – well after
she made her sexual harassment complaint against Mr. Hardy. The
existence of a possible motive for fabrication which has come to light
since Ms. Spann's investigation thus creates a question whether Ms.
Spann's conclusion was correct.

However, that doubt is insufficient to cause me to contradict Ms.
Spann or to recommend disciplinary action less than termination. Mr.
Hardy clearly attempted to retaliate against Ms. McMillian for filing
the complaint against him. Mr. Hardy is, or should be, familiar with
the grievance procedure which requires grievances to follow the chain
of command, yet he filed this "grievance" with the personnel director.
Moreover, the substance of this "grievance" was neither within the
scope of the grievance procedure nor within the scope of the anti-
discrimination complaint procedure–which requires complaints to be
directed to the personnel director. Mr. Hardy is well aware how
personally disturbing it is to be investigated by DYS. Witnesses
confirmed that Mr. Hardy had discussed this with them prior to Mr.
Hardy's retaliatory "grievance" against Ms. McMillian. I find that Mr.
Hardy initiated the "grievance" to retaliate against Ms. McMillian.
This Agency can no more tolerate retaliation than sexual harassment
itself.

Following the pre-dismissal conference, DYS Director, Walter Wood advised

Hardy of his termination effective January 6, 2006, in a letter dated the same.[4]

The letter explained that Hardy was being terminated for violation of the rules set

forth above. Hardy timely appealed his termination to the Alabama State

Personnel Board on January 12, 2006. The matter was originally set in March,

---

[4] Employee Ex. 14.

2006, but continued at the request of the parties until May, 2006. The hearing did not conclude in May as scheduled and was reconvened at the request of the parties in June of 2006. Additionally, the parties requested an additional opportunity to submit briefs, transcripts and further evidence, as set forth above. Finally, some question existed as to whether a witness had recorded his testimony over a cell phone during the hearing and sent it to another witnesses. That issue was examined, as well.

## II. FACTUAL BACKGROUND

Having reviewed the documentary evidence and having heard the testimony presented at the hearing and having observed the witnesses' demeanor and assessed their credibility, the undersigned finds the weight of the evidence supports the following findings of fact.

### A. DYS Policy and State Personnel Board Rules

#### (1) Grievances

Generally, the grievance procedure within DYS is employed when a subordinate employee has a complaint against a supervisor. In this event, the subordinate employee follows the chain of command and files the grievance with the person who supervises the employee he or she claims has been the source of the grievance action. In no event is the grievance filed with the Personnel

Director.

DYS Policy Number 3.13.1 states as follows:[5]

## I. POLICY

It is recognized that conflicts will develop between employee and employer. It shall be the policy of DYS to provide its employees an expeditious and systematic procedure for the resolution and alleviation of grievances as the might arise during the course of performing work-related activities. The grievance procedure is a method of settling disputes and break-downs in communication in a job-related situation. Suspensions and dismissals are not covered by this procedure.

...

## III. PROCEDURES

Step A:  Within five days of the event, **the aggrieved employee[6] should discuss the matter with his immediate supervisor.** If not resolved, the written documentation of the discussion must be maintained.

Step B:  In the event that the employee is not satisfied with the decision of the supervisor, he may request the review by the departmental administrator in charge of his respective area. The request must be in writing and within 10 days of the decision of his supervisor. The matter should be heard within 10 days or as soon as practicable. A decision will be rendered in writing.

Step C:  If the employee still feels that the decision rendered is not equitable, he may request a review by the Executive Director of DYS. This request must be in writing and filed within 10 days of receipt of the administrator's written decision. The director should reply in

---

[5] Employee Exhibit 3.

[6] Emphasis supplied.

writing within 10 days of receipt of the request or as soon as practicable.

Step D: The department considers the decision of the Executive Director as final. However, the State Personnel Board may elect to consider certain matters upon appeal to that body.

Institutions

Step A: The aggrieved employee should within five working days of the event discuss the matter with his immediate supervisor. Written documentation of the discussion must be maintained.

Step B: If in the opinion of the aggrieved employee satisfactory corrective measures have not been implemented, he should request a review of the grievance by the facility superintendent. This request must be in writing, accompanied by supportive documentation and made within ten working days of his supervisor's final decision. The superintendent should respond in writing within ten working days or as soon as practicable after receiving the request.

Step C: If still dissatisfied, the aggrieved employee may request a review of the grievance by the administrator of institutional services. This request must be in writing accompanied by supportive documentation and made within ten working days of the superintendent's written decision. The administrator should respond in writing with ten working days or as soon as practicable after receiving the request.

Step D: If the employee still feels that the decision rendered is not equitable, he may request a review by the Executive Director of DYS. This request must be in writing and filed within ten days of receipt of the administrator's written decision. The Director should reply in writing ten days of receipt of the request or as soon as practicable.

### (2) Sexual Harassment

DYS Policy 3.13.2[7] states in pertinent part as follows:

I. <u>POLICY</u>

Harassment on the basis of sex is a violation of Section 703 of Title VII. The Department of Youth Services will take any steps possible to prevent sexual harassment by its employees on its premises. If such harassment occurs the department will take immediate and appropriate corrective action.    ...

III. <u>PROCEDURES</u>

      Complaint should be made to the Departmental Personnel Manager. S/he will request that the Executive Director designate a non-biased investigator. Written records will be kepts of the complaint and investigation. The complainant and accused will be interviewed. If no violation is found both parties are notified and complainant is advised that if dissatisfied with the decision they have additional internal and external appeal routes. If sexual harassment is suspected or probable cause of violating the sexual harassment policy is found, refer complaints to the Executive Director for a hearing before him or his designee. The two parties may resolve the problem in a written statement of agreement acceptable to both. Appropriate disciplinary or personnel action may be taken.

### (3) Retaliation and/or Disruptive Conduct

State Personnel Board Rule 670-X-19-.01 <u>General Work Rule</u> provides:

      (1) In addition to any special rules issued by the various appointing

---

[7] Employee Exhibit 2.

authorities for the guidance of their employees, the following
standard general work rules shall apply to all classified employees:

(a) Violations that normally result in disciplinary actions of
increasing severity: ...

