**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **TERA A. McMILLAN,** | ) | |
| | ) | |
| | ) | **Case No: 2:07:CV-01-WKW** |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **ALABAMA DEPARTMENT OF** | ) | |
| **YOUTH SERVICES and** | ) | |
| **MICHAEL J. HARDY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**DEFENDANT ALABAMA DEPARTMENT OF YOUTH SERVICES' MOTION FOR
LEAVE TO FILE SUPPLEMENTAL REPLY TO PLAINTIFF'S BRIEF IN
OPPOSITION TO DEFENDANT ALABAMA DEPARTMENT OF YOUTH SERVICES'
MOTION FOR SUMMARY JUDGMENT**</u>

Comes now the Defendant, Alabama Department of Youth Services and requests leave to

file a supplemental reply to Plaintiff's Brief in Opposition to Defendant Alabama Department of

Youth Services' Motion for Summary Judgment. Attached hereto is a supplemental reply brief

that relates solely to the Plaintiff's claim of retaliation in this matter.

1.      The Department submits that the Plaintiff will not be prejudiced by the granting of

leave to submit this brief because the brief is based exclusively on evidence already in the record.

Specifically, it is based on the deposition of the Plaintiff, Tera McMillan and the exhibits Tera

McMillan submitted in this case.

2.      This brief is for the purpose of assisting the Court in identifying and analyzing the

Plaintiff's claim of retaliation.

Respectfully submitted this 7th day of March, 2008.

**s/ T. Dudley Perry Jr.**
T. Dudley Perry, Jr.
Bar Number: 3985-R67T
General Counsel
Attorney for the Defendant
Alabama Department of Youth Services
Post Office Box 66
Mt. Meigs, AL 36057
Telephone: (334) 215-3803
Fax: (334) 215-3872
E-Mail: dudley.perry@dys.alabama.gov

**s/Sancha E. Teele**
Sancha E. Teele
Assistant Attorney General
Bar Number: 0103-H71T
Attorney for the Defendant
Alabama Department of Youth Services
Post Office Box 66
Mt. Meigs, AL 36057
Telephone: 334-215-3803
Fax: (334) 215-3872
E-Mail: sancha.teele@dys.alabama.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th of March , 2008, I electronically filed the foregoing, **DEFENDANT ALABAMA DEPARTMENT OF YOUTH SERVICES' MOTION FOR LEAVE TO FILE SUPPLEMENTAL REPLY TO PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT ALABAMA DEPARTMENT OF YOUTH SERVICES' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to
the following:

Jimmy Jacobs
E-mail:jacobslawoffice@charter.net
Attorney At Law
143 Eastern Boulevard
Montgomery, AL 36117
Tel: (334) 215-1788
Fax: (334) 215-1198

James Eldon Wilson
Attorney at Law
4625 Lomac Street
Montgomery, AL 36106

**s/ T. Dudley Perry Jr.**
T. Dudley Perry, Jr.
Bar Number: 3985-R67T
General Counsel

Attorney for the Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TERA A. McMILLAN, | ) | |
| | ) | |
| | ) | Case No: 2:07:CV-01-WKW |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ALABAMA DEPARTMENT OF | ) | |
| YOUTH SERVICES and | ) | |
| MICHAEL J. HARDY, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT ALABAMA DEPARTMENT OF YOUTH SERVICES'
SUPPLEMENTAL REPLY TO PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANT ALABAMA DEPARTMENT OF YOUTH SERVICES'
MOTION FOR SUMMARY JUDGMENT**

COMES NOW THE DEFENDANT DEPARTMENT OF YOUTH SERVICES (DYS,) by and through the undersigned counsel, and submits the following supplement to the brief in reply to the plaintiff's brief in opposition to DYS' motion for summary judgment. This supplement relates solely to the Plaintiff's claim of retaliation.  It is supported solely by the deposition of the Plaintiff and the evidence submitted by Plaintiff:

The Plaintiff alleges that she was subjected to retaliation as a result of a complaint she made against Michael Hardy on June 16, 2005.  She seeks damages for this alleged retaliation from DYS.  DYS has moved for summary judgment, *inter alia*, on the basis that the Plaintiff has failed to make a *prima facie* case of retaliation.  (Doc. 28, ¶ 4).  The Plaintiff responded to DYS's motion for summary judgment (Doc. 44).  DYS filed (Doc. 53) for leave for an extension to reply to the Plaintiff's response to summary judgment, which leave the Court granted (Doc.

