IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

TERA A. McMILLIAN,                    )
                                      )
            Plaintiff,                )
                                      )
      v.                              )       CASE NO. 2:07-cv-001-WKW
                                      )       [wo]
ALABAMA DEPARTMENT OF                 )
YOUTH SERVICES, *et al.*,             )
                                      )
            Defendants.               )

## MEMORANDUM OPINION AND ORDER

This case is before the court on three motions for summary judgment and two motions

to strike.  Plaintiff Tera McMillian ("McMillian"),[1] Defendant Alabama Department of

Youth Services ("DYS"), and Defendant Michael Hardy ("Hardy") have summary judgment

motions pending.  (Docs. # 23, # 25 & # 28.)  McMillian has moved for partial summary

judgment only as to her claims against Hardy.  (Doc. # 25.)  Additionally, McMillian has two

motions pending to strike DYS's evidentiary submissions.  (Docs. # 31 & # 77.)  For the

reasons set forth below, all of the motions are due to be DENIED.

## I.  FACTS AND PROCEDURAL HISTORY

At the summary judgment stage, the court views the evidence in the light most

---

[1] McMillian's name is incorrectly spelled in the complaint as Tera McMillan.  (*See* Doc. # 1.)
However, at her deposition McMillian stated that her last name is spelled "M-C-M-I-L-L-I-A-N."
(McMillian Dep. 32:18-20.) McMillian's attorney admits that the spelling error is his fault.  (*Id.* 32:21-33:2.)
The style of the case is due to be amended to reflect the correct spelling.

favorable to the non-movant.[2]  McMillian alleges that she was sexually harassed by her supervisor, Hardy, from 2003 until 2005.  She brings claims against DYS for sex discrimination and retaliation under 42 U.S.C. § 2000e  and against Hardy for violating § 1983, invasion of privacy, assault, and battery.  (Am. Compl.)

McMillian began to work for DYS in October 2002 at the Mt. Meigs campus.  (McMillian Decl. ¶ 1.)  She is currently employed in the Intensive Treatment Unit ("ITU") at Mt. Meigs.  Hardy was McMillian's supervisor from May 2003 until July 2005.  In January 2006, DYS terminated Hardy's employment after a hearing involving McMillian's allegations of sexual harassment and retaliation.

## A.    *Hardy's Sexual Advances*

In May 2003, after McMillian was transferred to DYS's Paige Hall facility, Hardy began to make sexual advances toward her.  During this time, Hardy told McMillian about his relationship with another female employee.  (McMillian Decl. ¶ 2.)  He frequently stated that he "loved big titties" and once asked McMillian "to let him suck [her] breasts."  (*Id.*; McMillian Dep. 101:21-102:20.)  He talked about his sexual prowess and told McMillian that he could not "f--- all night like he used to" but instead could "only f--- real hard for 5 or 6 minutes."  (McMillian Decl. ¶ 3.)  In 2003, Hardy asked McMillian to travel to Birmingham with him.  (McMillian Dep. 227:19-23.)  While Hardy never stated the reason

---

[2] While McMillian and Hardy have filed motions for summary judgment, their arguments rely solely on legal issues of *res judicata* and collateral estoppel.  The facts as laid out below are relevant to DYS's summary judgment motion, and the court considers them in the light most favorable to McMillian.

for the trip, McMillian understood that Hardy sought a sexual rendezvous.  (*Id.* 228:12-229:3.)   In response to Hardy's comments, McMillian told him that she did not want to discuss these matters.  (McMillian Decl. ¶ 2.)

In 2004, Hardy asked McMillian to perform oral sex on him.  While other staff members and the children were at the dining hall, Hardy asked McMillian to see him in his office and told McMillian that if she helped him he would give her perks, like allowing her to arrive late and leave early.  (McMillian Dep. 205:11-17.)  Hardy then told McMillian: "[M]y fantasy is for you to s--- my d--- while [the other staff members and children are] at the dining hall."  (McMillian Dep. 209:3-6.)  McMillian responded "Mr. Hardy, I am sorry. I can't do that." (*Id.* 209:8-9.)

McMillian also claims that Hardy made other advances.  He asked McMillian how much child support she received and offered to give her $200 per month, to take care of her car, and to mow her lawn in exchange for a key to her house.  (McMillian Decl. ¶ 5.) Another time Hardy reached around behind McMillian and and grabbed her breasts to "get a little feel."  (*Id.* ¶ 2.)  He told her that her butt looked great in her pants.  (McMillian Dep. 221:15-16.)  Another time Hardy asked Veronica Harris ("Harris"), another DYS employee and a long-time friend of McMillian:  "What would it take to get Mac?"  (*Id.* ¶ 5.)