      7. Disruptive conduct of any sort.

(b) More serious violations that may result in suspension or discharge
on the first offense, considering work record and length of service. ...

      5. Use of abusive or threatening language. ...

      10. Serious violation of any other department rule.

## B. The Basis for the Dismissal

DYS initially employed Hardy beginning in July, 1987 as a Youth Services

Child Care worker.[8]  In 1994, DYS promoted Hardy to the position of Youth

Services Counselor I.

DYS also employed a woman by the name of Tera McMillian (hereinafter

"McMillian") at Mount Meigs for approximately 4 years at the time of this hearing

in the ITU (Intensive Treatment Unit).  Prior to that time, McMillian worked in

two dormitories on the Mount Meigs Campus: Paige Hall and prior to that,

Holloway Hall.  While working at both Paige and Holloway Hall, Hardy

---

[8] Hardy has been employed with the state for nearly 18 ½ years. After obtaining a BS
degree Hardy testified that he took counseling courses from Troy State but did not complete the
program. His first job with the state began in 1987 as a Mental Health Worker before coming to
DYS as a Youth Services Child Care Worker to supervise students.  He has also worked as a
Youth Services Counselor.

supervised McMillian either directly or indirectly, however, McMillian encountered very little contact with Hardy while in Holloway Hall. McMillian explained that from October of 2002, Hardy was her Unit Manager and she worked with him occasionally. At some point in time, the entire dormitory staff transferred from Holloway Hall to Paige Hall. Only two employees (Estes and Duchett) remained at Holloway Hall. No one told McMillian that she would be required to transfer to Paige Hall in May of 2003, however, she transferred with the rest of the group. Prior to this point, she had very little direct day-to-day contact with Hardy.

At the hearing, McMillian testified she first remembered being harassed by Hardy while working in Paige Hall. The first incident occurred when she went to speak to Hardy about processing some accreddation paperwork. At that time, according to McMillian, Hardy told her that there were potential perks to her job such as coming in late and leaving early. He also talked to McMillian about scripture, claiming he had the gift of prophecy. However, he confessed that he still had some "yokes." Then McMillian states that he began making sexual remarks, such as that he said he had a fantasy for her to "s*** his d***" while the others were in the dining hall. McMillian stated Hardy held a gold necklace in his hand twirling while he talked. McMillian stated she refused Hardy's offer and

left the room by telling Hardy she needed some air.  After McMillian allegedly

refused Hardy, she reported many other occasions wherein Hardy would say "Mac,

I need to talk to you out on the porch."   McMillian speculates that Hardy

threatened to "write her up" later for an incident in retaliation for her refusal of

Hardy's advances.  However, no evidence suggests that Hardy actually ever

disciplined McMillian.

After the first harassment incident, Hardy asked McMillian if she refused

him because she was involved with another man.  McMillian described a second

incident when Hardy was on duty one night.  McMillian stated that she sat at a

desk when Hardy reached over to her and said "I want you."

On a third occasion, McMillian stated that she and Hardy were in the same

building.  She had just returned from lunch after stopping at Subway.  She sat

down at desk and began eating her sandwich.  Hardy came out of his office,

walked up to desk and grabbed her breast.  Hardy said to McMillian "I just

wanted to get a little feel before Smitty gets here because I like big t***s."

McMillian contends she told him not to do this.

Another time, McMillian testified that Hardy asked her how much her child

support payments were and offered to pay them along with upkeep of her car and

yard for the prospect of getting a key to her home.  McMillian stated that Hardy

would call her at home on her off days for just conversation. McMillian stated

that during these phone calls, Hardy would ask her to go to a hotel with him to just

have some drinks and talk. One time when Hardy called home phone number,

McMillian was in the restroom. McMillian's mother answered the phone and gave

it to her. Her mother sat at the kitchen table during this conversation. This is the

conversation which included the "is it another man..." question. Her mother asked

her who it was and she said it was her boss. Her mother overheard the entire

conversation on McMillian's end.[9]

Veronica Harris (hereinafter "Harris") has worked with DYS since

December of 2001. Harris presented herself as poised, well spoken and articulate.

Although Harris has been childhood friends with McMillian for many years, she

appeared very reluctant to have become involved in this matter and her testimony

carried a great deal of credibility. Having worked in the dormitories at Mt.

Meigs, Harris was very familiar with Hardy. Harris testified that she had one

conversation with Hardy and during that conversation he asked her, "What would

it take for Mac?" Harris understood Hardy to be talking about money. She did not

believe that Hardy was talking about sex at that point, but instead she thought that

Hardy was asking McMillian for some sort of favor. Harris only replied "I don't

---

[9] Employee Exhibit 18, Deposition of Birdie Montgomery, pages 22-46.

know." They talked bit more while standing in front of Harris Hall. Harris testified that this conversation took place a couple of months before December 2004.

One of the most significant events, according to McMillian, occurred a few days after Christmas of 2004, when she returned home after shopping. That day, Hardy called her cell phone. He said that someone was not "respecting" McMillian at work. Harris and McMillian were returning to McMillian's home to wrap presents. As McMillian talked to Hardy on the phone, McMillian and Harris went inside to "make drinks," according to McMillian. A few minutes after McMillian hung up the phone, Hardy arrived. McMillian also testified that Hardy claimed that he had to bring her a check from work, however, McMillian stated her salary is generally paid by direct deposit.[10] Nevertheless, McMillian admitted to allowing Hardy to come to her home and offering him an alcoholic drink. Hardy specifically requested a specialty drink, a Long Island iced tea, which McMillian testified she had on hand and provided to Hardy. She stated this was the type of mixed drink which she purchased premixed from the liquor store. The

---



[10] Hardy testified that he went to McMillian's home to deliver an envelope that included a check because she called the dormitory and asked for someone to bring her a check. The shift ends at 4 o'clock and a staff member asked him to bring the check to her home. He does not normally do this for staff, however, he considered "Mac" a special friend and agreed to deliver the check to her.

testimony demonstrated that a Long Island iced tea was the only alcoholic drink that Hardy enjoyed.