1

56) on February 4, 2008.  DYS filed a reply on February 8, 2008.  (Doc. 61).  The following is a supplement to DYS's reply to Plaintiff's response to summary judgment motion.

The Defendant alleges, and asserted in (Doc. 5, ¶ 19) the Answer to the Complaint that the Plaintiff's retaliation claim is frivolous.  As discussed herein, the Plaintiff has failed to articulate a good faith basis for the claim.

To prevail on a retaliation claim the Plaintiff must show that (1) she engaged in a protected activity, (2) simultaneously therewith or subsequent thereto, she suffered an adverse employment action, and (3) some causal connection exists between the protected activity and the adverse employment action.  *Gupta v. Florida Bd. Of Regents*, 212 F.3d 571, 587 (11th Cir. 2000); *Morgan v. Jasper*, 959 f.2d 1542, 1547 (11th Cir. 1992).  The following paragraphs will show that the Plaintiff has failed to show either an adverse employment action, or a causal link.

First, not one of the alleged acts are "adverse employment actions."  The Supreme Court has clarified that a Plaintiff "must show that a reasonable employee would have found the challenged action materially adverse," and that it "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination'" *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S.Ct. 2405, 2414-15, 165 L.Ed.2d 345 (2006).  The purpose of the standard is to "screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination."  *Id.*

Second, the Plaintiff has submitted no evidence of a causal connection.  McMillian filed a sexual harassment complaint pursuant to DYS policy on or about June 16, 2005, (McMillian depo p. 131, lines 16-21), and claims that she was subject to retaliation as a result of making that complaint.  (McMillian depo p. 37, lines 17-20; p. 84, lines 1-3).  But she offers no evidence of

2

any material act temporally related to her complaint.  Without that temporal evidence, the case

law cited herein shows it would be difficult, if not impossible, for the Plaintiff to show a causal

connection.  If the chronology in this case supported an inference of causal connection, which it

does not, no evidence exists to support an inference that McMillian's supervisor's or co-workers'

actions were in any way motivated by retaliatory animus.  There is simply no causal connection.

The Plaintiff claims that she was subjected to retaliation by DYS based on the following:

1. She has "been denied off-days for which she has not been compensated"[1] (brief p. 13).

2. She has been "isolated and refused training by her supervisor and co-workers"[2] (brief p. 13).

3. She "had a discriminatory warning placed in her file without notice on her evaluation"[3] (brief p. 13).

4. She "suffered a lowered evaluation" (brief p. 14).[4]

5. She has been "placed under surveillance by her co-workers at

_____

[1]  This claim was restated on page 16 of the Plaintiff's brief as "she was required to work eight or more days consecutively with no time off to this move."  (Brief p. 16, ¶ 50).

[2]  This claim was restated on page 16 of the Plaintiff's brief as "she has been ostracized by personnel who refused to help her learn the new procedures," (Brief p. 16, ¶ 51); and again at page 28 as "she was ostracized and isolated by her supervisor and co-employees upon her transfer after reporting Hardy's harassment", (Brief p. 28).

[3]  This claim was restated on page 17 of the Plaintiff's brief as "McMillian's supervisor wrote six memos about her being tardy to work.  On February 12, 2007, he placed a disciplinary warning in her file for being late three times" (Brief p. 17 ¶ 52).

[4]  This claim was restated on page 17 of the Plaintiff's brief as: "the rating she received on the performance appraisal covering 2005 was in the "Meets Standards" range and contained three unsatisfactory marks (attendance, punctuality and cooperation with coworkers)."  (Brief p. 17 ¶ 53).  This is a mischaracterization of the evidence as discussed below.

3

the instruction of her supervisor"[5] (brief p. 14);

     6.  She was "denied leave given to other employees" (Brief p. 28).

The alleged "facts" stated in the Plaintiff's brief , assuming for the sake of argument they state adverse employment actions causally connected to the Plaintiff's complaint, are not supported by the record. The Plaintiff's own testimony conflicts with her brief. Her brief is false and misleading in many respects as more specifically described below. For the convenience of the Court, the Defendant will discuss each alleged act of "retaliation" and the actual evidence in the record relating to each:

     <u>So Called "Denial of Off Days"</u>. There is no evidence that the Plaintiff was denied any "off days." Rather, the evidence shows that the Plaintiff's off days changed as a result of her own request to transfer, and when her regular off day came around she was routinely scheduled off as she would have otherwise been. The evidence is as follows:

     When the Plaintiff reported to Ms. P. R. (Michael Hardy's supervisor) the alleged sexual harassment by Michael Hardy on which this lawsuit is based, she **<u>asked for</u>** a transfer to a different dorm. (McMillian depo p. 132). Instantly Ms. P. R. transferred McMillian. (McMillian depo p. 134, 135). McMillian claims Ms. P. R. sent her for one day to Trustee Hall, and the next day sent her permanently to ITU. As a result of that change, the Plaintiff testified (see below) that her off days also changed, and she testified that when her next regular off day came around, she received her regular off day. Her testimony clearly shows this trivial "act" was not "retaliatory", and in no conceivable way could it have dissuaded the Plaintiff, or any other

---

[5] This claim was restated on page 16 of the Plaintiff's brief as "she has also been singled out by her supervisor for heightened scrutiny and surveillance by co-employees." (Brief p. 16, ¶ 51).

4

reasonable person, from complaining about discrimination:

P. 134

4 Q Now, [P. R.] then called you -- What you had
5 wanted from [P. R.] was a transfer to a different dorm;
6 right?
7 A Yes, sir.
8 Q And then she called you and told you to go to
9 a different dorm?
10 A She did.
11 Q She did exactly what you asked her to do,
12 didn't she?
13 A She did exactly what I wanted to do to get
14 away from him.
15 Q Now, you have said or your lawyer has said, or
16 maybe it was in your statement here, that you were tired
17 and beat down and that you had worked previously that
18 day and then you had to work another shift that same
19 night. Now, are you complaining or suggesting that -- I
20 know you are not complaining about [P. R.],
21 because we covered that.
22 Are you suggesting in your affidavit that P.
23 R. mistreated you?

P. 135

1 A Mistreated me?
2 Q Yes.
3 A To have me working eight days in a row?
4 Q No, to have you go -- I think you went to
5 Trustee that night?
6 A I did.
7 Q To have you go to Trustee that night? You
8 wanted to get out of that dorm immediately. Did you say
9 to her, "I don't want to work tonight"?
10 A Of course not.
11 Q Because you wanted to go out of that dorm and
12 go somewhere else, didn't you?
13 A I wanted to keep my job. After I told her
14 what had happened, I knew it wouldn't be long before
15 everybody else knew. I wanted to do everything that I
16 needed to do.
17 Q Here's the point. You don't really have a
18 problem with [P. R.] having immediately sent you
19 to work the next shift to go work at Trustees Hall, do

5

20 you?
21 A I didn't have any say in it. I just did it.
22 Q That is not my question.
23 A Yes, I should have been off, but I wasn't

P. 136

1 going to tell her, no, I am not going to do it.
2 Q Did she even know when your previous shift had
3 been?
4 A I don't know.
5 Q You don't have any reason to think that she
6 did know that, do you?
7 A I don't know.
8 Q You wanted to immediately go to another dorm
9 and she did that, didn't she?
10 A She did that.
11 Q And you didn't tell her, Look, I just got off
12 another shift, put me on another shift? You didn't say
13 anything like that, did you?
14 A No, I did not. Whatever she would have told
15 me to do, I was going to do.
16 Q Now, what is it -- you just said something
17 about working eight days. What are you talking about?
18 A I did.
19 Q When?
20 A I got off that morning. I went to work that
21 night. I went to work the next night, the next night.
22 Q So you had eight days on after that?
23 A In order to be off on my off days, which were

P. 137

1 Sunday and Monday.
2 Q Sunday, Monday were your off days?
3 A They became my off days.
4 Q When did they become your off days?
5 A When I went to ITU.
6 Q I see. How many days did you actually work at
7 Trustee?
8 A One.
9 Q And then you went to ITU the very next night?
10 A I think so. I am not for sure.
11 Q Okay. So you went to ITU -- Do Trustee and
12 ITU have the same shifts?
13 A I don't know.