In late December 2004, Hardy called McMillian and asked if he could come to her home to discuss something detrimental to her future at DYS and alluded to another employee disrespecting her.  (McMillian Dep. 264:2-15.)  Hardy appeared at McMillian's home, and

Harris, who had spent the afternoon with McMillian, let him in. (*Id.* 267:4-17.) Harris and McMillian had drinks, and McMillian asked Hardy if he would like one. (*Id.* 269:5-10.) Hardy told McMillian he only drank Long Island Iced Tea, and McMillian made him one. (*Id.* 269:11-270:6.) The three talked and McMillian waited for Hardy to bring up the issue he had called her about. (*Id.* 271:7-12.) When Harris went into the kitchen, Hardy lifted his sweater and shirt up, rubbed his chest with his hand, and asked McMillian to lick his chest. (*Id.* 274:7-12.) At this time, Hardy had consumed only one drink. (*Id.* 272:16-19.) McMillian responded to Hardy's advances: "Hell mother-f------ no."[3] (*Id.* 131:1-4.)

In January 2005, McMillian's shift changed, and she no longer had regular encounters at work with Hardy. Hardy continued to call McMillian frequently. He offered to buy her a car, tires, and other presents if she went out with him. (McMillian Decl. ¶ 10.) In April 2005, Hardy called McMillian and told her that another employee was disrespecting her. While they were discussing this issue, he asked her to go to a hotel with him for drinks and to engage in sex. McMillian declined his invitation. The next day, Hardy told McMillian "I guess you know that you have lost your foundation around here now." (McMillian Decl. ¶ 10.)

During this period, McMillian did not report Hardy's sexual advances because she was worried that Hardy would have her fired. Hardy repeatedly bragged to McMillian that

---

[3] In her affidavit, McMillian claims she stated "hell no." (McMillian Decl. ¶ 8.) When asked in her deposition about the changed language, she explained that she censored the language in the declaration because it was being filed with the court. (McMillian Dep. 130:21-131:12.).

he had been accused of sex discrimination before and had "handled" it.  (*Id.* ¶ 4.) Additionally, Hardy repeatedly told McMillian that he was "in" with the clique that ran Mt. Meigs and "that it would not do [McMillian] any good to say anything about his actions." (*Id.* ¶ 6.)  Hardy explained that J. Walter Wood ("Wood"), the DYS director, owed him a favor after he stopped DYS staff members from filing a lawsuit against Wood.  (*Id.*)  Hardy showed McMillian a complaint that a female employee had filed against a male employee and told McMillian that he knew how to take of complaints and that he would "take care of [the female employee]."  (*Id.*)  He bragged how he "turned the tables" on another female employee when she complained about sexual harassment.  (*Id.*)

## B.     DYS's Sexual Harassment Policy

DYS had a codified sexual harassment policy in place during this time.  (*See* DYS Reply Br. Ex. 4.)  The policy states that DYS "will take any steps possible to prevent sexual harassment by its employees or on its premises."  (*Id.*)  The policy defines sexual harassment and includes procedures for employees to file sexual harassment complaints:  "Complaint[s] should be made to the Departmental Personnel Manager."  (*Id.*)

DYS also trained its employees on sexual harassment.  DYS staff members are required to complete 40 hours of training, including sexual harassment training, before beginning work.  Additionally, all DYS staff receive yearly training, which includes a module on sexual harassment.  A copy of the DYS sexual harassment policy is kept in the dorms so that employees can access it.  (McMillian Dep. 164:13-15.)  McMillian admits that

5

she received training about the policy on more than one occasion.  (*Id.* 164:20-22.)

### C.    McMillian's Complaint

In May 2005, McMillian tried to transfer dorms to get away from Hardy because the stress of working near him caused her physical and emotion problems.  (McMillian Decl. ¶ 11.)  She asked Hardy to transfer her to another dorm and concocted a story that she needed a transfer because she needed to work a different shift so that she could take a second job.[4] (*Id.*)  Hardy denied her request and told her that it would take at least two years for her to obtain a transfer without his approval.  (*Id.*)  Another dorm supervisor confirmed to McMillian that she could not transfer dorms without Hardy's approval.  (*Id.*)

On June 15, 2005, while Hardy and most of the other administrative staff members were at a retreat, McMillian went to see Phyllis Rankins ("Rankins"), a specialist on duty that day, to ask about transferring dorms.  She did not go see Rankins intending to file a sexual harassment complaint.  (*Id.* ¶ 12.)  Rankins told McMillian that she could not transfer dorms. McMillian then confessed to Rankins that she wanted a transfer to get away from Hardy and his unwanted sexual advances.  (*Id.*)  Rankins sent McMillian to Deborah Spann ("Spann"), a personnel manager, to report her allegations.  Spann took McMillian's statement and later conducted an investigation.  (*Id.*; Spann Dep. 46:20-48:2.)