After McMillian gave Hardy the Long Island iced tea, Hardy and McMillian sat together in the living/den area to talk while Harris went to another room to giftwrap presents. McMillian admitted to also having "a couple of drinks" while she was with Hardy. Harris testified that Hardy remained at the house for at least an hour. Harris testified that she went to sleep for a portion of the time.

At some point in the conversation between Hardy and McMillian, McMillian claims that Hardy stated the temperature in the room was hot. Then, McMillian testified Hardy pulled up his shirt and asked McMillian to "lick his chest."[11] Harris happened to observe Hardy raise his shirt while in the other room, but did not hear the conversation. Harris did not state that McMillian asked her to come in the room at that point, nor did McMillian leave the room. However, Harris did stay in the house, but not in the living/den area, until after Hardy left.

Before the incident in December, 2004, McMillian worked 4 p.m. to 12 a.m. and occasionally worked the "second shift" from 2 p.m. to 12:00 a.m. After the December 2004 incident, around January 2005, Hardy changed McMillian's

---

[11] McMillian testified she was aware that Hardy suffered from high blood pressure, however, she did not anticipate this event. She stated that she was not aware of what medications Hardy was taking.

schedule to 12 a.m. to 8 a.m. (third shift). On this shift, McMillian almost never saw Hardy. The reason for this shift change was to supposedly to accommodate staffing requirements. Two males and one female are required to be on each shift. In January of 2005, the third shift had three males, thus the second shift would have to move one of its second shift females to the third shift. McMillian discussed the shift change with Hardy and because only two females were available, Hardy gave McMillian the choice of whether she or the other second shift female would be moved to the third shift. McMillian volunteered to move third shift instead of her colleague, Ingria Williams. McMillian knew that at that time, the third shift would present a conflict for Williams because she teaches school during the day and could not work until 8 a.m. Hardy and McMillian had little or no contact on a daily basis.[12]

McMillian testified that she did not apply for a transfer to a different dormitory in December because she did not want to "challenge" Hardy at that time. She did not seem appeased by the fact that she was given a shift change in

_____

[12] McMillian testified that the 4 p.m. to 12 a.m. shift in January included Miles, Williams, Wilson, Farley, Dorthch, Cullam and Moore. There were at least 4 or 5 people on the shift at the time, yet it only takes three. The 12 a.m. to 8 a.m. shift was made up of only three employees–Harvis, Ellis, and Howard. When one person on the night shift left, adjustments had to be made. Three people wanted the night shift. Miles, Wilson and Farley all wanted the night shift because they had discussed it with everyone when Bernice Howard reported that she was leaving.

January where she had almost no contact with Hardy after that point.

McMillian contends that in March or April of 2005, Hardy made a sexually harassing statement to her when she took a book back to him and he said that they could go to a hotel to have some drinks.

McMillian and Hardy's final contact occurred sometime in May. McMillian asked to meet Hardy for the purpose of discussing a transfer to another shift. She told Hardy that she had another job and needed a shift change. He told her that a shift change could take some time to work out. McMillian contends that Hardy never referred her to anyone else that she could talk to about a transfer to another shift. McMillian admits that she did not really have a second job at that time but stated that she may have told Hardy this as an excuse simply to attempt to be removed from under his supervision to another shift. She stated that she wanted to leave in good standing without angering Hardy.

She contends that later in June, she simply had enough and wanted to be out of Hardy's dorm so she went to talk to an EEOC counselor in June, 2005.[13] However, McMillian also admitted that she knew that Hardy's son had been ill and that Hardy had been away from DYS for most of May through September of 2005. Nevertheless, at the time McMillian reported the alleged harassment, she

---

[13] Employee Ex. 13.

also told Phyllis Rankins about the alleged harassment and requested to be

transferred to another area of the campus.    When Rankins asked why McMillian

was requesting the transfer, McMillian first said that she simply needed a "change

of pace." Later, McMillian told another employee, Debra Spann (hereinafter

"Spann"), her motive for the transfer was to avoid Hardy. McMillian offered little

to explain her conflicting reasons as to why she waited so long to report the

alleged harassment.    When counsel inquired why McMillian waited so long after

the alleged sexual advances began or the December incident to report the

harassment, McMillian replied that she did not want any backlash.  McMillian

alleged that Hardy always said that his power base was "on the hill," (meaning the

Mt. Meigs campus) and she believed him.  McMillian filed a complaint with the

EEOC on or about July 12, 2005 which was not received by DYS legal counsel

until July 25, 2005.[14]

---

[14] Department Exhibit 1.  The Complaint states as follows:
1. My name is Tera McMillian and I am employed by the Respondent at its Mount Meigs
campus.  I was first hired by the Respondent in October 2002 and since that time I have always
performed my duties and responsibilities in a satisfactory manner.  Since May of 2003, I have
been subjected to a sexually hostile work environment by my supervisory and my co-workers.

2. Beginning in May of 2003, I have persistently been propositioned for sex and sexual favors by
my immediate supervisor Michael J. Hardy.  On an almost daily basis, Hardy has requested that I
"s*** his d***"  He has offered me money and other material objects if I would perform this act
of oral sex on him.  Furthermore, Hardy has almost on a daily basis talked about his sexual
prowess with other female workers at the Respondent's Mount Meigs campus.  For example,
Hardy has stated to me that he can not "f*** all night like he used to" and that he can "only f***
real hard for 5 or 6 minutes" at this time in his life.  Also, Hardy grabbed both my breasts while I

After she reported the matter, DYS immediately reassigned McMillian to ITU where she was no longer under Hardy's supervision. When McMillian was initially hired with DYS, she admitted that she may have had sexual harassment training. She also admitted that she may have had other sexual harassment training while at DYS, although she did not readily recall the training.