6

14 Q So after you went to Trustee, you went to ITU
15 and then you worked until Sunday came around and then
16 you got --
17 A Until Sunday morning.
18 Q So as a result of you going to Trustee, the
19 effect was that you worked eight days? Am I correct?
20 A For me going to Trustee?
21 Q Right. Because you worked at Trustee for at
22 least one day?
23 A Yes. I worked there one day and the rest of

P. 138

1 the days were at ITU.
2 Q And as soon as your regular off day came
3 around --
4 A My regular off day was that morning that I
5 went to see [P. R.].
6 Q And Ms. [P. R.] sent you to Trustee that
7 night?
8 A Yes.
9 Q Did your regular off days change? When you
10 were at, I guess it was Paige, the day that you went to
11 see Ms. [P. R.], were your off days at that time Sunday
12 and Monday?
13 A No.
14 Q What were your off days?
15 A I think they were Thursday and Friday. I
16 don't know. If I am not mistaken, it was Thursday and
17 Friday, but I am not sure. Whatever day that was
18 started my off day.
19 Q So, essentially, the result of asking for a
20 change to a different dorm, you worked eight days and
21 then when your regular off days came up, you began
22 taking those off days as they came around; correct?
23 A Yes.

P. 139

1 Q Now, you don't suggest that Ms. [P. R.] did
2 that to punish you for having filed a complaint against
3 Michael Hardy?
4 A I don't know what Ms. [P. R.] was thinking.
5 Q You don't?
6 A I should hope not.
7 Q I mean, you know better than that. She sent

7

8 you straight to personnel. She said to you, I will show
9 you he is not invincible, and then she did, didn't she?
10 A Eventually, yes.
11 Q So you are not suggesting that [P. R. ]
12 somehow mistreated you or did something to you because
13 you filed this complaint against Michael Hardy? The
14 opposite is true, isn't it? She did something to
15 Michael Hardy?
16 MR. JACOBS: Object to the form of the
17 question.
18 Q Isn't that true?
19 MR. JACOBS: Object to form.
20 A I don't know what she did to Mr. Hardy, but I
21 had to work those eight days.
22 Q You are not suggesting that having to work
23 those eight days was some kind of punishment, are you?

P. 140

1 A In this environment, it is hard to say.
2 Q Well, let me ask it another way. What
3 evidence do you have to suggest that you had to work
4 eight days because you complained against Michael Hardy?
5 What can you tell me that could possibly lead to
6 that conclusion?
7 A I don't know.
8 Q Do you blame that on anybody, for example?
9 Was it somebody's fault?
10 A I guess somebody should have been keeping up
11 with it.
12 Q I didn't ask you that. Is it your testimony
13 that somebody, in particular, is at fault for that? Or
14 are you just saying that that happened, so, therefore,
15 it must be because I complained against Michael Hardy?
16 Is that what you are saying? Are you suggesting there
17 might really be a basis to believe that?
18 MR. JACOBS: Object to the form of the
19 question.
20 A I don't know, Mr. Perry.
21 Q Don't know what?
22 A Whether it has something to do with that or
23 not.

McMillian is not suing DYS for anything that Ms. P. R.  did, and does not claim that Ms.

8

P. R. did anything discriminatory against her.  (McMillian depo p. 50-51).  In other words the

Plaintiff concedes that Ms.  P. R.  did not do anything to intentionally discriminate against her.

There is no claim under the law for unintentional discrimination.  The allegation that McMillian

suffered unintentional retaliation by the denial of off days as a result of complaining against

Hardy is simply meritless.   Although it is the only event that was temporally close to her

complaint, her own testimony shows it is clearly a frivolous claim.

Even if there were evidence from which an inference could be drawn that working eight

days without a scheduled day off was an intentional retaliatory act by Ms. P. R. for complaining

about Hardy, which there is none, the Plaintiff submits no case law to support the allegation that

working eight days without a scheduled day off is an actionable adverse employment action.

DYS submits that no such case law exists.  This act is too trivial to support a retaliation claim.

So Called Isolation and Refusal of Training by Supervisor and Co-workers.  This

allegation is somewhat muddled.  It contains claims both against the Plaintiff's supervisors

(though unidentified) and her co-workers, but there is no indication of who did what.  The

following will discuss the record first for the claim of "isolation" and for the claim of "refusal of

training" stated in the Plaintiff's brief.

There is in fact no evidence in the record, and none cited by McMillian in her brief, that

McMillian was ever "isolated."   Neither is the so called isolation claim made factually clear in

her brief.  In any event, the so called "isolation" claim is not an actionable claim for retaliation.