While McMillian was meeting with Spann, Rankins called and directed McMillian

---

[4] DYS disputes this fact because shortly after changing shifts McMillian began to work at a second job.  However, at the summary judgment stage the court views the facts in the light most favorable to McMillian and assumes that she sought a transfer to escape Hardy, not to accommodate a second job.

to report to work that day at a new dorm, which resulted in her working a double shift. (McMillian. Decl. ¶ 12.) McMillian did not protest at that time. (*Id.*) As a result of the shift changes, McMillian worked eight or more consecutive days and complains that she was not compensated for the days she was not allowed to take off. (*Id.*)

Shortly after McMillian filed her complaint, Hardy filed a grievance against her, alleging that she made derogatory comments about him and encouraged other employees to interfere with investigations and to file false claims. In November 2005, DYS held an administrative fact-finding hearing to determine whether disciplinary action against Hardy was warranted. After the hearing, DYS decided to terminate Hardy's employment. (Def.'s Reply Br. Ex. 6 at 5.) DYS noted that McMillian's testimony was not credible and that it was unclear whether Hardy violated the sexual assault policy. Nevertheless, DYS concluded that Hardy violated policy by filing a grievance against McMillian. (*Id.* at 7.) On January 6, 2006, DYS terminated Hardy.[5]

Hardy appealed his termination to the Alabama State Personnel Board. A hearing was held in June 2006 at which McMillian testified against Hardy. In fact, Attorney Perry who represents DYS in this case met with McMillian to prepare her testimony. An administrative law judge ("ALJ") made a recommendation to the Personnel Board, which upheld Hardy's termination. The ALJ concluded that "Hardy had more than a work-related relationship with McMillian and violated the DYS sexual harassment policy. . . . However, the undersigned

---

[5] Hardy has sued Wood, claiming he was improperly terminated from DYS. *See Hardy v. Wood*, No. 08-cv-15-MHT. DYS filed a motion to consolidate the two cases, which was denied. (Doc. # 87.)

was NOT convinced that McMillian was the victim of sexual harassment." (*Id.* at 29.)  The ALJ found that Hardy's termination was appropriate because of his conduct and because of his abuse of the grievance procedure.  The ALJ did not reach the issue of whether Hardy's actions constituted retaliation but noted they possibly could.  The Personnel Board adopted the ALJ's report and upheld the termination.  (Def.'s Reply Br. Ex. 7.) The Personnel Board found "the testimony of the alleged victim is not credible and her complaints of sexual harassment are unfounded."[6]  (*Id.*)

D.    *McMillian's Time in the ITU Dorm*

After McMillian was transferred to the ITU dorm, she alleges that her co-workers took actions against her because she filed a complaint against Hardy.  First, she alleges that one her co-workers would not help train her.  Other staff members prepared a memo expressing their support for Hardy and another denouncing McMillian, as out to get Hardy.  (Pl.'s Ex. 19.)

After filing her complaint, McMillian was repeatedly disciplined and given lower performance evaluations.  McMillian filed a retaliation complaint with the EEOC in July 2005.  In November 2005, she received a warning letter for not attending a mandatory training session; McMillian denies being told about the training.  (Pl.'s Ex. 22.) In December 2005, she filed a second retaliation complaint with the EEOC.  Within two months,

---

[6] Findings of the Personnel Board and the ALJ regarding the credibility of McMillian are not binding on the court when considering DYS's motion for summary judgment.  The court is bound to consider the facts of this case in a light most favorably to McMillian without making a credibility determination.

McMillian had eight disciplinary memorandums placed in her file.  At her annual evaluation in February 2006, her evaluation score and rating were lower than they had been in the past. (*See* Pl.'s Ex. 13.)   She was also written up for being late to work even though other similarly situated employees were not disciplined when they were tardy.

### E.    *Procedural History*

On January 3, 2007, McMillian filed her complaint against DYS and Hardy, alleging sex discrimination, violation of § 1983, and retaliation. (Doc. # 1.) Subsequently, McMillian amended her complaint to include state-law claims of invasion of privacy, assault, and battery against Hardy.  (Doc. # 14.)  In November 2007, Hardy, McMillian, and DYS all moved for summary judgment.  (Docs. # 23, # 25 & # 28.)  Shortly thereafter, the litigation became highly contentious, and more motions came before the court.

Around the time summary judgment motions were filed, McMillian brought a Motion to Compel (Doc. # 27), alleging that DYS had not responded to all of her discovery.  DYS eventually produced additional files, which it claimed had been inadvertently omitted because they were stored in another location.  (*See* Doc. # 39.)  DYS estimates that it has produced over 5,000 documents in this case.  (Doc. # 46 ¶ 8.)

In another discovery dispute, McMillian accused DYS of wrongfully refusing to provide a copy of the transcript from Hardy's administration hearing.  DYS told McMillian that it had the transcript but refused to provide a copy.  McMillian filed a Motion for Sanctions (Doc. # 50) based on DYS's failure to give her a copy of the transcript for free.