Prior to working with DYS, McMillian worked with Call Points as a Senior Teleconferencing Operator. McMillian admitted that she had been terminated from that position. She also admitted that after being terminated, she and other employees instituted a lawsuit against Call Points wherein she alleged, *inter alia*, that she was the victim of race discrimination.[15] That lawsuit later settled out of

---

sat a desk [sic]in the facility. All of this behavior was uninvited and unwelcome and I asked Hardy to stop harassing me, but he did not. Hardy also stated that he loved big "t******" and requested that [sic] be allowed to suckle my breast in the office. Again, I declined his invitation. Hardy also spoke regularly of his abilities with regard to oral sex and asked me to allow him to try such with me. As before I declined his invitation and requested that he leave me alone.

3. During this time of almost constant harassment, I began seeing a doctor for anxiety and depression regarding these issues. My treating position [sic] placed me on medication and referred me to a therapist to help me deal with these issues.

4. In March of 2005, Hardy began asking for me to go to hotels with him for sex and offered to buy me a car, tires and other goods in exchange for my compliance. I did not go along with his request. Hardy's harassment of me continued until I reported him on June 16, 2005. After I reported Hardy, I was made to transfer to another Department within the Mount Meigs facility. Since arriving in the new department, I have been subject to retaliation in the form of personnel not willing to help me learn the new position and I have been threatened with being disciplined for no reason.

[15] Employee's Ex. 30. (a copy of a docket sheet from the Federal court.)

court.

McMillian admitted she did not report most of the events she alleged against Hardy at the time they occurred.  Specifically, when Hardy touched her breasts, she did not report it, although she knew she could.   Likewise, when Hardy called her at home, she did not report those incidents right away.  Although, at the hearing, McMillian contended that Hardy asked her for a sexual relationship daily, beginning around May 2003 until she transferred to the 12 a.m. to 8 a.m. shift (which would have been in January 2005).  She waited to contact a lawyer until July 12.  To the contrary, on cross examination, McMillian appeared surprised when asked why she told the EEOC that she was *not* harassed on a daily basis from January 2005 until July 2005.  McMillian attempted to avoid  this question by trying to ask another question.[16]

McMillian testified that her evaluations from Hardy were average or above average.   The only other witnesses to the alleged harassment by Hardy were Harris and her mother.  Despite any training she may have received at DYS, and the knowledge she may have acquired in any previous litigation experience,

---

[16] Employee's Ex. 28.  McMillian stated that she did not prepare this EEOC document but she gave the information to a legal secretary.  McMillian testified that she signed the EEOC statement under the penalty of perjury that the information she provided was correct and that she was not providing misleading information.  She stated that from January through May, Hardy was not abusing her as he had before.

McMillian testified that she did not decide to file a complaint until after she saw a

show on Oprah one day.

On July 14, 2005, Michael Hardy in turn filed a grievance against his former

subordinate, Tera McMillian, on the basis that she had made unsubstantiated

derogatory statements referencing him.[17]   The "grievance": stated as follows:

> Please consider this memo pursuant to DYS policy 3.13.1 i.e. filing of
> a grievance. Ms. Tera McMillian, a former Paige Hall Staff, has
> continued to make unsubstanted [sic] derogatory statement [sic]
> referencing the writer. Additionally, she has encouraged past and
> present employees (Some of which have been disciplined by the
> writer) to interfere with an ongoing investigation and file false claims.
> Due to the fact that this investigation is ongoing, I am filing this
> claim with your office for assignment to proper authority.
>
> MJH/dm
>
> cc: J. Walter Wood
> Tim Davis
> G. Wayne Booker
> Janice Coles

Attached to this document were several pages of allegations Hardy made against

McMillian.  Hardy filed this alleged grievance, not in accordance with the

grievance procedure, but rather, with Debra Spann, the Personnel Manager, who

had handled portions of McMillian's harassment complaint and transfer.  Spann,

did not investigate or handle grievance matters.  He also copied persons who were

---

[17]   Employee Exhibit 7.

not within the appropriate chain of command according to the grievance procedure. His actions could have been perceived as purely responsive to McMillian, rather than following any policy or procedure of DYS.

 Wood testified that it is not appropriate under any circumstances, much less for a supervisor, to file a grievance against a subordinate in a sexual harassment investigation. Even if the circumstance was grievable, it should have followed the chain of command, not given to Spann. Sexual harassment is not a grievable issue when the grievant is the alleged sexual harasser. There is not a policy or procedure wherein the harasser can turn the tables and have the victim investigated. The grievance, had it been a legitimate offense, would go to a specialist in the unit (such as the unit manager), to the facility administrator and then to the director. Spann is not in the chain of command, she is the Personnel Manager for DYS. When the matter arose, Wood discussed the matter with Tim Davis. Wood then acted upon several pieces of information that came to him. The grievance procedure was being discussed on campus and Wood became concerned that Hardy's actions were retaliatory, even though McMillian was no longer under Hardy's supervision. Wood then contacted the State Personnel Department to ask for assistance in conducting training specifically addressing these issues as to instruct all employees, including McMillian and Hardy, regarding appropriate

behavior and appropriate mechanisms to handle these types of situations. The

Personnel Department brought in someone from the Attorney General's Office to

assist with instruction.

Director Wood also testified that Debra Spann investigated the sexual

harassment complaint made by McMillian.[18]    Spann's investigation found as

follows:

> I have investigated the above complaint. I find the complaint
> to be valid. Two (2) witnesses heard or were asked sexually
> inappropriate questions concerning Ms. McMillian by Mr. Hardy.   In
> addition, from the information provided by Ms. McMillian, I
> definitely feel one or more of the incidents which were described to
> me occurred.
>
> Mr. Hardy is making much of the fact that he has not seen or
> been around Ms. McMillian except for a few minutes since February,
> 2005 - she has been on the 12p.m.-8a.m. shift. Ms. McMillian states
> these incidents occurred over the past two (2) years. Mr. Hardy also
> is quite concerned that confidentiality has been breached and his good
> name and character have been compromised.
>
> Mr. Hardy should be disciplined for his actions.  All staff
> should be retrained on sexual harassment. It is apparent to me
> thinking has not changed in this department. We cannot condone
> telling staff to do one thing and doing something else ourselves (it is
> my understanding Mr. Hardy went over sexual harassment at every
> staff meeting). I have contacted Maxine Wheeler to do Sexual
> Harassment Training for our staff as it did not sink in with State
> Personnel doing it.