*See, e.g. Faragher v. Boca Raton*, 524 U.S. 775, 778, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)

(judicial standards for sexual harassment must "filter out complaints attacking the ordinary

tribulations of the workplace"); *see also, Bozeman v. Per Se Technologies, Inc.*, 456 F.Supp.

1282, 1345 (N.D. GA 2006) (stating "generally the courts have held that shunning or ostracism by co-workers and supervisors is insufficient to sustain a retaliation claim") (citations omitted).

The "refusal of training" claim is likewise unsupported in the record other than one single reference. McMillian testified that one of the co-workers named V. H. was "not very nice" because McMillian "asked [her] to help [McMillian] fill out some paperwork", and V. H. told her "she didn't know how to do it." (McMillian depo p. 52). As stated above, that claim, even if true, could not possibly be deemed to meet the standard for an actionable retaliation claim. It is trivial at best, and the Defendant submits it is frivolous.

Finally, McMillian offers no evidence to connect the alleged acts of her co-workers to her complaint against Hardy. McMillian claims not to know V. H. and therefore does not know what she was upset with her about. (McMillian depo p. 57 line 18 - 58 line 21). There is no legal or factual basis for a good faith claim against DYS for isolation and refusal of training.

So Called "Discriminatory Warning Placed in Her File Without Notice on Her Evaluation. This allegation is supposedly supported by Plaintiff's Exhibit 12–which goes to great lengths to ideintify employees who– like the Plaintiff– were also late to work, but does not otherwise supply evidence that the Plaintiff and those employees were similarly situated. It is also supported by Plaintiff's Exhibit 11–which is the "unsatisfactory" performance appraisal in issue for which McMillian actually got the highest rating possible, and by Plaintiff 's Exhibit 13–which is a list of the Plaintiff's other performance appraisals, and Plaintiff's Exhibit 15–the ALJ hearing transcript. The subject February 12, 2007 evaluation indicates McMillian received a score of "28" which "exceeds standards." **There is simply no higher rating available**. Obviously, the Plaintiff was not injured or harmed in any way as a result of receiving the highest

performance evaluation available–even assuming her allegations were true that the "warning" was somehow "discriminatory"–which is not true nor supported by any evidence.

The so called "unsatisfactory evaluation" which is actually no more than an indication on her exceedingly high evaluation that she had been "late 3 times" with no deduction in score whatsoever, was YEARS after her complaint, and therefore unconnected to the complaint as a matter of law.  A plaintiff in a retaliation case must show, at a minimum, a temporal link between a protected activity and an adverse employment action.  *E.g. Hammons v. George C. Wallace State Community College*, 174 Fed.Appx. 459 (11th Cir. 2006) (holding that five months was insufficient to show causal nexus); *Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 951 (11th Cir. 2000) (holding that a 7-month time period is too indirect to satisfy the causal connection requirement); *Breech v. Ala. Power Co.*, 962 F.Supp. 1447, 1461 (S.D.Ala.1997), aff'd 140 F.3d 1043 (11th Cir.1998) (holding that more than a year between the protected activity and the discharge is not close enough to support the causal connection requirement).  The Defendant submits this claim is frivolous.

Moreover, this claim appears to be unique in this case insofar as it claims "discriminatory discipline" based on retaliation.  To sustain a claim for discriminatory discipline the Plaintiff would have to submit evidence of a modified *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), analysis. Under this test, the plaintiff has the initial burden of establishing a prima facie case of unlawful employment discrimination by a preponderance of the evidence. *Id.* at 802. To establish a prima facie case of discrimination the plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was

11

treated; and (4) she was qualified to do the job. *Burke-Fowler v. Orange County*, Fla., 447 F.3d 1319, 1323 (11th Cir.2006). "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

The Plaintiff has not met elements 2 or 3 described above with regard to a discriminatory discipline claim. As discussed above, the evaluation complained about was the highest evaluation an employee can receive. Clearly there was no adverse employment action–the second element. Moreover, assuming the notation on her exceptionally high evaluation that she had been "late 3 times" was "discriminatory", there is no evidence to show the third element.