The Magistrate Judge ruled against McMillian (Doc. # 66), and she subsequently appealed that decision to this court, which also ruled against her (Doc. # 83).

Frustrated by the course of discovery, DYS filed a Motion for a Protective Order (Doc. # 46), which sought to bar McMillian from engaging in any further discovery. The motion did not mention any specific discovery requests for which DYS sought a protective order but instead complained about how McMillian's counsel conducted discovery. Because DYS did not identify any specific discovery requests for which it sought a protective order, the Magistrate Judge denied the motion. (Doc. # 47.)

The briefing for summary judgment illustrates that there are factual disputes. DYS's summary judgment brief was 16 pages long with 6 pages of facts; its reply brief was 39 pages long with 28 pages of facts. In its reply brief under the heading of "Undisputed Facts," DYS lists specific facts that it has asserted, McMillian's response to each fact, and its reply. This format alone suggests that there are disputed issues of fact and that summary judgment is inappropriate. In its argument, DYS describes McMillian's arguments as "deceitful," "self-serving," "outrageous," and "preposterous." (DYS's Reply Br. 31-32.)

The dispute over summary judgment did not end with DYS filing its reply brief. McMillian filed a Motion to Strike (Doc. # 77), asking the court to strike some of the evidence attached to the reply brief and parts of the reply brief. Less than a month after filing its reply brief, DYS sought leave to file a supplemental brief on the retaliation issue, which the court granted. (Doc. # 87.) The court also granted McMillian the opportunity to reply.

Exactly four months after briefing began and with eleven summary judgment briefs filed, briefing on all dispositive motions was completed.  The dispositive motions have been heavily briefed and are ripe for resolution.

## II.  JURISDICTION AND VENUE

The court exercises jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question).  The parties do not contest personal jurisdiction or venue, and the court finds allegations sufficient to support both.

## III.  STANDARD OF REVIEW

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Under Rule 56, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).  The movant can meet this burden by presenting evidence showing there is no genuine issue of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Celotex Corp.*, 477 U.S. at 322-23.

Once the moving party has met its burden, "an opposing party may not rely merely on

allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A genuine factual dispute exists if "a reasonable jury could return a verdict for the non-moving party." *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1358 (11th Cir. 1999) (internal quotation marks and citation omitted).  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

## IV. DISCUSSION

### A.  *DYS's Motion for Summary Judgment*

DYS has moved for summary judgment as to McMillian's claims against it for sex discrimination and retaliation.[7]  The court analyzes each cause of action separately.

---

[7] McMillian brings claims for both tangible employment action and hostile work environment sex discrimination, as well as retaliation.  Each type of claim requires McMillian to show some type of change to her working environment.  The court briefly lays out the relevant standards here as a quick primer to avoid confusion as to the distinctions between the standards and explain what differentiates a tangible employment action, an action that alters the terms of employment, and an adverse employment action.

To hold an employer strictly liable, the employee must show that there was a **tangible employment action** that inflicted direct economic harm.  *See Burlington Indus. v. Ellereth*, 524 U.S. 742, 761 (1998).  To state a claim for a hostile working environment, which is another type of sex discrimination claim, the employee must show that the harassment was **severe or pervasive and altered the terms and conditions of employment**, which requires the court to consider whether the conduct was severe, frequent, threatening or humiliating, or unreasonably interfered with the employee's job performance.  *Id.* at 754.  Finally, to state

1.    **McMillian's Sex Discrimination Claim**

Title VII prohibits sex-based discrimination that alters the terms and conditions of

employment. *See* 42 U.S.C. § 2000e-2(a)(1). There are two ways an employee can establish

a sex-based discrimination claim: "1) through tangible employment action – i.e., discharge,

demotion, pay decrease, etc.; or 2) through creation of a hostile work environment caused by

sexual harassment that is sufficiently severe or pervasive to alter the terms and conditions of

the work." *Nurse "BE" v. Columbia Palms W. Hosp. Ltd. P'ship*, 490 F.3d 1302, 1308 (11th

Cir. 2007). McMillian has alleged each type of violation and also claims that DYS's motion

is due to be denied based on judicial estoppel. The court first explains why judicial estoppel

does not apply and then examines the merits of DYS's argument.

a.    **Judicial Estoppel**

McMillian alleges that because DYS sought Hardy's termination in the previous

administrative hearing it is estopped from denying that the elements of a *prima facie* case of

sex discrimination are met here. Under the doctrine of judicial estoppel, "'[w]here a party

assumes a certain position in a legal proceeding, and succeeds in maintaining that position,

he may not thereafter, simply because his interests have changed, assume a contrary position,

especially if it be to the prejudice of the party who has acquiesced in the position formerly

---

a claim for retaliation, the employee must show that there was a **materially adverse employment action**, which might have dissuaded a reasonable worker from making a discrimination charge. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). The adverse-employment-action standard focuses not on the nature of the discrimination but whether the employer has taken actions that would result in employees not reporting discrimination. The Supreme Court has explicitly refused to apply the tangible employment action standard to retaliation claims. *Id.*

taken by him.'" *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Davis v. Wakelee,* 156 U.S. 680, 689 (1895)). The purpose of judicial estoppel is "to protect the integrity of the judicial process." *Id.* (internal quotation marks and citation omitted).