---

[18] Employee Exhibit 10.

DLS[19]

Hardy presented the testimony of three witnesses. The first witness was a friend and former co-worker, Eugene Smith (hereinafter "Smith"). Smith has been employed with DYS for ten and a half years. Smith became a Shift Supervisor about six years ago. Smith usually supervises the 4 p.m. to 12 a.m. shift. Smith testified that Hardy was the manager of Paige Hall at the time. Smith has worked with McMillian on the 2 p.m. to 10 p.m. shift, as well at the 8 a.m. to 4 p.m. shift and the 4 p.m. to 12 a.m. shift. If staff has a problem, Smith was usually the first person they could talk to. He talked to all the staff at Holloway Hall or Paige Hall. Smith testified that McMillian never complained that Hardy made any sexual advances toward her. She got mad at him when he told her to fill out the log book, but otherwise she seemed happy. She never said anything about Hardy groping her. The modular area where she and other employees worked is a wide open space and voices carry. Smith also testified that McMillian was trained and told about the DYS Sexual Harassment policy every year. Smith admitted that he and McMillian did not necessarily have a cordial relationship after she sold him a truck but he refused to pay her the price she demanded. Following the sale, their relationship soured and turned "nasty." Smith, who appeared to be colleagues

---

[19] Employee Ex. 10.

and friends with Hardy, described McMillian in such a crude and derogatory manner, that his perceptions lost credibility.[20] Smith has worked with Hardy for many years and had talked with him prior to coming to the hearing.

At the time of the hearing Rashin Farley (hereinafter "Farley") had been employed with DYS for about three years. He was originally assigned to Holloway Hall at Mt. Meigs and then to Paige Hall. Hardy was his supervisor. When Hardy moved, Farley moved with him. He moved only one time. When he was working with him, he was working on the evening shift 4 p.m. to 12 a.m. Farley worked with McMillian at times. Farley never recalled any instance in which Hardy made a request to McMillian of a sexual nature. Likewise, Farley testified that he did not perceive McMillian as being sexually aggressive with him or anyone else that he knew. Finally, Hardy called Rogers Leon Dortch (hereinafter "Dortch"). Dortch has been employed with DYS for 13 years. Prior to his DYS employment, he served in the United States Army for twenty years and retired as a SGT 1st Class. Dortch, at the time of the hearing, was a Shift Supervisor. The unit manager has the power to change the off-days of employees.

---

[20] Smith described some sexual contact which allegedly occurred between himself and McMillian. Smith stated that he did not complain about it, nor did he "brag" about it. He also stated that he did not complain or feel harassed. He also did not object when she asked him to take her to an adult "toy store" and purchase specific "lifelike" items which he described in detail. Smith then went on to say how he was a Christian and went to church. Then Smith looked at the undersigned as if these two contradictory actions bolstered his credibility.

Unit managers have the ability to change or call an employee and ask them to cover a shift. When he first came to DYS, he was assigned to Paige Hall and Hardy was his supervisor. Dortch worked with McMillian for a little over two years. He testified that their shifts overlapped. Specifically, he arrived 2 hours before she would and left 2 hours before her. Dortch testified that McMillian had poor work habits. Dortch also testified that McMillian volunteered to change shifts in January. Dortch also confirmed that McMillian would have been well aware of the sexual harassment policy and that staff is well trained every year.

### C. The Employee's Personnel File

A review of the Employee's personnel file reflects overall ratings throughout his career in the "Exceeds Standards" category with overall scores averaging around 28. There were two exceptions wherein the Employee received a "Meets Standards" rating.

### III. ISSUE

Did DYS produce sufficient evidence to warrant dismissal of the Employee for violations of DYS's grievance procedure, retaliatory or disruptive type conduct, prohibition of DYS sexual harassment policy and/or State Personnel Board Rules regarding the use of abusive or threatening language?

# IV.  DISCUSSION

The purpose of the Administrative Appeal is to determine if the termination of the Employee is warranted and supported by the evidence.  *Kucera v. Ballard*, 485 So. 2d 345 (Ala. Civ. App. 1986); *Thompson v. Alabama Dept. of Mental Health*, 477 So. 2d 427 (Ala. Civ. App. 1985); *Roberson v. Personnel Bd. of the State of Alabama*, 390 So. 2d 658 (Ala. Civ. App. 1980).  In determining whether employee's dismissal is warranted, the departmental agency bears the burden of proving the charges warrant termination by a  "preponderance of the evidence." The law is well settled that a "preponderance of the evidence" standard requires a showing of a *probability* that the Employee is guilty of the acts as charged.  Thus, there must be more than a mere possibility or one possibility among others that the facts support the disciplinary action at issue, the evidence must establish that *more probably than not*, the Employee  performed, or failed to properly perform, as charged. *See  Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 117 S. Ct. 1953, 138 L. Ed. 2d 327 (1997), holding that a "significant possibility" falls far short of the APA's preponderance of the evidence standard;  *See also Wright v. State of Tex.*, 533 F.2d 185 (5th Cir. 1976)[21]

---

[21]*Bonner v. City of Pritchard,* 661 F.2d 1206, 1209 (11th Cir.1981) the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

## Violations of DYS Sexual Harassment Policy

Based upon the evidence presented, the undersigned was convinced that Hardy had more than a work-related relationship with McMillian and violated the DYS sexual harassment policy. The testimony of Harris also convinced the undersigned that Hardy made comments to McMillian which were inappropriate for the workplace. However, the undersigned was NOT convinced that McMillian was the victim of sexual harassment. While Hardy's conduct as a supervisor was subject to disciplinary action, the undersigned does not believe that Hardy's advances were unwelcome. McMillian's testimony was exaggerated and lacked complete credibility and candor. Clearly, McMillian possessed a host of other personal motivations for her testimony. While McMillian and Hardy had some sort of relationship for some period of time, any relationship between the two involved McMillian's complicity. Nevertheless, that does not excuse Hardy for engaging in what he should have known could have been misconstrued as an inappropriate verbal exchange with a subordinate. Therefore, the undersigned does find that Hardy's verbal conduct supports termination.