The third element requires a showing that the Plaintiff was similarly situated with her alleged comparators. The record is devoid of evidence regarding the circumstances of the alleged comparators. In other words the Plaintiff has not even attempted to meet the third element of a discriminatory discipline case–that of showing similarly situated employees were treated differently. For example, The Plaintiff has submitted no evidence regarding the identity of her supervisors or the identity of the supervisors of the co-workers she identified as also having been late. "Courts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis." *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989). This is merely an example of the kind of missing evidence needed to show similar situated employees were treated differently. Essentially, the Plaintiff would have to show the alleged comparators were "similar in all relevant respects". *See Smith v. Status Computer, Inc.*, 40 f.3d 11, 12 (1st cir. 1994); *Holifield v. Reno*, 155 f.3d 1555, 1552 (11th Cir. 1997). Without evidence regarding the circumstances of the alleged comparators the claim of discriminatory

discipline fails.  There is no offering of any such evidence.

Moreover, even if the Plaintiff had submitted evidence of the identity of the supervisors and the circumstances of the alleged comparators, which she did not, she submitted no evidence of the intent of the decision maker.  In a discriminatory discipline claim the court "must focus on the actual knowledge and actions of the decision-maker."  *Lubetsky v. Applied Card Sys., Inc.*, 296 F.3d 1301, 1306 (11th Cir. 2002).  McMillian seems to simply suggest that because a note was placed on her evaluation accurately reflecting that she was "late 3 times", she was necessarily subjected to discrimination.  She is wrong.  See *Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001) ("Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent.")

So called "Lowered Evaluation" Claim.  Next the Plaintiff claims that her evaluation was "lowered" in retaliation for her complaint against Hardy.  On February 13, 2006, the Plaintiff received an evaluation score of "25" which "meets standards."  (Plainitff's Exhibit 13, p. 4 of 7).[6] The evaluation was signed by her supervisor Mr. S. L.

First, in the absence of specific evidence of discriminatory intent, a performance evaluation is generally insufficient to establish a claim of discrimination.  *See, e.g. Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 127 S.Ct. 2162 (2007) *citing, Zhuang v. Datacard Corp.,* 414

---

[6]  On page 17 of her brief, the Plaintiff makes reference to a so called 2005 evaluation (Plaintiff's Exhibit 13, p. 5 of 7) containing "three unsatisfactory marks (attendance, punctuality and cooperation with coworkers)."  That is a misrepresentation.  That unsigned draft evaluation does not have the Plaintiff's name nor a reviewing supervisor's name.  Plaintiff's counsel obtained through discovery this unsigned draft.  The actual appraisal, completed and signed by the reviewing supervisor, is attached to Plaintiff's Exhibit 13 at page 4.  It shows one unsatisfactory mark for "compliance with rules".  The drafter apparently reversed the "unsatisfactory" and "satisfactory" marks on the first draft, then corrected that error on the final, executed draft.

F.3d 849 (8th Cir. 2005) (rejecting inference of discrimination from performance evaluations); *also citing Cooper v. Southern Co.,* 390 F.3d 695, 732-733 (11th Cir. 2004) (isolated negative comments in evaluations cannot support an inference of discrimination); *see also See Hollins v. Atlantic Co., Inc.,* 188 F.3d 652, 662 (6th Cir.1999) (it is not an adverse employment action for an employee to receive a performance evaluation that is followed by a merit increase that is less than what the employee would have given himself); *Richardson v. N.Y.S. Dep't of Correctional Serv.,* 180 F.3d 426, 443-44 (2d Cir.1999) (holding that a performance evaluation classifying an employee as "average" rather than "excellent" did not constitute an adverse employment decision); *Montandon v. Farmland Ind.,* 116 F.3d 355, 359 (8th Cir.1997) (lower evaluation score, which still equaled a "meets expectation" score did not rise to the level of an adverse employment action where no demonstrable result flowed from the lower score); *Harris v. Secretary U.S. Dep't of Army,* 119 F.3d 1313, 1319 (8th Cir.1997) (lowering of evaluation score, as part of effort to lower inflated scores across the board, does not reasonably constitute adverse employment action); *McGinnis v. U.S. Air Force*, 266 F.Supp.2d 748 (S.D.Ohio 2003) ("a performance evaluation that is lower than an employee feels is warranted is not an adverse employment action sufficient to state a claim of discrimination").

Second, if the "lowered" evaluation were a sufficient act on which to base a retaliation claim, the Plaintiff must present some evidence that the "lowered" evaluation was motivated by retaliatory animus resulting from her complaint of discrimination.  She has utterly failed to submit any such evidence.