The following factors "typically inform" the decision about whether judicial estoppel applies: (1) "[A] party's later position must be clearly inconsistent with its earlier position;" (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 750-51 (internal quotation marks and citations omitted). The Eleventh Circuit uses a two-step analysis in to determine whether judicial estoppel applies: "[F]irst, it must be established that the allegedly inconsistent positions were made **under oath** in a prior proceeding; and, second, the inconsistencies must have been calculated to make a mockery of the judicial system." *Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 430 F.3d 1326, 1335 (11th Cir. 2005) (emphasis added). Judicial estoppel applies to facts, not legal theories. *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996).

Judicial estoppel does not apply here because McMillian has not met either prong of the Eleventh Circuit's test. She has not identified any position taken by DYS under oath in

the prior proceeding.[8]  Even if McMillian identified a specific position taken by DYS, she would be unable to show any inconsistency in its positions.  At Hardy's termination hearing, DYS took the position that Hardy was terminated because he violated DYS policy.  This is not inconsistent with DYS's position here that Hardy's actions did not constitute sex-based discrimination.  Finally, even if McMillian could identify an inconsistent position taken under oath, she fails to meet the second prong of the Eleventh Circuit's test.  She has presented no evidence that DYS's inconsistent positions were calculated to make a mockery of the judicial system.

### b.    Tangible Employment Action Claim

"A tangible employment action constitutes a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellereth*, 524 U.S. at 761.  In most cases, a tangible employment action "inflicts direct economic harm." *Id.* Because of the nature of tangible employment actions, in general only a supervisor's acts can give rise to tangible employment action because a supervisor is empowered as an agent of the employer to make economic decisions. *Id.*

McMillian alleges that Hardy's refusal to transfer her was a tangible employment action.  She does not rely on case law to support this position nor does she allege that the

---

[8]  While undoubtedly DYS took a position at the earlier hearing, McMillian has failed to identify any specific position taken by DYS under oath.  McMillian has failed to identify with specificity and particularity the facts to which she seeks to apply judicial estoppel.

transfer would have been a promotion or significantly changed her responsibilities. Accordingly, the failure to transfer is not a tangible employment action under the facts presented.

The other actions McMillian has identified as tangible employment actions fail to meet the standard, as well. She complains that she was forced to work eight consecutive days after making her complaint and was ostracized by her co-workers. Neither of these grievances constitutes a tangible employment action because McMillian has not shown these acts caused direct economic harm or significantly changed her employment status.

### c.    Hostile Work Environment Claim

McMillian also asserts that she is the victim of sex-based discrimination because she was forced to work in a hostile environment. DYS contends that it is entitled to summary judgment because McMillian has failed to state a *prima facie* case because the harassment was not sufficiently pervasive or severe and because it is entitled to the *Faragher-Ellereth*[9] affirmative defense.

In order to establish a hostile work environment a plaintiff must show:

(1) [T]hat she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists.

*Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004).

---

[9] *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998); *Ellereth*, 524 U.S. at 764-65.

16

     **i.**    *Pervasive and Severe Harassment that Alters the Terms and Conditions of Employment*

For conduct to be sufficiently pervasive and severe to alter the terms and conditions of employment, it must be both subjectively and objectively offensive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). DYS argues that McMillian was not subjectively offended and that Harris's actions are not objectively offensive.

DYS states that McMillian failed to establish she was subjectively offended by Hardy's actions because she admitted to engaging in sexual banter in the past. However, DYS fails to view the evidence in the light most favorable to McMillian and ignores the evidence that she was offended by Hardy's action and suffered physically and emotionally. (*See* McMillian Decl. ¶ 11; McMillian Dep. 117:19-21.) Moreover, DYS's argument that McMillian has talked about sex outside of work does not establish that she was not offended by Hardy's comments about his sexual prowess, his invitations to engage in oral sex, and his grabbing of her breasts.

"[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris*, 510 U.S. at 23). Courts consider four factors in determining whether harassment objectively altered the terms and conditions of employment: "(1) [T]he frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job

17

performance." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999). "[N]o single factor is determinative." *Reeves v. C.H. Robinson Worldwide, Inc.*, 525 F.3d 1139, 1146 (11th Cir. 2008). *[E]ither* severity *or* pervasiveness can satisfy the element, if sufficient." *Id.*

In evaluating the frequency of harassment, there is no magic number of harassing incidents. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002); *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (holding that fifteen instances over four months was not infrequent). Hardy supervised McMillian for over two years, and McMillian stated that at times Hardy made comments almost every time he saw her about how he liked "big titties." (McMillian Dep. 101:21-102:21.) He also solicited oral sex from her regularly. (*Id.* 159:5-8.) While DYS argues that the conduct infrequently occurred over a period of twenty-five months, this position is not based on viewing the evidence in the light most favorable to McMillian.