Regardless of Hardy's relationship with McMillian, his most egregious offense however, is the manner in which he handled the investigation of

McMillian's EEOC and sexual harassment complaint, as hereinafter discussed.

**Violations of the Grievance Procedure and Disruptive Conduct**

Despite the fact that McMillian's credibility has questionable merit, equally or more serious than the sexual harassment charge is the disruptive conduct, potential retaliation, and Hardy's violation of the grievance procedure. Employees must be allowed the freedom to have civil rights actions investigated, even if questionable, without the fear of retaliation. If McMillian's allegations proved to be meritless, the inquiry ends there.

In the present action, Hardy admitted he provided training on the sexual harassment policy on numerous occasions. He also admitted to instructing his employees on the proper procedure to follow when filing claims. McMillian followed the procedures as she had been trained to do.

Flying in the face of this policy, Hardy also admitted to filing a "grievance" against her for following the very procedure he trained her to follow. As a supervisor, he knew better than to conduct himself in such a harassing fashion. He knew he was not following policy, nor was he following the chain of command as proscribed in DYS Grievance Procedure 3.13.1 Since McMillian had filed a claim with the Personnel Manager, Debra Spann, Hardy in turn filed his "grievance" with Debra Spann. This type of threatening behavior, in and of itself, merited

dismissal and was uncharacteristic of a supervisor with his training, background and experience. Such conduct is clearly disruptive and in violation of the <u>Rules of the State Personnel Board</u> 670-X-19-.01(1g)- (disruptive conduct), the <u>Rules of the State Personnel Board</u> 670-X-19-.01(2e)- (use of abusive or threatening language) and/or violation of the <u>Rules of the State Personnel Board</u> 670-X-19-.01(2j)-(serious violation of any other Department Rule). Further, such conduct could also be potentially perceived as retaliatory. This one violation alone, was sufficient to warrant Hardy's dismissal.

Since the above-referenced rules are sufficient to warrant dismissal in this cause, the issue of whether the conduct actually reaches the level of retaliation is moot and shall not be addressed in this forum.

Accordingly, the undersigned finds the totality of the evidence warrants dismissal in this cause. Therefore, the undersigned recommends to the State Personnel Board that the dismissal be UPHELD

Done, this the 1st day of August, 2007.

JULIA JORDAN WELLER
Administrative Law Judge
State of Alabama Personnel Department
64 North Union Street
Montgomery, Alabama 36130
(334) 242-3451
(334) 353-4481

VIA FACSIMILE AND UNITED STATES MAIL

Dudley Perry, Esq.
Alabama Department of Youth Services
P. O. Box 66
Mt. Meigs, AL 36057
FAX: 215-3872

Theron Stokes, Esq.
Monica Arrington, Esq.
Alabama Education Association
P. O. Box 4177
Montgomery, AL 36103-4177
FAX: 262-8377

# McMILLAN
# V
# DYS AND
# HARDY

# DEFENDANT'S
# EXHIBIT 7

# BEFORE THE PERSONNEL BOARD OF THE STATE OF ALABAMA

## IN THE APPEAL OF

## MICHAEL HARDY

## OCTOBER 17, 2007

*OCT 19 2007*

This matter came before the Board upon the dismissal of the Employee from his employment with the Department of Youth Services. The Employee was dismissed effective January 6, 2006 based upon charges contained in a letter to the Employee dated the same. This matter was assigned to Administrative Law Judge Julia J. Weller, as Hearing Officer for the State Personnel Board and a hearing was held on this matter on May 8, 2006 and June 10, 2006. The Administrative Law Judge's Report is now before the Board for consideration. The Board has also had the benefit of oral argument.

Essentially the charges against Hardy are a result of a harassment complaint which was filed by one of his subordinate employees. Hardy allegedly made sexual advances and created a hostile working environment for a subordinate employee. The subordinate employee filed a harassment complaint against Hardy. In response, Hardy attempted to cause an investigation against the complaining employee for having filed a complaint against him. The Department alleges that Hardy violated State Personnel Board Rules 670-X-19-.01 (1a)(7)—Disruptive Conduct; (1b)(5)—Use of Abusive or Threatening Language; (1b)(10)—Serious Violation of any Other Department Rule and DYS Policy 3.13.2—Prohibition of Sexual Harassment.

The Administrative Law Judge found that the totality of the evidence warrants dismissal in this cause and recommended that the Employee's dismissal be sustained. The Board hereby adopts by reference the



EXHIBIT
Defendants
7

findings of fact and conclusions of law as found by the Administrative Law Judge as a part of this Order as if fully set forth herein. The Board finds that the testimony of the alleged victim is not credible and her complaints of sexual harassment are unfounded; however, the Employee's response to these allegations as a supervisor were inappropriate.

The Board has carefully considered the Administrative Law Judge's Report in this case and is of the opinion that the decision of the appointing authority to dismiss the Employee is supported by the evidence and that the termination is warranted.

It is therefore the Order of this Board that the decision of the appointing authority to dismiss the Employee is hereby affirmed.