Moreover, if the evaluation could support a retaliation clause, and if the evidence suggested a retaliatory motive, neither of which is true, the evidence shows a legitimate business

14

reason for a "lowered evaluation."  DYS Youth Service Aids like the Plaintiff must get 40 hours

of continuing training as a condition of continued employment.  (McMillian depo p. 144, lines

21- 145 line 1; p. 145 lines 10-14).  The Plaintiff's evidence on this claim is contained in Exhibit

8 and in her deposition testimony.  This evidence shows that on November 29, 2005, during the

2005 evaluation period, McMillian failed to attend a mandatory training session.  She was thus

counseled by Mr. S. L. for that failure to comply with DYS rules.  (Plaintiff's Exhibit 8, page 1

of 23).  The training took place at a staff meeting.  (Plaintiff's Exhibit 8, McMillian depo p. 88,

lines 17-18).  The Plaintiff's own evidence[7] thus shows the evaluation score of "25" was

justified, based on the legitimate business necessity of continuing employee training.  On August

9, 2006, the Plaintiff again was counseled for her refusal to attend mandatory training, indicating

that she continued to refuse to get her mandatory training even after being counseled.  (Plaintiff's

Exhibit 8, page 18 of 23).

      The Plaintiff must therefore submit evidence of discriminatory intent to refute this

legitimate business reason, however the Plaintiff offers no basis to suggest that Mr. S. L. was

motivated by retaliatory animus.  There is absolutely no such evidence in the record.  (McMillian

---

      [7] The Plaintiff's claim regarding her evaluation has been inconsistent.  When McMillian
reported this allegation to DYS in a recorded statement to the DYS Special Investigator on
February 16, 2006 at 2:06, p.m., she claimed that she **had** actually attended the training for which
she was counseled (Plaintiff's Exhibit 2, Report of DYS Special Investigator, p. 2 of 3, fifth line
from top), but DYS records show she had NOT (Plaintiff's Exhibit 2, Report of Special
Investigator, p. 3 of 3, last paragraph).  She now claims that she "was not informed" of the
training session and that it took place on her "off day".  (Plaintiff's Exhibit 1, Affidavit, ¶ 15, last
sentence).  She furthermore conceded in her deposition that she did not know how many hours of
training she had actually attained during the time period in issue.  (McMillian depo p. 144 line 21
- 145 line 17).  It is therefore logically impossible for her to continue to claim that she attained
her training or contradict her supervisor's counseling note (Plaintiff's Exhibit 8, page 1 of 23) as
she originally claimed when she reported this allegation on February 16, 2006.

depo p. 90, lines 11-20; p. 91 line 13 - p. 92 line 5).  She concedes that Mr. S. L.and Michael

Hardy didn't know each other, (McMillian depo p. 181 lines 10-11), and she offers no evidence

anywhere in the record that Mr. S. L. even knew about her complaint against Hardy when he

counseled her on November 29, 2005 for failure to attend the mandatory staff meeting.

(Plaintiff's Exhibit 8, page 1).  Without such evidence the Plaintiff's claim necessarily fails.

Finally, the events also took place approximately five months after her complaint.  Her

complaint against Hardy was made on or about June 16, 2005.  (McMillian depo p. 131, lines 16-

21).  The alleged "lowered evaluation", which was made on February 13, 2006 (Plaintiff's

Exhibit 13, page 4 of 7),  was therefore not temporally connected as a matter of law, and no

additional evidence exists to supply the causal nexus element.  Therefore the claim fails.

So Called Surveillance By Co-Workers At the Instruction of Her Supervisor.  This claim

is also unsupported by evidence.  The Plaintiff submitted as Exhibit 8 a list of so called

"memos/reports".   The Plaintiff claims the memos show that her co-workers "were watching

her closely" and "giving information to Mr. S. L." her supervisor.  (McMillian depo p. 79 lines

13-22).  The memos/reports merely evidence routine documentation necessary for business as

usual and cannot under any stretch of the imagination support a logical inference that the Plaintiff

was "placed under surveillance".

There are 24 documents attached to Plaintiff's Exhibit 8–all of which were produced by

the Defendant during discovery.  Approximately 17 are notations by Plaintiff's supervisor Mr. S.