The second factor is whether the conduct was sufficiently severe. McMillian alleges that Hardy physically touched her breasts, made repeated comments about her appearance, and talked about his desire to engage in sexual acts with her. DYS tries to minimize the harassment by claiming that Hardy made "innocuous comments." (DYS's Summ. J. Br. 11.) However, DYS failed to view the evidence in the light most favorable to McMillian, which reveals that Hardy repeatedly asked McMillian to perform sexual acts on him and groped her – this conduct is sufficiently severe.

18

The next factor is whether the conduct was threatening or humiliating. DYS argues that McMillian was obviously not threatened or humiliated because she "plied" Hardy with drinks at her home in December 2004. (*Id.* 12.) Once again, DYS fails to view the evidence in the light most favorable to McMillian. McMillian has presented evidence that Hardy's comments about his sexual prowess, invitations to engage in oral sex, and grabbing of her breasts humiliated her. Further, Hardy's trumpeting of his success in deflecting other charges of sexual harassment, his claimed "inside" position with DYS's management, and his overall attitude of being above or outside the sexual harassment policy are probative of the threatening work atmosphere to which McMillian claims she was subjected. In fact, Hardy did retaliate against McMillian as he had promised. Viewing the totality of the evidence, the court finds it was reasonable for McMillian to feel threatened and humiliated by Hardy's conduct.

The final factor is whether the harassment interfered with McMillian's employment. DYS argues that it did not interfere with her employment because McMillian received positive performance reviews. The Eleventh Circuit recently rejected an identical argument and noted that "the conduct in question need not have tangibly affected the plaintiff's job performance in order to be actionable." *Reeves*, 525 F.3d at 1147. In *Reeves*, the Eleventh Circuit found the conduct unreasonably interfered with the employee's job performance when the plaintiff testified that the conduct made it difficult for her to concentrate and caused her to start shaking. *Id.* McMillian testified that as a result of Hardy's actions she suffered

physically and emotionally. The court finds this factor weighs in McMillian's favor.

Viewing all of the above factors, the court finds that the harassment was sufficiently severe and pervasive that it altered the terms and conditions of McMillian's employment. Accordingly, McMillian has stated a *prima facie* case for a hostile working environment.

### ii.    *Faragher-Ellereth Affirmative Defense*

DYS argues that it is entitled to summary judgment as to McMillian's sex discrimination claim because of the *Faragher-Ellereth* affirmative defense. This defense limits the liability of an employer when a supervisor is alleged to have created a hostile work environment. *Ellereth*, 524 U.S. at 765. "The defense has two halves, one of which focuses on the employer's responsibility to prevent or correct workplace harassment, and the other of which focuses on the employee's responsibility to protect herself and others from harassment by using the procedures the employer has in place to promptly report it." *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1292 (11th Cir. 2007). An employer can avoid liability if (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (2) the "employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807. The defendant bears the burden of establishing both elements. *Nurse "BE"*, 490 F.3d at 1309. Because the court finds that there is a material issue of fact about whether McMillian unreasonably failed to take

advantage of DYS's complaint procedure, the court only analyzes the second factor.[10]

An employer must show that the employee unreasonably failed to take advantage of its complaint procedures.

> [W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an *unreasonable failure* to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Faragher*, 524 U.S. at 807-08 (emphasis added). In determining whether an employee unreasonably failed to take advantage of available procedures, courts consider "whether there were extenuating circumstances that might explain why [an employee] failed to timely use the complaint procedures." *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1316 (11th Cir. 2001). In *Frederick*, the court concluded that the employer was not entitled to summary judgment because there was a disputed issue of fact about whether the employee's failure to report the harassment was reasonable when a supervisor told the employee not to report it. *Id.*

While McMillian undisputably failed to take advantage of DYS's complaint procedures in a timely manner, there are extenuating circumstances justifying why she waited to report the harassment. First, Hardy was her supervisor, and he repeatedly threatened to

---

[10] This should not be taken by the parties to mean that the first half of the this defense, whether DYS exercised reasonable case, is not at issue. At this stage, it is. After McMillian reported Hardy's harassment, Spann sent a memorandum to Wood suggesting that the staff be re-trained on sexual harassment because it did not previously "sink in." (Pl.'s Ex. 4.) McMillian has put forth evidence that creates a factual issue about whether the sexual harassment policy was sufficiently communicated to DYS staff.

take action against her if she reported him. Hardy bragged to McMillian that he had quashed previous harassment claims against him and helped other DYS supervisors when complaints were filed against them. Moreover, at each staff meeting, Hardy reviewed the sexual harassment policy. The juxtaposition of his harassing behavior and his responsibility for communicating the policy could have suggested to McMillian that filing a complaint would be futile. Spann's memorandum recommending additional sexual harassment training for DYS staff by someone outside of DYS reinforces this conclusion. (*See* Pl.'s Ex. 4.) Finally, McMillian had observed DYS ignore other employees' sexual harassment complaints. (McMillian Decl. ¶ 6.)