JACKIE GRAHAM
SECRETARY

JOE N. DICKSON
CHAIRMAN

JOHN MCMILLAN
MEMBER

JOYCE P. O'NEAL
MEMBER

ELLEN G. MCNAIR
MEMBER

JAMES H. ANDERSON
MEMBER

# McMILLAN
# V
# DYS AND
# HARDY

# DEFENDANT'S
# EXHIBIT 8

# STATE OF ALABAMA DEPARTMENT OF PERSONNEL

## HEARING OF MICHAEL HARDY

**May 8, 2006 and June 10, 2006**

**Pages 1 through 691**

## CONDENSED TRANSCRIPT AND CONCORDANCE PREPARED BY:

Laura A. Head
Court Reporter
Phone:  (334) 286-4938
Cell:  (334) 202-4851
lauraheadreporter@charter.net



EXHIBIT
Defendant
8

1

1          BEFORE THE

2          STATE OF ALABAMA

3          DEPARTMENT OF PERSONNEL

4          MONTGOMERY, ALABAMA

5

6  IN THE MATTER OF:  MICHAEL HARDY

7          TERMINATION APPEAL

8

9

10

11

12

13          * * * * * * * * * *

14

15          TESTIMONY AND PROCEEDINGS, taken before

16  the Honorable Julia J. Weller, Administrative Law

17  Judge, at The Folsom Administration Building, 64

18  North Union Street, Montgomery, Alabama, on

19  Monday, May 8, 2006, and Monday, July 10, 2006,

20  and reported by Laura A. Head, Court Reporter and

21  Commissioner for the State of Alabama at Large.

22          * * * * * * * * * *

23

2

1          APPEARANCES:

2  ADMINISTRATIVE LAW JUDGE:

3  Honorable Julia J. Weller
   Administrative Law Judge
4  Folsom Administrative Building
   64 North Union Street
5  Montgomery, Alabama  36130

6  FOR THE ALABAMA DEPARTMENT OF YOUTH SERVICES:

7  Mr. T. Dudley Perry, Jr.
   Deputy Attorney General
8  Alabama Department of Youth Services
   P. O. Box 66
9  Mt. Meigs, Alabama 36057

10  FOR EMPLOYEE MICHAEL HARDY:

11  Mr. Theron Stokes
    Attorney at Law
12  P. O. Box 4177
    Montgomery, Alabama 36103
13
    Ms. Monica Arrington
14  Attorney at Law
    317 Rosa Parks
15  Montgomery, Alabama 36104

16          * * * * * * * * * *

17          EXAMINATION INDEX

18
   TERA MCMILLIAN
19     DIRECT BY MR. PERRY . . . . .  65
       CROSS BY MR. STOKES . . . . . 100
20     REDIRECT BY MR. PERRY . . . . 167
       RECROSS BY MR. STOKES . . . . 192
21     FURTHER REDIRECT BY MR. PERRY. 205
       FURTHER RECROSS BY MR. STOKES. 208
22
   VERONICA HARRIS
23     DIRECT BY MR. PERRY . . . . . 214
       CROSS BY MS. ARRINGTON . . . . 228

3

1     REDIRECT BY MR. PERRY . . . . 262
      RECROSS BY MS. ARRINGTON . . . 264
2
   MICHAEL HARDY
3     DIRECT BY MR. PERRY . . . . . 267

4  EUGENE SMITH
      DIRECT BY MR. STOKES . . . . 330
5     CROSS BY MR. PERRY . . . . . 361
      REDIRECT BY MR. STOKES . . . . 373
6
   WALTER WOOD
7     DIRECT BY MR. PERRY . . . . . 386
      CROSS BY MR. STOKES . . . . . 408
8     REDIRECT BY MR. PERRY . . . . 476
      RECROSS BY MR. STOKES . . . . 482
9
   RASHIN FARLEY
10    DIRECT BY MR. STOKES . . . . 492
      CROSS BY MR. PERRY . . . . . 496
11    REDIRECT BY MR. STOKES . . . . 499

12  ROGERS LEON DORTCH
      DIRECT BY MS. ARRINGTON . . . 501
13    CROSS BY MR. PERRY . . . . . 528
      REDIRECT BY MS. ARRINGTON . . 541
14    REDIRECT BY MS. ARRINGTON . . 548
      RECROSS BY MR. PERRY . . . . 551
15    FURTHER REDIRECT BY MS. ARRINGT 554

16  MICHAEL HARDY (recalled)
      DIRECT BY MR. STOKES . . . . 556
17    CROSS BY MR. PERRY . . . . . 626
      REDIRECT BY MR. STOKES . . . . 653
18

19          * * * * * * * * * *

20

21

22

23

4

1          (Whereupon, the following

2          TESTIMONY AND PROCEEDINGS

3          were had and done on Monday,

4          July 10, 2006, commencing at

5          9:43 a.m. as follows:)

6     THE COURT:  Let's start with the

7  motions that y'all have got this morning.

8     MR. PERRY:  Okay.  Why don't we --

9     THE COURT:  I know you've got a motion

10  in limine.

11     MR. PERRY:  I do, and I have another

12  oral motion.  Procedurally, first of all, we

13  have had a couple of conference calls where

14  we have talked about the procedure and the

15  issues to be tried.  You remember I made a

16  couple of arguments.

17     First, I argued that under the statute,

18  that I don't think the employer has the

19  burden of proof but the employee does.  As I

20  understand your ruling, the employer does

21  have the burden, and I'm prepared to go

22  forward on that basis.

23     Second, I argued that if the employer

5

1  in this case does have the burden, that the
2  employer should be allowed to prove that an
3  investigation was conducted and a hearing was
4  held on the administrative level at the
5  department and that the director's decision
6  was based on the recommendation from the
7  hearing officer after that thorough
8  investigatory process. As I understand --
9  and that therefore his decision was -- what's
10 the word -- based on -- it was well-founded.
11 I forget the word that you had used. As I
12 understand your ruling, I am -- my burden is
13 not to prove the investigation but to prove
14 that the underlying bases of the termination
15 were more likely factually true than not.
16     THE COURT: What you have to show is
17 there was a legitimate business reason for
18 the termination.
19     MR. PERRY: But as a factual matter.
20 And I'm prepared to go forward, and on that
21 basis, I have not come prepared to try the
22 case of DYS's procedure on which Mr. Wood
23 relied which gave --