L. evidencing routine business.  Mr. S. L. became supervisor of the ITU dorm after McMillian

was transferred there.  Obviously a good supervisor documents such routine matters, and the

Plaintiff's use of these routine memos/reports to attempt to fabricate a "surveillance" allegation

reveals the weakness of the retaliation claim.  Five of the Plaintiff's documents are memos from

co-workers (one from Wa., three from Wh., and one from Jo.) stating that McMillian had called

in to say she would not be at work on a particular occasion.  There is no evidence that McMillian

was disciplined for these absences and these documents support why McMillian was not

disciplined for these absences.  One of the memos is from a co-worker named Ho. which also

supports McMillian by documenting that  McMillian did not "disrespect" her supervisor Mr. S.

L. during a particular confrontation.  The only co-worker document in the record that does not

support McMillian is a memo by her co-worker Ms. Wh. documenting that McMillian cursed at

Wh.  No logical inference can be drawn from those documents to support the allegation that the

Plaintiff was "placed under surveillance by her co-workers at the instruction of her supervisor."

If such routine documentation of ordinary business can be construed as evidence of retaliatory

"surveillance", then every employer would be required to STOP documenting routine matters

related to an employee who simply makes a complaint of discrimination!  That would be a

ridiculous result and simply cannot be.

Moreover, this so called "surveillance", if it could be characterized as such, took place

months after McMillian's complaint against Hardy and therefore is not temporally related as a

matter of law.

Finally, the Plaintiff offers no evidence to suggest any nexus between her complaint

against Hardy and the alleged surveillance.  Rather, she claims that Wh. was upset with her

because McMillian got Wh.'s off days when McMillian was sent to ITU.  (McMillian Depo p. 56

lines 15-20).  She concedes that she has no information to suggest why Wh. was upset with her

other than that fact.  (McMillian depo p. 61 line 12 - 64 line 3).  McMillian specifically conceded

17

that she has no idea why her co-workers were allegedly "watching her." (McMillian depo p. 82 lines 14-22). She offers no evidence that would connect her supervisor Mr. S. L. to Mr. Hardy in any way, (McMillian depo p. 90 lines 4-20), and no evidence to connect any of her other co-workers to Mr. Hardy (McMillian depo p. 92, line 6 through 93 line 23). This claim is frivolous in every way.

So Called Denial of Leave Given to Other Employees. This statement at p. 28 of the Plaintiff's brief is not discernable in the evidence. Other than the claim that McMillian had to work 8 days before getting an off day, which was discussed above, there does not appear to be any evidentiary support for the statement and it appears to be false.

Conclusion. The Plaintiff has failed to submit evidence that (1) she suffered an adverse employment action after complaining about discrimination by Michael Hardy, or (2) a causal connection exists between the protected activity and the adverse employment action. Having failed to submit evidence to support the elements of her claim, DYS is entitled to summary judgment.

Respectfully submitted,

s/ T. Dudley Perry Jr.
T. Dudley Perry, Jr.
Bar Number: 3985-R67T
General Counsel
Attorney for the Defendant
Alabama Department of Youth Services
Post Office Box 66
Mt. Meigs, AL 36057
Telephone: (334) 215-3803
Fax: (334) 215-3872
E-Mail: dudley.perry@dys.alabama.gov

s/Sancha E. Teele

Sancha E. Teele
Assistant Attorney General
Bar Number: 0103-H71T
Attorney for the Defendant
Alabama Department of Youth Services
Post Office Box 66
Mt. Meigs, AL 36057
Telephone: 334-215-3803
Fax: (334) 215-3872
E-Mail: sancha.teele@dys.alabama.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of March, 2008, I electronically filed the foregoing, **DEFENDANT ALABAMA DEPARTMENT OF YOUTH SERVICES' SUPPLEMENTAL REPLY TO PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT ALABAMA DEPARTMENT OF YOUTH SERVICES' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jimmy Jacobs                              James Eldon Wilson
E-mail:jacobslawoffice@charter.net        Attorney at Law
Attorney At Law                           4625 Lomac Street
143 Eastern Boulevard                     Montgomery, AL 36106
Montgomery, AL 36117
Tel: (334) 215-1788
Fax: (334) 215-1198

**s/ T. Dudley Perry Jr.**
T. Dudley Perry, Jr.
Bar Number: 3985-R67T
General Counsel
Alabama Department of Youth Services
Attorney for the Defendants
143 Eastern Boulevard
Montgomery, AL 36117
Tel: (334) 215-1788
Fax: (334) 215-1198

**s/ T. Dudley Perry Jr.**
T. Dudley Perry, Jr.

19

Bar Number: 3985-R67T
Deputy Attorney General
Attorney for the Defendants