DYS claims that McMillian's failure to report the harassment was unreasonable because when she finally did complain DYS took prompt, corrective action. However, DYS's adequate reaction does not establish that McMillian's earlier doubts were unreasonable. The court concludes that there is a disputed factual issue about whether McMillian was unreasonable in not reporting Hardy's harassment, an issue best resolved by a jury. Accordingly, DYS's motion for summary judgment is due to be denied as to McMillian's hostile working environment claim.

### 2. McMillian's Retaliation Claim

DYS claims that it is entitled to summary judgment as to McMillian's retaliation claim. The retaliation statute provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any

practice made an unlawful employment practice by this subchapter, or because
he has made a charge, testified, assisted, or participated in any manner in an
investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  To state a *prima facie* retaliation claim, "a plaintiff must show that

(1) she engaged in statutorily protected expression; (2) she suffered an adverse employment

action; and (3) the adverse action was causally related to the protected expression." *Weeks*

*v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002).

DYS contests that McMillian has not shown that she suffered an adverse employment

action or that it was causally related to a protected expression.  An action is an adverse

employment action if "a reasonable employee would have found the challenged action

materially adverse, which in this context means it might well have dissuaded a reasonable

worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68

(internal quotation marks and citation omitted).  The Eleventh Circuit has broadly interpreted

the causation requirement: "[A] plaintiff merely has to prove that the protected activity and

the negative employment action are not completely unrelated." *Meeks v. Computer Assocs.*

*Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994) (internal quotation marks and citation omitted).

McMillian alleges that after reporting Hardy's harassing behavior she was retaliated

against.  Within two weeks of McMillian reporting Hardy's behavior to DYS personnel, she

had to work a double shift and was denied days off.  Additionally, other staff members in

Paige Hall circulated a memo expressing support for Hardy and another one denouncing

McMillian.  (Pl.'s Ex. 19.)  After McMillian filed her first retaliation change, she was

23

disciplined for missing a mandatory training session, although she claims that she was not aware of it.  In the two months after McMillian filed her second retaliation charge with the EEOC, she had eight disciplinary memos placed in her folder and received a lower evaluation rating than she had in the past.  She was also written up for being tardy, although other employees who were late for work were not disciplined.

This brief recitation includes only some of the facts that McMillian alleges in her retaliation claim, and many of these facts are disputed by DYS.  Viewing the totality of the evidence, the court finds that there is a question of fact about whether DYS took an adverse employment action against McMillian and whether there is a causal connection between the adverse employment action and McMillian's protected activity.  Accordingly, summary judgment as to McMillian's retaliation claim is due to be denied.

### 3.    DYS's Statute of Limitations Defense

An employee must file a charge "within one hundred and eighty days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1).

> It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period may be considered by a court for the purpose of determining liability.

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002).

DYS claims that it is entitled to summary judgment because the statute of limitations expired as to all but one of the incidents McMillian alleges in her complaint.  Here, within

180 days of McMillian filing her EEOC complaint Hardy told her that another employee had a problem with her and invited her to go to a hotel with him. When she refused, he threatened her the next day. There is also evidence that Hardy called McMillian during this period and offered her gifts if she would go out with him. Because at least one act occurred within 180 days, the court may consider other earlier acts as well. While DYS attempts to portray this as an isolated instance, Hardy's actions during the relevant period were part of a larger pattern of sexual harassment. The statute of limitations does not bar McMillian's claims. As a result, the court concludes that DYS's summary judgment motion is due to be denied.[11]

**B.    Defendant Hardy's Motion for Summary Judgment (Doc. # 23)**

Hardy claims that he is entitled to summary judgment because *res judicata* establishes that he is not liable to McMillian under § 1983. He argues that "he should be given the benefit of *res judicata* as to the Administrative Law Judges' finding and that [s]ummary [j]udgment should issue [o]n his behalf as to Plaintiff's sexual harassment allegations." (Hardy's Summ. J. Br. 3.)