6

1     THE COURT: Really, whatever the
2  director determined is kind of irrelevant
3  because, as you know, this is a de novo
4  proceeding. I come in and take a completely
5  new look at it. All I am evaluating is
6  whether or not the termination was
7  warranted. And I look at all the same facts
8  that the director would have looked at and
9  make my own determination. What he thinks, I
10 might as well ask what somebody on the street
11 thinks. It's not preclusive in this case.
12 It only reinforces what the department's
13 argument is, but it doesn't bind me in this
14 proceeding.
15     MR. PERRY: That's my understanding.
16 Now, I have -- there are two issues that come
17 up, therefore, in connection with this --
18 these two rulings that you have made. One
19 I've raised in a motion in limine, and I'll
20 get to that. The second is basically an oral
21 motion in limine now.
22     During the depositions, there were some
23 questions that went to the validity or

7

1  sufficiency or the competency of the
2  investigation. And I obviously didn't object
3  to any questions and allowed the discovery to
4  go forward. But what I expect today is that
5  the employee intends to set that up as a
6  straw man and attack that process, and I'm
7  not -- I didn't -- I would love to have tried
8  this case on that basis. But I'm not
9  prepared to try it, and I think that will get
10 us off track. So I believe that when the
11 time comes, I will object. But I believe
12 that that evidence should be excluded given
13 the fact that the issue is the underlying
14 validity of either of the two bases for which
15 Mr. Hardy was terminated. One, whether he
16 sexually harassed this subordinate employee
17 or, two, whether he filed a grievance against
18 her in retaliation for that or a couple of
19 other factual issues that he himself did.
20     THE COURT: What is your response to
21 that? Why is the investigation relevant?
22     MR. STOKES: Why is the investigation
23 relevant? Because that is part of the

8

1  pattern for termination. And the reason --
2     THE COURT: You have to be more
3  specific than that.
4     MR. STOKES: Well, what I'm saying,
5  Your Honor, is that according to the law,
6  Mr. Hardy had a property to -- a due process
7  right because he was a merit system employee.
8     THE COURT: Right.
9     MR. STOKES: That that was taken away
10 from him by --
11     THE COURT: Due process is met in this
12 hearing. It's a de novo hearing.
13     MR. STOKES: Yes, ma'am, I understand
14 it's de novo.
15     THE COURT: We're not dealing with any
16 due process at the agency. That's all cured
17 by having a new hearing here.
18     MR. STOKES: No, I'm not saying we're
19 curing all of that. It's a process statement
20 about the fact-finding matter that's very
21 relevant to this hearing.
22     THE COURT: The facts are either there
23 to warrant the termination or they're not.

141

1  Q. You testified -- so what you're saying was
2     you didn't testify earlier that you decided
3     that you wasn't going to take it, couldn't
4     take it, and you went up there to report it
5     because you were so frustrated?  You don't
6     remember giving any --
7  A. I was frustrated.  I was mentally upset.  But
8     I did not get aggressive with him.  I was
9     very anxiety filled, yes.
10 Q. Okay.  So but that -- what triggered you to
11    go and actually talk to them didn't have
12    anything to do with Mr. Hardy, did it?
13 A. I went there to get a transfer from the dorm.
14 Q. But that incident didn't have anything to do
15    with Mr. Hardy.
16 A. Yes, it did because I thought that since
17    Mr. Hardy is so powerful there, that not only
18    him but these people were working with him.
19    Yes, I did think that.
20 Q. Okay.  So you thought this incident in which
21    Mr. Harvest was telling you if you did, it
22    would violate policy of DYS, you thought that
23    that was also part of this conspiracy against

142

1     you by Mr. Hardy.
2  A. Yes.
3  Q. Okay.  Now, isn't it also true that when you
4     went and talked to Ms. Deborah Spann, that
5     your mother was present?
6  A. She was there.
7  Q. And isn't it also true that you were present
8     when your mother said she heard Michael Hardy
9     on the telephone, holding the telephone to
10    her ear and you holding the telephone to your
11    ear, ask Michael Hardy -- he asked you to
12    take you to a hotel?
13 A. That may be an inconsistency because I was on
14    the phone and she was sitting at the table.
15 Q. No, I'm not asking you an inconsistency.
16 A. No.
17 Q. I'm asking you do you remember her telling --
18 A. No, I don't.
19 Q. -- Ms. Deborah Spann that?  You don't
20    remember her telling her that.
21 A. No.
22 Q. And if Ms. Deborah Spann said she told her
23    that, that wouldn't be correct, would it?

143

1     Your mother.
2  A. The three of us were talking at the same
3     time, and that could be an inconsistency.
4     But what --
5  Q. No, I'm not asking you --
6  A. -- happened is I have no recollection of it.
7  Q. No --
8  A. But if she says that that happened, it's
9     probable.
10 Q. If Ms. Spann said that it happened, you would
11    say that that was correct?
12 A. I said it was probable because that's not
13    what happened.
14 Q. Okay.  Now, help me with this now.  They
15    decided to transfer you that day, and you
16    were going to go to ITU; is that correct?
17 A. No, I went to Trustees.
18 Q. You went to Trustees first, but you
19    understood you were going to be going to
20    ITU.  You said you were going to --
21 A. No.
22 Q. You don't remember that --
23 A. It wasn't understood that I was going to go

144

1     to ITU.  She told me to go to Trustees Hall.
2  Q. And then was not your understanding you were
3     going to go to Trustees Hall for seven days
4     and then go to ITU, Ms. McMillian?
5  A. No.
6  Q. Did not --
7  A. I stayed at ITU one day, and then I went to
8     Trustees.  I stayed at Trustees one day, and
9     then I went to ITU.  One night.
10 Q. Isn't it correct to say that ITU was the only
11    dorm with a 10:00 to 6:00 shift?
12 A. No.  CAPS has a 10:00 to 6:00, and I think
13    Holloway Hall does too.
14 Q. Which one?
15 A. I think CAPS and Holloway Hall does.  I'm not
16    for sure about that.
17 Q. It was your desire to have a 10:00 to 6:00
18    shift, wasn't it?
19 A. No, it wasn't.  It was my desire to have a
20    6:00 to 2:00.
21 Q. And when you went to ITU, Ms. McMillian, I
22    think you stated that you went and talked to
23    Ms. Spann on June 25th; is that correct?  Of