"Under res judicata, also known as claim preclusion, a final judgment on the merits bars the parties to a prior action from re-litigating a cause of action that was or could have been raised in that action." *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1296 (11th Cir. 2001). A party seeking to utilize *res judicata* must satisfy four elements: "(1) [T]here must be a

---

[11] Because the court finds that DYS's summary judgment motion is due to be denied considering all the evidence before the court, McMillian's two motions to strike are due to be denied as moot.

final judgment on the merits, (2) the decision must be rendered by a court of competent jurisdiction, (3) the parties, or those in privity with them, must be identical in both suits, and (4) the same cause of action must be involved in both cases." *Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1501 (11th Cir. 1990) (internal quotation marks and citation omitted). The court then determines "whether the claim in the new suit was or could have been raised in the prior action; if the answer is yes, res judicata applies." *Piper*, 244 F.3d at 1296.

*Res judicata* does not apply here. Even assuming the Personnel Board is a court of competent jurisdiction, Hardy fails to establish the other elements to claim *res judicata*. There are not identical parties in the two suits because McMillian was not a party to the first suit and Hardy has presented no evidence that DYS and Hardy were in privity. Second, there are not identical causes of action in the two suits. His termination hearing did not involve a Title VII or § 1983 claim. Accordingly, the court concludes that Hardy is not entitled to summary judgment.

**C.    *McMillian's Motion for Partial Summary Judgment (Doc. # 25)***

McMillian has moved for partial summary judgment on the issue of liability for her claims against Hardy. McMillian claims collateral estoppel establishes that Hardy is "guilty of sexual harassment and retaliatory actions" based on the outcome of his termination hearing. (McMillian's Mot. Partial Summ. J. 6.)

Collateral estoppel, or issue preclusion, is distinct from *res judicata*. While *res*

26

*judicata* prevents parties from bringing claims that were previously raised or should have been raised, collateral estoppel "bars relitigation of fact or law an issue that has been litigated and decided in a prior suit." *McKinnon v. Blue Cross & Blue Shield of Ala.*, 935 F.2d 1187, 1192 (11th Cir. 1991). For collateral estoppel to apply, "(1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that earlier action." *Greenblatt v. Drexel Burnham Lambert, Inc.*, 763 F.2d 1352, 1360 (11th Cir. 1980).

Here, collateral estoppel does not apply because the issues at stake are not identical. McMillian claims that the previous action[12] established that Hardy was liable for sexual harassment and retaliation. In fact, a closer look at the recommendation of the ALJ, which was adopted by the Personnel Board, reveals that neither issue was decided. The ALJ "was NOT convinced that McMillian was the victim of sexual harassment" and concluded that Hardy's actions "could also be **potentially** perceived as retaliatory." (McMillian's Mot. Partial Summ. J. 29, 31 (emphasis added).) The ALJ also never decided whether Hardy's actions rose to the level of retaliation: "[T]he issue of whether the conduct actually reaches the level of retaliation is moot and shall not be addressed in this forum." (*Id.*) Because the issues for which McMillian seeks collateral estoppel were not previously decided, collateral estoppel does not apply, and she is not entitled to summary judgment.

---

[12] The court makes no finding regarding whether an action before a state personnel board is "prior litigation."

27

**D.    *McMillian Prosecuting Simultaneous Lawsuits against DYS and Hardy***

Both DYS and Hardy argue unconvincingly that summary judgment should be granted in their favor because McMillian cannot recover from both parties on her Title VII and § 1983 claims.  Neither defendant presents any case law prohibiting recovery on both claims or requiring summary judgment to be granted on this ground.  While the parties have cited *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) and *Clanton v. Orleans Parish School Board*, 649 F.2d 1084, 1099 n.19 (5th Cir. Unit A July 6, 1981), neither of these cases stands for the proposition stated above.  While it may turn out that McMillian may not be able to recover from both defendants if they are found to liable as to her Title VII and § 1983 claims, this issue remains for resolution later in the case.[13]

## V.    CONCLUSION

Accordingly, it is ORDERED that:

1.    Defendant Michael Hardy's Motion for Summary Judgment (Doc. # 23) is DENIED;

2.    Plaintiff Tera McMillian's Motion for Partial Summary Judgment Against Defendant Michael J. Hardy (Doc. # 25) is DENIED;

3.    Defendant Alabama Department of Youth Services' Motion for Summary Judgment (Doc. # 28) is DENIED;

4.    Plaintiff Tera McMillian's Motion to Strike Alabama Department of Youth

---

[13]  Each defendant asks for summary judgment on this basis, but neither presents a standard that the court would use to decide which of the two should be dismissed.

Services' Summary Judgment Exhibits (Doc. # 31) is DENIED;

  5.  Plaintiff Tera McMillian's Motion for Attorney Fees and Costs (Doc. # 31)

is DENIED;

  6.  Plaintiff Tera McMillian's Motion to Strike Defendant Alabama Department

of Youth Services' Summary Judgment Reply Exhibits and Argument (Doc. # 77) is

DENIED;

  7.  The Clerk is DIRECTED to change the style of the case to reflect the Plaintiff's

correct name:  Tera A. McMillian.

  DONE this 16th day of June, 2008.

           /s/  W.  Keith Watkins
          UNITED STATES DISTRICT JUDGE